Appeal Nos. 22-1824, -1825, -1826, -1828, -1829, -1830

# United States Court of Appeals for the Federal Circuit

## QUALCOMM INCORPORATED,

*Appellant*,

v.

## INTEL CORPORATION,

*Cross-Appellant*.

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2018-01326, IPR2018-01327, IPR2018-01328, IPR2018-01329, IPR2018-01330, IPR2018-01340

## APPELLANT'S OPENING BRIEF

JENNIFER L. SWIZE
JONES DAY
51 LOUISIANA AVENUE, N.W.
WASHINGTON, DC 20001
(202) 879-5417

ROBERT M. BREETZ
JONES DAY
901 LAKESIDE AVENUE
CLEVELAND, OH 44114
(216) 586-7213

SASHA MAYERGOYZ
JONES DAY
110 NORTH WACKER DRIVE
SUITE 4800
CHICAGO, ILLINOIS 60606
(312) 269-1572

MATTHEW W. JOHNSON
JOSHUA R. NIGHTINGALE
JONES DAY
500 GRANT STREET, SUITE 4500
PITTSBURGH, PA 15219
(412) 394-9524

*Attorneys for Appellant*

Claim 1:

1. An apparatus comprising:

a power tracker configured to determine a single power tracking signal based on a plurality of inphase (I) and quadrature (Q) components of a plurality of carrier aggregated transmit signals being sent simultaneously, wherein the power tracker receives the plurality of I and Q components corresponding to the plurality of carrier aggregated transmit signals and generates the single power tracking signal based on a combination of the plurality of I and Q components, wherein the plurality of carrier aggregated transmit signals comprise Orthogonal Frequency Division Multiplexing (OFDM) or Single Carrier Frequency Division Multiple Access (SC-FDMA) signals;

a power supply generator configured to generate a single power supply voltage based on the single power tracking signal; and

a power amplifier configured to receive the single power supply voltage and the plurality of carrier aggregated transmit signals being sent simultaneously to produce a single output radio frequency (RF) signal.

Appx343 (14:28-48).

## <u>CERTIFICATE OF INTEREST</u>

Case No. 22-1824, -1825, -1826, -1828, -1829, -1830

*Qualcomm Incorporated v. Intel Corporation*

Filing Party/Entity:  Qualcomm Incorporated


I certify the following information and any attached sheets are accurate and

complete to the best of my knowledge.

Date:  November 7, 2022          Signature:  */s/ I. Sasha Mayergoyz*

                                 Name:       I. Sasha Mayergoyz

**1. Represented Entities** (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

Qualcomm Incorporated

**2. Real Party in Interest** (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None

**3. Parent Corporations and Stockholders** (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None

**4. Legal Representatives** – List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

Richard A. Graham, Jones Day
Joseph M. Sauer, Jones Day
David M. Maiorana, Jones Day

**5. Related Cases** – Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

None

**6. Organizational Victims and Bankruptcy Cases** – Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

Not Applicable

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES .......................................................v

TABLE OF ABBREVIATIONS .....................................................ix

STATEMENT OF RELATED CASES ..................................................x

STATEMENT OF JURISDICTION.....................................................1

INTRODUCTION .................................................................1

STATEMENT OF THE ISSUES....................................................4

STATEMENT OF THE CASE.....................................................5

    A.    The '675 Patent ........................................................5

    B.    Intel's IPR Petitions And Asserted Grounds......................................8

        1.    Yu.......................................................................8

        2.    Chen .............................................................13

    C.    The Board's Original Final Written Decisions ..................................14

        1.    The Board's Original Claim Construction................................14

        2.    The Board's Original Patentability Analysis ..........................15

    D.    This Court's Decision In The Prior Appeal .......................................15

    E.    The Remanded IPR Proceedings.......................................16

        1.    The Board Adopted A Construction Requiring An Increase In The Bandwidth For The User................................16

        2.    The Board's Patentability Analysis .........................................17

SUMMARY OF ARGUMENT ....................................................22

STANDARD OF REVIEW ......................................................25

ARGUMENT ..................................................................26

I.    THE BOARD ERRED IN HOLDING THAT YU'S ISOLATED STATEMENT SUPPLIED A REASON TO MODIFY BASE-STATION IMPLEMENTATIONS FOR A MOBILE DEVICE .................26

    A.    Yu's Statement Does Not Provide A Reason To Modify The Base-Station Implementations...........................................27

# TABLE OF CONTENTS
## (continued)

Page

    B.    The Board's Treatment Of The Chen-Based Grounds Confirms That The Board's Decision Lacks Substantial Evidence ...................36

II.    EVEN IF A REASON TO MODIFY YU EXISTED, THE BOARD'S TRUNCATED OBVIOUSNESS ANALYSIS IS LEGALLY ERRONEOUS AND LACKS SUBSTANTIAL EVIDENCE .....................38

    A.    The Board Failed To Provide An Evidentiary-Based Explanation About How Any Alleged Modifications To Yu's Figures 3 And 4 Would Work In A Mobile Device ...........................39

        1.    The Board's Reliance On "Ordinary Creativity" Is Conclusory And Inadequate ......................................41

        2.    The Record Contradicts The Board's Reliance On "Ordinary Creativity" ...............................................44

        3.    Viewed In Proper Context, Dr. Williams's Testimony Cited By The Board Refutes Rather Than Supports An Obviousness Determination ......................................50

        4.    The Board's Statements Regarding Bodily Incorporation Are Wrong.......................................................51

    B.    The Board Did Not Make, And The Evidence Does Not Support, Any Finding That Skilled Artisans Would Have Reasonably Expected Success In Modifying Yu's Base-Station Implementations For A Mobile Device .............................53

CONCLUSION .................................................56

# TABLE OF AUTHORITIES

**Page**

CASES

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ..................................................passim

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
580 F.3d 1340 (Fed. Cir. 2009) .........................................................53

*Applications in Internet Time, LLC v. RPX Corp.*,
897 F.3d 1336 (Fed. Cir. 2018) .........................................................49

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) ...................................................42, 44

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) .........................................................25

*Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*,
119 F.3d 953 (Fed. Cir. 1997) ...........................................................52

*Broadcom Corp. v. Emulex Corp.*,
732 F.3d 1325 (Fed. Cir. 2013) ...................................38, 52, 54, 55

*Cutsforth, Inc. v. MotivePower, Inc.*,
636 F. App'x 575 (Fed. Cir. 2016) ....................................................42

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
885 F.3d 1367 (Fed. Cir. 2018) ...................................................passim

*EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*,
859 F.3d 1341 (Fed. Cir. 2017) .........................................................25

*Garmin Int'l, Inc. v. LoganTree, LP*,
825 F. App'x 894 (Fed. Cir. 2020) ....................................................47

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Hynix Semiconductor Inc. v. Rambus Inc.*,
　645 F.3d 1336 (Fed. Cir. 2011) ..........................................................53

*In re Keller*,
　642 F.2d 413 (Fed. Cir. 1981) ............................................................20

*In re Lee*,
　277 F.3d 1338 (Fed. Cir. 2002) ...................................................35, 43

*In re Magnum Oil Tools Int'l, Ltd.*,
　829 F.3d 1364 (Fed. Cir. 2016) ......................................35, 47, 51, 52

*In re Nuvasive, Inc.*,
　842 F.3d 1376 (Fed. Cir. 2016) ..........................................................42

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*,
　821 F.3d 1359 (Fed. Cir. 2016) ..........................................................56

*Koito Mfg. v. Turn-Key-Tech, LLC*,
　381 F.3d 1142 (Fed. Cir. 2004) ..........................................................34

*KSR Int'l Co. v. Teleflex Inc.*,
　550 U.S. 398 (2007).................................................................... passim

*OSI Pharms., LLC v. Apotex Inc.*,
　939 F.3d 1375 (Fed. Cir. 2019) ..........................................................31

*Owens Corning v. Fast Felt Corp.*,
　873 F.3d 896 (Fed. Cir. 2017) ............................................................50

*Pers. Web Techs., LLC v. Apple, Inc.*,
　848 F.3d 987 (Fed. Cir. 2017) .......................................26, 38, 40, 49

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Power-One, Inc. v. Artesyn Techs., Inc.*,
   599 F.3d 1343 (Fed. Cir. 2010) ..........................................................53

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
   786 F.3d 960 (Fed. Cir. 2015) ...........................................................49

*Qualcomm Inc. v. Intel Corp.*,
   6 F.4th 1256 (Fed. Cir. 2021) ...........................................2, 15, 16, 35

*Randall Mfg. v. Rea*,
   733 F.3d 1355 (Fed. Cir. 2013) ..........................................................25

*Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*,
   925 F.3d 1373 (Fed. Cir. 2019) ..........................................................55

*SkinMedica, Inc. v. Histogen Inc.*,
   727 F.3d 1187 (Fed. Cir. 2013) ..........................................................47

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
   655 F.3d 1364 (Fed. Cir. 2011) .....................................................32, 38

*TriVascular, Inc. v. Samuels*,
   812 F.3d 1056 (Fed. Cir. 2016) ..........................................................52

**STATUTES**

28 U.S.C. § 1295 ....................................................................................1

35 U.S.C. § 103 .......................................................................1, 8, 14, 51

35 U.S.C. § 141 ......................................................................................1

35 U.S.C. § 311 *et seq.*............................................................................1

# TABLE OF AUTHORITIES
## (continued)

**Page**

35 U.S.C. § 319 ................................................................................................1

**OTHER AUTHORITIES**

Fed. Cir. R. 47.5 ..............................................................................................ix

# TABLE OF ABBREVIATIONS

The following abbreviations are used in this brief:

*Parties*

| Abbreviation | Term |
|---|---|
| Intel or petitioner | Intel Corporation |
| Qualcomm or patent owner | Qualcomm Incorporated |

*Citations*

| Abbreviation | Term |
|---|---|
| Appx__ | Joint Appendix at page(s) ___ |

*Terms*

| Abbreviation | Term |
|---|---|
| '675 Patent | U.S. Patent No. 9,608,675 (Appx325-345) |
| APA | Administrative Procedural Act |
| The Board | The Patent Trial and Appeal Board |
| challenged claims | Claims 1-15, 17-25, and 27-33 of U.S. Patent No. 9,608,675 |
| Chen | Article entitled "Hybrid Envelope Tracking For Efficiency Enhancement In Concurrent Dual-Band PAs" (Appx2851-2853) |
| I component | Inphase component |
| IC | Integrated circuit |
| IPR | *Inter Partes* Review |
| ITC | International Trade Commission |
| POSITA or POSA | A person of ordinary skill in the art at the time of the invention |
| Q component | Quadrature component |
| RF | Radio frequency |
| Yu | European Patent Application No. EP 2442440 A1 (Appx2469-2482) |

*Additionally, throughout this brief, all emphasis is added unless otherwise noted, and all internal citations and quotations are omitted unless otherwise noted.*

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellant Qualcomm Incorporated provides as follows:

1.    This appeal consolidates Qualcomm's appeal in IPR2018-01326, -01327, -01329, and -01340 with Intel's appeal in IPR2018-01328 and -01330.

2.    There was a previous appeal of the Board's Final Written Decisions in the IPRs underlying the present appeal and cross-appeal: *Qualcomm Incorporated v. Intel Corporation*, Nos. 20-1589, -1590, -1591, -1592, -1593, -1594, reported at 6 F.4th 1256 (Fed. Cir. July 27, 2021) (Moore, C.J., Reyna and Stoll, JJ.).

3.    The patent at issue in the prior and present appeals and cross-appeal, U.S. Patent No. 9,608,675, was previously asserted in the following litigations: *Certain Mobile Electronic Devices and Radio Frequency and Processing Components Thereof*, Inv. No. 337-TA-1065 (U.S.I.T.C.), and *Qualcomm Incorporated v. Apple Inc.*, No. 3:17-cv-01375-DMS-MDD (S.D. Cal.).  These cases have been resolved.

## STATEMENT OF JURISDICTION

Qualcomm's appeal arises from four IPR proceedings filed by Intel Corporation before the Patent Trial and Appeal Board pursuant to 35 U.S.C. §§ 311 et seq.: IPR2018-01326, -01327, -1329, and 01340. On March 23, 2022, on remand from this Court in a prior appeal regarding these and two related IPRs, the Board entered Final Written Decisions on Remand, collectively holding claims 1-15, 17-25, and 27-33 of the '675 Patent unpatentable under 35 U.S.C. § 103 over Yu in view of other prior art. Appx1-56 (IPR 2018-01326); Appx57-112 (IPR2018-01327); Appx163-218 (IPR2018-01329); Appx269-324 (IRP2018-01340). Qualcomm timely filed notices of appeal on May 24, 2022, and the Court consolidated the appeals. *E.g.*, Dkt. 1; Dkt. 2.

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) & 319.

## INTRODUCTION

This appeal is the second time around at this Court for these IPR proceedings. As with the first appeal, this Court should reverse the Board's determination of unpatentability. Holding that "the Board violated Qualcomm's procedural rights under the APA," this Court previously vacated the Board's determination that shortcut the patentability analysis by adopting, in its Final

Written Decisions, an overbroad claim construction that was not advocated by either party. *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1265 (Fed. Cir. 2021).

On remand, the Board properly discarded its overly broad construction for the limitation "plurality of carrier aggregated transmit signals" and adopted the correct construction, determining that the limitation means "signals for transmission on multiple carriers at the same time *to increase the bandwidth for a user*." Appx38. The Board also noted that "user" in the construction refers to a mobile device and "*does not encompass a base station*." Appx48.

Then, however, the Board once again shortcut the obviousness analysis. In addressing Yu, Intel's primary reference which the Board treated as disclosing base-station implementations in Figures 3 and 4, the Board cursorily concluded that skilled artisans using "ordinary creativity" "would have made *any necessary modifications* so that a mobile device could appropriately implement" Yu's base-station implementations. Appx50. That was it. The Board never identified or made any evidence-supported findings as to *what* the necessary modifications would be, *how* skilled artisans would make those modifications, or *how* such modifications of base-station technology would work in a mobile device. Indeed, the Board never made any finding that the unspecified "necessary modifications" would actually "increase the bandwidth for a user," which was the key issue from the prior appeal and the remand.

This Court reverses obviousness determinations where, as here, the Board provides no specific fact findings, "ma[kes] no further citation to the record," and "refer[s] instead to the 'ordinary creativity' of the skilled artisan," because that "is not enough." *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1375 (Fed. Cir. 2018). Here, the Board's unsubstantiated determination of "ordinary creativity" to make "any necessary modifications" is contrary to the APA and substantive law. Obviousness determinations "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The Board's undeveloped invocation of the "ordinary creativity" catch-all is legally erroneous and lacks substantial evidence, which is reason alone to reverse.

The remainder of the Board's abridged obviousness discussion is also legally and evidentiarily deficient. The Board accepted a single-sentence, footnote argument from Intel that skilled artisans would have modified Yu's base-station implementations for a mobile device; the Board cited Qualcomm's expert testimony that refuted rather than supported the Board's obviousness determination; the Board quoted general principles about a motivation to "improve similar devices in the same way" without providing any reasoning or evidentiary explanation as to why or how that principle applies here; and the Board failed to

consider (much less explain) whether there was a reasonable expectation of success for the supposed, unspecified modifications.

The Board's conclusory analysis and its failure to make necessary findings cannot be sustained. Moreover, there is no such evidence that could sustain the Board's determination. On this record, Intel failed to carry its burden. The Board's erroneously truncated and factually unsupported obviousness determination should be reversed.

## STATEMENT OF THE ISSUES

1.    By isolating a single sentence in the Yu prior-art reference from its proper context and ignoring expert testimony establishing the absence of a "reason to modify Yu's base station implementations … to provide a mobile device implementation" (Appx52), did the Board err in determining that the single sentence provided the requisite reason to modify Yu?

2.    Even if that sentence provided a reason to modify Yu, did the Board err in its obviousness determination where it (i) relied on generalized "ordinary creativity" and an undeveloped conclusion that skilled artisans "would have made any necessary modificvations," without any evidence-based explanation of *how* base-station implementations would have been modified to work with mobile devices (let alone "increase the bandwidth for a user"), and (ii) failed to even

consider, much less make any evidence-based determinations, that skilled artisans would have reasonably expected such modifications to be successful?

## STATEMENT OF THE CASE

### A.    The '675 Patent

The '675 Patent, entitled "Power Tracker For Multiple Transmit Signals Sent Simultaneously," issued on March 28, 2017, to Qualcomm.  Appx325.

The increasing popularity of social media, entertainment applications, and other mobile applications has resulted in rapid growth in the volume of data transmitted by mobile devices.  Appx3967 ¶ 29.  These mobile applications require intensive data transmissions, such as video, that create demand for faster throughputs in mobile devices.  *Id*.  One way to improve transmission throughput is by using carrier aggregation to increase the bandwidth for users to transmit data.  Mobile devices use "carriers," which are portions of bandwidth at different frequencies, to transmit radio frequency ("RF") signals.  Absent carrier aggregation, transmission bandwidth is confined to the bandwidth of a single carrier.  The limited bandwidth constrains the rate at which data can be transmitted for the user.  Appx337-338 (2:63-3:35); Appx3967-3968 ¶¶ 30-32.

The '675 Patent describes a novel implementation for power- and component-efficient carrier aggregation.  In prior approaches, multiple power amplifiers and power tracking circuits were used such that the envelope for each

carrier component signal was separately tracked.  This was undesirable because it required "more circuits, higher power consumption, and increased cost."  Appx339 (6:15-19).  For mobile devices, using "more circuits" hinders reducing the form factor (or size) of the device and increases overall power consumption.  Appx3970-3971 ¶ 35.

The '675 Patent resolved these issues by implementing carrier aggregation for simultaneous transmission of multiple carrier aggregated signals to increase bandwidth using only a single power amplifier (shown in pink below) and a single power tracking circuit (shown in yellow below):



Appx1242 (Intel's petition annotating Figure 5).

With respect to Figure 5, the '675 Patent teaches that multiple transmit signals, where each signal includes an I (inphase) component and a Q (quadrature)

component, are separately processed for up-conversion by the transmit circuits

(540a-540k shown in purple) before being combined (aggregated) at a summer

552.  Appx339 (6:40-62).  In parallel with this processing, the '675 Patent teaches

a power tracker 582 that generates a single power tracking signal "based on a

combination of the plurality of I and Q components" of the transmit signals.

Appx339-340 (6:63-7:6); Appx343 (14:29-41).  The power supply generator 586

then generates a supply voltage based on the single power tracking signal.

Appx340 (7:6-8).  A single power amplifier 560 receives the single power supply

voltage and uses it to transmit the aggregated signals.  Appx340 (7:9-14).

Claim 1 is representative of the challenged claims.  With the disputed

limitation in italics, claim 1 recites:

> 1. An apparatus comprising:
>
> a power tracker configured to determine a single power tracking
> signal based on a plurality of inphase (I) and quadrature (Q)
> components of *a plurality of carrier aggregated transmit signals
> being sent simultaneously*, wherein the power tracker receives the
> plurality of I and Q components corresponding to the plurality of
> carrier aggregated transmit signals and generates the single power
> tracking signal based on a combination of the plurality of I and Q
> components, wherein the plurality of carrier aggregated transmit
> signals comprise Orthogonal Frequency Division Multiplexing
> (OFDM) or Single Carrier Frequency Division Multiple Access (SC-
> FDMA) signals;
>
> a power supply generator configured to generate a single power
> supply voltage based on the single power tracking signal; and

a power amplifier configured to receive the single power supply voltage and the plurality of carrier aggregated transmit signals being sent simultaneously to produce a single output radio frequency (RF) signal.

Appx343 (14:28-48).

## B.    Intel's IPR Petitions And Asserted Grounds

In 2018, Intel filed six IPR petitions challenging the claims of the '675 Patent under 35 U.S.C. § 103.  Four petitions relied on Yu (Appx2469-2482) as the primary prior-art reference and asserted that claims 1-15, 17-25, and 27-33 were unpatentable.  Appx1221-1302, Appx4263-4348, Appx10832-10918, Appx17376-17457.  The other two petitions relied on Chen (Appx2851-2853) as the primary reference and challenged many of the same claims as the Yu-based petitions (specifically, claims 1-3, 5, 7-15, 17-21, 23-25, and 27-30).  Appx7537-7624, Appx14098-14179.

Intel cited to a number of secondary references for use in combination with the Yu-based and/or Chen-based grounds, none of which is at issue in this appeal.

### 1.    Yu

Yu is a European patent application entitled "Control Unit for a Power Amplifier and Method of Operating a Control Unit for a Power Amplifier." Appx2469.  Yu describes managing operation of a power amplifier configured to amplify an RF signal obtained from at least two input signals.  Appx2469.  Yu discloses a "control signal for influencing the supply voltage of the power

amplifier in such cases where there are a plurality of input signals, which may []

have a varying frequency spacing with reference to their upconverted state."

Appx2470 ¶ 10.

Figures 2, 3, and 4 of Yu depict "signal flow diagram[s]" in accordance with

three different embodiments.  Appx2472 ¶ 32.  Figure 2, reproduced below,

"depicts a signal flow according to a particularly preferred embodiment."

Appx2473 ¶ 47.



Appx2478.

Input signals S1 and S2 are baseband signals that "are correspondingly

arranged in a baseband frequency range."  Appx2473 ¶ 41.  The input signals S1

and S2 undergo signal processing that includes, *inter alia*, upconverting the

baseband signals to a higher frequency range "in a per se known manner, *e.g.* by

multiplying with a local oscillator signal."  Appx2473 ¶ 41.  The upconverted

signals are "transform[ed]" into a radio-frequency signal $S_{RF}$ that is amplified by a

power amplifier (PA).  Appx2472 ¶ 33, Appx2473 ¶ 37, Appx2474 ¶ 59.  The upconverted signals have a frequency spacing Δf equal to the difference between the center frequencies of the respective upconverted signals.  Appx2473 ¶¶ 40-42, Appx2480 (Figure 5).

Yu explains that in Figure 2, "the maximum bandwidth of the input signals in the baseband range may amount to about 5 MHz, whereas a desired frequency spacing Δf of the modulated (i.e., upconverted) signal components S1', S2' may be equal to about 30 MHz."  Appx2473 ¶ 43.  "The embodiment according to Figure 2 is particularly preferred for such signal processing scenarios, in which a desired frequency spacing Δf [is] much smaller than the frequency of the local oscillator LO."  Appx2474 ¶ 56.  As Qualcomm's expert Dr. Williams explained, skilled artisans would have recognized that a ~30 MHz bandwidth was achievable by a mobile terminal.  Appx3983-3984 ¶¶ 64-65.

Intel's petitions did not rely on Yu's Figure 2 embodiment.  Appx1250-1254, Appx1258-1298.  Rather, Intel relied exclusively on Yu's embodiments in Figures 3 and 4, which are shown below.



Appx2479.



Appx2479.

Yu explains that the signal processing of Figures 3 and 4 causes the

upconverted signals to have relatively large frequency spacings Δf.  Appx2474

¶¶ 57-62, Appx2475 ¶¶ 70-71.  Thus, whereas the embodiment of Yu's Figure 2 is

"preferred for … signal processing scenarios[] in which a desired frequency

spacing Δf [is] much smaller than the frequency of the local oscillator LO," Appx2474 ¶ 56, the embodiments of Figures 3 and 4 are "particularly preferred for … signal processing scenarios[] wherein a desired frequency spacing Δf … is comparatively large, e.g. larger than for the situation according to Figure 2." Appx2474 ¶ 59.

Yu describes Figure 3 as an embodiment that "may advantageously be employed" where "a desired frequency spacing Δf" exceeds the bandwidth of the input signals "by a factor of ten or more." Appx2474 ¶ 59. Yu explains that the Figure 4 embodiment is designed for even wider signal spacing, for instance, to achieve a frequency spacing Δf that "exceeds several hundred MHz or even 1 GHz." Appx2474 ¶ 62, Appx3984-3986 ¶¶ 66-68.

The unpatentability arguments in Intel's petitions hinged on the assumption that Yu's Figures 3 and 4 are appropriate for mobile devices. Appx1267-1268 n.6. Qualcomm showed that assumption to be incorrect. Qualcomm's expert Dr. Williams showed that skilled artisans would have recognized the relatively large frequency spacings of Yu's Figures 3 and 4 as being achievable only by base stations, and not by mobile devices. Appx3985-3986 ¶¶ 66-68. Aside from asserting in a footnote that "even if Yu were directed to base stations and the claims were limited to mobile devices, it would have been obvious to a [skilled artisan] to take advantage of Yu's invention in a mobile device" (Appx1267-1268

n.6), Intel never explained the modifications necessary to use Yu's Figures 3 and 4 in a mobile device, nor why skilled artisans would have been motivated to make any such modifications.

### 2. Chen

Chen is a two-page paper entitled "Hybrid Envelope Tracking for Efficiency Enhancement in Concurrent Dual-Band PAs." Appx2851. Chen discloses a hybrid envelope tracking architecture where two input signals are provided at different frequencies. Appx2851. Chen provides two paths for the input signals. On one path, each signal is fed into separate envelope detectors, weighted with a power factor, and then added together by an envelope combiner. Appx2851. On a second path, the signals are separately upconverted and then added together by a power combiner. Appx2851. Chen's dual-band power amplifier generates an output signal based on the inputs from the envelope combiner and power combiner. Appx2851.

Chen is directed to base stations, not mobile devices. Appx3989-3994 ¶¶ 73-78. Intel acknowledged this fact. Appx158 (the Board stating that "Petitioner does not dispute that Chen is directed to base stations, acknowledging that 'the authors of Chen validated their envelope-tracking structure for transmitting multiple signals with a single amplifier by using a base-station implementation'") (quoting Appx7819).

### C.     The Board's Original Final Written Decisions

On January 14, 2020, the Board issued separate Final Written Decisions on Intel's six IPRs.  Each decision concluded that the subject challenged claims were unpatentable under Section 103.

### 1.     The Board's Original Claim Construction

In all of its petitions, Intel proposed the following construction for the claim limitation "plurality of carrier aggregated transmit signals":  "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user."  Appx1255.  Qualcomm similarly proposed that the term be construed as "signals from a single terminal utilizing multiple component carriers which provide extended transmission bandwidth for a user transmission from the single terminal."  Appx1414.  Like Intel's proposed construction, Qualcomm's construction required "increas[ing] the bandwidth for a user."  *Compare* Appx1255 ("to increase the bandwidth for a user") *to* Appx1414 ("provid[ing] extended transmission bandwidth for a user transmission").

In those original Final Written Decisions, the Board departed from both parties' proposals and construed the limitation more broadly to mean "signals for transmission on multiple carriers"—with no requirement of an increase in bandwidth for a user.  Appx12.

## 2.    The Board's Original Patentability Analysis

Applying its much broader construction, the Board did not need to reach many of Qualcomm's arguments distinguishing the prior art. Appx424-426 ("Patent Owner's argument [for the Yu-led grounds] focuses on features that the claims do not require, namely, … providing extended transmission bandwidth for a user transmission...."), Appx572-573 (same statement made with respect to the Chen-led grounds). The Board determined that all the challenged claims were unpatentable on both the Yu-based and Chen-based grounds. Appx430, Appx511-512, Appx592-593, Appx675-676, Appx761-762, Appx849-850. Qualcomm appealed.

## D.    This Court's Decision In The Prior Appeal

In the prior appeal, this Court addressed Qualcomm's argument that "it was not afforded notice of, or an adequate opportunity to respond to, the Board's construction of 'a plurality of carrier aggregated transmit signals.'" *Qualcomm*, 6 F.4th at 1262. This Court agreed that "the Board violated Qualcomm's procedural rights with respect to [this limitation]." *Id.* This Court noted that it is "difficult to imagine either party anticipating that this agreed-upon matter of claim construction was a moving target," and the Board therefore "needed to provide notice of and an adequate opportunity to respond to its construction." *Id.* at 1263. This Court concluded that because Qualcomm did not receive the required notice and

opportunity to be heard regarding the Board's construction, "the Board violated Qualcomm's procedural rights under the APA." *Id.* at 1265. This Court therefore vacated the Board's original Final Written Decisions and remanded for further proceedings. *Id.* at 1267.

### E.     The Remanded IPR Proceedings

On remand, the Board authorized additional briefing to address the proper construction of the limitation "plurality of carrier aggregated transmit signals" and Intel's unpatentability arguments. Appx20020-20021. The Board also authorized the submission of additional documentary and testimonial evidence. Appx20021. Intel introduced new evidence with respect to claim construction, but it did not introduce new evidence on the patentability issues.

### 1.     The Board Adopted A Construction Requiring An Increase In The Bandwidth For The User

In its post-remand briefing, Intel changed direction with respect to its proposed claim construction for the limitation "plurality of carrier aggregated transmit signals." Abandoning the construction it had applied in its petitions, Intel instead argued for the construction that the Board improperly used in the original Final Written Decisions. Appx20028. Qualcomm argued that the term requires an "increase the bandwidth for a user"—as both parties agreed in the original proceedings—and therefore the Board's original construction was incorrect. Appx20154-20170.

The Board agreed with Qualcomm that its prior construction of "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers" was erroneous and overbroad by not requiring an increase in user bandwidth. In a detailed analysis, the Board construed "plurality of carrier aggregated transmit signals" as "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." Appx38; *see* Appx16-38.

## 2. The Board's Patentability Analysis

Despite agreeing with Qualcomm on the proper claim construction, the Board nevertheless held that claims 1-15, 17-25, and 27-33 would have been obvious based on the Yu-based grounds. Appx40-53. The Board, however, held that Intel failed to carry its burden with regard to the Chen-based grounds. Appx154-160.

*The Yu-Based Grounds.* For the Yu-based grounds, Qualcomm established that Yu's Figures 3 and 4 do not increase the bandwidth for a user device. Specifically, Qualcomm established that the relatively wide frequency spacings $\Delta f$ of Yu's Figures 3 and 4 demonstrate that these embodiments would have been used in base stations not mobile devices, and therefore they do not disclose increasing the bandwidth for a user. As taught by the '675 Patent and other evidence, mobile devices and base stations are different. Appx48-49, Appx1514, Appx327 (Fig. 1), Appx337 (1:56-57, 2:19-20, 2:28-30, 2:32-34), Appx3903. And as Yu discloses,

the base station in Figures 3 and 4 receives two signals, each of which is from a different user, and then transmits the two signals simultaneously. Appx1424-1425, Appx2470 ¶¶ 5-6, Appx2471 ¶ 15, Appx3986-3989 ¶¶ 69-72.  By transmitting two signals from two users simultaneously, neither user gets increased bandwidth. Appx1438-1439, Appx4015-4017 ¶¶ 110-114.  Thus, the base-station implementations in Yu's Figures 3 and 4 do not employ carrier aggregation, and instead use a predecessor technology referred to as "multicarrier configuration (nonaggregated)."  Appx2517, Appx4016 ¶ 112.  Qualcomm also established that Yu does not disclose simultaneous transmission of multiple signals to a user device to increase the bandwidth for that user device.  Appx1496-1497, Appx1515-1516.

Qualcomm's expert Dr. Williams specifically testified on these points. Dr. Williams explained that the power amplifiers of Figures 3 and 4 would be too large for use in a mobile device, and the respective technologies used in implementing base stations and mobile devices are "very different."  Appx3985 ¶ 67.  Dr. Williams further testified that power constraints would have precluded Yu's Figures 3 and 4 from being implemented in a mobile device at the time of the '675 Patent.  Appx3985-3986 ¶ 68.  Dr. Williams explained that skilled artisans would have understood Figures 3 and 4 of Yu as depicting "base station implementations that are not appropriate for use in mobile terminals," and

therefore these figures did not teach carrier aggregation under the Board's proper construction.  Appx3984-3985 ¶ 66.

Addressing the Yu-based grounds, the Board explained that "'user,' in the construction applicable here, does not encompass a base station." Appx48.  The Board, however, declined to make a finding about whether Yu's Figures 3 and 4 are base-station implementations.  Appx50 (stating that "we do not determine" whether "Figures 3 and 4 of Yu are directed to base stations"), Appx52 (noting "the possibility that Figures 3 and 4 are directed to base stations," but declining to make a formal finding).  Instead, the Board stated that "even if Figures 3 and 4 of Yu are directed to base stations …, it would have been obvious to a [POSITA] to take advantage of Yu's invention in a mobile device." Appx50.  The Board's conclusion rested on the single sentence in paragraph 34 of Yu:  "The power amplifier PA may e.g. be employed in wireless communications systems such as base stations of cellular communications networks or wireless transceivers of mobile terminals and the like." Appx2472 ¶ 34.  The Board stated that Yu "teach[es] that its power amplifier 'may e.g. be employed in wireless communication systems such as … wireless transceivers of mobile terminals.'" Appx49 (quoting Appx2472 ¶ 34).

Absent citation to any supporting evidence, the Board quoted the Supreme Court's *KSR* decision that "if a technique has been used to improve one device, and

a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." Appx50 (quoting *KSR*, 550 U.S. at 417). The Board's quotation of *KSR* was not accompanied by any further elaboration or explanation. Appx50, Appx52.

The Board dismissed Qualcomm's "contention that the base station implementations depicted in Figures 3 and 4 of Yu are not appropriate for use in mobile terminals" on the view that the contention was directed to bodily incorporation. Appx50. In rejecting this argument, the Board quoted *In re Keller*'s statement that "the test [for obviousness] is what the combined teachings … would have suggested to those of ordinary skill in the art" (Appx50, quoting 642 F.2d 413, 425 (C.C.P.A. 1981)), and also quoted *KSR*'s statement that "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." Appx50 (quoting 550 U.S. at 421). Relying on these legal truisms without any further explanation or analysis, the Board stated that "a person of ordinary skill would have made any necessary modifications so that a mobile device could appropriately implement Yu's power amplifier." Appx50.

The Board then concluded that "Petitioner's proposed modification of Yu, which provides a mobile device implementation of Yu's power amplifier, teaches the third part of our construction, 'to increase the bandwidth for a user.'" Appx52.

The Board further determined that "[b]ased on Yu's teaching that its power amplifier may be used in base stations or mobile devices …, we are also persuaded that an ordinarily skilled artisan would have had reason to modify Yu's base station implementations of the power amplifier to provide a mobile device implementation of the power amplifier." Appx52. The Board again quoted, without further discussion or fact-finding, *KSR*'s statement that "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." Appx52-53 (quoting *KSR*, 550 U.S. at 417). Resting on those statements in its Final Written Decisions, the Board held that claims 1-15, 17-25, and 27-33 of the '675 Patent would have been obvious. Appx52-53.

***The Chen-Based Grounds.*** As with the Yu-based grounds, Qualcomm made similar showings for the Chen prior-art reference, which is also directed to base stations. Appx7755-7767, Appx7780-7781, Appx3989-4002 ¶¶ 73-88, Appx4024-4026 ¶¶ 126-132.

When addressing the Chen-led grounds, the Board stated that "[Intel] does not dispute that Chen is directed to base stations" (Appx158), and that "[e]ven if Chen were not limited to base stations … [Intel] does not proffer any reason as to why an ordinarily skilled artisan would have considered modifying Chen's base

station implementation" for use in "a user device." Appx159. The Board therefore

concluded that "we are not persuaded that Chen teaches or suggests ... 'to increase

the bandwidth for a user.'" Appx160.

Qualcomm appealed the Final Written Decisions holding the '675 Patent

claims unpatentable over the Yu-based grounds. Intel has cross-appealed the Final

Written Decisions upholding the claims over the Chen-based grounds.

## SUMMARY OF ARGUMENT

Although it properly construed the limitation "plurality of carrier aggregated

transmit signals" to mean "signals for transmission on multiple carriers at the same

time to increase the bandwidth for a user," Appx38, the Board's determination that

the challenged claims would have been obvious should be reversed (or at a

minimum vacated) for several independent reasons.

I.     The Board's conclusion that skilled artisans would have reason to

modify Yu's disclosure of base-station implementations (Figures 3 and 4) for a

mobile device lacks substantial evidence. The Board's decision relies on a single

sentence in Yu stating that the "power amplifier PA may e.g. be employed in

wireless communication systems such as base stations ... or wireless transceivers

of mobile terminals and the like." Appx2472 ¶ 34. Read in full context and in

view of expert testimony, that sentence does not supply an invitation or reason to

modify Yu's base-station implementations for use in a mobile device. Rather, the

sentence simply refers to the fact that Yu discloses separate and different embodiments, some pertaining to base stations (Figures 3 and 4) and another for use in a mobile device (Figure 2). Because there is no substantial evidence in the record that could support the Board's determination, the Board's decision should be reversed. *See* Section I.A.

Moreover, the Board's determination that the challenged claims are patentable over Intel's Chen-based grounds underscores the absence of evidence for a reason to modify base-station technology for a mobile device. There is no dispute that Intel's Chen-based grounds relied on base-station implementations, Appx158, and the Board found that Intel did "not proffer any reason as to why an ordinarily skilled artisan would have considered modifying Chen's base station implementation … to provide a user device implementation." Appx265. The Chen-based and Yu-based ground are indistinguishable, other than the isolated, single sentence in Yu's paragraph 34. That sentence cannot support a reason to modify Yu's base-station embodiments for use in a mobile device. *See* Part I.B.

**II.** But even if the record supported a reason to modify Yu's Figures 3 and 4 for use in a mobile device (and it does not), the Board's unpatentability determination cannot be sustained for several additional reasons. *See* Section II.

To start, even if the sentence from Yu could constitute a reason to modify the base-station embodiments in Figures 3 and 4 for use mobile devices, that did

- 23 -

not end the inquiry nor obviate the need for additional, necessary fact findings. Yet, that is essentially where the Board stopped. The Board's failure to conduct a proper, complete obviousness analysis is legal error. And that failure reflects the lack of evidence that could support an obviousness determination.

Critically, the Board failed to make *any* findings as to what modifications to Yu would be necessary or how skilled artisans would have made the modifications to work with a mobile device. In fact, the Board failed to make any findings that the unspecified and undisclosed modifications would "increase the bandwidth for a user." Instead, the Board relied on the sweeping notion of "ordinary creativity" to "make any necessary modifications." This is precisely the type of unsupported statements that this Court has repeatedly rejected: "referr[ing] … to the ordinary creativity of skilled artisans" rather than making fact-findings with "citation to the record" "is not enough." *DSS*, 885 F.3d at 1375. Meanwhile, the substantial-evidence standard compels that Intel failed to carry its burden with respect to Yu. Intel offered nothing further in support of its case on which the Board could legitimately rely. *See* Section II.A.1-2. And the Board's mischaracterizations of Qualcomm's expert testimony and its arguments are further reflections of the lack of evidentiary support for the Board's decision. *See* Section II.A.3-4.

Finally, on top of all of this, the Board also failed to make any findings—and Intel offered no evidence—on a reasonable expectation of success. The Board

made no findings that skilled artisans would have had a reasonable expectation of success in modifying Yu's base-station implementations for a mobile device. *See* Section II.B.

Both by legal error in truncating the obviousness analysis and by factual error because there is a lack of substantial evidence, the Board's unpatentability determination is wrong and non-remediable. For any and all of these deficiencies, the Board's obviousness determination should be reversed. At minimum, the determination should be vacated and the case remanded (again).

## STANDARD OF REVIEW

This Court "review[s] the Board's compliance with governing legal standards *de novo* and its underlying factual determinations for substantial evidence." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). This Court reviews the Board's ultimate obviousness determination *de novo* and underlying factual findings for substantial evidence. *See Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1364 (Fed. Cir. 2015).

This Court "review[s] the Board's procedures for compliance with the Administrative Procedure Act [] *de novo*." *EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341, 1345 (Fed. Cir. 2017). This Court reviews "the Board's IPR decisions to ensure that they are not arbitrary, capricious, an abuse of discretion, ... otherwise not in accordance with law ... [or] unsupported

by substantial evidence." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 992

(Fed. Cir. 2017).

## ARGUMENT

## I. THE BOARD ERRED IN HOLDING THAT YU'S ISOLATED STATEMENT SUPPLIED A REASON TO MODIFY BASE-STATION IMPLEMENTATIONS FOR A MOBILE DEVICE

On remand, the Board construed the term "plurality of carrier aggregated

transmit signals" to mean "signals for transmission on multiple carriers at the same

time to *increase the bandwidth for a user*." Appx38. As the Board explained, this

construction "does not encompass increasing the bandwidth for a base station"

because, in the context of the '675 Patent, a "user" is a mobile device and not a

base station. Appx48. Attempting to show a prior-art teaching of the limitation

"plurality of carrier aggregated transmit signals," Intel relied solely on Yu's

Figures 3 and 4. Qualcomm established that these figures disclose embodiments

that are suitable only for base stations and therefore do not disclose simultaneously

transmitting multiple signals to a user device to increase bandwidth for that user.

Appx1423-1425, Appx1438-1439, Appx1494-1497, Appx1515-1516, Appx3632-

Appx3633, Appx3987-3989 ¶¶ 71-72, Appx4015-4016 ¶¶ 111-112.

The Board nevertheless concluded that "even if Figures 3 and 4 of Yu are

directed to base stations[,] … it would have been obvious to a [skilled artisan] to

take advantage of Yu's invention in a mobile device." Appx50, Appx52. The

Board reached this conclusion even though it recognized that for the Chen-based grounds, Intel failed to show any reason to modify a base-station implementation for a mobile device.  The only difference between the Board's analyses of this issue for the two sets of grounds was its reliance, for the Yu-based grounds, on a single sentence in Yu stating that the "power amplifier [PA] may e.g. be employed in a wireless communication systems such as base stations … or wireless transceivers of mobile terminals and the like."  Appx49-50 (quoting Appx2472 ¶ 34).

The Board's reading of Yu's sentence is contrary to the entirety of Yu's disclosure and is refuted by expert testimony.  Accordingly, the Board's unpatentability holdings should be reversed (or at minimum vacated) because there is no record evidence to support the Board's determination.  For purposes of this appeal, all of the claims challenged on the Yu-based grounds can be addressed together.

### A.    Yu's Statement Does Not Provide A Reason To Modify The Base-Station Implementations

The Board's conclusion that "it would have been obvious … to take advantage of Yu's [Figures 3 and 4] in a mobile device" to increase bandwidth for a user (Appx50) hinges on a single sentence in Yu stating that the "power amplifier PA may e.g. be employed in wireless communication systems such as base stations … or wireless transceivers of mobile terminals and the like."  Appx2472

¶ 34.  That sentence does not provide substantial evidence for the Board's determination.

The statement invoked by the Board is part of a paragraph where Yu generally posits that its technology could be applied across a full spectrum of "wired" and "wireless" communication systems:

> [0034]  The power amplifier PA may e.g. be employed in wireless communications systems such as base stations of cellular communications networks or wireless transceivers of mobile terminals and the like. The field of application of the power amplifier PA however, is not limited to wireless applications. The power amplifier PA may rather also be used for wired communication systems, wherein radio frequency signals are to be amplified.

Appx2472 ¶ 34.  As this context demonstrates, the single sentence is not an invitation or suggestion to modify Yu's (or any other) base-station implementations for a mobile device.  Rather, the sentence reflects Yu's disclosure of three separate embodiments for controlling a power amplifier—*one* that is for a mobile device (Figure 2), and *two others* that could only be implemented in base stations (Figures 3 and 4).

Yu precedes paragraph 34 with a brief description of the disclosed figures, stating that Figure 1 depicts "a simplified block diagram" of a "power amplifier system" (Appx2472 ¶¶ 32-33):



Appx2478.  Yu then describes Figures 2-4, as depicting "signal flow diagram[s]"

for three different embodiments (Appx2472 ¶ 32):






Appx2478-2479.

Yu employs the power amplifier differently in the separate embodiments.

As Yu explains, the different embodiments advantageously enable a "variety of …

different desired frequency spacings Δf." Appx2473 ¶ 46. Qualcomm's expert

Dr. Williams explained that the frequency spacing Δf dictates whether the

embodiment is suitable for a base station or a mobile device, and makes clear that

Figures 3 and 4 depict base-station implementations. Appx3984-3986 ¶¶ 65-68,

Appx4030-4035 ¶¶ 139-145. Specifically, Dr. Williams articulated why and how

skilled artisans would have understood Yu's reference to "mobile terminals" in

paragraph 34 as referring only to Figure 2 and not Figures 3 and 4:

> Yu discloses three embodiments for implementing its functionality
> across Figures 2-4. Yu states that its power amplifier embodiments
> may "be employed in wireless communications systems such as base
> stations of cellular communications networks or wireless transceivers
> of mobile terminals." [Appx2472 ¶ 34]. *And it is evident which of
> Yu's embodiments are appropriate for mobile terminals, and which
> can only be implemented in more robustly powered base station
> systems.*

Appx3983-3984 ¶ 64. Dr. Williams testified that, given Yu's description of input

signals with baseband ranges of about 5 MHz and frequency spacing Δf for

upconverted signals of about 30 MHz, "Figure 2 of Yu discloses a mobile-

terminal-appropriate system for controlling a supply voltage of a power amplifier."

Appx3984 ¶ 65 (analyzing Yu's discussion at Appx2473-2474 ¶¶ 43, 56). Based

on Yu's discussion of the frequency spacings Δf for Figures 3 and 4, Dr. Williams

further testified that these figures concern "base station implementations" that "are

not appropriate for use in mobile terminals." Appx3984-3985 ¶ 66 (analyzing Yu's discussion at Appx2474 ¶¶ 59, 62).

Viewed in the full context of Yu's own disclosure and Dr. Williams's testimony analyzing that disclosure, Yu's sentence in paragraph 34 ("The power amplifier PA *may* e.g. be employed in wireless communication systems such as base stations … or wireless transceivers of mobile terminals and the like," Appx2472 ¶ 34) does not suggest modifying base-station implementations for use in a mobile terminal. The sentence merely explains that Yu discloses certain embodiments for base stations (Figures 3 and 4) and a separate embodiment for mobile terminals (Figure 2).

The Board arrived at an erroneous reading by failing to situate paragraph 34 in the context of Yu's entire disclosure and ignoring Dr. Williams's analysis. The substantial evidence standard "involves examination of the record as a whole, taking into account evidence that both justifies *and detracts* from an agency's decision." *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1384 (Fed. Cir. 2019) (holding that Board "erred by not properly considering" documentation and testimony contradicting its reading of a prior-art reference). Here, the record refutes rather than supports the Board's determination.

Moreover, even if viewed in isolation and as a comment that the base-station implementations "may" be employed in mobile devices, Yu's cursory statement in

paragraph 34 could only be aspirational, failing to demonstrate the necessary motivation and teachings to modify base-station implementations for use in mobile devices.  This Court recognizes that such undeveloped, open-ended statements are inadequate to support an obviousness determination.  For example, in *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, this Court rejected an obviousness challenge because a prior-art reference's "speculative and tentative disclosure of what 'might' or 'may' lead to [the claimed invention] does not sufficiently direct or instruct one of skill in th[e] art."  655 F.3d 1364, 1376 (Fed. Cir. 2011).

As in *Star Scientific*, Yu's sentence on which the Board relied is merely aspirational, stating "[t]he power amplifier PA *may e.g.* be employed in … wireless transceivers of mobile terminals and the like." Appx2472 ¶ 34.  This fails to show that skilled artisans would have been motivated to modify the "base station implementations [of Yu's Figures 3 and 4]" to "provide a mobile device implementation."  Appx52.

The inadequacy of Yu's sentence is especially true in view of the one-sided evidence from Dr. Williams explaining that the power amplifiers of Figures 3 and 4 would have been "too large for use in a mobile device," and the power constraints inherent in mobile devices would have foreclosed the modification.  As Dr. Williams testified:

> Yu Figures 3 and 4 describe[] using a single PA [power amplifier] to amplify two signals that may *differ in frequency by hundreds of*

> *MHz.* One of ordinary skill in the art would recognize that *such a
> PA would necessarily be too large for use in a mobile device*….
> The technology used for implementing a base station is "very
> different" than the technology used for implementing a mobile
> device.

Appx3985 ¶ 67. Dr. Williams further explained that a skilled artisan:

> would recognize that, *due to power constraints, no mobile terminal*
> at the critical date *could implement power amplifiers that cover the
> bandwidth described with respect to Yu Figures 3 and 4.* Instead,
> *such a wideband PA must necessarily be for use in a base station*,
> since it would require, for example, large matching networks.

Appx3985-3986 ¶ 68.

Dr. Williams additionally testified that the "very different implementations"

of base stations and mobile devices demonstrate that there "would not be a

motivation to combine the[se] disparate technologies":

> Because of the very different implementations in base stations and
> UEs (handsets), there generally would not be a motivation to
> combine the disparate technologies used. For example, base
> stations require large power supplies. The large power supplies
> associated with base stations, for example, could easily generate
> any voltage needed with no need for any boost converter.

Appx4014-4015 ¶ 108.

Yu's conclusory statement—viewed by the Board as providing a reason to

modify the base-station embodiments of Yu's Figures 3 and 4 for use in a mobile

device—is contradicted by Dr. Williams's reasoned, evidence-supported testimony

and therefore fails to provide substantial evidence of a motivation to modify Yu to

reach the challenged claims. Further, Yu's aspirational statement is not buttressed

or elaborated upon in Intel's arguments or evidence.  Intel's petitions and expert declaration relegate Yu's paragraph 34 to a footnote (Appx1267-1268 n.6, Appx2397-2398 n.4) and fail to explain how that single sentence—alone or with other evidence—allegedly demonstrates the skilled artisan's motivation to modify Yu's Figures 3 and 4 for use in a mobile device.  Instead, the petitions and expert declaration assume that Yu's Figures 3 and 4 are appropriate for mobile devices and then summarily assert that "even if Yu were directed to base stations and the claims were limited to mobile devices, it would have been obvious to a POSA to take advantage of Yu's invention in a mobile device."  Appx1267-1268 n.6, Appx2397-2398 n.4.  This Court makes clear that such skeletal attorney argument and conclusory expert assertions cannot constitute substantial evidence.  *See*, *e.g.*, *Koito Mfg. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004) ("General and conclusory testimony … does not suffice as substantial evidence of invalidity.").

Finally, the Board's citation to *KSR*'s "similar devices in the same way" principle cannot constitute adequate reasoning on a motivation to modify Yu's base-station implementations for a mobile device.  *See* Appx50, Appx52-53.  The Board's reference to that general principle fails for several reasons.

First, Intel never relied on this theory.  Rather, the petition made the conclusory assertion that "even if Yu were directed to base stations and the claims

were limited to mobile devices, it would have been obvious to a [skilled artisan] to take advantage of Yu's invention in a mobile device." Appx1267-1268 n.6. The Petition never cited *KSR*'s "similar devices" principle nor raised such an argument, either in the original proceedings or on remand. Accordingly, the Board lacked authority to raise this theory *sua sponte*. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (explaining that the Board's "authority is not so broad that it allows the PTO to raise, address, and decide unpatentability theories never presented by the petitioner and not supported by record evidence"). Moreover, the Board did not have authority to raise this theory for the first time in its decision on remand, because that would (again) deprive Qualcomm of any notice and opportunity to respond. *See Qualcomm*, 6 F.4th at 1265, 1267.

Second, the Board's reference to "similar devices" lacks any supportive findings or explanation. The Board "must … explain the reasoning by which the findings are deemed to support the agency's conclusion." *In re Lee*, 277 F.3d 1338, 1342-44 (Fed. Cir. 2002). Here, the Board did not explain why a base station and a mobile device are allegedly "similar devices" as it relates to the technology of the '675 Patent, nor explain why skilled artisans would have concluded that Yu's base-station teachings would "improve [mobile] devices in the same way," nor make any findings to support such determinations. Appx50, Appx52-53. And the Board did not explain or make the necessary findings for

applying Yu's base-station teachings to mobile devices being within the skill of skilled artisans.  Appx50, Appx52-53.

Third, substantial record evidence contradicts any "similar devices in the same way" theory here.  As discussed above, Qualcomm's evidence established that mobile devices and base stations are *not* similar for the purposes of the technology at issue.  *See* Appx3985-3986 ¶¶ 67-68, Appx4014-4015 ¶¶ 108-109.  Qualcomm also showed that Yu's base-station teachings are incompatible with mobile devices.  *See* Appx3985-3986 ¶¶ 67-68, Appx4015-4016 ¶¶ 110-112.  And the Board never found disclosure supporting, nor proposed any modifications of the Yu reference to show, increased bandwidth for a user.

### B. The Board's Treatment Of The Chen-Based Grounds Confirms That The Board's Decision Lacks Substantial Evidence

The Chen-based grounds—including the Board's own analysis—underscore the deficiency of Yu's statement in paragraph 34 as a reason for modifying Yu's base-station implementations for a mobile device.  Intel's Chen-based grounds largely mirrored its Yu-based grounds.  *Compare* Appx1258-1283 (Petition's argument that Yu and Wang render obvious claim 1) *with* Appx7554-7581 (similar ground based on Chen and Wang).  Like the Yu-based grounds, Intel cited base-station implementations against the challenged claims.  *See* Appx3989-3994 ¶¶ 73-78.  As the Board noted, "Petitioner does not dispute that Chen is directed to base stations, acknowledging that 'the authors of Chen validated their envelope-tracking

structure for transmitting multiple signals with a single amplifier by using a base-station implementation.'" Appx158 (quoting Appx7819). Similar to Qualcomm's showings for Yu, Qualcomm responded to the Chen-based grounds by showing that skilled artisans would not have been motivated to modify Chen's teachings about base stations to provide mobile-device implementations. Appx7755-7767, Appx7780-7781, Appx3989-4002 ¶¶ 73-88, Appx4024-4026 ¶¶ 126-132.

The Board explained that Intel failed to demonstrate a motivation to modify Chen:

> Petitioner does not proffer any reason as to why an ordinarily skilled artisan would have considered modifying Chen's base station implementation of the concurrent dual-band PA to provide a user device implementation of the concurrent dual-band PA…. Petitioner's declarant likewise fails to discuss any potential modification of Chen for implementation in a user device.

Appx159 (citing Appx7562-7563). Accordingly, the Board found that the Chen-based grounds did not disclose or render obvious a "plurality of carrier aggregated transmit signals." Appx158-160.

The Board erred in reaching a different conclusion on the Yu-based grounds. The respective records on the Yu-based and Chen-based grounds are largely indistinguishable, aside from Yu's single statement in paragraph 34 on which the Board relied. As detailed above, that statement does not show that skilled artisans would have been motivated to modify Yu's base-station implementations for a mobile-device implementation, much less constitute substantial evidence. That is

particularly true given Intel's silence on that sentence—it offered no explanation or elaboration as to how that sentence could have purportedly provided a reason to modify Yu's Figures 3 and 4 for use in a mobile device.

## II.   EVEN IF A REASON TO MODIFY YU EXISTED, THE BOARD'S TRUNCATED OBVIOUSNESS ANALYSIS IS LEGALLY ERRONEOUS AND LACKS SUBSTANTIAL EVIDENCE

Even if Yu provided a reason to modify base-station implementations for use in mobile devices, the Board's unpatentability determination is legally erroneous and devoid of evidentiary support.  Obviousness involves more than a motivation to modify the prior art to achieve the claimed invention.  *See Star Sci.*, 655 F.3d at 1375 (noting that "[e]ven if the record showed some motivation" to modify the prior art, that did not suffice to establish obviousness).  An obviousness determination requires adequate, fact-based explanations as to (i) "why the prior art references would have worked together," *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1335 (Fed. Cir. 2013), and (ii) why skilled artisans would "reasonably expect success in" making the modification.  *Per. Web*, 848 F.3d at 994; *see ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (same).  These showings are a "prerequisite to adequately explaining and supporting a conclusion" of obviousness.  *Per. Web*, 848 F.3d at 994.

In this case, however, the Board did not go beyond the cursory determination that a skilled artisan would have had reason to modify Yu's Figures 3 and 4 for use in a mobile device. That was legal error. And because the Board improperly abridged the analysis, it did not consider (much less explain) any evidence-supported account of *how* Yu's base-station implementations would have been modified to achieve a mobile-device implementation, and the Board did not make any findings that any such modifications would actually "increase bandwidth for the user"—the key issue in the prior appeal and on remand. The legal principles it invoked do not substitute for reasoned decision-making based on substantial evidence. *See* Part II.A *infra*. The Board also did not consider (much less explain) whether skilled artisans would have reasonably expected success in making the unspecified modification—again, both legal error in failing to address the issue and, ultimately, lacking any support in the record evidence. *See* Section II.B *infra*.

In short, the Board's truncated obviousness analysis is legally incorrect and reflects the absence of probative evidence.

### A.    The Board Failed To Provide An Evidentiary-Based Explanation About How Any Alleged Modifications To Yu's Figures 3 And 4 Would Work In A Mobile Device

Obviousness requires an evidence-based articulation of "*how* specific references could be combined" and "*how* any specific combination would operate

or read on the asserted claims." *ActiveVideo*, 694 F.3d at 1327.  When there is an

insufficient factual basis to establish these showings, the petitioner fails to

establish obviousness.

Here, "the Board nowhere clearly explained, or cited evidence showing,

*how*" the purported modification of Figures 3 and 4 "was supposed to work" in a

mobile device. *Personal Web*, 848 F.3d at 994 (original emphasis).  The full

extent of the Board's treatment of this issue was three sentences—the first quoting

a legal truism, the second offering a conclusory statement that assumes its own

conclusion, and the third divorcing Qualcomm's expert testimony from the context

of the evidentiary record.  The Board stated:

> **[1]** Moreover, "[a] person of ordinary skill is also a person of
> ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421.
> **[2]** Thus, a person of ordinary skill would have made any
> necessary modifications so that a mobile device could
> appropriately implement Yu's power amplifier. **[3]** This is
> supported by Patent Owner's assertion that "Figure 2 of Yu
> discloses a mobile-terminal-appropriate system for controlling a
> supply voltage of a power amplifier."

Appx50-51 (bracketed numbering added).  As detailed below, the Board's cursory

statements using "ordinary creativity" and "any necessary modifications" as

shortcuts for evidence and analysis cannot sustain an obviousness determination.

### 1. The Board's Reliance On "Ordinary Creativity" Is Conclusory And Inadequate

Having quoted *KSR*'s "ordinary creativity" language, the Board summarily determined that skilled artisans "would have made *any necessary modifications*." Appx50. Resting on the loose and sweeping phrase "any necessary modifications," the Board never detailed *what* those necessary modifications would be, never identified *why* the modifications would be made, and never explained *how* the modifications of base-station implementations would have worked and operated in a mobile device. The Board thus held the challenge claims unpatentable based on modifications and structure that were nowhere disclosed or explained in the Final Written Decisions.

Indeed, the Board never explained why or how the resulting modified structure would have retained the aspects of Yu on which Intel relied as allegedly disclosing the claim limitations. While the Board's construction requires "increas[ing] the bandwidth for a user," the Board failed to articulate any finding or cite any supporting evidence as to how or why such modifications would have allegedly achieved this requirement. As such, the Board failed to find, let alone explain, how any modification "would operate or read on the asserted claims." *ActiveVideo*, 694 F.3d at 1327. The absence of such evidence-based finding is particularly glaring given Qualcomm's showing that Yu's Figures 3 and 4 process signals from two different users, such that neither user gets increased bandwidth.

*See* Appx1424-1425, Appx1438-1439, Appx2471 ¶ 15, Appx3986-3989 ¶¶ 69-72, Appx4015-4017 ¶¶ 110-114.

As "a wholesale substitute for reasoned analysis and evidentiary support," the Board erroneously rested on the rubric of "ordinary creativity." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1362 (Fed. Cir. 2016); *see DSS*, 885 F.3d at 1374 (explaining that "invocation of 'ordinary creativity' is no different from the reference to 'common sense'"). "When the Board determines that modifications … of the prior art render a claimed invention obvious, the Board *must fully explain why* a person of ordinary skill in the art would find such changes obvious." *Cutsforth, Inc. v. MotivePower, Inc.*, 636 F. App'x 575, 578-79 (Fed. Cir. 2016); *DSS*, 885 F.3d at 1374 ("We hold that the Board's final written decisions fail to provide sufficient explanation for its obviousness finding."). "Conclusory statements alone are insufficient and … the finding must be supported by a reasoned explanation." *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016). Skeletal assertions such as "ordinary creativity" and "any necessary modifications" are legally and evidentiarily deficient when proffered by parties and experts. And such statements are equally deficient when used by the Board without any accompanying analysis or record citation. Obviousness determinations "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the

legal conclusion of obviousness." *KSR*, 550 U.S. at 418. Here, the Board

contravened the fundamental principle that:

> The agency tribunal must set forth its findings and the grounds
> thereof, as supported by the agency record, and explain its application
> of the law to the found facts.… This standard requires that the agency
> not only have reached a sound decision, but have articulated the
> reasons for that decision.

*Lee*, 277 F.3d at 1342.

Addressing similar circumstances in *DSS*, this Court reversed an

obviousness determination when the Board concluded, without sufficient

explanation or evidence, that modifying a base station with technology from a

mobile device "would have been within the skill of the ordinary skilled artisan."

885 F.3d at 1375. In *DSS*, "the Board relied on a gap-filler—'ordinary

creativity'…—to supply a missing [claim] limitation" that "play[ed] a major role

in the subject matter claimed." *Id.* at 1374-75.

Similarly in this case, the Board relied on "ordinary creativity" as supplying

the limitation requiring a "plurality of carrier aggregated transmit signals," which

has been the subject of a prior appeal and a remand. As in *DSS*, the disputed

limitation "is not unusually simple." *Id.* at 1375. As in *DSS*, the "full extent of the

Board's analysis is contained in a single paragraph"—here, the Board merely

concluded that a modification of base-station technology for a mobile device

would have been within the ordinary skill of an artisan. *See id.* As in *DSS*, "[i]n

reaching these conclusions, the Board made no further citation to the record," and "[i]t referred instead to the 'ordinary creativity' of the skilled artisan." *Id.* As in *DSS*, that "*is not enough*." *Id.*

Indeed, the present circumstances are even more compelling than *DSS*. In that case, unlike here, the petitioner provided at least some expert testimony about applying mobile-device technology to base stations, stating that "RF systems of the base station and mobile stations … have the same physical structure." *Id.* at 1376. Explaining that "similarities in transmission hardware cannot close gaps without additional reasoned analysis," this Court found the testimony "conclusory" and "unspecific," and could not constitute substantial evidence "capable of supporting the Board's conclusions." *Id.* at 1376-77. Here, there is *no* testimony about how a skilled artisan would have allegedly modified Yu's base-station implementations for a mobile device.

The Board's sweeping reliance on ordinary creativity to make "any necessary modifications" to Yu is conclusory and inadequate.

### 2. The Record Contradicts The Board's Reliance On "Ordinary Creativity"

In fact, the record contradicts the Board's reliance on unarticulated "ordinary creativity" to modify Yu. Dr. Williams testified that the base-station technologies disclosed in Yu are fundamentally different from, and not transferable to, mobile-device implementations. *See Arendi*, 832 F.3d at 1366 (reversing obviousness

determination when "the Board ignored [patentee's] arguments regarding the differences between" technologies).

Dr. Williams testified that skilled artisans would have recognized that power amplifiers used in base-station implementations "would necessarily be too large for use in a mobile device." Appx3985 ¶ 67. And Dr. Williams explained that the "technology used for implementing a base station is very different than the technology used for implementing a mobile device." Appx3985 ¶ 67. He elaborated that "the disparate technologies" and "very different implementations in base stations and UEs (handsets) [mobile devices]" include that "large power supplies associated with base stations … could easily generate any voltage needed with no need for any boost converter." Appx4014 ¶ 108. He further testified skilled artisans "would recognize that, due to power constraints, no mobile terminal … could implement power amplifiers that cover the bandwidth described with respect to Yu Figures 3 and 4. Instead, such a wideband [power amplifier] must necessarily be for use in a base station, since it would require, for example, large matching networks." Appx3985 ¶ 68.

Supporting his testimony with reference to contemporaneous literature, Dr. Williams noted that "a product description of an Alcatel-Lucent 9100 base station from 2008, which is fairly typical for the relevant time frame, shows that normal power consumption is in the range of 1500 W and maximum power

consumption is over 2500 W." Appx4014-4015 ¶ 108. He further explained the

fundamental differences between base-station implementations and mobile-device

technology by analyzing additional prior art—the Kang reference (Appx4043-

4053)—that "illustrates the difficulties of applying base-station PA [power

amplifier] concepts to mobile handset PAs." Appx3985 ¶ 68. Kang described that

"microstrip lines used for matching in base-station PAs are 'too bulky to be

employed in PAs for handset applications' and that a gallium-nitride (GaN) device

with a high supply voltage … 'requires [a] too high bias voltage.'" Appx3985-

3986 ¶ 68 (quoting Kang reference at Appx4044). Dr. Williams further showed

that the base-station implementations of Yu's Figures 3 and 4 use a non-aggregated

multicarrier configuration as confirmed by Intel's Dahlman reference (Appx2499-

2521), thereby "stress[ing] the nonobviousness of applying multicarrier technology

to carrier aggregation in mobile handsets." Appx4016 ¶ 112 (quoting Appx2517).

In contrast to this reasoned and evidentiary-supported testimony, the Board

pointed to only a conclusory assertion by Intel. In five instances, the Board cited

to footnote 6 in Intel's petition as purportedly supporting the unspecified

modification. Appx45, Appx49-50 (citing to "n.6" in the petition). But all that

footnote did was make a throw-away and undeveloped argument on this point:

> Finally, *even if Yu were directed to base stations* and the claims
> were limited to mobile devices, *it would have been obvious to a*
> *POSA to take advantage of Yu's invention in a mobile device.* Ex.
> 1003 ¶104 n.4 [Appx2397-2398 n.4].

Appx1267-1268 n.6.  This is the epitome of conclusory attorney argument

insufficient to demonstrate obviousness.  "To satisfy its burden of proving

obviousness, a petitioner cannot employ mere conclusory statements.  The

petitioner must instead articulate specific reasoning, based on evidence of record,

to support the legal conclusion of obviousness."  *Magnum Oil*, 829 F.3d at 1380.

Intel completely failed to do so here.

The only citation Intel offered in its footnote 6 as purported support was a

likewise conclusory footnote—in fact, an identical assertion in its expert

Dr. Choi's declaration:

> Finally, even if Yu were directed to base stations and the claims
> were limited to mobile devices, it would have been obvious to a
> POSA to take advantage of Yu's invention in a mobile device.

Appx2397-2398 n.4

Just like Intel's petition, Dr. Choi's declaration fails to explain *what*

modifications would have been necessary to implement Yu's Figures 3 and 4 in a

mobile device, and does not address *how* these alleged modifications could have

been achieved.  An expert's conclusory opinion "deserves no weight" when it

"lacks any convincing detail."  *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187,

1209-10 (Fed. Cir. 2013); *see Garmin Int'l, Inc. v. LoganTree, LP*, 825 F. App'x

894, 898 n.5 (Fed. Cir. 2020) (according no weight to testimony that "merely

parroted attorney argument without any supporting evidence or reasoning").

On remand, the Board permitted Intel to submit declarations addressing "the applicability of the Board's construction of 'plurality of carrier aggregated transmit signals' to the asserted prior art disclosures," Appx20020-20022, but Intel offered no evidence on how skilled artisans would have purportedly modified Figures 3 and 4 for use in a mobile device if those figures disclose base stations. As a result, the record is simply devoid of any explanation, analysis, or reasoning as to how skilled artisans would have modified base-station implementations to work and operate in mobile devices.

Presented with similar circumstances involving a total lack of explanation and evidence about a proposed combinations and modifications, this Court consistently declines to sustain obviousness determinations. For example, in *ActiveVideo*, the district court held and this Court agreed that the expert "never provided any factual basis for his assertions." 694 F.3d at 1327. "The expert failed to explain *how specific references could be combined*, which combination(s) of elements in specific references would yield a predictable result, or *how any specific combination would operate or read on the asserted claims*." *Id.* This Court determined that the expert's testimony "was essentially a conclusory statement that a person of ordinary skill in the art would have known, based on the 'modular' nature of the claimed components, how to combine any of a number of references to achieve the claimed inventions." *Id.* This Court concluded that such

analysis "is not sufficient and is fraught with hindsight bias." *Id.*  Similarly, in *Personal Web*, this Court vacated the Board's obviousness determination because it "nowhere clearly explained, or cited evidence showing, *how* the combination of the two references *was supposed to work*" even though "a clear, evidence-supported account of the *contemplated workings* of the combination is a prerequisite."  848 F.3d at 994 (first italicization in original).

The Board's truncated analysis was legally erroneous and bereft of evidentiary support.  "The Supreme Court has stressed the importance of not simply rubber-stamping agency factfinding." *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1356 (Fed. Cir. 2018).  "[S]ubstantial evidence review requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015). There is no substantial evidence to sustain the Board's obviousness determination on this record, which on the one hand contains extensive expert testimony explaining why base-station implementations are incompatible with mobile devices, and on the other hand the sum total of the "evidence" is a statement in a footnote that "it would have been obvious to a [skilled artisan] to take advantage of Yu's invention in a mobile device."  Appx1267-1268 n.6; Appx2397-2398 n.4.

Given that there is "only one possible evidence-supported finding"—here, Qualcomm's—the Board's obviousness determination should be reversed.  *Owens Corning v. Fast Felt Corp.*, 873 F.3d 896, 901 (Fed. Cir. 2017).

### 3.    Viewed In Proper Context, Dr. Williams's Testimony Cited By The Board Refutes Rather Than Supports An Obviousness Determination

After coupling a legalism with a conclusory statement, the Board's third and final statement in its cursory discussion of unspecified modifications of Yu stated: "This is supported by Patent Owner's assertion that 'Figure 2 of Yu discloses a mobile-terminal-appropriate system for controlling a supply voltage of a power amplifier,'" and it cited Dr. Williams's testimony discussed by Qualcomm in its Patent Owner Response.  Appx50-51.  As explained in Section I.A above, Dr. Williams's testimony refutes, rather than supports, the Board's conclusion.

Figure 2 pertains to an embodiment that is suitable for mobile devices, whereas Figures 3 and 4 are separate and different embodiments for use with base stations only.  Nothing about Figure 2's mobile-device implementation or Qualcomm's arguments suggests that the embodiments in Figures 3 and 4 would be—or even could be—modified for use in a mobile device.  As Dr. Williams testified, the embodiments in Figures 3 and 4 "can only be implemented in more robustly powered base station systems."  Appx3983-3984 ¶ 64.  Analyzing the explicit characteristics that Yu disclosed for each figure, Dr. Williams explained

why "Figure 2 of Yu discloses a mobile-terminal-appropriate system for controlling a supply voltage of a power amplifier," Appx3984 ¶ 65, whereas "Figure 3 and Figure 4 [are] base station implementations that are not appropriate for use in mobile terminals."  Appx3984 ¶ 66; *see* Appx4032-4035 ¶¶ 142-145 (explaining that Yu teaches away from using Figures 3 and 4 in instances where the frequency spacing Δf is small, as in Figure 2).

Simply put, the statements to which the Board points regarding Figure 2 highlight the complete absence of substantial evidence for the Board's obviousness determination.

### 4.  The Board's Statements Regarding Bodily Incorporation Are Wrong

In relying on "ordinary creativity" to "ma[k]e any necessary modifications," Appx50, the Board downplayed the large "differences between the subject matter sought to be patented and the prior art."  35 U.S.C. § 103(a) (pre-AIA).  Instead of contending with the significant differences between mobile-device implementations and base-station implementations, the Board wrongly characterized Qualcomm's position as addressing whether a "secondary reference or embodiment may be bodily incorporated into the structure of the primary reference or embodiment."  Appx50.  But the disputed issue was never whether physical substitution is necessary or required.  Rather, the issue is whether Intel "articulate[d] specific reasoning, based on evidence of record," *Magnum Oil*, 829

F.3d at 1380, to show how skilled artisans would have modified the base-station implementations in Figures 3 and 4 to work with the "very different" and "disparate" mobile-device technology. Appx3983-3986 ¶¶ 64-68, Appx4014-4015 ¶¶ 108-109.

The doctrine of bodily incorporation concerns whether two references or embodiments can "be physically bodily incorporated into each other." *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1067-68 (Fed. Cir. 2016). Here, Qualcomm's arguments did not concern a physical incorporation of two embodiments. Rather, Qualcomm addressed the purported reason to modify Yu's wide-bandwidth, high-power base-station implementations in Figures 3 and 4 for use in a narrower-bandwidth, lower-power mobile devices. Qualcomm was responding to Intel's assertion that skilled artisans would have been motivated to "take advantage" of Yu by modifying it for a mobile-device implementation. Appx1267-1268 n.6.

Moreover, Qualcomm's arguments and evidence addressed the technical infeasibility of a potential modification, which "must be considered" in an obviousness determination. *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 958 (Fed. Cir. 1997) ("The evidence that the combination was not viewed as technically feasible must be considered…."); *see Broadcom*, 732 F.3d at 1335 (affirming non-obviousness where "the record does not show any reasonable

expectation that this significant change would be successful"); *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1353 (Fed. Cir. 2011) ("How well a combination is expected to work is certainly a legitimate consideration in an obviousness inquiry."); *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010) (obviousness requires a "plausible rational[e] as to why the prior art references would have worked together"). That is precisely what Qualcomm's evidence and arguments addressed and what Intel failed to establish.

**B.    The Board Did Not Make, And The Evidence Does Not Support, Any Finding That Skilled Artisans Would Have Reasonably Expected Success In Modifying Yu's Base-Station Implementations For A Mobile Device**

An obviousness determination "requires that a skilled artisan would have perceived a reasonable expectation of success" in making a proposed modification. *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1362 (Fed. Cir. 2009). Here, the Board did not make any findings, and Intel did not proffer any evidence, establishing that skilled artisans would "have perceived a reasonable expectation of success in making the [claimed invention of the '675 patent] in light of [Yu]." *Id.* The Board's failure to make such necessary findings is legal error, and necessarily results in an obviousness determination lacking substantial evidence.

Moreover, there is no such evidence that could sustain the Board's determination. As detailed above, the Board relied on Yu's single sentence to conclude that "it would have been obvious … to take advantage of Yu's [Figures 3

and 4] in a mobile device." Appx50. But even if that sentence sufficed as a reason to modify, it completely fails to demonstrate that skilled artisans would have reasonably expected success in doing so, and Intel offered no evidence on this point. Meanwhile, Dr. Williams's testimony demonstrates that skilled artisans would not have reasonably expected success in modifying Yu's base-station embodiments in Figures 3 and 4 for use in mobile devices. Appx3983-3986 ¶¶ 64-68.

In *Broadcom*, this Court upheld the validity of a challenged claim given the absence of evidence that skilled artisans would have reasonably expected success in modifying a prior-art reference. 732 F.3d at 1335. The challenged claim concerned a communication device including "a data path." *Id.* at 1329-30. Although the prior art lacked the claimed "data path," the patent challenger asserted that skilled artisans "would have been able to adapt" the prior-art reference to include the claimed feature. *Id.* at 1330-31. Affirming the district court's holding that the challenged claim was not obvious as a matter of law, this Court explained:

> *Even assuming* that a person of ordinary skill might have some motivation to add a data path to [the prior-art reference], *the record does not show any reasonable expectation that this significant change would be successful.* An invention is not obvious just because all of the elements that comprise the invention were known in the prior art; rather a finding of obviousness at the time of invention *requires a plausible rational[e] as to why the prior art references would have worked together.*

*Id.* at 1335 (noting evidence demonstrating that modifying the prior-art reference to include a data path would result in an "unfunctional circuit").

Likewise, in *Samsung Electronics Co. v. Elm 3DS Innovations, LLC*, the Court affirmed the Board's non-obviousness determination when the petitioner proposed modifying a prior-art reference to achieve the claimed feature without any evidence that skilled artisans would "have had a reasonable expectation of success in doing so." 925 F.3d 1373, 1380-84 (Fed. Cir. 2019). The challenged claims concerned integrated circuits, and the petitioner's obviousness theory relied on modifying the prior-art reference such that "instead of growing [a] dielectric layer" (as disclosed in the reference), the dielectric layer would be deposited "using plasma-enhanced chemical vapor deposition." *Id.* at 1380-81. The Board held that the petitioner "failed to adequately explain" how the reference could have been modified to achieve the claimed invention. *Id.* Affirming that determination, this Court rejected the petitioner's conclusory assertion that dielectric material from one reference "could easily have been used in place" of material in a different reference. *Id.* at 1381. This Court further noted the patentee's testimony on the "complexity of semiconductor fabrication" and the "problem[s]" that would occur in implementing the proposed modification. *Id.* at 1381-82; *see id.* at 1382-83 (endorsing requirement that petitioner provide "specific evidence that a person of

ordinary skill in the art would have reasonably expected success" when dealing with complex technology).

Here, "[i]t was [Intel's] burden to demonstrate … that the skilled artisan would have had a reasonable expectation of success," *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367-68 (Fed. Cir. 2016), in modifying base-station implementations for use with mobile devices.  Intel, however, failed to proffer any probative evidence on this issue, and the Board failed to make any necessary findings.  Accordingly, the Board's obviousness determination should be reversed for this additional reason.

## CONCLUSION

The Board's holdings should be reversed and the challenged claims held to be patentable.  At minimum, the judgment should be vacated and the case remanded, again.

Dated:  November 7, 2022

Respectfully submitted,

*/s/ I. Sasha Mayergoyz*
I. Sasha Mayergoyz
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60606
(312) 269-1572

Jennifer L. Swize
JONES DAY
51 Louisiana Avenue, N.W.

Washington, DC 20001
(202) 879-5417
jswize@jonesday.com

Matthew W. Johnson
Joshua R. Nightingale
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 394-7950

Robert M. Breetz
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-7029

*Counsel for Appellant Qualcomm, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,692 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 pt.


Dated:  November 7, 2022

> */s/ I. Sasha Mayergoyz*
> I. Sasha Mayergoyz
> JONES DAY
> 110 North Wacker Drive, Suite 4800
> Chicago, IL 60606
> (312) 269-1572
>
> *Counsel for Qualcomm, Inc.*

# ADDENDUM

Trials@uspto.gov                                                    Paper 49
571.272.7822                                              Date: March 23, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

INTEL CORPORATION,
Petitioner,

v.

QUALCOMM INCORPORATED,
Patent Owner.

————————

IPR2018-01326
IPR2018-01327
IPR2018-01329
IPR2018-01340[1]
Patent 9,608,675 B2

————————

Before MICHELLE N. WORMMEESTER, AMANDA F. WIEKER, and
SCOTT B. HOWARD, *Administrative Patent Judges*.

WORMMEESTER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision on Remand
Determining All Challenged Claims Unpatentable
*35 U.S.C. §§ 144, 318*

---

[1] This Decision addresses issues that are identical in each of the identified
cases.  We exercise our discretion to issue this Decision to be filed in each
case.  The parties may not use this style heading in subsequent papers.

IPR2018-01326, IPR2018-01327,
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

## I. INTRODUCTION

We address these four cases on remand after a consolidated decision
for six related cases, including these four cases, by the U.S. Court of
Appeals for the Federal Circuit in *Qualcomm Inc. v. Intel Corp.*, 6 F.4th
1256 (Fed. Cir. 2021) (*see* Paper 33[2]).

As background, Intel Corporation[3] ("Petitioner") petitioned for six
*inter partes* reviews challenging the validity of U.S. Patent No. 9,608,675
B2 (Ex. 1001, "the '675 patent"). This Decision addresses only four of
those *inter partes* reviews, namely, IPR2018-01326, IPR2018-01327,
IPR2018-01329, and IPR2018-01340.[4] Petitioner filed petitions requesting
*inter partes* review of claims 1–15, 17–25, and 27–33 of the '675 patent
across these four cases. Paper 2 ("Petition" or "Pet.") (requesting review of
claims 1–6 and 18–22); 1327-Paper 3 (requesting review of claims 7–15, 17,
23–25, 27, and 33); 1329-Paper 3 (requesting review of claims 28–30);
1340-Paper 3 (requesting review of claims 31 and 32). Qualcomm
Incorporated ("Patent Owner") filed preliminary responses. Paper 7; 1327-
Paper 7; 1329-Paper 7; 1340-Paper 7. Pursuant to 35 U.S.C. § 314, we
instituted *inter partes* reviews as to all the challenged claims and all the

---

[2] Unless otherwise noted, papers and exhibits refer to IPR2018-01326.
Papers and exhibits preceded by "1327-" refer to IPR2018-01327. Papers
and exhibits preceded by "1329-" refer to IPR2018-01329. Papers and
exhibits preceded by "1340-" refer to IPR2018-01340.
[3] Intel Corporation identifies itself and Apple Inc. ("Apple") as real parties
in interest. Paper 2, 1.
[4] We address the other two *inter partes* reviews, IPR2018-01328 and
IPR2018-01330, in a separate decision on remand entered concurrently with
this Decision.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

grounds of unpatentability raised in the petitions.  Paper 8 ("Institution Decision" or "Inst. Dec."); 1327-Paper 8; 1329-Paper 8; 1340-Paper 8.

During trial, Patent Owner filed responses.  Paper 14 ("Response" or "PO Resp."); 1327-Paper 14; 1329-Paper 14; 1340-Paper 14.  Petitioner filed replies.  Paper 16 ("Reply" or "Pet. Reply"); 1327-Paper 16; 1329-Paper 16; 1340-Paper 16.  Patent Owner filed sur-replies.  Paper 19 ("Sur-reply" or "PO Sur-reply"); 1327-Paper 19; 1329-Paper 19; 1340-Paper 19.  On October 9, 2019, we conducted a consolidated oral hearing for all six related cases, including the four cases addressed in this Decision.  A copy of the transcript is included in the record.  Paper 29 ("Tr.").  With our authorization (*see* Paper 26), the parties subsequently filed additional briefs on the meaning of the claim term "generates the single power tracking signal based on a combination of the plurality of I and Q components."  Paper 27 (Patent Owner's brief); Paper 28 (Petitioner's brief).

Pursuant to 35 U.S.C. § 318(a), we issued final written decisions in the four cases addressed here.  Paper 30 ("Final Written Decision" or "Final Dec."); 1327-Paper 30; 1329-Paper 30; 1340-Paper 30.  We determined that Petitioner demonstrated by a preponderance of the evidence that all challenged claims, namely, claims 1–15, 17–25, and 27–33 of the '675 patent, are unpatentable.  Final Dec. 64; 1327-Paper 30, 80–81; 1329-Paper 30, 82; 1340-Paper 30, 86–87.  Patent Owner appealed our determinations that these challenged claims are unpatentable to the Federal Circuit.  Paper 31; 1327-Paper 31; 1329-Paper 31; 1340-Paper 31.

In its remand decision, the Federal Circuit addressed Patent Owner's arguments that "it was not afforded notice of, or an adequate opportunity to

3

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

respond to, the Board's construction of 'a plurality of carrier aggregated transmit signals,'" as well as Patent Owner's arguments "challeng[ing] the Board's construction of the power tracker limitation," which refers to the claim term "means for determining a single power tracking signal." *Qualcomm*, 6 F.4th at 1262. The power tracker limitation appears in just one of four challenged independent claims, namely, claim 28, and the Federal Circuit "s[aw] no error" in our construction of that limitation. *Id.* The Federal Circuit, however, agreed that "the Board violated [Patent Owner's] procedural rights with respect to the 'plurality of carrier aggregated transmit signals' limitation," vacated our final written decisions, and remanded for further proceedings. *Id.* at 1262, 1267. Each of the four challenged independent claims includes the limitation "plurality of carrier aggregated transmit signals." The Federal Circuit's mandate issued on September 17, 2021. Paper 32.

We subsequently issued an order in each case authorizing post-remand briefing tailored narrowly to addressing whether we properly construed "plurality of carrier aggregated transmit signals," and to addressing the applicability of our construction of "plurality of carrier aggregated transmit signals" to the asserted prior art disclosures. Paper 35, 2. Petitioner filed opening briefs (Paper 36, "Pet. Remand Br."), Patent Owner filed responsive briefs (Paper 38, "PO Remand Resp."), Petitioner filed reply briefs (Paper 41, "Pet. Remand Reply"), and Patent Owner filed sur-reply briefs (Paper 48, "PO Remand Sur-reply").

We have considered the record anew by reviewing the parties' positions on remand. For the reasons that follow, we determine that

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Petitioner has shown by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 of the '675 patent are unpatentable.

## II. BACKGROUND

### A. Related Proceedings

Prior to institution, the parties identified various matters involving the '675 patent, including a federal district court case, an International Trade Commission ("ITC") investigation, as well as the six petitions for *inter partes* review identified above. Pet. 1–2; Paper 5, 2. Since the entry of our institution decisions, Patent Owner has asserted that "[t]he '675 patent is currently not involved in any litigation beyond the PTAB." PO Resp. 16. Petitioner has not stated otherwise.

The six *inter partes* review cases that the parties identified are IPR2018-01326, IPR2018-01327, IPR2018-01328, IPR2018-01329, IPR2018-01330, and IPR2018-01340. Pet. 1–2; Paper 5, 2. These cases can be divided into two sets of cases, where the first set of cases includes IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340. These four cases involve prior art challenges based on Yu[5] as a primary reference. The second set of cases includes IPR2018-01328 and IPR2018-01330, which involve prior art challenges based on Chen[6] as a primary reference. As noted above, this Decision addresses only the first set of cases.

---

[5] Yu, EP 2442440 A1, published Apr. 18, 2012 (Ex. 1004).
[6] W. Chen et al., Hybrid Envelope Tracking for Efficiency Enhancement in Concurrent Dual-Band PAs, 54 Microwave & Optical Tech. Letters 662 (2012) (IPR2018-01328, Ex. 1212).

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

The second set of cases is addressed in a separate decision on remand entered concurrently with this Decision.

### B.  The '675 Patent

The '675 patent describes power tracking for generating a power supply voltage for a circuit, such as an amplifier, that processes multiple transmit signals sent simultaneously.  Ex. 1001, 1:8–10, 1:35–38.  Figure 5, which is reproduced below, illustrates a transmit module with power tracking for all transmit signals according to the '675 patent.  *Id.* at 1:65–67.



*FIG. 5*

In particular, Figure 5 shows transmit module 500, which includes K transmit circuits 540a to 540k that can simultaneously process K transmit

signals, with each transmit circuit processing one transmit signal. *Id.* at 6:34–37. Transmit module 500 also includes summer 552, power amplifier ("PA") 560, duplexer 570, and power tracking supply generator (or voltage generator) 580. *Id.* at 6:37–39.

Inphase (I) and quadrature (Q) samples for a transmit signal are provided to both a transmit circuit and voltage generator 580. Ex. 1001, 6:42–44. For example, transmit circuit 540a receives $I_1$ and $Q_1$ samples for a first transmit signal and generates a first upconverted radio frequency ("RF") signal for the first transmit signal. *Id.* at 6:40–42. Within transmit circuit 540a, the $I_1$ and $Q_1$ samples are converted to I and Q analog signals by digital-to-analog converters (DACs) 542a and 543a. *Id.* at 6:44–46. The I and Q analog signals are then filtered by lowpass filters 544a and 545a, amplified by amplifiers 546a and 547a, upconverted from baseband to RF by mixers 548a and 549a, and summed by summer 550a to generate the first upconverted RF signal. *Id.* at 6:46–50.

The other transmit circuits operate similarly. Ex. 1001, 6:54–57. Summer 552 receives all upconverted RF signals from the transmit circuits, sums the upconverted RF signals, and provides a modulated RF signal to PA 560. *Id.* at 6:59–62.

Within voltage generator 580, power tracker 582 receives $I_1$ to $I_K$ samples and $Q_1$ to $Q_K$ samples for all transmit signals being sent simultaneously. Ex. 1001, 6:63–65. Power tracker 582 then computes a digital power tracking signal based on the I and Q samples for these transmit signals and provides the digital power tracking signal to DAC 584. *Id.* at 6:65–7:1, 8:6–32. DAC 584 converts the digital power tracking signal to

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

analog and provides the analog power tracking signal to power supply

generator 586. *Id.* at 7:1–4, Fig. 5. Power supply generator 586 generates a

power supply voltage for PA 560. *Id.* at 7:6–8.

Once PA 560 receives both the modulated RF signal from

summer 552 and the power supply voltage from power supply

generator 586, PA 560 amplifies the modulated RF signal using the power

supply voltage. Ex. 1001, 7:8–11. PA 560 then provides an output RF

signal for all the transmit signals being sent simultaneously. *Id.* at 7:11–12.

The output RF signal is routed through duplexer 570 and transmitted via

antenna 590. *Id.* at 7:12–14.

### C. Illustrative Claim

Petitioner challenges claims 1–15, 17–25, and 27–33 of the '675

patent, all for our consideration on remand. Claims 1, 18, 28, and 33 are

independent. Claim 1 is illustrative of the challenged claims and includes

the subject matter the Federal Circuit instructed us to reconsider on remand:

1. An apparatus comprising:

> a power tracker configured to determine a single power
> tracking signal based on a plurality of inphase (I) and
> quadrature (Q) components of a plurality of carrier
> aggregated transmit signals being sent simultaneously,
> wherein the power tracker receives the plurality of I and Q
> components corresponding to the plurality of carrier
> aggregated transmit signals and generates the single power
> tracking signal based on a combination of the plurality of
> I and Q components, wherein the plurality of carrier
> aggregated transmit signals comprise Orthogonal
> Frequency Division Multiplexing (OFDM) or Single
> Carrier Frequency Division Multiple Access (SC-FDMA)
> signals;

8

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

> a power supply generator configured to generate a single
> power supply voltage based on the single power tracking
> signal; and

> a power amplifier configured to receive the single power
> supply voltage and the plurality of carrier aggregated
> transmit signals being sent simultaneously to produce a
> single output radio frequency (RF) signal.

### D. Instituted Grounds of Unpatentability

As discussed above, we instituted *inter partes* review based on all grounds raised in the four petitions addressed here. Inst. Dec.; 1327-Paper 8; 1329-Paper 8; 1340-Paper 8. The instituted grounds are as follows.

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–6, 11, 17–22, 27, 33[7] | 103 | Yu, Wang[8] |
| 7–10, 28–32[9] | 103 | Yu, Wang, Choi[10] |
| 12[11] | 103 | Yu, Wang, Eliezer[12] |
| 13–15, 23–25[13] | 103 | Yu, Wang, Dahlman[14] |

[7] Petitioner challenges claims 1–6 and 18–22 in IPR2018-01326, and claims 11, 17, 27, and 33 in IPR2018-01327.

[8] Wang et al., *Design of Wide-Bandwidth Envelope-Tracking Power Amplifiers for OFDM Applications*, 53 IEEE Transactions on Microwave Theory & Techniques 1244 (2005) (Ex. 1005).

[9] Petitioner challenges claims 7–10 in IPR2018-01327, claims 28–30 in IPR2018-01329, and claims 31 and 32 in IPR2018-01340.

[10] Jinsung Choi et al., *Envelope Tracking Power Amplifier Robust to Battery Depletion*, 2010 IEEE MTT-S Int'l Microwave Symposium Digest 1074 (2010) (1327-Ex. 1108, at Ex. A).

[11] Petitioner challenges claim 12 in IPR2018-01327.

[12] Eliezer, US 2009/0004981 A1, published Jan. 1, 2009 (1327-Ex. 1111).

[13] Petitioner challenges claims 13–15 and 23–25 in IPR2018-01327.

[14] Erik Dahlman et al., 4G LTE / LTE-ADVANCED FOR MOBILE BROADBAND 11–12, 19, 27, 103–104, 132–135, 205, 347–351, 355–358, 389 (2011) (Ex. 1006). The same paper is entered in IPR2018-01327 as Exhibit 1106.

9

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

In support of its petitions, Petitioner relied on a declaration (Ex. 1003) as well as a reply declaration (Ex. 1031) of David Choi, Ph.D.  Patent Owner submitted with its responses a declaration of Tim Williams, Ph.D. (Ex. 2001[15]).  The transcripts of the depositions of Dr. Choi are entered in the record as Exhibits 2006 and 2007, and the transcript of the deposition of Dr. Williams is entered in the record as Exhibit 1030.

## III. ANALYSIS

### A. Final Written Decisions

Our discussion of the final written decisions focuses on our previous construction of the claim term "plurality of carrier aggregated transmit signals," as recited in challenged independent claims 1, 18, 28, and 33.  In the final written decisions, we began our analysis by addressing the parties' arguments regarding the construction of that term.  Final Dec. 17–24.  Based on our review of the claims and specification of the '675 patent, we disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires signals comprising transmissions on *component* carriers.  *Id.* at 19–20.  We explained that the '675 patent explicitly defines "carrier aggregation" as "operation on multiple carriers," and that it also explicitly defines "[a] transmit signal" as "a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc."  *Id.* (citing Ex. 1001, 2:63–64, 3:60–62).  We

---

[15] Patent Owner has included the designation "Ex. 2002" on each page of Dr. Williams's declaration.  Because the declaration is entered in the record as Exhibit 2001, we cite Exhibit 2001 when referring to the declaration.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

further determined that these definitions refer broadly to signals comprising transmissions on carriers. *Id.* at 20.

We also disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires signals *from a single terminal.* Final Dec. 20–22. We explained that the claim language recites nothing about signals from a single terminal. *Id.* at 21. We additionally explained that although the '675 patent discloses examples and embodiments where signals are from a single terminal, the specification does not limit "carrier aggregated transmit signals" to those examples and embodiments. *Id.* (citing Ex. 1001, 14:21–25 (stating that the "disclosure is not intended to be limited to the examples and designs described")). We further noted that the '675 patent teaches that a wireless device "'may send and/or receive transmissions' on multiple carriers according to various combinations of bands and band groups." *Id.* at 21–22 (citing Ex. 1001, 3:1–35). We found this to be consistent with Dahlman, extrinsic evidence regarding carrier aggregation, which Patent Owner cited as teaching that multiple carriers "are aggregated and jointly used for transmission *to/from* a single terminal." *Id.* at 22 (citing Ex. 1006, 104 (cited by PO Resp. 15)).

Lastly, we disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires extended bandwidth for a user transmission from a single terminal. Final Dec. 22. We explained that the claim language recites nothing about extended transmission bandwidth, and that although the '675 patent discloses an example where carrier aggregation provides extended transmission bandwidth, it does not limit "carrier aggregated transmit signals" to that example. *Id.* (citing Ex. 1001, 2:65–67

11

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

("Wireless device 110 *may* be configured with up to 5 carriers in one or two bands in LTE[16] Release 11.") (emphasis added)).

Turning to Petitioner's proposed construction for the term "plurality of carrier aggregated transmit signals," we noted its similar requirement of increasing the bandwidth for a user. Final Dec. 22. As with Patent Owner, we disagreed with Petitioner in this regard for the same reasons discussed above. *Id.* We additionally noted that Petitioner's counsel conceded during oral argument that this requirement "does not come specifically from the specification," and that Petitioner would not object to eliminating the requirement. *Id.* at 22–23 (citing Tr. 10:22–11:17).

We also disagreed with Petitioner that the term "plurality of carrier aggregated transmit signals" requires "signals for transmission . . . at the same time." Final Dec. 23. We explained that the claim recites "a plurality of carrier aggregated transmit signals being sent simultaneously," and that requiring signals for transmission *at the same time* would render the claim language "being sent simultaneously" redundant and superfluous. *Id.*

In summary, we concluded that the broadest reasonable interpretation of the claim term "plurality of carrier aggregated transmit signals" is "signals for transmission on multiple carriers." Final Dec. 23. We stated that "[o]ur construction is consistent with the '675 patent, which defines the term 'carrier aggregation' as 'operation on multiple carriers' and the term '[a] transmit signal' as 'a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" *Id.* (citing Ex. 1001, 2:63–64, 3:60–62). We additionally noted that "[o]ur construction

---

[16] LTE stands for Long Term Evolution. Ex. 1001, 2:21.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

also encompasses, but is not limited to, Patent Owner's proposed construction." *Id.*

After providing a brief overview of Yu, we addressed whether Petitioner demonstrated by a preponderance of the evidence that the teachings in Yu account for the "plurality of carrier aggregated transmit signals," as recited in each of independent claims 1, 18, 28, and 33. Final Dec. 31–36. In particular, consistent with our construction of the claim term "plurality of carrier aggregated transmit signals," we agreed with Petitioner that Yu's signals S1 and S2 are transmitted on multiple carriers at the same time because the signals are upconverted to different intermediate frequencies, where the difference in frequencies is maintained when the signals are subsequently summed and when they are upconverted again to different RF center frequencies. *Id.* at 36 (citing Pet. 42–44 (citing Ex. 1004 ¶ 48); Ex. 1004 ¶¶ 32, 57). We also credited the testimony of Petitioner's declarant Dr. Choi on this particular issue. *Id.* (citing Pet. 42–44 (citing Ex. 1003 ¶¶ 101–104)). As to Patent Owner's argument challenging Petitioner's showing for the recited "plurality of carrier aggregated transmit signals," we disagreed because Patent Owner relied on its proposed construction, which we determined "is overly narrow and improperly requires signals from a single terminal as well as providing extended transmission bandwidth for a user transmission from a single terminal." *Id.* at 58 (citing PO Resp. 40).

13

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

*B. The Federal Circuit's Remand Decision*

Our discussion of the Federal Circuit's remand decision focuses only on the court's analysis regarding our construction of the recited "plurality of carrier aggregated transmit signals." On appeal to the Federal Circuit, Patent Owner argued that "it was not afforded notice of, or an adequate opportunity to respond to, the Board's construction of 'a plurality of carrier aggregated transmit signals.'" *Qualcomm*, 6 F.4th at 1262. The Federal Circuit agreed with Patent Owner that we "violated [Patent Owner's] procedural rights with respect to the 'plurality of carrier aggregated transmit signals' limitation." *Id.* The Federal Circuit explained that "the Board may adopt a claim construction of a disputed term that neither party proposes without running afoul of the [Administrated Procedure Act]." *Id.* As to the case here, however, the Federal Circuit pointed out that "the issue of whether increased bandwidth was a required part of the claim construction was not in dispute." *Id.* at 1262–63. That is, "[t]he Board's construction of 'a plurality of carrier aggregated transmit signals' diverged from the agreed-upon increased bandwidth requirement for the term." *Id.* at 1263. The Federal Circuit further noted that "[w]hile the Board did not change theories midstream or depart from a construction it previously adopted, it is still difficult to imagine either party anticipating that this agreed-upon matter of claim construction was a moving target," and that "unlike with disputed terms, it is unreasonable to expect parties to brief or argue agreed-upon matters of claim construction." *Id.* at 1263. The Federal Circuit counseled that "the Board needed to provide notice of and an adequate opportunity to respond to its

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

construction," which "departed from the agreed-upon increased bandwidth requirement." *Id.* at 1263, 1265.

The Federal Circuit disagreed with Petitioner that the oral hearing provided Patent Owner notice and an opportunity to respond. *Qualcomm*, 6 F.4th at 1263–64. The Federal Circuit explained that the panel's comment during the hearing that it would think about whether the increased bandwidth requirement is necessary "did not *provide* [Patent Owner] notice that the Board might depart from the increased bandwidth requirement," where "[t]he Board did not announce a construction, criticize the parties' agreed-upon requirement, ask any follow-up questions to [Petitioner], or ask any related questions to [Patent Owner]." *Id.* at 1264. The Federal Circuit further explained that "[t]he hearing also did not provide an adequate opportunity to respond" because the Board did not provide a theory or rationale for departing from the agreed-upon requirement to which Patent Owner could have responded, it did not ask Patent Owner questions about the requirement, and it did not request additional briefing after the hearing. *Id.* at 1264–65. The Federal Circuit added that Patent Owner did not have an opportunity to introduce evidence addressing why an ordinarily skilled artisan would have understood that the claim term "plurality of carrier aggregated transmit signals" requires signals that increase bandwidth. *Id.* at 1265.

The Federal Circuit also disagreed with Petitioner that Patent Owner's option to seek rehearing after receiving notice through the final written decisions provided an adequate opportunity to respond. *Qualcomm*, 6 F.4th at 1263, 1265. The Federal Circuit explained that "a party need not seek

15

**Appx15**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

rehearing in order to seek relief from a Board decision on appeal." *Id.* at 1265. The Federal Circuit acknowledged that "it may have been a more efficient use of resources had [Patent Owner] sought rehearing," but stated that Patent Owner "was not required to do so." *Id.*

Without deciding whether Patent Owner must show prejudice, as Petitioner argued, the Federal Circuit further reasoned that Patent Owner had made a sufficient showing. *Qualcomm*, 6 F.4th at 1263 & n.3. The Federal Circuit explained that Patent Owner "argued throughout the IPR proceedings that the prior art did not disclose the increased bandwidth requirement," and that "[b]y removing that requirement, the Board eliminated an element on which [Petitioner] bore the burden of proof." *Id.* The Federal Circuit additionally explained that "without notice of the Board's elimination of the increased bandwidth requirement, [Patent Owner] had no reason to brief that requirement or establish an evidentiary record supporting it, particularly given the limited word count and breadth of issues in these IPRs." *Id.* at 1263–64.

Accordingly, the Federal Circuit determined that we did not provide Patent Owner adequate notice of and opportunity to respond to our claim construction of "plurality of carrier aggregated transmit signals," vacated our final written decisions, and remanded for further proceedings. *Qualcomm*, 6 F.4th at 1267.

## C. Claim Construction

The claim construction standard applicable to these *inter partes* review proceedings is the broadest reasonable interpretation in light of the

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

patent specification. *See* 37 C.F.R. § 42.100(b) (2018); *Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard).[17]  Under this standard, claim terms generally are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  That is, we give words "their plain meaning" unless, however, it is "inconsistent with the specification and prosecution history." *Arista Networks, Inc. v. Cisco Sys., Inc.*, 908 F.3d 792, 796–98 (Fed. Cir. 2018) (rejecting construction as "overly broad, even under the broadest reasonable interpretation standard"); *see also Personalized Media Comm'cns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) ("[T]he Board's interpretation must be reasonable in light of the specification, prosecution history, and the understanding of one skilled in the art.").

In view of the Federal Circuit's remand decision, we address the parties' arguments on remand as to whether we properly construed the claim

---

[17] The revised claim construction standard for interpreting claims in *inter partes* review proceedings as set forth in the final rule published October 11, 2018, does not apply to these proceedings because the new "rule is effective on November 13, 2018 and applies to all IPR, PGR and CBM petitions filed on or after the effective date."  Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (codified at 37 C.F.R. § 42.100(b) (2019)).  The petitions here were filed on July 3, 2018.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

term "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers."[18]

The term "plurality of carrier aggregated transmit signals" appears in each of challenged independent claims 1, 18, 28, and 33, as well as several dependent claims. Petitioner originally proposed that we construe this term to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." Pet. 32. On remand, however, Petitioner argues that we properly construed the term to mean, more broadly, "signals for transmission on multiple carriers." Pet. Remand Br. 7–12. As support, Petitioner contends that "the '675 patent provides explicit definitions for this claim term, by stating that 'carrier aggregation . . . *is* operation on multiple carriers' and 'a transmit signal *is* a signal comprising a transmission on one

---

[18] Referring to Petitioner's opening briefs, Patent Owner asserts that, "[c]ontrary to the Board's Order dated November 1, 2021 (Paper 35 ('Order') in IPR2018-01326), Petitioner filed six substantively different briefs, which collectively exceed the 20-page limit set by the Order." PO Remand Resp. n.1. Patent Owner does not identify any differences. We have reviewed Petitioner's six opening briefs, and they appear to be substantively similar except for the discussions as to the applicability of our previous construction of "plurality of carrier aggregated transmit signals" to the asserted prior art disclosures. *Compare, e.g.*, Pet. Remand Br., *with, e.g.*, IPR2018-01328, Paper 33. In that regard, the briefs in IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340 focus on Yu's disclosures, whereas the briefs in IPR2018-01328 and IPR2018-01330 focus on Chen's disclosures. Pet. Remand Br. 13–16; IPR2018-01328, Paper 33, 12–14. If the six briefs each included the discussions regarding both Yu and Chen, the briefs would be substantively the same, and the sum total of pages for each brief would be less than twenty. Pet. Remand Br. 1–16 (brief, including Yu discussion, comprising about sixteen pages); IPR2018-01328, Paper 33, 12–14 (Chen discussion comprising about two pages). Thus, it is harmless for us to consider Petitioner's opening briefs.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

or more carriers, a transmission on one or more frequency channels, etc.'"
*Id.* at 7 (quoting Ex. 1001, 2:63–64, 3:60–62). Petitioner asserts that "[t]he
Federal Circuit has recognized that the use of the term 'is' or similar
language can 'signify that a patentee is serving as its own lexicographer.'"
*Id.* (quoting *Sinorgchem Co., Shandong v. USITC*, 511 F.3d 1132, 1136
(Fed. Cir. 2007)).

Petitioner also points to various other portions of the specification.
Pet. Remand Br. 9. For example, Petitioner cites the teaching that "[c]arrier
aggregation may also be referred to as multi-carrier operation." *Id.* (citing
Ex. 1001, 2:64–65). Petitioner additionally cites the teaching that "[i]ntra-
band [carrier aggregation] refers to operation on multiple carriers within the
same band," and "[i]nter-band [carrier aggregation] refers to operation on
multiple carriers in different bands." *Id.* (citing Ex. 1001, 3:1–5).
According to Petitioner, these teachings "confirm[] the accuracy of the
Board's construction under the broadest reasonable interprterion standard."
*Id.*

Petitioner acknowledges that our previous construction is broader than
the construction it originally proposed in the petitions. Pet. Remand Br. 10.
In particular, our construction omits two requirements from Petitioner's
originally-proposed construction, namely, signals for transmission *at the
same time* and *increasing the bandwidth for a user*. *Id.* Petitioner explains
that it originally "proposed its construction in an effort to minimize
disputes," noting that its "construction was actually the Patent Owner's
construction in the earlier ITC proceeding." *Id.* Petitioner contends,
however, "[t]he Board properly omitted the limitation 'to increase the

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

bandwidth for a user' because, as the Board explained, the claim language says nothing about increasing bandwidth for a user." *Id.* at 10–11 (citing Final Dec. 22). Petitioner further asserts that "while the '675 patent ***does*** include an example of carrier aggregation increasing bandwidth, it ***does not*** expressly limit carrier aggregation to this purpose." *Id.* at 11 (citing Ex. 1001, 2:65–67 ("Wireless device 110 ***may*** be configured with up to 5 carriers in one or two bands in LTE Release 11.") (emphasis added)).

Petitioner adds that "the Board properly omitted the limitation 'at the same time'" because claim 1 recites "a plurality of carrier aggregated transmit signals being sent simultaneously," and requiring signals for transmission *at the same time* "would render superfluous the claim language 'being sent simultaneously.'" Pet. Remand Br. 11–12; *see id.* at 9 n.6.

Patent Owner responds that the term "carrier aggregated transmit signals" instead carries its ordinary and customary meaning, which Petitioner originally proposed in its petitions: "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." PO Remand Resp. 2, 9; *see also* Pet. 32. Patent Owner contends that "[w]hile it is true that transmission of signals on multiple carriers is an attribute of carrier aggregation, the [person having ordinary skill in the art] would have further understood the term to mean that the multiple component carriers are aggregated (*i.e.*, combined) to increase the bandwidth for a user." PO Remand Resp. 9 (internal citation omitted). As support, Patent Owner relies on the '675 patent, its prosecution history file, as well as extrinsic evidence.

Starting with the '675 patent, Patent Owner asserts that the specification "specifically describes an example of a user device (*i.e.*,

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

wireless device 110) that 'supports carrier aggregation' by being 'configured with up to 5 carriers in one or two bands [in LTE Release 11].'" PO Remand Resp. 10 (quoting Ex. 1001, 2:63–67). To illustrate, Patent Owner asserts that "user devices of earlier LTE systems were limited to the 20 MHz bandwidth of a single channel," whereas "the carrier aggregation introduced in LTE Release 11 enables a user device to aggregate up to five of these 20 MHz channels as component carriers of a single virtual channel having a bandwidth of up to 100 MHz." *Id.* (citing Ex. 1001, 2:59–60, 65–67, Figs. 2A–2D). Patent Owner notes that "[t]he '675 patent further explains that LTE carriers may be aggregated from frequency bands listed in 3GPP TS (Technical Specification) 36.101," a 3GPP[19] technical report that Patent Owner points to specifically for describing carrier aggregation as "[a]ggregation of two or more component carriers in order to support wider transmission bandwidths." *Id.* at 11 (citing Ex. 1001, 2:58–62; quoting Ex. 2011, 14 (3GPP technical report)).

Moving on to the prosecution history of the '675 patent, Patent Owner asserts that the Examiner applied a U.S. publication, namely, the Chen publication,[20] in an Office action because it "discloses a plurality of carrier aggregated transmit signals." PO Remand Resp. 11 (quoting Ex. 1002, 266–279 (Office action, July 2, 2015)). According to Patent Owner, the Chen publication "makes clear that its multi-carrier aggregation provides increased bandwidth." *Id.* Patent Owner relies on the Chen publication's

---

[19] 3GPP stands for 3rd Generation Partnership Project. Ex. 2011 (cover).
[20] Chen, U.S. Publication No. 2012/0321018 A1, published Dec. 20, 2012 (Ex. 2012). The Chen publication is different than Chen, which is an asserted reference in the related cases not addressed here.

21

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

teaching that the "bandwidth of a signal constantly increases due to multi-carrier applications." *Id.* (quoting Ex. 2012 ¶ 4).

As to extrinsic evidence, Patent Owner points to teachings across various patents and publications to support its proposed construction on remand. PO Remand Resp. 12–13 (citing Ex. 2015, 6; Ex. 2016; Ex. 2017, 3:20–22; Ex. 2018, 3:27–62). For example, Patent Owner asserts that "U.S. Patent No. 9,161,254 teaches that carrier aggregation is a 'technique for providing additional bandwidth capacity to wireless devices' by 'aggregat[ing] . . . multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE).'" *Id.* at 12 (quoting Ex. 2017, 3:19–22[21]). Patent Owner also asserts that "a 2013 Qualcomm document states that '[c]arrier aggregation, as the name suggests, combines multiple carriers (a.k.a. channels) at the device to provide a bigger data pipe to the user.'" *Id.* (quoting Ex. 2015, 6).

With respect to our previous construction (which is Petitioner's proposed construction on remand), Patent Owner contends that it "is wrong because it reads 'aggregated' out of the term 'carrier aggregated transmit signals.'" PO Remand Resp. 13. Patent Owner asserts that "[a]ggregation refers to the process of combining constituent parts into a single thing." *Id.* (citing Ex. 2029 (dictionary defining "aggregation" as "the collecting of units . . . into a mass or whole")). Patent Owner further asserts that an ordinarily skilled artisan "would not have understood 'carrier aggregation' to be equivalent to any generic 'transmission on multiple carriers' because

---

[21] Patent Owner cites Exhibit 2017, lines 20 through 22, but the quoted language appears at lines 19 through 22.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

nothing is being aggregated when disparate signals are transmitted on different carriers to separate destinations." *Id.* at 14.

Patent Owner further contends "there is no lexicography" here, contrary to Petitioner's position. PO Remand Resp. 2 (capitalization and emphasis omitted); *see also* Pet. Remand Br. 7. Patent Owner asserts that "[w]hen the '675 patent sought to define a term, it used a very specific format, *i.e.*, putting the defined term in quotations marks, followed by the phrase 'is used herein to mean,' followed by the definition in quotation marks." PO Remand Resp. 3. For example, Patent Owner directs us to where the specification states, "The word 'exemplary' is used herein to mean 'serving as an example, instance, or illustration.'" *Id.* (citing Ex. 1001, 2:10–11). Patent Owner further asserts that "[n]one of the statements [Petitioner] relies on for the term 'carrier aggregated transmit signals' resembles this format" because "neither of [Petitioner's] citations employs the phrase 'is used herein to mean'" or "uses quotation marks for the term or its purported definition." *Id.* at 4 (citing Ex. 1001, 2:63–54, 3:60–62). As discussed above, Petitioner cites the '675 patent's statement that "carrier aggregation . . . is operation on multiple carriers" as well as its statement that "[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc." Pet. Remand Br. 7 (quoting Ex. 1001, 2:63–64, 3:60–62). According to Patent Owner, "[t]hese departures from the '675 patent's distinctive definitional format show that the patentee did not intend these statements to redefine the plain and ordinary meaning of 'carrier aggregated transmit signals.'" PO Remand Resp. 4; *see also id.* at 8 (characterizing "the

23

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

'675 patent's statement 'carrier aggregation . . . is operation on multiple carriers' [a]s nothing more than a generalized introduction to carrier aggregation, highlighting one aspect of it").

Patent Owner also urges that, "[t]aken together, the [person having ordinary skill in the art] would recognize that neither statement is definitional" because they additionally are inconsistent.  PO Remand Resp. 5–6 (citing Ex. 1001, 2:63–64, 3:60–62); PO Remand Sur-reply 6–7. Patent Owner points out in particular that one statement "has a broader scope than the [other statement], encompassing transmission on *one or more* general frequencies rather than *multiple carriers*," and "is open-ended via its use of the word 'etc.'"  PO Remand Resp. 6; *see also* PO Remand Sur-reply 6 ("For example, . . . 'transmit signals' includes transmission on *one* carrier, while 'carrier aggregation' is limited to implementations utilizing *multiple* carriers.").  *Compare* Ex. 1001, 2:63–64 ("carrier aggregation . . . is operation on multiple carriers"), *with* Ex. 1001, 3:60–62 ("[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.").

Lastly, Patent Owner directs our attention to another Board decision in a different case, IPR2019-00128, in which, according to Patent Owner, the parties "litigated nearly the same issue that is now before the Board," namely, "the correct construction of the term 'carrier aggregation.'"  PO Remand Resp. 14 (citing Ex. 2026).  In that decision, the Board determined that "carrier aggregation" requires, in part, providing higher bandwidth. Ex. 2026, 24–26.  The Board relied on intrinsic evidence in that case, including a technical report cited in the patent specification and a reference

24

relied on during prosecution.  *Id.*  Patent Owner asserts that the technical report cited there is the same 3GPP technical report cited in the '675 patent regarding LTE Release 11.  PO Remand Resp. 17 (citing Ex. 1001, 2:60–67; Ex. 2026, 24).

In reply, Petitioner addresses Patent Owner's arguments regarding Petitioner's reliance on the '675 patent's two statements that "carrier aggregation . . . is operation on multiple carriers" and "[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc."  Ex. 1001, 2:63–64, 3:60–62. Petitioner reiterates that "the Federal Circuit **has** found that 'is' can signal lexicography," and has further "held that specific or even explicit definitional formats are **not** required."  Pet. Remand Reply 2; *see also id.* at 4 (asserting that "Patent Owner's argument . . . is contradicted by the Federal Circuit's holdings that the word 'is' may define a term").  Petitioner also asserts that "operation on multiple carriers" is a "definition [that] is in the 'Detailed Description' of the purported invention," rather than "a generalized introduction to carrier aggregation," contrary to Patent Owner's position.  *Id.* at 4.  As to Patent Owner's emphasis on the way the '675 patent defines "exemplary," Petitioner counters that "the alleged 'definitional format' . . . is merely a legal boilerplate definition of 'exemplary,'" a word that "is not a technical claim term."  *Id.* at 3.

Regarding Patent Owner's characterization of the two statements as inconsistent with each other, Petitioner responds that Patent Owner "relies on a misquote of the definition of 'transmit signals'" and "omits the word 'channels.'"  Pet. Remand Reply 3–4.  Petitioner asserts that "[t]he actual

25

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

phrases in that definition—'transmission on one or more carriers' and 'transmission on one or more frequency channels'—which Patent Owner's own expert confirmed is 'reasonable'—are consistent and closely related because a carrier is transmitted on a frequency *channel*." *Id.* at 4 (citing Ex. 1001, 3:60–62; Ex. 1044 ¶¶ 10–17; Ex. 1041, 15:8–16:4). Petitioner further asserts that "Patent Owner also cites the 'etc.' in the definition but fails to identify what else is signaled by that language." *Id.*

Turning to Patent Owner's proposed construction of "plurality of carrier aggregated transmit signals," Petitioner argues that "Patent Owner seeks to import 'to increase the bandwidth for a user.'" Pet. Remand Reply 5. Petitioner contends that the "added language is improper because it imports an ***objective*** or potential ***result or benefit*** of carrier aggregation, not what carrier aggregation ***is***." *Id.* (citing *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1355 (Fed. Cir. 2014)). Petitioner adds that "increased signal bandwidth is only a ***potential*** result of carrier aggregation which may not occur." *Id.* at 6. As support, Petitioner relies on Dr. Choi's testimony in his reply declaration on remand. *Id.* at 6 n.5 (citing Ex. 1044 ¶¶ 18–29). To illustrate, Dr. Choi testifies,

> So, for example, . . . one component carrier from each of Band 1 and Band 18 can be carrier aggregated. . . . [I]n Band 1, carriers with 5, 10, 15, and 20 MHz bandwidths are available for aggregation . . . , while in Band 18, carriers with 5, 10, or 15 MHz are available for aggregation . . . .
>
> As one example where carrier aggregation would not result in increased bandwidth, ***aggregating a 5 MHz carrier from Band 1 . . . with a 5 MHz carrier from Band 18 . . . would only result in 10 MHz, which does not result in increased bandwidth compared with the bandwidth of a single, non-aggregated,***

26

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

> *carrier*, for instance, a single 20 MHz carrier in Band 1 . . . a
> single 15 MHz carrier in Band 1, or a single 15 MHz carrier in
> Band 18, etc.

Ex. 1044 ¶¶ 24–25.

Petitioner further contends that neither the specification, the prosecution history, nor the extrinsic evidence of record supports Patent Owner's proposed construction. Pet. Remand Reply 6–7. Referring to the specification, Petitioner asserts that it "states that multiple transmissions on different carriers '*may* have increased envelope bandwidth,'" its "discussion of Figures 2A–2D, cited by Patent Owner . . . does not mention increasing bandwidth," its "discussion of the LTE specification . . . mentions only that frequency bands may cover up to 200 MHz and 35 bands are supported in Release 11," and it "does not incorporate the statement in 3GPP TS 36.101 about 'carrier aggregation' quoted by Patent Owner." *Id.* at 6 (citing Ex. 1001, 2:58–62, 6:10–12). As for the prosecution history, Petitioner asserts that "[n]either the Examiner nor the applicant made *any* such argument or suggestion" about understanding "that increasing bandwidth for a user is a required part of the construction of 'carrier aggregated transmit signals.'" *Id.* at 6–7. Petitioner also notes that the Examiner never cited paragraph 4 of the Chen publication on which Patent Owner relies. *Id.* at 7. With respect to the extrinsic evidence, Petitioner asserts that it was not cited or considered during prosecution. *Id.* Petitioner adds that "[w]here, as here, the claim term is defined in the patent, reliance on such extrinsic evidence is improper." *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584–85 (Fed. Cir. 1996)).

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Also, Petitioner contends that "Patent Owner wrongly criticizes the Board's construction for allegedly 'read[ing] "aggregated" out of the term'" because "the claims already state that the claimed apparatus 'produce[s] a single output radio frequency (RF) signal.'"  Pet. Remand Reply 7 (citing Ex. 1044 ¶¶ 30–33).

Lastly, Petitioner contends that the Board's construction of "carrier aggregation" in the other decision, in IPR2019-00128, should not dictate our decision here because the construction there "***excludes*** 'for a user,' and relies on several prior art references not relevant here."  Pet. Remand Reply 8.  Petitioner also submits, "More importantly, [the] Board's construction here is consistent with the ALJ's construction of the same term in the associated ITC investigation as 'simultaneous operation on multiple carriers,' whereas the [other] construction—currently on appeal—is not." *Id.* (citing Ex. 1042, 37–42).  Petitioner asserts that "[t]he ALJ's construction and reasoning expressly rejected the inclusion of 'to increase the bandwidth for a user.'"  *Id.* (citing Ex. 1042, 37–42).

Patent Owner counters that "increased user bandwidth is the necessary purpose of carrier aggregation," and that "Dr. Choi fails to show that carrier aggregation does not always increase the bandwidth of a user."  PO Remand Sur-reply 2.  Referring to Dr. Choi's example discussed above (*see also* Ex. 1044 ¶ 25), Patent Owner asserts that "[a]ggregating *two 5-MHz carriers* necessarily increases the bandwidth for a user as compared to a *single 5-MHz carrier* allocated to the user and Dr. Choi admits this."  PO Remand Sur-reply 2 (citing Ex. 2030, 28:2–24 ("So I think you're asking me if you were to aggregate these two 5-megahertz carriers for a resultant total

28

**Appx28**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

aggregated bandwidth of 10 megahertz, would that be greater than if you were just to have a single 5-megahertz carrier.  And the answer's, obviously, yes because ten is greater than five."))  Patent Owner adds that during prosecution "[t]he applicant amended the claims based on the prior art to recite 'carrier *aggregated* transmit signals' (Ex. 1002 at 237), and the increased bandwidth requirement gives meaning to the explicitly recited 'aggregat[ion].'"  *Id.* at 2–3.  Patent Owner states that "[p]ointing to other language in the claim as allegedly establishing the 'aggregating' concept," as Petitioner does, "would cause the word 'aggregated,' where it is recited in the claim, to be superfluous."  *Id.* at 5 (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)).

With respect to Petitioner's contention that Patent Owner's proposed construction on remand is unsupported by the specification, the prosecution history, and the extrinsic evidence, Patent Owner responds that Petitioner "point[s] to no counter-examples where increased bandwidth for a user is not present."  PO Remand Sur-reply 3.  Patent Owner also notes Petitioner "does not even attempt to show" that the statement in the 3GPP technical report describing carrier aggregation as "[a]ggregation of two or more component carriers in order to support wider transmission bandwidths" is "wrong or inconsistent with the [person having ordinary skill in the art's] understanding of the term."  *Id.*; *see also id.* at 4 (stating "[Petitioner's] only counter to [Patent Owner's] evidence that the Examiner understood 'carrier aggregation' to increase the bandwidth of a user is that [Patent Owner] cited Chen paragraph [0004], whereas the Examiner specifically cited paragraph [0007]"); *id.* at 4 (stating "[Petitioner's] further criticism that

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

[Patent Owner's] 'external documents' were not 'cited or considered during prosecution' just means that they are extrinsic evidence" (internal citation omitted)).

Patent Owner further maintains its position that there is no lexicography in this case. PO Remand Sur-reply 6–8. Patent Owner adds that Petitioner "cites no authority for the proposition that two alleged definitions can be combined to yield lexicography for a disputed claim term." *Id.* at 7. Lastly, Patent Owner notes that "there is no rule forbidding generalized introductions in a patent's detailed description." *Id.* at 8.

On the record now before us, we determine that our previous construction of "plurality of carrier aggregated transmit signals" (i.e., "signals for transmission on multiple carriers") is overly broad. As Petitioner points out, the '675 patent "stat[es] that 'carrier aggregation . . . *is* operation on multiple carriers' and 'a transmit signal *is* a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" Pet. Remand Br. 7 (quoting Ex. 1001, 2:63–64, 3:60–62). Read together in isolation, we agree with Petitioner that these statements in the specification say "carrier aggregated transmit signals" means "signals for transmission on multiple carriers." Our construction, however, must also take into account the prosecution history. *See Personalized Media*, 952 F.3d at 1340. The prosecution history "facilitates claim construction by revealing the intended meaning and scope of technical terms and may even trump the weight of specification language in some circumstances." *TDM Am., LLC v. U.S.*, 85 Fed. Cl. 774, 788 (2009) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir.

1999)).  For example, "an applicant's amendment accompanied by explanatory remarks can define a claim term by demonstrating what the applicant meant by the amendment." *Personalized Media*, 952 F.3d at 1340. Thus, "like the specification, the prosecution history can act like a dictionary." *Hemphill v. McNeil-PPC, Inc.*, 25 F. App'x 915, 918 (Fed. Cir. 2001) (non-precedential).

Here, during prosecution of the '675 patent, the applicant amended independent claim 1 to recite "a plurality of different transmit signals" as well as "a power amplifier to receive . . . the plurality of different transmit signals . . . and to produce a single output RF signal."  Ex. 1002, 189 (Amendment, Nov. 12, 2014).  The applicant later amended claim 1 again solely to replace "a plurality of *different* transmit signals" with "a plurality of *carrier aggregated* transmit signals," and remarked to the Examiner that "[i]t is Applicant's understanding that the above amendments place all claims in a condition for allowance." *Id.* at 237, 246 (Amendment, March 6, 2015).  The applicant similarly amended the other independent claims during prosecution. *Id.* at 191–194, 240–241, 243–244.

Based on the applicant's amendments, we agree with Patent Owner that maintaining our previous construction of "plurality of carrier aggregated transmit signals" as "signals for transmission on multiple carriers" would ignore the word "aggregated." *See* PO Remand Resp. 13–14.  The amendment limiting the recited signals to "carrier aggregated" signals indicates that the claims require something more than just signals for transmission on multiple carriers; otherwise, the claims would encompass signals that are *not* carrier aggregated. *See, e.g.*, Ex. 1001, 6:10–12

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

("Multiple transmit signals may be sent on different frequencies (e.g., different carriers) and hence *may* have increased envelope bandwidth." (emphasis added)) (cited by Pet. Remand Reply 6); Ex. 1002, 189, 237 (application claims reciting *different* transmit signals before being amended to recite *carrier aggregated* transmit signals). Thus, our previous construction of "plurality of carrier aggregated transmit signals," though consistent with the specification language, is broader than the applicant's intended meaning and scope of the term as illuminated by the prosecution history.

We note Petitioner's contention that the claim limitation "produc[ing] a single output radio frequency (RF) signal" accounts for the claim term "aggregated." Pet. Remand Reply 7. As discussed above, however, that limitation was already included in the claims before the applicant amended them to require "carrier aggregated" signals. *Compare* Ex. 1002, 189 (Amendment, Nov. 12, 2014), *with id.* at 237 (Amendment, March 6, 2015). Thus, if producing a single output RF signal were to account for "aggregated," as Petitioner urges, then "aggregated" would be rendered superfluous. *See Dig.-Vending Servs. Int'l, LLC v. Univ. of Phx., Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (noting "the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered superfluous").

We turn now to Patent Owner's proposed construction on remand, namely, "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user," which can be divided into three parts: (1) "signals for transmission on multiple carriers," (2) "at the same time,"

32

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

(3) "to increase the bandwidth for a user." PO Remand Resp. 9. The parties' dispute in this regard addresses primarily the third part of Patent Owner's proposed construction, centering on whether the broadest reasonable interpretation of "plurality of carrier aggregated transmit signals" requires increasing bandwidth.[22] *See* Pet. Remand Br. 10–12; PO Remand Resp. 9–18; Pet. Remand Reply 5–8; PO Remand Sur-reply 1–5. We determine that the intrinsic evidence supports this aspect of Patent Owner's proposed construction.

"[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence," and "when prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (quoting *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000)) (other

---

[22] Petitioner does not dispute the first part of Patent Owner's proposed construction. *See* Pet. Remand Br. 7 ("The Board construed the claim term 'plurality of carrier aggregated transmit signals' to mean 'signals for transmission on multiple carriers.' This construction is correct." (internal citation omitted)). With respect to the second part of the construction, we note Petitioner's contention that our previous construction properly omitted "at the same time." *See id.* at 11–12. Determining whether "plurality of carrier aggregated transmit signals" requires this aspect of Patent Owner's proposed construction, however, is not necessary to resolve any controversy here. *See Vivid Techs.*, 200 F.3d at 803 (explaining that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy").

33

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

citations omitted). Thus, for the third part of Patent Owner's proposed construction, we rely on the 3GPP technical report cited in the '675 patent, as well as the Chen publication, which was cited in the prosecution history of the '675 patent. The 3GPP technical report defines "[c]arrier aggregation" as "[a]ggregation of two or more component carriers in order to *support wider transmission bandwidths*." Ex. 2011, 14 (emphasis added) (cited by Ex. 1001, 2:60–62 ('675 patent)). The Chen publication additionally states that the "*bandwidth of a signal constantly increases* due to multi-carrier applications." Ex. 2012 ¶ 4 (emphasis added) (cited by Ex. 1002, 270 (Office Action, July 2, 2015)).

The teachings in both the 3GPP technical report and the Chen publication are consistent with contemporaneous extrinsic evidence introduced into the record on remand. For example, as discussed above, Patent Owner directs us to U.S. Patent No. 9,161,254, which states that "[o]ne technique for providing additional bandwidth capacity to wireless devices is through the use [of] carrier aggregation of multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE)." Ex. 2017, 3:19–22 (quoted in PO Remand Resp. 12); *see also id.* at 3:49–51 ("Carrier aggregation . . . enable[s] more bandwidth to be obtained.") (cited by PO Remand Resp. 12). The application for that patent was filed in May 2013, just three months after the application for the '675 patent was filed. Ex. 1001, code (22); Ex. 2017, code (22). Similarly, Patent Owner draws our attention to a 2013 Qualcomm paper, which states that "[c]arrier aggregation, as the name suggests, combines multiple carriers

34

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

. . . at the device to provide a bigger data pipe to the user." Ex. 2015, 6
(quoted in PO Remand Resp. 12).

We note Petitioner's contention that the passage in the Chen
publication on which Patent Owner relies was never cited by the Examiner.
*See* Pet. Remand Reply 7.  That passage provides additional support for the
definition of carrier aggregation that is provided in the 3GPP technical
report, however, and is therefore relevant to our analysis here.  *See V-
Formation*, 401 F.3d at 1311; *see also* Ex. 1002, 278 (the Examiner advising
the applicant during prosecution "to fully consider the [cited] references in
their entirety as potentially teaching all or part of the claimed invention, as
well as the context of the passage as taught by the prior art or disclosed by
the Examiner").  Moreover, contrary to Petitioner's position, that neither the
Examiner nor the applicant explicitly expressed an understanding that carrier
aggregation requires increasing bandwidth does not change what is taught in
the 3GPP technical report or in the Chen publication, both part of the
intrinsic evidence.  *See* Pet. Remand Reply 6–7 (Petitioner arguing that "the
file history does not support Patent Owner's argument that the Examiner
'understood' that increasing bandwidth for a user is a required part of the
construction of 'carrier aggregated transmit signals'" because "[n]either the
Examiner nor the applicant made *any* such argument or suggestion").

We further note Petitioner's contention that the third part of Patent
Owner's proposed construction, increasing bandwidth, "is improper because
it imports an objective or potential result or benefit of carrier aggregation,
not what carrier aggregation is."  Pet. Remand Reply 5 (emphases omitted).
Petitioner relies on *Braintree*, a Federal Circuit case in which the court

35

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

rejected the argument that "purgation" means cleansing, even though "the specification . . . indicates that a dosage amount is 'effective' only if it produces a clean colon in preparation for a colonoscopy." *Braintree*, 749 F.3d at 1354–55.  The court explained that "while cleansing is the goal specifically articulated in the specification, it is not a claim requirement," where the claims "only require that the compositions 'induce' (i.e., bring about or start) diarrhea," rather than "achiev[e] a fully cleansed colon." *Id.*

Petitioner's reliance on *Braintree* is misplaced.  The facts here are different.  Specifically, the claims of the '675 patent require *carrier aggregated* transmit signals.  The 3GPP technical report noted above, which is part of the intrinsic evidence, defines "carrier aggregation" as "[a]ggregation of two or more component carriers in order *to support wider transmission bandwidths*."  Ex. 2011, 14 (emphasis added); *see also* Ex. 2012 ¶ 4 (Chen publication, also part of the intrinsic evidence, stating that the "*bandwidth of a signal constantly increases* due to multi-carrier applications" (emphasis added)).  Thus, carrier aggregation *is* the aggregation of two or more carriers in order *to support wider transmission bandwidths*.  As discussed above, the extrinsic evidence supports this definition.  *See* Ex. 2015, 6 ("Carrier aggregation, as the name suggests, combines multiple carriers . . . at the device to provide a bigger data pipe to the user."); Ex. 2017, 3:19–22 ("One technique for providing additional bandwidth capacity to wireless devices is through the use [of] carrier aggregation of multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE)."), 49–51 ("Carrier aggregation . . . enable[es] more bandwidth to be obtained.").

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Dr. Choi's example about aggregating two 5 MHz carriers from different bands also supports this definition. *See* Ex. 1044 ¶¶ 24–25 (cited by Pet. Remand Reply 6 n.5). Dr. Choi states that the aggregation of two 5 MHz carriers, which would provide a bandwidth of 10 MHz, "does not result in increased bandwidth compared with the bandwidth of a single, non-aggregated, carrier, for instance, a single 20 MHz carrier." *Id.* ¶ 25 (emphasis omitted). As Patent Owner points out, however, such aggregation "necessarily increases the bandwidth for a user as compared to a *single 5-MHz carrier* allocated to the user." PO Remand Sur-reply 2. We agree with Patent Owner's reasoning in this regard. *See* Ex. 2011, 14 (defining "[c]arrier aggregation" as "[a]ggregation of two or more *component* carriers in order *to support wider transmission bandwidths*" (emphases added)). Indeed, Dr. Choi testified at his deposition on remand, "So I think you're asking me if you were to *aggregate these two 5-megahertz carriers for a resultant total aggregated bandwidth of 10 megahertz*, would that be greater than if you were just to have a single 5-megahertz carrier. And the answer's, obviously, yes because ten is greater than five." Ex. 2030, 28:2–24 (emphasis added) (cited by PO Remand Sur-reply 2). Consistently, Dr. Choi also previously testified in his reply declaration during trial,

> LTE explicitly allows for transmission of *two aggregated 1.4 MHz signals*, even though the standard can also transmit a single 20 MHz carrier, which provides much higher bandwidth than the *combined bandwidth of 2.8 MHz*. . . . [C]arrier aggregation can achieve higher data rates and can increase the overall capacity of wireless networks by allowing network operators to exploit fragmented spectrum allocations. . . . *Aggregating two narrow band signals could do precisely that—increasing bandwidth by using fragmented spectrum allocations*.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Ex. 1031 ¶ 25 (emphases added) (cited by PO Remand Sur-reply 2).

In view of the foregoing, we adopt Patent Owner's proposed construction of "plurality of carrier aggregated transmit signals" on remand (which is the same construction that Petitioner originally proposed in its petitions), namely, "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user."[23] *See* PO Remand Resp. 9; Pet. 32. For the reasons given above, our construction is supported by the intrinsic evidence. *See, e.g.*, Ex. 1001, 2:60–67, 3:60–62 ('675 patent); Ex. 1002, 189, 237, 246 (prosecution history file); Ex. 2011, 14 (3GPP technical report); Ex. 2012 ¶ 4 (Chen publication). Our construction also is consistent with relevant extrinsic evidence. *See, e.g.*, Ex. 2015, 6; Ex. 2017, 3:19–22, 3:49–51. Further, our construction reflects Petitioner's proposed language on remand, "signals for transmission on multiple carriers," as well as portions of the specification cited by Petitioner. *See* Pet. Remand Br. 7 (citing Ex. 1001, 2:63–64, 3:60–62).

## *D. Obviousness Based on Yu*

Petitioner asserts that claims 1–6, 11, 17–22, 27, and 33 would have been obvious over Yu and Wang; claims 7–10 and 28–32 would have been

---

[23] As previously noted, determining whether "plurality of carrier aggregated transmit signals" requires the second part of Patent Owner's proposed construction, "at the same time," is not necessary to resolve any controversy here. *See Vivid Techs.*, 200 F.3d at 803. We explain below it is undisputed that the asserted prior art teaches this aspect of Patent Owner's proposed construction. *See infra* Part III.D.2.a.ii. The outcome of our obviousness analysis would thus be the same whether or not our construction requires "at the same time."

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

obvious over Yu, Wang, and Choi; claim 12 would have been obvious over Yu, Wang, and Eliezer; and claims 13–15 and 23–25 would have been obvious over Yu, Wang, and Dahlman.  Pet. 35–75; 1327-Paper 3, 12–79; 1329-Paper 3, 24–79; 1340-Paper 3, 22–75.  Patent Owner opposes.  PO Resp. 30–41.  For the reasons explained below, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 would have been obvious over the asserted grounds.

We start with an overview of Yu.  As the issues in dispute all turn on the teachings and suggestions of Yu, we do not address the substance of Wang, Choi, Eliezer, or Dahlman.

*1.  Overview of Yu*

Yu states that its "inventive principle may be considered as an extension to the known principle of envelope-tracking amplifiers, which determine an envelope signal of the radio frequency signal to be amplified, and which control the voltage supply to the power amplifier depending on said envelope signal."  Ex. 1004 ¶ 8.  Figure 1, which is reproduced below, illustrates a power amplifier system according to Yu.  *Id.* ¶ 33.

Fig. 1



**Appx39**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

As Figure 1 shows, Yu's power amplifier system includes signal processing unit SP, control unit 100, and power amplifier PA. *Id.* ¶¶ 33, 37–38. Input signals S1 and S2 are forwarded to signal processing unit SP, which transforms the input signals into radio frequency signal $S_{RF}$. *Id.* ¶ 37. Power amplifier PA is configured to amplify radio frequency signal $S_{RF}$, which is fed to an input of power amplifier PA. *Id.* ¶ 33. Power amplifier PA comprises power amplifier supply voltage module PA'. *Id.* ¶ 35. Power amplifier supply voltage module PA' is configured to modify supply voltage Vsup, which is applied to power amplifier PA. *Id.*

Control unit 100 is used to control the operation of power amplifier PA and its supply voltage module PA'. Ex. 1004 ¶ 38. Control unit 100 has digital signal processing means DSP, which derive control signal CTRL based on input signals S1 and S2. *Id.* According to Yu, by deriving control signal CTRL in this way, "an improved supply voltage control for the power amplifier PA as compared to conventional envelope tracking systems may be obtained, especially in such cases, where more than one input signal S1, S2, . . . is to be processed to obtain said RF signal $S_{RF}$." *Id.* ¶ 39.

*2. Analysis*

As discussed above, the Federal Circuit explained in its remand decision that we "needed to provide notice of and an adequate opportunity to respond to [our] construction" of the claim limitation "plurality of carrier aggregated transmit signals," and then it remanded for further proceedings. *Qualcomm*, 6 F.4th at 1263, 1267. Our analysis here thus focuses on

40

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

whether the asserted prior art teaches or suggests the limitation "plurality of carrier aggregated transmit signals" in view of our construction on remand. We incorporate our prior analysis of other aspects of the challenged claims, which do not turn on the resolution of our construction on remand. *See* Final Dec.; 1327-Paper 30; 1329-Paper 30; 1340-Paper 30.

### a. Independent Claims 1, 18, 28, and 33

Each of independent claims 1, 18, 28, and 33 recites, in relevant part, "plurality of carrier aggregated transmit signals." As discussed above, we construe "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." *Supra* Part III.C. This construction can be divided into three parts: (1) "signals for transmission on multiple carriers," (2) "at the same time," (3) "to increase the bandwidth for a user." We address each part of the construction in turn.

### i. "signals for transmission on multiple carriers"

In its opening brief on remand, Petitioner maintains its position set forth in the petitions that Yu teaches signals for transmission on multiple carriers. *Compare* Pet. 41–44, *with* Pet. Remand Br. 13–16. Petitioner identifies Yu's input signals S1 and S2 as "carrier aggregated transmit signals." Pet. Remand Br. 13 (citing Pet. 41–44); *see also* Pet. 42 ("Signals S1 and S2 form 'carrier aggregated transmit signals.'"). To illustrate, Petitioner provides an annotated version of Figure 3 of Yu, which is reproduced below. Pet. Remand Br. 13–14; *see also* Pet. 43.

41

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2



Fig. 3

Figure 3 of Yu, as annotated by Petitioner, is a signal flow diagram. *See* Ex. 1004 ¶¶ 32, 57. Petitioner asserts that signals S1 and S2 are upconverted to different intermediate frequencies, as shown in the red box. Pet. Remand Br. 14 (citing Ex. 1004 ¶ 48); *accord* Pet. 43. Petitioner further asserts that the difference in frequencies is maintained when the signals are subsequently summed by adder a1, as shown in the blue box, and when they are upconverted again to different RF center frequencies, as shown in the yellow box. Pet. Remand Br. 14–15; *see also* Pet. 43–44. Petitioner contends that "Figure 3 shows that Yu's signals S1 and S2 are transmitted on multiple carriers at the same time," therefore satisfying the first part of our construction of "plurality of carrier aggregated transmit signals," namely, "signals for transmission on multiple carriers." Pet. Remand Br. 15; *see also* Pet. 42–44. Petitioner relies on Dr. Choi's testimony from his declaration submitted in support of the petitions. Pet. Remand Br. 15–16 (citing Ex. 1003 ¶¶ 100–103).

Petitioner adds that "Figure 4 [of Yu] also shows that signals S1 and S2 are signals for transmission on multiple carriers," pointing specifically to

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

"the frequency diagram to the left of the PA show[ing] signals S1 and S2 being transmitted on different carrier frequencies." Pet. 44; *see also* Pet. Remand Br. 15–16 (providing an analysis for Figure 4 of Yu that is similar to the analysis for Figure 3 of Yu).

Patent Owner does not dispute Petitioner's showing for this aspect of our construction. *See* PO Remand Resp. 19–20; PO Resp. 40–41.

Based on the record before us, we are persuaded that Yu teaches signals for transmission on multiple carriers.

### ii. "at the same time"

As discussed above, Petitioner argues on remand that "plurality of carrier aggregated transmit signals" does not require the second part of our construction, "at the same time." Pet. Remand Br. 7, 11–12. In its opening brief, however, Petitioner nonetheless asserts that "Figure 3 [of Yu] shows that Yu's signals S1 and S2 are transmitted on multiple carriers *at the same time*." *Id.* at 15 (emphasis added); *see also id.* at 14 (Petitioner's annotated version of Yu's Figure 3). This is consistent with Petitioner's position set forth in its petitions, where Petitioner "applie[d] the construction, 'signals for transmission on multiple carriers at the same time to increase the bandwidth for a user,'" which is the same as our construction on remand. Pet. 41–43. In particular, Petitioner argued in its petitions that "Yu's transmit signals S1 and S2 are sent simultaneously." *Id.* at 41. As support, Petitioner pointed to Yu's teaching of "simultaneously process[ing] various input signals." Ex. 1004 ¶ 15 (cited by Pet. 42). Yu explains that "both input signals may simultaneously be processed by the digital signal

43

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

processing means," which "performs per se known signal processing techniques to transform the various input signals S1, S2, . . . into the radio frequency signal S$_{RF}$." *Id.* ¶¶ 16, 37 (cited by Pet. 42).

Patent Owner does not dispute Petitioner's showing for this aspect of our construction. *See* PO Remand Resp. 19–20; PO Resp. 40–41.

Based on the record before us, we are persuaded that Yu teaches signals for transmission on multiple carriers *at the same time*.

### iii. "to increase the bandwidth for a user"

Petitioner also argues on remand that "plurality of carrier aggregated transmit signals" does not require the third part of our construction, "to increase the bandwidth for a user." Pet. Remand Br. 7, 10–11. In its petitions, however, Petitioner "applie[d] the construction, 'signals for transmission on multiple carriers at the same time to increase the bandwidth for a user.'" Pet. 41–43. As noted above, this construction is the same as our construction on remand. We thus consider the parties' arguments during trial.

In the petitions, Petitioner contends that an ordinarily skilled artisan "would have understood Yu's method of aggregating multiple signals on different frequencies increases the bandwidth for a user, allowing more information to be transmitted per unit of time." Pet. 44. As support, Petitioner directs us to where Yu states that "both input signals may simultaneously be processed by the digital signal processing means." *Id.* (citing Ex. 1004 ¶ 16); *see also* Ex. 1004 ¶ 15 ("This advantageously enables to simultaneously process various input signals according to different

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

communications standards . . . .") (cited by Pet. 44). Petitioner relies on the declaration testimony of Dr. Choi. Pet. 44 (citing Ex. 1003 ¶ 104).

Petitioner further notes in the petitions that "Patent Owner has argued in the ITC that Yu does not disclose an increase of bandwidth 'for a user' because Yu is allegedly directed to transmissions by a base station, not by a mobile device." Pet. 44 n.6. Petitioner asserts that "Yu, however, states expressly that its PA 'may e.g. be employed in wireless communications systems such as base stations of cellular communications networks *or wireless transceivers of mobile terminals and the like*.'" *Id.* at 44–45 n.6 (quoting Ex. 1004 ¶ 34 (emphasis added in Pet.)). Petitioner thus contends that, "even if Yu were directed to base stations and the claims were limited to mobile devices, it would have been obvious to a [person of ordinary skill in the art] to take advantage of Yu's invention in a mobile device." *Id.* at 45 n.6. Petitioner relies on the declaration testimony of Dr. Choi. *Id.* (citing Ex. 1003 ¶ 104 n.4).

In its responses, Patent Owner counters that "Yu's Figure 3 and Figure 4 embodiments describe base station technology that is processing signals provided by different users." PO Resp. 40. According to Patent Owner, "[i]n providing a system that 'simultaneously process[es] various input signals *according to different communication standards*, which have completely different target frequency ranges, with only one power amplifier,' Yu's base station is processing signals from different users," which "fails to disclose '*signals from a single terminal* utilizing multiple component carriers *which provide extended transmission bandwidth for a*

45

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

*user transmission* from the single terminal.'" *Id.* Patent Owner relies on the declaration testimony of Dr. Williams. *Id.* (citing Ex. 2001 ¶¶ 112–113).

Patent Owner adds that "the Figure 3 and Figure 4 base station implementations . . . are not appropriate for use in mobile terminals." PO Resp. 23. Patent Owner recognizes Yu's teaching that "its power amplifier embodiments may 'be employed in wireless communications systems such as base stations of cellular communications networks or wireless transceivers of mobile terminals,'" but contends that "due to power constraints, no mobile terminal at the critical date could implement power amplifiers that cover the bandwidth described with respect to Yu Figures 3 and 4." *Id.* at 23–24 (quoting Ex. 1004 ¶ 34). Patent Owner also states that "Figure 2 of Yu discloses a mobile-terminal-appropriate system for controlling a supply voltage of a power amplifier," and that "[i]t is noteworthy that [Petitioner] does not cite to Figure 2 as disclosing any claim limitations." *Id.* at 23. Patent Owner relies on the declaration testimony of Dr. Williams. *Id.* at 23–24 (citing Ex. 2001 ¶¶ 65–68).

Petitioner replies that "Patent Owner's argument relies entirely on the assumptions that (1) 'user' in this claim construction refers only to an individual mobile device owner, and (2) Yu is inapplicable because Figures 3 and 4 from Yu are limited to transmissions by base stations," both of which Petitioner says "are wrong." Pet. Reply 21. Regarding the first assumption, Petitioner contends that "[i]f a base station is processing two signals, then it is undisputed that the bandwidth for that user, i.e., the base station, is increased." *Id.*

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

As to the second assumption, Petitioner contends that carrier aggregation "is not, in ordinary usage, limited to the transmission of signals by a wireless device to a base station, *i.e.*, it is not limited to 'uplink' transmissions." Pet. Reply 21. As support, Petitioner directs us to where Dahlman describes carrier aggregation as "multiple component carriers [that] are aggregated and jointly used for *transmission to/from a single terminal*." Ex. 1006, 104 (emphasis added & original emphasis omitted) (cited by Pet. Reply 21–22). In other words, according to Dahlman, "component carriers can be aggregated for the downlink and uplink." *Id.* (cited by Pet. Reply 22). Petitioner also notes that Patent Owner stated at the ITC *Markman* hearing that "carrier aggregation . . . can be used in both the uplink and downlink a[s] it exists in systems, and the patent is really agnostic as to that." Pet. Reply 22 (quoting Ex. 1029, 143:17–19); *see also* Ex. 1030, 45:5–12 (Dr. Williams's deposition transcript) (cited by Pet. Reply 22).

With respect to Petitioner's user argument, Patent Owner responds that it "is inconsistent with the plain and ordinary meaning of 'user' and contradicted by the '675 patent and other evidence of record." PO Sur-reply 21–22. As support, Patent Owner asserts that "the '675 patent uses the term 'user equipment (UE)' to refer to a wireless device 110, as depicted in Fig. 1," whereas "the base stations 130, 132 of Fig. 1 are only referred to as 'base stations,'" never as "users" or "user equipment." *Id.* at 22 (citing Ex. 1001, 2:28–34, Fig. 1). In particular, the '675 patent teaches that its "[w]ireless device 110 may also be referred to as a user equipment (UE), a mobile station, a terminal, an access terminal, a subscriber unit, a station,

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

etc." Ex. 1001, 2:32–34. Patent Owner also directs us to a 2010 3GPP technical paper that distinguishes between user equipment and base stations. PO Sur-reply 23 (citing Ex. 1036, 6 (listing technical reports titled "User Equipment (UE) radio transmission and reception" and "Base Station (BS) radio transmission and reception")).

Turning to Petitioner's uplink/downlink argument, Patent Owner counters that "in both the uplink and downlink scenarios, the bandwidth must be extended for a *single user terminal*." PO Sur-reply 23. According to Patent Owner, "Yu does not disclose downlink carrier aggregation—*i.e.*, using a base station to simultaneously transmit multiple signals to a *single terminal* to increase the bandwidth for that terminal." *Id.* Patent Owner asserts that "Yu discloses using its base station to transmit the two input signals S1 and S2 to multiple, different destination terminals simultaneously." *Id.* at 24. Patent Owner further asserts that "[d]ownlink carrier aggregation had not yet been implemented as of January 2018— much less as of Yu's 2010 filing date—and Yu contains no teaching or suggestion of this theoretical system." *Id.* at 23–24.

Patent Owner adds that "Petitioner also rehashes its argument that Figures 3 and 4 of Yu are not limited to transmissions by base stations," and that "this is an improper new argument not made in the petition[s], and it is substantively wrong." PO Sur-reply 24.

On the record before us, we agree with Patent Owner that "user," in the construction applicable here, does not encompass a base station. As Patent Owner points out, the '675 patent distinguishes between wireless device 110 (which may be referred to as a *user* equipment) and base

48

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

stations 130 and 132. PO Sur-reply 22 (citing Ex. 1001, 2:32–34, Fig. 1).

To illustrate, Figure 1 of the '675 patent is reproduced below.



*FIG. 1*

Figure 1 shows a wireless device communicating with a wireless system. Ex. 1001, 1:56–57. Specifically, Figure 1 shows wireless device 110 communicating with wireless system 120 that includes base stations 130 and 132. *Id.* at 2:19–20, 28–30. Extrinsic evidence supports this distinction between wireless device 110 (e.g., user equipment) and a base station. *See* Ex. 1036, 6 (cited by PO Sur-reply 23). Accordingly, the third part of our construction, "to increase the bandwidth for a user," does not encompass increasing the bandwidth for a base station.

Both parties, however, acknowledge Yu's teaching that its power amplifier "may e.g. be employed in wireless communications systems such as base stations of cellular communications networks or wireless transceivers of mobile terminals and the like." Ex. 1004 ¶ 34 (cited by

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Pet. 44–45 n.6; PO Sur-reply 23).  Based on this teaching in Yu, we agree
with Petitioner that even if Figures 3 and 4 of Yu are directed to base
stations (which we do not determine), "it would have been obvious to a
[person of ordinary skill in the art] to take advantage of Yu's invention in a
mobile device."  Pet. 45 n.6; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S.
398, 417 (2007) ("[I]f a technique has been used to improve one device, and
a person of ordinary skill in the art would recognize that it would improve
similar devices in the same way, using the technique is obvious unless its
actual application is beyond his or her skill.").  Indeed, Patent Owner asserts
that "Yu discloses three embodiments for implementing its functionality
across Figures 2–4," and that "Figure 2 of Yu discloses a mobile-terminal-
appropriate system for controlling a supply voltage of a power amplifier."
*See* PO Resp. 23.

We note Patent Owner's contention that the base station
implementations depicted in Figures 3 and 4 of Yu "are not appropriate for
use in mobile terminals."  PO Resp. 23; *see id.* at 23–24.  Even if that were
true, "[t]he test for obviousness is not whether the features of a secondary
reference [or embodiment] may be bodily incorporated into the structure of
the primary reference [or embodiment]."  *In re Keller*, 642 F.2d 413, 425
(Fed. Cir. 1981).  Instead, "the test is what the combined teachings . . .
would have suggested to those of ordinary skill in the art."  *Id.*  Moreover,
"[a] person of ordinary skill is also a person of ordinary creativity, not an
automaton."  *KSR*, 550 U.S. at 421.  Thus, a person of ordinary skill would
have made any necessary modifications so that a mobile device could
appropriately implement Yu's power amplifier.  This is supported by Patent

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Owner's assertion that "Figure 2 of Yu discloses a mobile-terminal-appropriate system for controlling a supply voltage of a power amplifier." *See* PO Resp. 23.

We further note Patent Owner's contention that downlink carrier aggregation had not been implemented as of Yu's filing date in 2010. PO Sur-reply 23–24. Even if this were true, it is of no moment in the context of a mobile device implementation of Yu's power amplifier, where the signals are processed by the mobile device, not the base station.

In addition, we note Patent Owner's emphasis on requiring extended bandwidth for a *single* user terminal. *See* PO Resp. 40 (arguing Yu's "fail[ure] to disclose '*signals from a single terminal* utilizing multiple component carriers *which provide extended transmission bandwidth for a user transmission* from the single terminal'"); PO Sur-reply 23 (arguing "the bandwidth must be extended for a *single user terminal*"). Patent Owner's arguments in this regard are based on its proposed construction of "plurality of carrier aggregated transmit signals" during trial, namely, "signals from a single terminal utilizing multiple component carriers which provide extended transmission bandwidth for a user transmission from the single terminal." PO Resp. 16. Patent Owner's proposed construction on remand, however, does not require increasing bandwidth for a "single terminal." Accordingly, Patent Owner's arguments do not undermine Petitioner's showing as to the third part of our construction (which is the same as Patent Owner's proposed construction on remand). We nevertheless note that in the context of the mobile device implementation of Yu's power amplifier,

51

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

processing the signals simultaneously in the mobile device would increase
the bandwidth for the mobile device, i.e., a single terminal.

Lastly, we note Patent Owner's contention that Petitioner's "argument
that Figures 3 and 4 of Yu are not limited to transmissions by base stations
. . . is an improper new argument not made in the petition[s], and it is
substantively wrong." PO Sur-reply 24. As discussed above, however, our
analysis accounts for the possibility that Figures 3 and 4 are directed to base
stations. Moreover, we disagree that Petitioner's argument is improper and
new because Petitioner's argument is in response to Patent Owner's
argument that "Yu's Figure 3 and Figure 4 embodiments describe base
station technology." *See* PO Resp. 40. Accordingly, Petitioner's argument
is appropriate. *See* 37 C.F.R. § 42.23(b) ("A reply may only respond to
arguments raised in the . . . patent owner response.").

For the reasons given above, we are persuaded that Petitioner's
proposed modification of Yu, which provides a mobile device
implementation of Yu's power amplifier, teaches the third part of our
construction, "to increase the bandwidth for a user." Based on Yu's
teaching that its power amplifier may be used in base stations or mobile
devices (Ex. 1004 ¶ 34), we also are persuaded that an ordinarily skilled
artisan would have had reason to modify Yu's base station implementations
of the power amplifier to provide a mobile device implementation of the
power amplifier. *See KSR*, 550 U.S. at 418 ("[T]here must be some
articulated reasoning with some rational underpinning to support the legal
conclusion of obviousness."). As noted above, "if a technique has been used
to improve one device, and a person of ordinary skill in the art would

52

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 417.

### iv. Remaining Limitations

As we explained above, the Federal Circuit instructs us to address the limitation "plurality of carrier aggregated transmit signals." Accordingly, we do not address the other limitations recited in independent claims 1, 18, 28, and 33 for purposes of this Decision. We note that, in our final decisions, we were persuaded that the asserted references teach the other limitations, and that an ordinarily skilled artisan would have had reason to combine the teachings in those references. Final Dec. 64; 1327-Paper 30, 80; 1329-Paper 30, 82; 1340-Paper 30, 86. As mentioned above, we incorporate our prior analysis as to the other limitations recited in independent claims 1, 18, 28, and 33.

### b.  Dependent Claims 2–15, 17, 19–25, 27, and 29–32

Because the Federal Circuit instructs us to address the limitation "plurality of carrier aggregated transmit signals," which appears in each of the independent claims, we do not address the dependent claims for purposes of this Decision. Although several dependent claims recite "plurality of carrier aggregated transmit signals," the parties do not argue the dependent claims separately in this regard. We note that, in our final decisions, we were persuaded that the asserted references teach the limitations recited in the dependent claims, and that an ordinarily skilled artisan would have had

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

reason to combine the teachings of those references.  Final Dec. 64; 1327-Paper 30, 80; 1329-Paper 30, 82; 1340-Paper 30, 86.  As mentioned above, we incorporate our prior analysis as to the limitations recited in the dependent claims.

### *3.  Summary*

In view of the foregoing, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 would have been obvious over the asserted prior art.  We determine in particular that Petitioner has demonstrated by a preponderance of the evidence that claims 1–6, 11, 17–22, 27, and 33 would have been obvious over Yu and Wang; claims 7–10 and 28–32 would have been obvious over Yu, Wang, and Choi; claim 12 would have been obvious over Yu, Wang, and Eliezer; and claims 13–15 and 23–25 would have been obvious over Yu, Wang, and Dahlman.

54

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

## IV. CONCLUSION[24]

On remand, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 of the '675 patent are unpatentable as follows.

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–6, 11, 17–22, 27, 33 | 103 | Yu, Wang | 1–6, 11, 17–22, 27, 33 | |
| 7–10, 28–32 | 103 | Yu, Wang, Choi | 7–10, 28–32 | |
| 12 | 103 | Yu, Wang, Eliezer | 12 | |
| 13–15, 23–25 | 103 | Yu, Wang, Dahlman | 13–15, 23–25 | |
| **Overall Outcome** | | | 1–15, 17–25, 27–33 | |

## V. ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1–15, 17–25, and 27–33 of the '675 patent are held *unpatentable*; and

---

[24] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

FURTHER ORDERED that, because this Decision on Remand amounts to a final written decision, parties to the proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

David Cavanaugh
Richard Goldenberg
Theodoros Konstantakopoulos
Louis Tompros
Kathryn Zalewski
WILMER CUTLER PICKERING HALE & DORR LLP
David.cavanaugh@wilmerhale.com
Richard.goldenberg@wilmerhale.com
Louis.tompros@wilmerhale.com
Theodoros.konstantakopoulos@wilmerhale.com
Kathryn.zalewski@wilmerhale.com

For PATENT OWNER:

Matthew Johnson
Joseph Sauer
David Cochran
David Maiorana
Richard Graham
Joshua Nightingale
JONES DAY
mwjohnson@jonesday.com
jmsauer@jonesday.com
dcochran@jonesday.com
dmaiorana@jonesday.com
ragraham@jonesday.com
jrnightingale@jonesday.com

**Appx56**

Trials@uspto.gov                                                    Paper 46
571.272.7822                                          Date: March 23, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

INTEL CORPORATION,
Petitioner,

v.

QUALCOMM INCORPORATED,
Patent Owner.

———————

IPR2018-01326
IPR2018-01327
IPR2018-01329
IPR2018-01340[1]
Patent 9,608,675 B2

———————

Before MICHELLE N. WORMMEESTER, AMANDA F. WIEKER, and
SCOTT B. HOWARD, *Administrative Patent Judges*.

WORMMEESTER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision on Remand
Determining All Challenged Claims Unpatentable
*35 U.S.C. §§ 144, 318*

---

[1] This Decision addresses issues that are identical in each of the identified
cases.  We exercise our discretion to issue this Decision to be filed in each
case.  The parties may not use this style heading in subsequent papers.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

## I.  INTRODUCTION

We address these four cases on remand after a consolidated decision for six related cases, including these four cases, by the U.S. Court of Appeals for the Federal Circuit in *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256 (Fed. Cir. 2021) (*see* Paper 33[2]).

As background, Intel Corporation[3] ("Petitioner") petitioned for six *inter partes* reviews challenging the validity of U.S. Patent No. 9,608,675 B2 (Ex. 1001, "the '675 patent").  This Decision addresses only four of those *inter partes* reviews, namely, IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340.[4]  Petitioner filed petitions requesting *inter partes* review of claims 1–15, 17–25, and 27–33 of the '675 patent across these four cases.  Paper 2 ("Petition" or "Pet.") (requesting review of claims 1–6 and 18–22); 1327-Paper 3 (requesting review of claims 7–15, 17, 23–25, 27, and 33); 1329-Paper 3 (requesting review of claims 28–30); 1340-Paper 3 (requesting review of claims 31 and 32).  Qualcomm Incorporated ("Patent Owner") filed preliminary responses.  Paper 7; 1327-Paper 7; 1329-Paper 7; 1340-Paper 7.  Pursuant to 35 U.S.C. § 314, we instituted *inter partes* reviews as to all the challenged claims and all the

---

[2] Unless otherwise noted, papers and exhibits refer to IPR2018-01326. Papers and exhibits preceded by "1327-" refer to IPR2018-01327.  Papers and exhibits preceded by "1329-" refer to IPR2018-01329.  Papers and exhibits preceded by "1340-" refer to IPR2018-01340.

[3] Intel Corporation identifies itself and Apple Inc. ("Apple") as real parties in interest.  Paper 2, 1.

[4] We address the other two *inter partes* reviews, IPR2018-01328 and IPR2018-01330, in a separate decision on remand entered concurrently with this Decision.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

grounds of unpatentability raised in the petitions.  Paper 8 ("Institution Decision" or "Inst. Dec."); 1327-Paper 8; 1329-Paper 8; 1340-Paper 8.

During trial, Patent Owner filed responses.  Paper 14 ("Response" or "PO Resp."); 1327-Paper 14; 1329-Paper 14; 1340-Paper 14.  Petitioner filed replies.  Paper 16 ("Reply" or "Pet. Reply"); 1327-Paper 16; 1329-Paper 16; 1340-Paper 16.  Patent Owner filed sur-replies.  Paper 19 ("Sur-reply" or "PO Sur-reply"); 1327-Paper 19; 1329-Paper 19; 1340-Paper 19. On October 9, 2019, we conducted a consolidated oral hearing for all six related cases, including the four cases addressed in this Decision.  A copy of the transcript is included in the record.  Paper 29 ("Tr.").  With our authorization (*see* Paper 26), the parties subsequently filed additional briefs on the meaning of the claim term "generates the single power tracking signal based on a combination of the plurality of I and Q components."  Paper 27 (Patent Owner's brief); Paper 28 (Petitioner's brief).

Pursuant to 35 U.S.C. § 318(a), we issued final written decisions in the four cases addressed here.  Paper 30 ("Final Written Decision" or "Final Dec."); 1327-Paper 30; 1329-Paper 30; 1340-Paper 30.  We determined that Petitioner demonstrated by a preponderance of the evidence that all challenged claims, namely, claims 1–15, 17–25, and 27–33 of the '675 patent, are unpatentable.  Final Dec. 64; 1327-Paper 30, 80–81; 1329-Paper 30, 82; 1340-Paper 30, 86–87.  Patent Owner appealed our determinations that these challenged claims are unpatentable to the Federal Circuit.  Paper 31; 1327-Paper 31; 1329-Paper 31; 1340-Paper 31.

In its remand decision, the Federal Circuit addressed Patent Owner's arguments that "it was not afforded notice of, or an adequate opportunity to

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

respond to, the Board's construction of 'a plurality of carrier aggregated transmit signals,'" as well as Patent Owner's arguments "challeng[ing] the Board's construction of the power tracker limitation," which refers to the claim term "means for determining a single power tracking signal." *Qualcomm*, 6 F.4th at 1262. The power tracker limitation appears in just one of four challenged independent claims, namely, claim 28, and the Federal Circuit "s[aw] no error" in our construction of that limitation. *Id.* The Federal Circuit, however, agreed that "the Board violated [Patent Owner's] procedural rights with respect to the 'plurality of carrier aggregated transmit signals' limitation," vacated our final written decisions, and remanded for further proceedings. *Id.* at 1262, 1267. Each of the four challenged independent claims includes the limitation "plurality of carrier aggregated transmit signals." The Federal Circuit's mandate issued on September 17, 2021. Paper 32.

We subsequently issued an order in each case authorizing post-remand briefing tailored narrowly to addressing whether we properly construed "plurality of carrier aggregated transmit signals," and to addressing the applicability of our construction of "plurality of carrier aggregated transmit signals" to the asserted prior art disclosures. Paper 35, 2. Petitioner filed opening briefs (Paper 36, "Pet. Remand Br."), Patent Owner filed responsive briefs (Paper 38, "PO Remand Resp."), Petitioner filed reply briefs (Paper 41, "Pet. Remand Reply"), and Patent Owner filed sur-reply briefs (Paper 48, "PO Remand Sur-reply").

We have considered the record anew by reviewing the parties' positions on remand. For the reasons that follow, we determine that

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Petitioner has shown by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 of the '675 patent are unpatentable.

## II. BACKGROUND

### A. Related Proceedings

Prior to institution, the parties identified various matters involving the '675 patent, including a federal district court case, an International Trade Commission ("ITC") investigation, as well as the six petitions for *inter partes* review identified above. Pet. 1–2; Paper 5, 2. Since the entry of our institution decisions, Patent Owner has asserted that "[t]he '675 patent is currently not involved in any litigation beyond the PTAB." PO Resp. 16. Petitioner has not stated otherwise.

The six *inter partes* review cases that the parties identified are IPR2018-01326, IPR2018-01327, IPR2018-01328, IPR2018-01329, IPR2018-01330, and IPR2018-01340. Pet. 1–2; Paper 5, 2. These cases can be divided into two sets of cases, where the first set of cases includes IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340. These four cases involve prior art challenges based on Yu[5] as a primary reference. The second set of cases includes IPR2018-01328 and IPR2018-01330, which involve prior art challenges based on Chen[6] as a primary reference. As noted above, this Decision addresses only the first set of cases.

---

[5] Yu, EP 2442440 A1, published Apr. 18, 2012 (Ex. 1004).
[6] W. Chen et al., Hybrid Envelope Tracking for Efficiency Enhancement in Concurrent Dual-Band PAs, 54 Microwave & Optical Tech. Letters 662 (2012) (IPR2018-01328, Ex. 1212).

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

The second set of cases is addressed in a separate decision on remand entered concurrently with this Decision.

### B. The '675 Patent

The '675 patent describes power tracking for generating a power supply voltage for a circuit, such as an amplifier, that processes multiple transmit signals sent simultaneously.  Ex. 1001, 1:8–10, 1:35–38.  Figure 5, which is reproduced below, illustrates a transmit module with power tracking for all transmit signals according to the '675 patent.  *Id.* at 1:65–67.



*FIG. 5*

In particular, Figure 5 shows transmit module 500, which includes K transmit circuits 540a to 540k that can simultaneously process K transmit

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

signals, with each transmit circuit processing one transmit signal. *Id.* at 6:34–37. Transmit module 500 also includes summer 552, power amplifier ("PA") 560, duplexer 570, and power tracking supply generator (or voltage generator) 580. *Id.* at 6:37–39.

Inphase (I) and quadrature (Q) samples for a transmit signal are provided to both a transmit circuit and voltage generator 580. Ex. 1001, 6:42–44. For example, transmit circuit 540a receives $I_1$ and $Q_1$ samples for a first transmit signal and generates a first upconverted radio frequency ("RF") signal for the first transmit signal. *Id.* at 6:40–42. Within transmit circuit 540a, the $I_1$ and $Q_1$ samples are converted to I and Q analog signals by digital-to-analog converters (DACs) 542a and 543a. *Id.* at 6:44–46. The I and Q analog signals are then filtered by lowpass filters 544a and 545a, amplified by amplifiers 546a and 547a, upconverted from baseband to RF by mixers 548a and 549a, and summed by summer 550a to generate the first upconverted RF signal. *Id.* at 6:46–50.

The other transmit circuits operate similarly. Ex. 1001, 6:54–57. Summer 552 receives all upconverted RF signals from the transmit circuits, sums the upconverted RF signals, and provides a modulated RF signal to PA 560. *Id.* at 6:59–62.

Within voltage generator 580, power tracker 582 receives $I_1$ to $I_K$ samples and $Q_1$ to $Q_K$ samples for all transmit signals being sent simultaneously. Ex. 1001, 6:63–65. Power tracker 582 then computes a digital power tracking signal based on the I and Q samples for these transmit signals and provides the digital power tracking signal to DAC 584. *Id.* at 6:65–7:1, 8:6–32. DAC 584 converts the digital power tracking signal to

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

analog and provides the analog power tracking signal to power supply
generator 586. *Id.* at 7:1–4, Fig. 5. Power supply generator 586 generates a
power supply voltage for PA 560. *Id.* at 7:6–8.

Once PA 560 receives both the modulated RF signal from
summer 552 and the power supply voltage from power supply
generator 586, PA 560 amplifies the modulated RF signal using the power
supply voltage. Ex. 1001, 7:8–11. PA 560 then provides an output RF
signal for all the transmit signals being sent simultaneously. *Id.* at 7:11–12.
The output RF signal is routed through duplexer 570 and transmitted via
antenna 590. *Id.* at 7:12–14.

### C. Illustrative Claim

Petitioner challenges claims 1–15, 17–25, and 27–33 of the '675
patent, all for our consideration on remand. Claims 1, 18, 28, and 33 are
independent. Claim 1 is illustrative of the challenged claims and includes
the subject matter the Federal Circuit instructed us to reconsider on remand:

 1. An apparatus comprising:

  a power tracker configured to determine a single power
tracking signal based on a plurality of inphase (I) and
quadrature (Q) components of a plurality of carrier
aggregated transmit signals being sent simultaneously,
wherein the power tracker receives the plurality of I and Q
components corresponding to the plurality of carrier
aggregated transmit signals and generates the single power
tracking signal based on a combination of the plurality of
I and Q components, wherein the plurality of carrier
aggregated transmit signals comprise Orthogonal
Frequency Division Multiplexing (OFDM) or Single
Carrier Frequency Division Multiple Access (SC-FDMA)
signals;

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

> a power supply generator configured to generate a single power supply voltage based on the single power tracking signal; and

> a power amplifier configured to receive the single power supply voltage and the plurality of carrier aggregated transmit signals being sent simultaneously to produce a single output radio frequency (RF) signal.

### D. Instituted Grounds of Unpatentability

As discussed above, we instituted *inter partes* review based on all grounds raised in the four petitions addressed here.  Inst. Dec.; 1327-Paper 8; 1329-Paper 8; 1340-Paper 8.  The instituted grounds are as follows.

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–6, 11, 17–22, 27, 33[7] | 103 | Yu, Wang[8] |
| 7–10, 28–32[9] | 103 | Yu, Wang, Choi[10] |
| 12[11] | 103 | Yu, Wang, Eliezer[12] |
| 13–15, 23–25[13] | 103 | Yu, Wang, Dahlman[14] |

[7] Petitioner challenges claims 1–6 and 18–22 in IPR2018-01326, and claims 11, 17, 27, and 33 in IPR2018-01327.

[8] Wang et al., *Design of Wide-Bandwidth Envelope-Tracking Power Amplifiers for OFDM Applications*, 53 IEEE Transactions on Microwave Theory & Techniques 1244 (2005) (Ex. 1005).

[9] Petitioner challenges claims 7–10 in IPR2018-01327, claims 28–30 in IPR2018-01329, and claims 31 and 32 in IPR2018-01340.

[10] Jinsung Choi et al., *Envelope Tracking Power Amplifier Robust to Battery Depletion*, 2010 IEEE MTT-S Int'l Microwave Symposium Digest 1074 (2010) (1327-Ex. 1108, at Ex. A).

[11] Petitioner challenges claim 12 in IPR2018-01327.

[12] Eliezer, US 2009/0004981 A1, published Jan. 1, 2009 (1327-Ex. 1111).

[13] Petitioner challenges claims 13–15 and 23–25 in IPR2018-01327.

[14] Erik Dahlman et al., 4G LTE / LTE-ADVANCED FOR MOBILE BROADBAND 11–12, 19, 27, 103–104, 132–135, 205, 347–351, 355–358, 389 (2011) (Ex. 1006).  The same paper is entered in IPR2018-01327 as Exhibit 1106.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

In support of its petitions, Petitioner relied on a declaration (Ex. 1003) as well as a reply declaration (Ex. 1031) of David Choi, Ph.D.  Patent Owner submitted with its responses a declaration of Tim Williams, Ph.D. (Ex. 2001[15]).  The transcripts of the depositions of Dr. Choi are entered in the record as Exhibits 2006 and 2007, and the transcript of the deposition of Dr. Williams is entered in the record as Exhibit 1030.

## III. ANALYSIS

### A. Final Written Decisions

Our discussion of the final written decisions focuses on our previous construction of the claim term "plurality of carrier aggregated transmit signals," as recited in challenged independent claims 1, 18, 28, and 33.  In the final written decisions, we began our analysis by addressing the parties' arguments regarding the construction of that term.  Final Dec. 17–24.  Based on our review of the claims and specification of the '675 patent, we disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires signals comprising transmissions on *component* carriers.  *Id.* at 19–20.  We explained that the '675 patent explicitly defines "carrier aggregation" as "operation on multiple carriers," and that it also explicitly defines "[a] transmit signal" as "a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc."  *Id.* (citing Ex. 1001, 2:63–64, 3:60–62).  We

---

[15] Patent Owner has included the designation "Ex. 2002" on each page of Dr. Williams's declaration.  Because the declaration is entered in the record as Exhibit 2001, we cite Exhibit 2001 when referring to the declaration.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

further determined that these definitions refer broadly to signals comprising transmissions on carriers. *Id.* at 20.

We also disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires signals *from a single terminal*. Final Dec. 20–22. We explained that the claim language recites nothing about signals from a single terminal. *Id.* at 21. We additionally explained that although the '675 patent discloses examples and embodiments where signals are from a single terminal, the specification does not limit "carrier aggregated transmit signals" to those examples and embodiments. *Id.* (citing Ex. 1001, 14:21–25 (stating that the "disclosure is not intended to be limited to the examples and designs described")). We further noted that the '675 patent teaches that a wireless device "'may send and/or receive transmissions' on multiple carriers according to various combinations of bands and band groups." *Id.* at 21–22 (citing Ex. 1001, 3:1–35). We found this to be consistent with Dahlman, extrinsic evidence regarding carrier aggregation, which Patent Owner cited as teaching that multiple carriers "are aggregated and jointly used for transmission *to/from* a single terminal." *Id.* at 22 (citing Ex. 1006, 104 (cited by PO Resp. 15)).

Lastly, we disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires extended bandwidth for a user transmission from a single terminal. Final Dec. 22. We explained that the claim language recites nothing about extended transmission bandwidth, and that although the '675 patent discloses an example where carrier aggregation provides extended transmission bandwidth, it does not limit "carrier aggregated transmit signals" to that example. *Id.* (citing Ex. 1001, 2:65–67

11

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

("Wireless device 110 *may* be configured with up to 5 carriers in one or two bands in LTE[16] Release 11.") (emphasis added)).

Turning to Petitioner's proposed construction for the term "plurality of carrier aggregated transmit signals," we noted its similar requirement of increasing the bandwidth for a user. Final Dec. 22. As with Patent Owner, we disagreed with Petitioner in this regard for the same reasons discussed above. *Id.* We additionally noted that Petitioner's counsel conceded during oral argument that this requirement "does not come specifically from the specification," and that Petitioner would not object to eliminating the requirement. *Id.* at 22–23 (citing Tr. 10:22–11:17).

We also disagreed with Petitioner that the term "plurality of carrier aggregated transmit signals" requires "signals for transmission . . . at the same time." Final Dec. 23. We explained that the claim recites "a plurality of carrier aggregated transmit signals being sent simultaneously," and that requiring signals for transmission *at the same time* would render the claim language "being sent simultaneously" redundant and superfluous. *Id.*

In summary, we concluded that the broadest reasonable interpretation of the claim term "plurality of carrier aggregated transmit signals" is "signals for transmission on multiple carriers." Final Dec. 23. We stated that "[o]ur construction is consistent with the '675 patent, which defines the term 'carrier aggregation' as 'operation on multiple carriers' and the term '[a] transmit signal' as 'a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" *Id.* (citing Ex. 1001, 2:63–64, 3:60–62). We additionally noted that "[o]ur construction

---

[16] LTE stands for Long Term Evolution. Ex. 1001, 2:21.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

also encompasses, but is not limited to, Patent Owner's proposed construction." *Id.*

After providing a brief overview of Yu, we addressed whether Petitioner demonstrated by a preponderance of the evidence that the teachings in Yu account for the "plurality of carrier aggregated transmit signals," as recited in each of independent claims 1, 18, 28, and 33. Final Dec. 31–36. In particular, consistent with our construction of the claim term "plurality of carrier aggregated transmit signals," we agreed with Petitioner that Yu's signals S1 and S2 are transmitted on multiple carriers at the same time because the signals are upconverted to different intermediate frequencies, where the difference in frequencies is maintained when the signals are subsequently summed and when they are upconverted again to different RF center frequencies. *Id.* at 36 (citing Pet. 42–44 (citing Ex. 1004 ¶ 48); Ex. 1004 ¶¶ 32, 57). We also credited the testimony of Petitioner's declarant Dr. Choi on this particular issue. *Id.* (citing Pet. 42–44 (citing Ex. 1003 ¶¶ 101–104)). As to Patent Owner's argument challenging Petitioner's showing for the recited "plurality of carrier aggregated transmit signals," we disagreed because Patent Owner relied on its proposed construction, which we determined "is overly narrow and improperly requires signals from a single terminal as well as providing extended transmission bandwidth for a user transmission from a single terminal." *Id.* at 58 (citing PO Resp. 40).

13

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

### B. The Federal Circuit's Remand Decision

Our discussion of the Federal Circuit's remand decision focuses only on the court's analysis regarding our construction of the recited "plurality of carrier aggregated transmit signals." On appeal to the Federal Circuit, Patent Owner argued that "it was not afforded notice of, or an adequate opportunity to respond to, the Board's construction of 'a plurality of carrier aggregated transmit signals.'" *Qualcomm*, 6 F.4th at 1262. The Federal Circuit agreed with Patent Owner that we "violated [Patent Owner's] procedural rights with respect to the 'plurality of carrier aggregated transmit signals' limitation." *Id.* The Federal Circuit explained that "the Board may adopt a claim construction of a disputed term that neither party proposes without running afoul of the [Administrated Procedure Act]." *Id.* As to the case here, however, the Federal Circuit pointed out that "the issue of whether increased bandwidth was a required part of the claim construction was not in dispute." *Id.* at 1262–63. That is, "[t]he Board's construction of 'a plurality of carrier aggregated transmit signals' diverged from the agreed-upon increased bandwidth requirement for the term." *Id.* at 1263. The Federal Circuit further noted that "[w]hile the Board did not change theories midstream or depart from a construction it previously adopted, it is still difficult to imagine either party anticipating that this agreed-upon matter of claim construction was a moving target," and that "unlike with disputed terms, it is unreasonable to expect parties to brief or argue agreed-upon matters of claim construction." *Id.* at 1263. The Federal Circuit counseled that "the Board needed to provide notice of and an adequate opportunity to respond to its

14

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

construction," which "departed from the agreed-upon increased bandwidth requirement." *Id.* at 1263, 1265.

The Federal Circuit disagreed with Petitioner that the oral hearing provided Patent Owner notice and an opportunity to respond. *Qualcomm*, 6 F.4th at 1263–64. The Federal Circuit explained that the panel's comment during the hearing that it would think about whether the increased bandwidth requirement is necessary "did not *provide* [Patent Owner] notice that the Board might depart from the increased bandwidth requirement," where "[t]he Board did not announce a construction, criticize the parties' agreed-upon requirement, ask any follow-up questions to [Petitioner], or ask any related questions to [Patent Owner]." *Id.* at 1264. The Federal Circuit further explained that "[t]he hearing also did not provide an adequate opportunity to respond" because the Board did not provide a theory or rationale for departing from the agreed-upon requirement to which Patent Owner could have responded, it did not ask Patent Owner questions about the requirement, and it did not request additional briefing after the hearing. *Id.* at 1264–65. The Federal Circuit added that Patent Owner did not have an opportunity to introduce evidence addressing why an ordinarily skilled artisan would have understood that the claim term "plurality of carrier aggregated transmit signals" requires signals that increase bandwidth. *Id.* at 1265.

The Federal Circuit also disagreed with Petitioner that Patent Owner's option to seek rehearing after receiving notice through the final written decisions provided an adequate opportunity to respond. *Qualcomm*, 6 F.4th at 1263, 1265. The Federal Circuit explained that "a party need not seek

15

**Appx71**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

rehearing in order to seek relief from a Board decision on appeal." *Id.* at 1265. The Federal Circuit acknowledged that "it may have been a more efficient use of resources had [Patent Owner] sought rehearing," but stated that Patent Owner "was not required to do so." *Id.*

Without deciding whether Patent Owner must show prejudice, as Petitioner argued, the Federal Circuit further reasoned that Patent Owner had made a sufficient showing. *Qualcomm*, 6 F.4th at 1263 & n.3. The Federal Circuit explained that Patent Owner "argued throughout the IPR proceedings that the prior art did not disclose the increased bandwidth requirement," and that "[b]y removing that requirement, the Board eliminated an element on which [Petitioner] bore the burden of proof." *Id.* The Federal Circuit additionally explained that "without notice of the Board's elimination of the increased bandwidth requirement, [Patent Owner] had no reason to brief that requirement or establish an evidentiary record supporting it, particularly given the limited word count and breadth of issues in these IPRs." *Id.* at 1263–64.

Accordingly, the Federal Circuit determined that we did not provide Patent Owner adequate notice of and opportunity to respond to our claim construction of "plurality of carrier aggregated transmit signals," vacated our final written decisions, and remanded for further proceedings. *Qualcomm*, 6 F.4th at 1267.

## C. Claim Construction

The claim construction standard applicable to these *inter partes* review proceedings is the broadest reasonable interpretation in light of the

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

patent specification.  *See* 37 C.F.R. § 42.100(b) (2018); *Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard).[17]  Under this standard, claim terms generally are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  That is, we give words "their plain meaning" unless, however, it is "inconsistent with the specification and prosecution history." *Arista Networks, Inc. v. Cisco Sys., Inc.*, 908 F.3d 792, 796–98 (Fed. Cir. 2018) (rejecting construction as "overly broad, even under the broadest reasonable interpretation standard"); *see also Personalized Media Comm'cns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) ("[T]he Board's interpretation must be reasonable in light of the specification, prosecution history, and the understanding of one skilled in the art.").

In view of the Federal Circuit's remand decision, we address the parties' arguments on remand as to whether we properly construed the claim

---

[17] The revised claim construction standard for interpreting claims in *inter partes* review proceedings as set forth in the final rule published October 11, 2018, does not apply to these proceedings because the new "rule is effective on November 13, 2018 and applies to all IPR, PGR and CBM petitions filed on or after the effective date."  Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (codified at 37 C.F.R. § 42.100(b) (2019)).  The petitions here were filed on July 3, 2018.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

term "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers."[18]

The term "plurality of carrier aggregated transmit signals" appears in each of challenged independent claims 1, 18, 28, and 33, as well as several dependent claims. Petitioner originally proposed that we construe this term to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." Pet. 32. On remand, however, Petitioner argues that we properly construed the term to mean, more broadly, "signals for transmission on multiple carriers." Pet. Remand Br. 7–12. As support, Petitioner contends that "the '675 patent provides explicit definitions for this claim term, by stating that 'carrier aggregation . . . *is* operation on multiple carriers' and 'a transmit signal *is* a signal comprising a transmission on one

---

[18] Referring to Petitioner's opening briefs, Patent Owner asserts that, "[c]ontrary to the Board's Order dated November 1, 2021 (Paper 35 ('Order') in IPR2018-01326), Petitioner filed six substantively different briefs, which collectively exceed the 20-page limit set by the Order." PO Remand Resp. n.1. Patent Owner does not identify any differences. We have reviewed Petitioner's six opening briefs, and they appear to be substantively similar except for the discussions as to the applicability of our previous construction of "plurality of carrier aggregated transmit signals" to the asserted prior art disclosures. *Compare, e.g.*, Pet. Remand Br., *with, e.g.*, IPR2018-01328, Paper 33. In that regard, the briefs in IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340 focus on Yu's disclosures, whereas the briefs in IPR2018-01328 and IPR2018-01330 focus on Chen's disclosures. Pet. Remand Br. 13–16; IPR2018-01328, Paper 33, 12–14. If the six briefs each included the discussions regarding both Yu and Chen, the briefs would be substantively the same, and the sum total of pages for each brief would be less than twenty. Pet. Remand Br. 1–16 (brief, including Yu discussion, comprising about sixteen pages); IPR2018-01328, Paper 33, 12–14 (Chen discussion comprising about two pages). Thus, it is harmless for us to consider Petitioner's opening briefs.

IPR2018-01326, IPR2018-01327,
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

or more carriers, a transmission on one or more frequency channels, etc.'"
*Id.* at 7 (quoting Ex. 1001, 2:63–64, 3:60–62). Petitioner asserts that "[t]he
Federal Circuit has recognized that the use of the term 'is' or similar
language can 'signify that a patentee is serving as its own lexicographer.'"
*Id.* (quoting *Sinorgchem Co., Shandong v. USITC*, 511 F.3d 1132, 1136
(Fed. Cir. 2007)).

Petitioner also points to various other portions of the specification.
Pet. Remand Br. 9. For example, Petitioner cites the teaching that "[c]arrier
aggregation may also be referred to as multi-carrier operation." *Id.* (citing
Ex. 1001, 2:64–65). Petitioner additionally cites the teaching that "[i]ntra-
band [carrier aggregation] refers to operation on multiple carriers within the
same band," and "[i]nter-band [carrier aggregation] refers to operation on
multiple carriers in different bands." *Id.* (citing Ex. 1001, 3:1–5).
According to Petitioner, these teachings "confirm[] the accuracy of the
Board's construction under the broadest reasonable interprerion standard."
*Id.*

Petitioner acknowledges that our previous construction is broader than
the construction it originally proposed in the petitions. Pet. Remand Br. 10.
In particular, our construction omits two requirements from Petitioner's
originally-proposed construction, namely, signals for transmission *at the
same time* and *increasing the bandwidth for a user*. *Id.* Petitioner explains
that it originally "proposed its construction in an effort to minimize
disputes," noting that its "construction was actually the Patent Owner's
construction in the earlier ITC proceeding." *Id.* Petitioner contends,
however, "[t]he Board properly omitted the limitation 'to increase the

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

bandwidth for a user' because, as the Board explained, the claim language says nothing about increasing bandwidth for a user." *Id.* at 10–11 (citing Final Dec. 22).  Petitioner further asserts that "while the '675 patent ***does*** include an example of carrier aggregation increasing bandwidth, it ***does not*** expressly limit carrier aggregation to this purpose." *Id.* at 11 (citing Ex. 1001, 2:65–67 ("Wireless device 110 ***may*** be configured with up to 5 carriers in one or two bands in LTE Release 11.") (emphasis added)).

Petitioner adds that "the Board properly omitted the limitation 'at the same time'" because claim 1 recites "a plurality of carrier aggregated transmit signals being sent simultaneously," and requiring signals for transmission *at the same time* "would render superfluous the claim language 'being sent simultaneously.'"  Pet. Remand Br. 11–12; *see id.* at 9 n.6.

Patent Owner responds that the term "carrier aggregated transmit signals" instead carries its ordinary and customary meaning, which Petitioner originally proposed in its petitions:  "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user."  PO Remand Resp. 2, 9; *see also* Pet. 32.  Patent Owner contends that "[w]hile it is true that transmission of signals on multiple carriers is an attribute of carrier aggregation, the [person having ordinary skill in the art] would have further understood the term to mean that the multiple component carriers are aggregated (*i.e.*, combined) to increase the bandwidth for a user."  PO Remand Resp. 9 (internal citation omitted).  As support, Patent Owner relies on the '675 patent, its prosecution history file, as well as extrinsic evidence.

Starting with the '675 patent, Patent Owner asserts that the specification "specifically describes an example of a user device (*i.e.*,

wireless device 110) that 'supports carrier aggregation' by being 'configured with up to 5 carriers in one or two bands [in LTE Release 11].'" PO Remand Resp. 10 (quoting Ex. 1001, 2:63–67). To illustrate, Patent Owner asserts that "user devices of earlier LTE systems were limited to the 20 MHz bandwidth of a single channel," whereas "the carrier aggregation introduced in LTE Release 11 enables a user device to aggregate up to five of these 20 MHz channels as component carriers of a single virtual channel having a bandwidth of up to 100 MHz." *Id.* (citing Ex. 1001, 2:59–60, 65–67, Figs. 2A–2D). Patent Owner notes that "[t]he '675 patent further explains that LTE carriers may be aggregated from frequency bands listed in 3GPP TS (Technical Specification) 36.101," a 3GPP[19] technical report that Patent Owner points to specifically for describing carrier aggregation as "[a]ggregation of two or more component carriers in order to support wider transmission bandwidths." *Id.* at 11 (citing Ex. 1001, 2:58–62; quoting Ex. 2011, 14 (3GPP technical report)).

Moving on to the prosecution history of the '675 patent, Patent Owner asserts that the Examiner applied a U.S. publication, namely, the Chen publication,[20] in an Office action because it "discloses a plurality of carrier aggregated transmit signals." PO Remand Resp. 11 (quoting Ex. 1002, 266–279 (Office action, July 2, 2015)). According to Patent Owner, the Chen publication "makes clear that its multi-carrier aggregation provides increased bandwidth." *Id.* Patent Owner relies on the Chen publication's

---

[19] 3GPP stands for 3rd Generation Partnership Project. Ex. 2011 (cover).
[20] Chen, U.S. Publication No. 2012/0321018 A1, published Dec. 20, 2012 (Ex. 2012). The Chen publication is different than Chen, which is an asserted reference in the related cases not addressed here.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

teaching that the "bandwidth of a signal constantly increases due to multi-carrier applications." *Id.* (quoting Ex. 2012 ¶ 4).

As to extrinsic evidence, Patent Owner points to teachings across various patents and publications to support its proposed construction on remand. PO Remand Resp. 12–13 (citing Ex. 2015, 6; Ex. 2016; Ex. 2017, 3:20–22; Ex. 2018, 3:27–62). For example, Patent Owner asserts that "U.S. Patent No. 9,161,254 teaches that carrier aggregation is a 'technique for providing additional bandwidth capacity to wireless devices' by 'aggregat[ing] . . . multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE).'" *Id.* at 12 (quoting Ex. 2017, 3:19–22[21]). Patent Owner also asserts that "a 2013 Qualcomm document states that '[c]arrier aggregation, as the name suggests, combines multiple carriers (a.k.a. channels) at the device to provide a bigger data pipe to the user.'" *Id.* (quoting Ex. 2015, 6).

With respect to our previous construction (which is Petitioner's proposed construction on remand), Patent Owner contends that it "is wrong because it reads 'aggregated' out of the term 'carrier aggregated transmit signals.'" PO Remand Resp. 13. Patent Owner asserts that "[a]ggregation refers to the process of combining constituent parts into a single thing." *Id.* (citing Ex. 2029 (dictionary defining "aggregation" as "the collecting of units . . . into a mass or whole")). Patent Owner further asserts that an ordinarily skilled artisan "would not have understood 'carrier aggregation' to be equivalent to any generic 'transmission on multiple carriers' because

---

[21] Patent Owner cites Exhibit 2017, lines 20 through 22, but the quoted language appears at lines 19 through 22.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

nothing is being aggregated when disparate signals are transmitted on different carriers to separate destinations." *Id.* at 14.

Patent Owner further contends "there is no lexicography" here, contrary to Petitioner's position. PO Remand Resp. 2 (capitalization and emphasis omitted); *see also* Pet. Remand Br. 7. Patent Owner asserts that "[w]hen the '675 patent sought to define a term, it used a very specific format, *i.e.*, putting the defined term in quotations marks, followed by the phrase 'is used herein to mean,' followed by the definition in quotation marks." PO Remand Resp. 3. For example, Patent Owner directs us to where the specification states, "The word 'exemplary' is used herein to mean 'serving as an example, instance, or illustration.'" *Id.* (citing Ex. 1001, 2:10–11). Patent Owner further asserts that "[n]one of the statements [Petitioner] relies on for the term 'carrier aggregated transmit signals' resembles this format" because "neither of [Petitioner's] citations employs the phrase 'is used herein to mean'" or "uses quotation marks for the term or its purported definition." *Id.* at 4 (citing Ex. 1001, 2:63–54, 3:60–62). As discussed above, Petitioner cites the '675 patent's statement that "carrier aggregation . . . is operation on multiple carriers" as well as its statement that "[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc." Pet. Remand Br. 7 (quoting Ex. 1001, 2:63–64, 3:60–62). According to Patent Owner, "[t]hese departures from the '675 patent's distinctive definitional format show that the patentee did not intend these statements to redefine the plain and ordinary meaning of 'carrier aggregated transmit signals.'" PO Remand Resp. 4; *see also id.* at 8 (characterizing "the

23

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

'675 patent's statement 'carrier aggregation . . . is operation on multiple carriers' [a]s nothing more than a generalized introduction to carrier aggregation, highlighting one aspect of it").

Patent Owner also urges that, "[t]aken together, the [person having ordinary skill in the art] would recognize that neither statement is definitional" because they additionally are inconsistent.  PO Remand Resp. 5–6 (citing Ex. 1001, 2:63–64, 3:60–62); PO Remand Sur-reply 6–7. Patent Owner points out in particular that one statement "has a broader scope than the [other statement], encompassing transmission on *one or more* general frequencies rather than *multiple carriers*," and "is open-ended via its use of the word 'etc.'"  PO Remand Resp. 6; *see also* PO Remand Sur-reply 6 ("For example, . . . 'transmit signals' includes transmission on *one* carrier, while 'carrier aggregation' is limited to implementations utilizing *multiple* carriers.").  *Compare* Ex. 1001, 2:63–64 ("carrier aggregation . . . is operation on multiple carriers"), *with* Ex. 1001, 3:60–62 ("[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.").

Lastly, Patent Owner directs our attention to another Board decision in a different case, IPR2019-00128, in which, according to Patent Owner, the parties "litigated nearly the same issue that is now before the Board," namely, "the correct construction of the term 'carrier aggregation.'"  PO Remand Resp. 14 (citing Ex. 2026).  In that decision, the Board determined that "carrier aggregation" requires, in part, providing higher bandwidth. Ex. 2026, 24–26.  The Board relied on intrinsic evidence in that case, including a technical report cited in the patent specification and a reference

24

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

relied on during prosecution.  *Id.*  Patent Owner asserts that the technical

report cited there is the same 3GPP technical report cited in the '675 patent

regarding LTE Release 11.  PO Remand Resp. 17 (citing Ex. 1001, 2:60–67;

Ex. 2026, 24).

    In reply, Petitioner addresses Patent Owner's arguments regarding

Petitioner's reliance on the '675 patent's two statements that "carrier

aggregation . . . is operation on multiple carriers" and "[a] transmit signal is

a signal comprising a transmission on one or more carriers, a transmission

on one or more frequency channels, etc." Ex. 1001, 2:63–64, 3:60–62.

Petitioner reiterates that "the Federal Circuit ***has*** found that 'is' can signal

lexicography," and has further "held that specific or even explicit

definitional formats are ***not*** required."  Pet. Remand Reply 2; *see also id.* at

4 (asserting that "Patent Owner's argument . . . is contradicted by the

Federal Circuit's holdings that the word 'is' may define a term").  Petitioner

also asserts that "operation on multiple carriers" is a "definition [that] is in

the 'Detailed Description' of the purported invention," rather than "a

generalized introduction to carrier aggregation," contrary to Patent Owner's

position.  *Id.* at 4.  As to Patent Owner's emphasis on the way the

'675 patent defines "exemplary," Petitioner counters that "the alleged

'definitional format' . . . is merely a legal boilerplate definition of

'exemplary,'" a word that "is not a technical claim term."  *Id.* at 3.

    Regarding Patent Owner's characterization of the two statements as

inconsistent with each other, Petitioner responds that Patent Owner "relies

on a misquote of the definition of 'transmit signals'" and "omits the word

'channels.'"  Pet. Remand Reply 3–4.  Petitioner asserts that "[t]he actual

25

**Appx81**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

phrases in that definition—'transmission on one or more carriers' and 'transmission on one or more frequency channels'—which Patent Owner's own expert confirmed is 'reasonable'—are consistent and closely related because a carrier is transmitted on a frequency *channel*." *Id.* at 4 (citing Ex. 1001, 3:60–62; Ex. 1044 ¶¶ 10–17; Ex. 1041, 15:8–16:4). Petitioner further asserts that "Patent Owner also cites the 'etc.' in the definition but fails to identify what else is signaled by that language." *Id.*

Turning to Patent Owner's proposed construction of "plurality of carrier aggregated transmit signals," Petitioner argues that "Patent Owner seeks to import 'to increase the bandwidth for a user.'" Pet. Remand Reply 5. Petitioner contends that the "added language is improper because it imports an ***objective*** or potential ***result or benefit*** of carrier aggregation, not what carrier aggregation ***is***." *Id.* (citing *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1355 (Fed. Cir. 2014)). Petitioner adds that "increased signal bandwidth is only a ***potential*** result of carrier aggregation which may not occur." *Id.* at 6. As support, Petitioner relies on Dr. Choi's testimony in his reply declaration on remand. *Id.* at 6 n.5 (citing Ex. 1044 ¶¶ 18–29). To illustrate, Dr. Choi testifies,

> So, for example, . . . one component carrier from each of Band 1 and Band 18 can be carrier aggregated. . . . [I]n Band 1, carriers with 5, 10, 15, and 20 MHz bandwidths are available for aggregation . . . , while in Band 18, carriers with 5, 10, or 15 MHz are available for aggregation . . . .
>
> As one example where carrier aggregation would not result in increased bandwidth, ***aggregating a 5 MHz carrier from Band 1 . . . with a 5 MHz carrier from Band 18 . . . would only result in 10 MHz, which does not result in increased bandwidth compared with the bandwidth of a single, non-aggregated,***

26

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

> *carrier*, for instance, a single 20 MHz carrier in Band 1 . . . a
> single 15 MHz carrier in Band 1, or a single 15 MHz carrier in
> Band 18, etc.

Ex. 1044 ¶¶ 24–25.

Petitioner further contends that neither the specification, the prosecution history, nor the extrinsic evidence of record supports Patent Owner's proposed construction.  Pet. Remand Reply 6–7.  Referring to the specification, Petitioner asserts that it "states that multiple transmissions on different carriers '*may* have increased envelope bandwidth,'" its "discussion of Figures 2A–2D, cited by Patent Owner . . . does not mention increasing bandwidth," its "discussion of the LTE specification . . . mentions only that frequency bands may cover up to 200 MHz and 35 bands are supported in Release 11," and it "does not incorporate the statement in 3GPP TS 36.101 about 'carrier aggregation' quoted by Patent Owner."  *Id.* at 6 (citing Ex. 1001, 2:58–62, 6:10–12).  As for the prosecution history, Petitioner asserts that "[n]either the Examiner nor the applicant made *any* such argument or suggestion" about understanding "that increasing bandwidth for a user is a required part of the construction of 'carrier aggregated transmit signals.'"  *Id.* at 6–7.  Petitioner also notes that the Examiner never cited paragraph 4 of the Chen publication on which Patent Owner relies.  *Id.* at 7.  With respect to the extrinsic evidence, Petitioner asserts that it was not cited or considered during prosecution.  *Id.*  Petitioner adds that "[w]here, as here, the claim term is defined in the patent, reliance on such extrinsic evidence is improper."  *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584–85 (Fed. Cir. 1996)).

27

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Also, Petitioner contends that "Patent Owner wrongly criticizes the Board's construction for allegedly 'read[ing] "aggregated" out of the term'" because "the claims already state that the claimed apparatus 'produce[s] a single output radio frequency (RF) signal.'"  Pet. Remand Reply 7 (citing Ex. 1044 ¶¶ 30–33).

Lastly, Petitioner contends that the Board's construction of "carrier aggregation" in the other decision, in IPR2019-00128, should not dictate our decision here because the construction there "***excludes*** 'for a user,' and relies on several prior art references not relevant here."  Pet. Remand Reply 8.  Petitioner also submits, "More importantly, [the] Board's construction here is consistent with the ALJ's construction of the same term in the associated ITC investigation as 'simultaneous operation on multiple carriers,' whereas the [other] construction—currently on appeal—is not." *Id.* (citing Ex. 1042, 37–42).  Petitioner asserts that "[t]he ALJ's construction and reasoning expressly rejected the inclusion of 'to increase the bandwidth for a user.'"  *Id.* (citing Ex. 1042, 37–42).

Patent Owner counters that "increased user bandwidth is the necessary purpose of carrier aggregation," and that "Dr. Choi fails to show that carrier aggregation does not always increase the bandwidth of a user."  PO Remand Sur-reply 2.  Referring to Dr. Choi's example discussed above (*see also* Ex. 1044 ¶ 25), Patent Owner asserts that "[a]ggregating *two 5-MHz carriers* necessarily increases the bandwidth for a user as compared to a *single 5-MHz carrier* allocated to the user and Dr. Choi admits this."  PO Remand Sur-reply 2 (citing Ex. 2030, 28:2–24 ("So I think you're asking me if you were to aggregate these two 5-megahertz carriers for a resultant total

28

aggregated bandwidth of 10 megahertz, would that be greater than if you were just to have a single 5-megahertz carrier.  And the answer's, obviously, yes because ten is greater than five.")).  Patent Owner adds that during prosecution "[t]he applicant amended the claims based on the prior art to recite 'carrier *aggregated* transmit signals' (Ex. 1002 at 237), and the increased bandwidth requirement gives meaning to the explicitly recited 'aggregat[ion].'" *Id.* at 2–3.  Patent Owner states that "[p]ointing to other language in the claim as allegedly establishing the 'aggregating' concept," as Petitioner does, "would cause the word 'aggregated,' where it is recited in the claim, to be superfluous." *Id.* at 5 (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)).

With respect to Petitioner's contention that Patent Owner's proposed construction on remand is unsupported by the specification, the prosecution history, and the extrinsic evidence, Patent Owner responds that Petitioner "point[s] to no counter-examples where increased bandwidth for a user is not present."  PO Remand Sur-reply 3.  Patent Owner also notes Petitioner "does not even attempt to show" that the statement in the 3GPP technical report describing carrier aggregation as "[a]ggregation of two or more component carriers in order to support wider transmission bandwidths" is "wrong or inconsistent with the [person having ordinary skill in the art's] understanding of the term." *Id.*; *see also id.* at 4 (stating "[Petitioner's] only counter to [Patent Owner's] evidence that the Examiner understood 'carrier aggregation' to increase the bandwidth of a user is that [Patent Owner] cited Chen paragraph [0004], whereas the Examiner specifically cited paragraph [0007]"); *id.* at 4 (stating "[Petitioner's] further criticism that

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

[Patent Owner's] 'external documents' were not 'cited or considered during prosecution' just means that they are extrinsic evidence" (internal citation omitted)).

Patent Owner further maintains its position that there is no lexicography in this case. PO Remand Sur-reply 6–8. Patent Owner adds that Petitioner "cites no authority for the proposition that two alleged definitions can be combined to yield lexicography for a disputed claim term." *Id.* at 7. Lastly, Patent Owner notes that "there is no rule forbidding generalized introductions in a patent's detailed description." *Id.* at 8.

On the record now before us, we determine that our previous construction of "plurality of carrier aggregated transmit signals" (i.e., "signals for transmission on multiple carriers") is overly broad. As Petitioner points out, the '675 patent "stat[es] that 'carrier aggregation . . . *is* operation on multiple carriers' and 'a transmit signal *is* a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" Pet. Remand Br. 7 (quoting Ex. 1001, 2:63–64, 3:60–62). Read together in isolation, we agree with Petitioner that these statements in the specification say "carrier aggregated transmit signals" means "signals for transmission on multiple carriers." Our construction, however, must also take into account the prosecution history. *See Personalized Media*, 952 F.3d at 1340. The prosecution history "facilitates claim construction by revealing the intended meaning and scope of technical terms and may even trump the weight of specification language in some circumstances." *TDM Am., LLC v. U.S.*, 85 Fed. Cl. 774, 788 (2009) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir.

30

1999)).  For example, "an applicant's amendment accompanied by explanatory remarks can define a claim term by demonstrating what the applicant meant by the amendment." *Personalized Media*, 952 F.3d at 1340. Thus, "like the specification, the prosecution history can act like a dictionary." *Hemphill v. McNeil-PPC, Inc.*, 25 F. App'x 915, 918 (Fed. Cir. 2001) (non-precedential).

Here, during prosecution of the '675 patent, the applicant amended independent claim 1 to recite "a plurality of different transmit signals" as well as "a power amplifier to receive . . . the plurality of different transmit signals . . . and to produce a single output RF signal."  Ex. 1002, 189 (Amendment, Nov. 12, 2014).  The applicant later amended claim 1 again solely to replace "a plurality of *different* transmit signals" with "a plurality of *carrier aggregated* transmit signals," and remarked to the Examiner that "[i]t is Applicant's understanding that the above amendments place all claims in a condition for allowance." *Id.* at 237, 246 (Amendment, March 6, 2015).  The applicant similarly amended the other independent claims during prosecution. *Id.* at 191–194, 240–241, 243–244.

Based on the applicant's amendments, we agree with Patent Owner that maintaining our previous construction of "plurality of carrier aggregated transmit signals" as "signals for transmission on multiple carriers" would ignore the word "aggregated." *See* PO Remand Resp. 13–14.  The amendment limiting the recited signals to "carrier aggregated" signals indicates that the claims require something more than just signals for transmission on multiple carriers; otherwise, the claims would encompass signals that are *not* carrier aggregated. *See, e.g.*, Ex. 1001, 6:10–12

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

("Multiple transmit signals may be sent on different frequencies (e.g., different carriers) and hence *may* have increased envelope bandwidth." (emphasis added)) (cited by Pet. Remand Reply 6); Ex. 1002, 189, 237 (application claims reciting *different* transmit signals before being amended to recite *carrier aggregated* transmit signals).  Thus, our previous construction of "plurality of carrier aggregated transmit signals," though consistent with the specification language, is broader than the applicant's intended meaning and scope of the term as illuminated by the prosecution history.

        We note Petitioner's contention that the claim limitation "produc[ing] a single output radio frequency (RF) signal" accounts for the claim term "aggregated."  Pet. Remand Reply 7.  As discussed above, however, that limitation was already included in the claims before the applicant amended them to require "carrier aggregated" signals.  *Compare* Ex. 1002, 189 (Amendment, Nov. 12, 2014), *with id.* at 237 (Amendment, March 6, 2015). Thus, if producing a single output RF signal were to account for "aggregated," as Petitioner urges, then "aggregated" would be rendered superfluous.  *See Dig.-Vending Servs. Int'l, LLC v. Univ. of Phx., Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (noting "the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered superfluous").

        We turn now to Patent Owner's proposed construction on remand, namely, "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user," which can be divided into three parts: (1) "signals for transmission on multiple carriers," (2) "at the same time,"

32

**Appx88**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

(3) "to increase the bandwidth for a user."  PO Remand Resp. 9.  The parties' dispute in this regard addresses primarily the third part of Patent Owner's proposed construction, centering on whether the broadest reasonable interpretation of "plurality of carrier aggregated transmit signals" requires increasing bandwidth.[22]  *See* Pet. Remand Br. 10–12; PO Remand Resp. 9–18; Pet. Remand Reply 5–8; PO Remand Sur-reply 1–5.  We determine that the intrinsic evidence supports this aspect of Patent Owner's proposed construction.

"[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence," and "when prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning."  *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (quoting *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000)) (other

---

[22] Petitioner does not dispute the first part of Patent Owner's proposed construction.  *See* Pet. Remand Br. 7 ("The Board construed the claim term 'plurality of carrier aggregated transmit signals' to mean 'signals for transmission on multiple carriers.'  This construction is correct." (internal citation omitted)).  With respect to the second part of the construction, we note Petitioner's contention that our previous construction properly omitted "at the same time."  *See id.* at 11–12.  Determining whether "plurality of carrier aggregated transmit signals" requires this aspect of Patent Owner's proposed construction, however, is not necessary to resolve any controversy here.  *See Vivid Techs.*, 200 F.3d at 803 (explaining that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy").

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

citations omitted).  Thus, for the third part of Patent Owner's proposed

construction, we rely on the 3GPP technical report cited in the '675 patent,

as well as the Chen publication, which was cited in the prosecution history

of the '675 patent.  The 3GPP technical report defines "[c]arrier

aggregation" as "[a]ggregation of two or more component carriers in order

to *support wider transmission bandwidths*."  Ex. 2011, 14 (emphasis added)

(cited by Ex. 1001, 2:60–62 ('675 patent)).  The Chen publication

additionally states that the "*bandwidth of a signal constantly increases* due

to multi-carrier applications."  Ex. 2012 ¶ 4 (emphasis added) (cited by

Ex. 1002, 270 (Office Action, July 2, 2015)).

  The teachings in both the 3GPP technical report and the Chen

publication are consistent with contemporaneous extrinsic evidence

introduced into the record on remand.  For example, as discussed above,

Patent Owner directs us to U.S. Patent No. 9,161,254, which states that

"[o]ne technique for providing additional bandwidth capacity to wireless

devices is through the use [of] carrier aggregation of multiple smaller

bandwidths to form a virtual wideband channel at a wireless device (e.g.,

UE)."  Ex. 2017, 3:19–22 (quoted in PO Remand Resp. 12); *see also id.* at

3:49–51 ("Carrier aggregation . . . enable[s] more bandwidth to be

obtained.") (cited by PO Remand Resp. 12).  The application for that patent

was filed in May 2013, just three months after the application for the

'675 patent was filed.  Ex. 1001, code (22); Ex. 2017, code (22).  Similarly,

Patent Owner draws our attention to a 2013 Qualcomm paper, which states

that "[c]arrier aggregation, as the name suggests, combines multiple carriers

34

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

. . . at the device to provide a bigger data pipe to the user." Ex. 2015, 6

(quoted in PO Remand Resp. 12).

We note Petitioner's contention that the passage in the Chen

publication on which Patent Owner relies was never cited by the Examiner.

*See* Pet. Remand Reply 7.  That passage provides additional support for the

definition of carrier aggregation that is provided in the 3GPP technical

report, however, and is therefore relevant to our analysis here.  *See V-*

*Formation*, 401 F.3d at 1311; *see also* Ex. 1002, 278 (the Examiner advising

the applicant during prosecution "to fully consider the [cited] references in

their entirety as potentially teaching all or part of the claimed invention, as

well as the context of the passage as taught by the prior art or disclosed by

the Examiner").  Moreover, contrary to Petitioner's position, that neither the

Examiner nor the applicant explicitly expressed an understanding that carrier

aggregation requires increasing bandwidth does not change what is taught in

the 3GPP technical report or in the Chen publication, both part of the

intrinsic evidence.  *See* Pet. Remand Reply 6–7 (Petitioner arguing that "the

file history does not support Patent Owner's argument that the Examiner

'understood' that increasing bandwidth for a user is a required part of the

construction of 'carrier aggregated transmit signals'" because "[n]either the

Examiner nor the applicant made ***any*** such argument or suggestion").

We further note Petitioner's contention that the third part of Patent

Owner's proposed construction, increasing bandwidth, "is improper because

it imports an objective or potential result or benefit of carrier aggregation,

not what carrier aggregation is."  Pet. Remand Reply 5 (emphases omitted).

Petitioner relies on *Braintree*, a Federal Circuit case in which the court

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

rejected the argument that "purgation" means cleansing, even though "the specification . . . indicates that a dosage amount is 'effective' only if it produces a clean colon in preparation for a colonoscopy." *Braintree*, 749 F.3d at 1354–55. The court explained that "while cleansing is the goal specifically articulated in the specification, it is not a claim requirement," where the claims "only require that the compositions 'induce' (i.e., bring about or start) diarrhea," rather than "achiev[e] a fully cleansed colon." *Id.*

Petitioner's reliance on *Braintree* is misplaced. The facts here are different. Specifically, the claims of the '675 patent require *carrier aggregated* transmit signals. The 3GPP technical report noted above, which is part of the intrinsic evidence, defines "carrier aggregation" as "[a]ggregation of two or more component carriers in order *to support wider transmission bandwidths*." Ex. 2011, 14 (emphasis added); *see also* Ex. 2012 ¶ 4 (Chen publication, also part of the intrinsic evidence, stating that the "*bandwidth of a signal constantly increases* due to multi-carrier applications" (emphasis added)). Thus, carrier aggregation *is* the aggregation of two or more carriers in order *to support wider transmission bandwidths*. As discussed above, the extrinsic evidence supports this definition. *See* Ex. 2015, 6 ("Carrier aggregation, as the name suggests, combines multiple carriers . . . at the device to provide a bigger data pipe to the user."); Ex. 2017, 3:19–22 ("One technique for providing additional bandwidth capacity to wireless devices is through the use [of] carrier aggregation of multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE)."), 49–51 ("Carrier aggregation . . . enable[es] more bandwidth to be obtained.").

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Dr. Choi's example about aggregating two 5 MHz carriers from different bands also supports this definition. *See* Ex. 1044 ¶¶ 24–25 (cited by Pet. Remand Reply 6 n.5). Dr. Choi states that the aggregation of two 5 MHz carriers, which would provide a bandwidth of 10 MHz, "does not result in increased bandwidth compared with the bandwidth of a single, non-aggregated, carrier, for instance, a single 20 MHz carrier." *Id.* ¶ 25 (emphasis omitted). As Patent Owner points out, however, such aggregation "necessarily increases the bandwidth for a user as compared to a *single 5-MHz carrier* allocated to the user." PO Remand Sur-reply 2. We agree with Patent Owner's reasoning in this regard. *See* Ex. 2011, 14 (defining "[c]arrier aggregation" as "[a]ggregation of two or more *component* carriers in order *to support wider transmission bandwidths*" (emphases added)). Indeed, Dr. Choi testified at his deposition on remand, "So I think you're asking me if you were to *aggregate these two 5-megahertz carriers for a resultant total aggregated bandwidth of 10 megahertz*, would that be greater than if you were just to have a single 5-megahertz carrier. And the answer's, obviously, yes because ten is greater than five." Ex. 2030, 28:2–24 (emphasis added) (cited by PO Remand Sur-reply 2). Consistently, Dr. Choi also previously testified in his reply declaration during trial,

> LTE explicitly allows for transmission of *two aggregated 1.4 MHz signals*, even though the standard can also transmit a single 20 MHz carrier, which provides much higher bandwidth than the *combined bandwidth of 2.8 MHz*. . . . [C]arrier aggregation can achieve higher data rates and can increase the overall capacity of wireless networks by allowing network operators to exploit fragmented spectrum allocations. . . . *Aggregating two narrow band signals could do precisely that—increasing bandwidth by using fragmented spectrum allocations.*

37

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Ex. 1031 ¶ 25 (emphases added) (cited by PO Remand Sur-reply 2).

In view of the foregoing, we adopt Patent Owner's proposed construction of "plurality of carrier aggregated transmit signals" on remand (which is the same construction that Petitioner originally proposed in its petitions), namely, "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user."[23] *See* PO Remand Resp. 9; Pet. 32. For the reasons given above, our construction is supported by the intrinsic evidence. *See, e.g.*, Ex. 1001, 2:60–67, 3:60–62 ('675 patent); Ex. 1002, 189, 237, 246 (prosecution history file); Ex. 2011, 14 (3GPP technical report); Ex. 2012 ¶ 4 (Chen publication). Our construction also is consistent with relevant extrinsic evidence. *See, e.g.*, Ex. 2015, 6; Ex. 2017, 3:19–22, 3:49–51. Further, our construction reflects Petitioner's proposed language on remand, "signals for transmission on multiple carriers," as well as portions of the specification cited by Petitioner. *See* Pet. Remand Br. 7 (citing Ex. 1001, 2:63–64, 3:60–62).

### D. Obviousness Based on Yu

Petitioner asserts that claims 1–6, 11, 17–22, 27, and 33 would have been obvious over Yu and Wang; claims 7–10 and 28–32 would have been

---

[23] As previously noted, determining whether "plurality of carrier aggregated transmit signals" requires the second part of Patent Owner's proposed construction, "at the same time," is not necessary to resolve any controversy here. *See Vivid Techs.*, 200 F.3d at 803. We explain below it is undisputed that the asserted prior art teaches this aspect of Patent Owner's proposed construction. *See infra* Part III.D.2.a.ii. The outcome of our obviousness analysis would thus be the same whether or not our construction requires "at the same time."

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

obvious over Yu, Wang, and Choi; claim 12 would have been obvious over
Yu, Wang, and Eliezer; and claims 13–15 and 23–25 would have been
obvious over Yu, Wang, and Dahlman. Pet. 35–75; 1327-Paper 3, 12–79;
1329-Paper 3, 24–79; 1340-Paper 3, 22–75. Patent Owner opposes. PO
Resp. 30–41. For the reasons explained below, we determine that Petitioner
has demonstrated by a preponderance of the evidence that claims 1–15, 17–
25, and 27–33 would have been obvious over the asserted grounds.

We start with an overview of Yu. As the issues in dispute all turn on
the teachings and suggestions of Yu, we do not address the substance of
Wang, Choi, Eliezer, or Dahlman.

### 1. Overview of Yu

Yu states that its "inventive principle may be considered as an
extension to the known principle of envelope-tracking amplifiers, which
determine an envelope signal of the radio frequency signal to be amplified,
and which control the voltage supply to the power amplifier depending on
said envelope signal." Ex. 1004 ¶ 8. Figure 1, which is reproduced below,
illustrates a power amplifier system according to Yu. *Id.* ¶ 33.

Fig. 1



39

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

As Figure 1 shows, Yu's power amplifier system includes signal processing unit SP, control unit 100, and power amplifier PA. *Id.* ¶¶ 33, 37–38. Input signals S1 and S2 are forwarded to signal processing unit SP, which transforms the input signals into radio frequency signal $S_{RF}$. *Id.* ¶ 37. Power amplifier PA is configured to amplify radio frequency signal $S_{RF}$, which is fed to an input of power amplifier PA. *Id.* ¶ 33. Power amplifier PA comprises power amplifier supply voltage module PA'. *Id.* ¶ 35. Power amplifier supply voltage module PA' is configured to modify supply voltage Vsup, which is applied to power amplifier PA. *Id.*

Control unit 100 is used to control the operation of power amplifier PA and its supply voltage module PA'. Ex. 1004 ¶ 38. Control unit 100 has digital signal processing means DSP, which derive control signal CTRL based on input signals S1 and S2. *Id.* According to Yu, by deriving control signal CTRL in this way, "an improved supply voltage control for the power amplifier PA as compared to conventional envelope tracking systems may be obtained, especially in such cases, where more than one input signal S1, S2, . . . is to be processed to obtain said RF signal $S_{RF}$." *Id.* ¶ 39.

### 2. Analysis

As discussed above, the Federal Circuit explained in its remand decision that we "needed to provide notice of and an adequate opportunity to respond to [our] construction" of the claim limitation "plurality of carrier aggregated transmit signals," and then it remanded for further proceedings. *Qualcomm*, 6 F.4th at 1263, 1267. Our analysis here thus focuses on

40

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

whether the asserted prior art teaches or suggests the limitation "plurality of carrier aggregated transmit signals" in view of our construction on remand. We incorporate our prior analysis of other aspects of the challenged claims, which do not turn on the resolution of our construction on remand. *See* Final Dec.; 1327-Paper 30; 1329-Paper 30; 1340-Paper 30.

### a. Independent Claims 1, 18, 28, and 33

Each of independent claims 1, 18, 28, and 33 recites, in relevant part, "plurality of carrier aggregated transmit signals." As discussed above, we construe "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." *Supra* Part III.C. This construction can be divided into three parts: (1) "signals for transmission on multiple carriers," (2) "at the same time," (3) "to increase the bandwidth for a user." We address each part of the construction in turn.

### i. "signals for transmission on multiple carriers"

In its opening brief on remand, Petitioner maintains its position set forth in the petitions that Yu teaches signals for transmission on multiple carriers. *Compare* Pet. 41–44, *with* Pet. Remand Br. 13–16. Petitioner identifies Yu's input signals S1 and S2 as "carrier aggregated transmit signals." Pet. Remand Br. 13 (citing Pet. 41–44); *see also* Pet. 42 ("Signals S1 and S2 form 'carrier aggregated transmit signals.'"). To illustrate, Petitioner provides an annotated version of Figure 3 of Yu, which is reproduced below. Pet. Remand Br. 13–14; *see also* Pet. 43.

41

**Appx97**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Fig. 3



Figure 3 of Yu, as annotated by Petitioner, is a signal flow diagram. *See* Ex. 1004 ¶¶ 32, 57. Petitioner asserts that signals S1 and S2 are upconverted to different intermediate frequencies, as shown in the red box. Pet. Remand Br. 14 (citing Ex. 1004 ¶ 48); *accord* Pet. 43. Petitioner further asserts that the difference in frequencies is maintained when the signals are subsequently summed by adder a1, as shown in the blue box, and when they are upconverted again to different RF center frequencies, as shown in the yellow box. Pet. Remand Br. 14–15; *see also* Pet. 43–44. Petitioner contends that "Figure 3 shows that Yu's signals S1 and S2 are transmitted on multiple carriers at the same time," therefore satisfying the first part of our construction of "plurality of carrier aggregated transmit signals," namely, "signals for transmission on multiple carriers." Pet. Remand Br. 15; *see also* Pet. 42–44. Petitioner relies on Dr. Choi's testimony from his declaration submitted in support of the petitions. Pet. Remand Br. 15–16 (citing Ex. 1003 ¶¶ 100–103).

Petitioner adds that "Figure 4 [of Yu] also shows that signals S1 and S2 are signals for transmission on multiple carriers," pointing specifically to

42

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

"the frequency diagram to the left of the PA show[ing] signals S1 and S2 being transmitted on different carrier frequencies." Pet. 44; *see also* Pet. Remand Br. 15–16 (providing an analysis for Figure 4 of Yu that is similar to the analysis for Figure 3 of Yu).

Patent Owner does not dispute Petitioner's showing for this aspect of our construction. *See* PO Remand Resp. 19–20; PO Resp. 40–41.

Based on the record before us, we are persuaded that Yu teaches signals for transmission on multiple carriers.

### ii. "at the same time"

As discussed above, Petitioner argues on remand that "plurality of carrier aggregated transmit signals" does not require the second part of our construction, "at the same time." Pet. Remand Br. 7, 11–12. In its opening brief, however, Petitioner nonetheless asserts that "Figure 3 [of Yu] shows that Yu's signals S1 and S2 are transmitted on multiple carriers *at the same time*." *Id.* at 15 (emphasis added); *see also id.* at 14 (Petitioner's annotated version of Yu's Figure 3). This is consistent with Petitioner's position set forth in its petitions, where Petitioner "applie[d] the construction, 'signals for transmission on multiple carriers at the same time to increase the bandwidth for a user,'" which is the same as our construction on remand. Pet. 41–43. In particular, Petitioner argued in its petitions that "Yu's transmit signals S1 and S2 are sent simultaneously." *Id.* at 41. As support, Petitioner pointed to Yu's teaching of "simultaneously process[ing] various input signals." Ex. 1004 ¶ 15 (cited by Pet. 42). Yu explains that "both input signals may simultaneously be processed by the digital signal

43

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

processing means," which "performs per se known signal processing techniques to transform the various input signals S1, S2, . . . into the radio frequency signal $S_{RF}$." *Id.* ¶¶ 16, 37 (cited by Pet. 42).

Patent Owner does not dispute Petitioner's showing for this aspect of our construction. *See* PO Remand Resp. 19–20; PO Resp. 40–41.

Based on the record before us, we are persuaded that Yu teaches signals for transmission on multiple carriers *at the same time*.

### iii. "to increase the bandwidth for a user"

Petitioner also argues on remand that "plurality of carrier aggregated transmit signals" does not require the third part of our construction, "to increase the bandwidth for a user." Pet. Remand Br. 7, 10–11. In its petitions, however, Petitioner "applie[d] the construction, 'signals for transmission on multiple carriers at the same time to increase the bandwidth for a user.'" Pet. 41–43. As noted above, this construction is the same as our construction on remand. We thus consider the parties' arguments during trial.

In the petitions, Petitioner contends that an ordinarily skilled artisan "would have understood Yu's method of aggregating multiple signals on different frequencies increases the bandwidth for a user, allowing more information to be transmitted per unit of time." Pet. 44. As support, Petitioner directs us to where Yu states that "both input signals may simultaneously be processed by the digital signal processing means." *Id.* (citing Ex. 1004 ¶ 16); *see also* Ex. 1004 ¶ 15 ("This advantageously enables to simultaneously process various input signals according to different

44

communications standards . . . .") (cited by Pet. 44).  Petitioner relies on the declaration testimony of Dr. Choi.  Pet. 44 (citing Ex. 1003 ¶ 104).

Petitioner further notes in the petitions that "Patent Owner has argued in the ITC that Yu does not disclose an increase of bandwidth 'for a user' because Yu is allegedly directed to transmissions by a base station, not by a mobile device."  Pet. 44 n.6.  Petitioner asserts that "Yu, however, states expressly that its PA 'may e.g. be employed in wireless communications systems such as base stations of cellular communications networks *or wireless transceivers of mobile terminals and the like*.'"  *Id.* at 44–45 n.6 (quoting Ex. 1004 ¶ 34 (emphasis added in Pet.)).  Petitioner thus contends that, "even if Yu were directed to base stations and the claims were limited to mobile devices, it would have been obvious to a [person of ordinary skill in the art] to take advantage of Yu's invention in a mobile device."  *Id.* at 45 n.6.  Petitioner relies on the declaration testimony of Dr. Choi.  *Id.* (citing Ex. 1003 ¶ 104 n.4).

In its responses, Patent Owner counters that "Yu's Figure 3 and Figure 4 embodiments describe base station technology that is processing signals provided by different users."  PO Resp. 40.  According to Patent Owner, "[i]n providing a system that 'simultaneously process[es] various input signals *according to different communication standards*, which have completely different target frequency ranges, with only one power amplifier,' Yu's base station is processing signals from different users," which "fails to disclose '*signals from a single terminal* utilizing multiple component carriers *which provide extended transmission bandwidth for a*

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

*user transmission* from the single terminal.'" *Id.* Patent Owner relies on the declaration testimony of Dr. Williams. *Id.* (citing Ex. 2001 ¶¶ 112–113).

Patent Owner adds that "the Figure 3 and Figure 4 base station implementations . . . are not appropriate for use in mobile terminals." PO Resp. 23. Patent Owner recognizes Yu's teaching that "its power amplifier embodiments may 'be employed in wireless communications systems such as base stations of cellular communications networks or wireless transceivers of mobile terminals,'" but contends that "due to power constraints, no mobile terminal at the critical date could implement power amplifiers that cover the bandwidth described with respect to Yu Figures 3 and 4." *Id.* at 23–24 (quoting Ex. 1004 ¶ 34). Patent Owner also states that "Figure 2 of Yu discloses a mobile-terminal-appropriate system for controlling a supply voltage of a power amplifier," and that "[i]t is noteworthy that [Petitioner] does not cite to Figure 2 as disclosing any claim limitations." *Id.* at 23. Patent Owner relies on the declaration testimony of Dr. Williams. *Id.* at 23–24 (citing Ex. 2001 ¶¶ 65–68).

Petitioner replies that "Patent Owner's argument relies entirely on the assumptions that (1) 'user' in this claim construction refers only to an individual mobile device owner, and (2) Yu is inapplicable because Figures 3 and 4 from Yu are limited to transmissions by base stations," both of which Petitioner says "are wrong." Pet. Reply 21. Regarding the first assumption, Petitioner contends that "[i]f a base station is processing two signals, then it is undisputed that the bandwidth for that user, i.e., the base station, is increased." *Id.*

46

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

As to the second assumption, Petitioner contends that carrier aggregation "is not, in ordinary usage, limited to the transmission of signals by a wireless device to a base station, *i.e.*, it is not limited to 'uplink' transmissions." Pet. Reply 21. As support, Petitioner directs us to where Dahlman describes carrier aggregation as "multiple component carriers [that] are aggregated and jointly used for *transmission to/from a single terminal*." Ex. 1006, 104 (emphasis added & original emphasis omitted) (cited by Pet. Reply 21–22). In other words, according to Dahlman, "component carriers can be aggregated for the downlink and uplink." *Id.* (cited by Pet. Reply 22). Petitioner also notes that Patent Owner stated at the ITC *Markman* hearing that "carrier aggregation . . . can be used in both the uplink and downlink a[s] it exists in systems, and the patent is really agnostic as to that." Pet. Reply 22 (quoting Ex. 1029, 143:17–19); *see also* Ex. 1030, 45:5–12 (Dr. Williams's deposition transcript) (cited by Pet. Reply 22).

With respect to Petitioner's user argument, Patent Owner responds that it "is inconsistent with the plain and ordinary meaning of 'user' and contradicted by the '675 patent and other evidence of record." PO Sur-reply 21–22. As support, Patent Owner asserts that "the '675 patent uses the term 'user equipment (UE)' to refer to a wireless device 110, as depicted in Fig. 1," whereas "the base stations 130, 132 of Fig. 1 are only referred to as 'base stations,'" never as "users" or "user equipment." *Id.* at 22 (citing Ex. 1001, 2:28–34, Fig. 1). In particular, the '675 patent teaches that its "[w]ireless device 110 may also be referred to as a user equipment (UE), a mobile station, a terminal, an access terminal, a subscriber unit, a station,

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

etc." Ex. 1001, 2:32–34. Patent Owner also directs us to a 2010 3GPP technical paper that distinguishes between user equipment and base stations. PO Sur-reply 23 (citing Ex. 1036, 6 (listing technical reports titled "User Equipment (UE) radio transmission and reception" and "Base Station (BS) radio transmission and reception")).

Turning to Petitioner's uplink/downlink argument, Patent Owner counters that "in both the uplink and downlink scenarios, the bandwidth must be extended for a *single user terminal*." PO Sur-reply 23. According to Patent Owner, "Yu does not disclose downlink carrier aggregation—*i.e.*, using a base station to simultaneously transmit multiple signals to a *single terminal* to increase the bandwidth for that terminal." *Id.* Patent Owner asserts that "Yu discloses using its base station to transmit the two input signals S1 and S2 to multiple, different destination terminals simultaneously." *Id.* at 24. Patent Owner further asserts that "[d]ownlink carrier aggregation had not yet been implemented as of January 2018— much less as of Yu's 2010 filing date—and Yu contains no teaching or suggestion of this theoretical system." *Id.* at 23–24.

Patent Owner adds that "Petitioner also rehashes its argument that Figures 3 and 4 of Yu are not limited to transmissions by base stations," and that "this is an improper new argument not made in the petition[s], and it is substantively wrong." PO Sur-reply 24.

On the record before us, we agree with Patent Owner that "user," in the construction applicable here, does not encompass a base station. As Patent Owner points out, the '675 patent distinguishes between wireless device 110 (which may be referred to as a *user* equipment) and base

48

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

stations 130 and 132.  PO Sur-reply 22 (citing Ex. 1001, 2:32–34, Fig. 1).

To illustrate, Figure 1 of the '675 patent is reproduced below.



*FIG. 1*

Figure 1 shows a wireless device communicating with a wireless system.
Ex. 1001, 1:56–57.  Specifically, Figure 1 shows wireless device 110
communicating with wireless system 120 that includes base stations 130 and
132.  *Id.* at 2:19–20, 28–30.  Extrinsic evidence supports this distinction
between wireless device 110 (e.g., user equipment) and a base station.  *See*
Ex. 1036, 6 (cited by PO Sur-reply 23).  Accordingly, the third part of our
construction, "to increase the bandwidth for a user," does not encompass
increasing the bandwidth for a base station.

Both parties, however, acknowledge Yu's teaching that its power
amplifier "may e.g. be employed in wireless communications systems such
as base stations of cellular communications networks or wireless
transceivers of mobile terminals and the like."  Ex. 1004 ¶ 34 (cited by

49

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Pet. 44–45 n.6; PO Sur-reply 23).  Based on this teaching in Yu, we agree
with Petitioner that even if Figures 3 and 4 of Yu are directed to base
stations (which we do not determine), "it would have been obvious to a
[person of ordinary skill in the art] to take advantage of Yu's invention in a
mobile device."  Pet. 45 n.6; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S.
398, 417 (2007) ("[I]f a technique has been used to improve one device, and
a person of ordinary skill in the art would recognize that it would improve
similar devices in the same way, using the technique is obvious unless its
actual application is beyond his or her skill.").  Indeed, Patent Owner asserts
that "Yu discloses three embodiments for implementing its functionality
across Figures 2–4," and that "Figure 2 of Yu discloses a mobile-terminal-
appropriate system for controlling a supply voltage of a power amplifier."
*See* PO Resp. 23.

We note Patent Owner's contention that the base station
implementations depicted in Figures 3 and 4 of Yu "are not appropriate for
use in mobile terminals."  PO Resp. 23; *see id.* at 23–24.  Even if that were
true, "[t]he test for obviousness is not whether the features of a secondary
reference [or embodiment] may be bodily incorporated into the structure of
the primary reference [or embodiment]."  *In re Keller*, 642 F.2d 413, 425
(Fed. Cir. 1981).  Instead, "the test is what the combined teachings . . .
would have suggested to those of ordinary skill in the art."  *Id.*  Moreover,
"[a] person of ordinary skill is also a person of ordinary creativity, not an
automaton."  *KSR*, 550 U.S. at 421.  Thus, a person of ordinary skill would
have made any necessary modifications so that a mobile device could
appropriately implement Yu's power amplifier.  This is supported by Patent

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Owner's assertion that "Figure 2 of Yu discloses a mobile-terminal-appropriate system for controlling a supply voltage of a power amplifier." *See* PO Resp. 23.

We further note Patent Owner's contention that downlink carrier aggregation had not been implemented as of Yu's filing date in 2010. PO Sur-reply 23–24. Even if this were true, it is of no moment in the context of a mobile device implementation of Yu's power amplifier, where the signals are processed by the mobile device, not the base station.

In addition, we note Patent Owner's emphasis on requiring extended bandwidth for a *single* user terminal. *See* PO Resp. 40 (arguing Yu's "fail[ure] to disclose '*signals from a single terminal* utilizing multiple component carriers *which provide extended transmission bandwidth for a user transmission* from the single terminal'"); PO Sur-reply 23 (arguing "the bandwidth must be extended for a *single user terminal*"). Patent Owner's arguments in this regard are based on its proposed construction of "plurality of carrier aggregated transmit signals" during trial, namely, "signals from a single terminal utilizing multiple component carriers which provide extended transmission bandwidth for a user transmission from the single terminal." PO Resp. 16. Patent Owner's proposed construction on remand, however, does not require increasing bandwidth for a "single terminal." Accordingly, Patent Owner's arguments do not undermine Petitioner's showing as to the third part of our construction (which is the same as Patent Owner's proposed construction on remand). We nevertheless note that in the context of the mobile device implementation of Yu's power amplifier,

51

**Appx107**

processing the signals simultaneously in the mobile device would increase the bandwidth for the mobile device, i.e., a single terminal.

Lastly, we note Patent Owner's contention that Petitioner's "argument that Figures 3 and 4 of Yu are not limited to transmissions by base stations . . . is an improper new argument not made in the petition[s], and it is substantively wrong." PO Sur-reply 24. As discussed above, however, our analysis accounts for the possibility that Figures 3 and 4 are directed to base stations. Moreover, we disagree that Petitioner's argument is improper and new because Petitioner's argument is in response to Patent Owner's argument that "Yu's Figure 3 and Figure 4 embodiments describe base station technology." *See* PO Resp. 40. Accordingly, Petitioner's argument is appropriate. *See* 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the . . . patent owner response.").

For the reasons given above, we are persuaded that Petitioner's proposed modification of Yu, which provides a mobile device implementation of Yu's power amplifier, teaches the third part of our construction, "to increase the bandwidth for a user." Based on Yu's teaching that its power amplifier may be used in base stations or mobile devices (Ex. 1004 ¶ 34), we also are persuaded that an ordinarily skilled artisan would have had reason to modify Yu's base station implementations of the power amplifier to provide a mobile device implementation of the power amplifier. *See KSR*, 550 U.S. at 418 ("[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."). As noted above, "if a technique has been used to improve one device, and a person of ordinary skill in the art would

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 417.

### iv. Remaining Limitations

As we explained above, the Federal Circuit instructs us to address the limitation "plurality of carrier aggregated transmit signals."  Accordingly, we do not address the other limitations recited in independent claims 1, 18, 28, and 33 for purposes of this Decision.  We note that, in our final decisions, we were persuaded that the asserted references teach the other limitations, and that an ordinarily skilled artisan would have had reason to combine the teachings in those references.  Final Dec. 64; 1327-Paper 30, 80; 1329-Paper 30, 82; 1340-Paper 30, 86.  As mentioned above, we incorporate our prior analysis as to the other limitations recited in independent claims 1, 18, 28, and 33.

### b.  Dependent Claims 2–15, 17, 19–25, 27, and 29–32

Because the Federal Circuit instructs us to address the limitation "plurality of carrier aggregated transmit signals," which appears in each of the independent claims, we do not address the dependent claims for purposes of this Decision.  Although several dependent claims recite "plurality of carrier aggregated transmit signals," the parties do not argue the dependent claims separately in this regard.  We note that, in our final decisions, we were persuaded that the asserted references teach the limitations recited in the dependent claims, and that an ordinarily skilled artisan would have had

53

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

reason to combine the teachings of those references.  Final Dec. 64; 1327-Paper 30, 80; 1329-Paper 30, 82; 1340-Paper 30, 86.  As mentioned above, we incorporate our prior analysis as to the limitations recited in the dependent claims.

### 3.  *Summary*

In view of the foregoing, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 would have been obvious over the asserted prior art.  We determine in particular that Petitioner has demonstrated by a preponderance of the evidence that claims 1–6, 11, 17–22, 27, and 33 would have been obvious over Yu and Wang; claims 7–10 and 28–32 would have been obvious over Yu, Wang, and Choi; claim 12 would have been obvious over Yu, Wang, and Eliezer; and claims 13–15 and 23–25 would have been obvious over Yu, Wang, and Dahlman.

54

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

## IV. CONCLUSION[24]

On remand, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 of the '675 patent are unpatentable as follows.

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–6, 11, 17–22, 27, 33 | 103 | Yu, Wang | 1–6, 11, 17–22, 27, 33 | |
| 7–10, 28–32 | 103 | Yu, Wang, Choi | 7–10, 28–32 | |
| 12 | 103 | Yu, Wang, Eliezer | 12 | |
| 13–15, 23–25 | 103 | Yu, Wang, Dahlman | 13–15, 23–25 | |
| **Overall Outcome** | | | 1–15, 17–25, 27–33 | |

## V.  ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1–15, 17–25, and 27–33 of the '675 patent are held *unpatentable*; and

---

[24] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*.  *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

FURTHER ORDERED that, because this Decision on Remand amounts to a final written decision, parties to the proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

David Cavanaugh
Richard Goldenberg
Theodoros Konstantakopoulos
Louis Tompros
Kathryn Zalewski
WILMER CUTLER PICKERING HALE & DORR LLP
David.cavanaugh@wilmerhale.com
Richard.goldenberg@wilmerhale.com
Louis.tompros@wilmerhale.com
Theodoros.konstantakopoulos@wilmerhale.com
Kathryn.zalewski@wilmerhale.com

For PATENT OWNER:

Matthew Johnson
Joseph Sauer
David Cochran
David Maiorana
Richard Graham
Joshua Nightingale
JONES DAY
mwjohnson@jonesday.com
jmsauer@jonesday.com
dcochran@jonesday.com
dmaiorana@jonesday.com
ragraham@jonesday.com
jrnightingale@jonesday.com

56

Trials@uspto.gov                                                    Paper 46
571.272.7822                                             Date: March 23, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

INTEL CORPORATION,
Petitioner,

v.

QUALCOMM INCORPORATED,
Patent Owner.

————————

IPR2018-01326
IPR2018-01327
IPR2018-01329
IPR2018-01340[1]
Patent 9,608,675 B2

————————

Before MICHELLE N. WORMMEESTER, AMANDA F. WIEKER, and
SCOTT B. HOWARD, *Administrative Patent Judges*.

WORMMEESTER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision on Remand
Determining All Challenged Claims Unpatentable
*35 U.S.C. §§ 144, 318*

_____

[1] This Decision addresses issues that are identical in each of the identified
cases.  We exercise our discretion to issue this Decision to be filed in each
case.  The parties may not use this style heading in subsequent papers.

IPR2018-01326, IPR2018-01327,
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

## I. INTRODUCTION

We address these four cases on remand after a consolidated decision for six related cases, including these four cases, by the U.S. Court of Appeals for the Federal Circuit in *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256 (Fed. Cir. 2021) (*see* Paper 33[2]).

As background, Intel Corporation[3] ("Petitioner") petitioned for six *inter partes* reviews challenging the validity of U.S. Patent No. 9,608,675 B2 (Ex. 1001, "the '675 patent"). This Decision addresses only four of those *inter partes* reviews, namely, IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340.[4] Petitioner filed petitions requesting *inter partes* review of claims 1–15, 17–25, and 27–33 of the '675 patent across these four cases. Paper 2 ("Petition" or "Pet.") (requesting review of claims 1–6 and 18–22); 1327-Paper 3 (requesting review of claims 7–15, 17, 23–25, 27, and 33); 1329-Paper 3 (requesting review of claims 28–30); 1340-Paper 3 (requesting review of claims 31 and 32). Qualcomm Incorporated ("Patent Owner") filed preliminary responses. Paper 7; 1327-Paper 7; 1329-Paper 7; 1340-Paper 7. Pursuant to 35 U.S.C. § 314, we instituted *inter partes* reviews as to all the challenged claims and all the

---

[2] Unless otherwise noted, papers and exhibits refer to IPR2018-01326. Papers and exhibits preceded by "1327-" refer to IPR2018-01327. Papers and exhibits preceded by "1329-" refer to IPR2018-01329. Papers and exhibits preceded by "1340-" refer to IPR2018-01340.

[3] Intel Corporation identifies itself and Apple Inc. ("Apple") as real parties in interest. Paper 2, 1.

[4] We address the other two *inter partes* reviews, IPR2018-01328 and IPR2018-01330, in a separate decision on remand entered concurrently with this Decision.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

grounds of unpatentability raised in the petitions.  Paper 8 ("Institution Decision" or "Inst. Dec."); 1327-Paper 8; 1329-Paper 8; 1340-Paper 8.

During trial, Patent Owner filed responses.  Paper 14 ("Response" or "PO Resp."); 1327-Paper 14; 1329-Paper 14; 1340-Paper 14.  Petitioner filed replies.  Paper 16 ("Reply" or "Pet. Reply"); 1327-Paper 16; 1329-Paper 16; 1340-Paper 16.  Patent Owner filed sur-replies.  Paper 19 ("Sur-reply" or "PO Sur-reply"); 1327-Paper 19; 1329-Paper 19; 1340-Paper 19.  On October 9, 2019, we conducted a consolidated oral hearing for all six related cases, including the four cases addressed in this Decision.  A copy of the transcript is included in the record.  Paper 29 ("Tr.").  With our authorization (*see* Paper 26), the parties subsequently filed additional briefs on the meaning of the claim term "generates the single power tracking signal based on a combination of the plurality of I and Q components."  Paper 27 (Patent Owner's brief); Paper 28 (Petitioner's brief).

Pursuant to 35 U.S.C. § 318(a), we issued final written decisions in the four cases addressed here.  Paper 30 ("Final Written Decision" or "Final Dec."); 1327-Paper 30; 1329-Paper 30; 1340-Paper 30.  We determined that Petitioner demonstrated by a preponderance of the evidence that all challenged claims, namely, claims 1–15, 17–25, and 27–33 of the '675 patent, are unpatentable.  Final Dec. 64; 1327-Paper 30, 80–81; 1329-Paper 30, 82; 1340-Paper 30, 86–87.  Patent Owner appealed our determinations that these challenged claims are unpatentable to the Federal Circuit.  Paper 31; 1327-Paper 31; 1329-Paper 31; 1340-Paper 31.

In its remand decision, the Federal Circuit addressed Patent Owner's arguments that "it was not afforded notice of, or an adequate opportunity to

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

respond to, the Board's construction of 'a plurality of carrier aggregated transmit signals,'" as well as Patent Owner's arguments "challeng[ing] the Board's construction of the power tracker limitation," which refers to the claim term "means for determining a single power tracking signal." *Qualcomm*, 6 F.4th at 1262.  The power tracker limitation appears in just one of four challenged independent claims, namely, claim 28, and the Federal Circuit "s[aw] no error" in our construction of that limitation. *Id.*  The Federal Circuit, however, agreed that "the Board violated [Patent Owner's] procedural rights with respect to the 'plurality of carrier aggregated transmit signals' limitation," vacated our final written decisions, and remanded for further proceedings. *Id.* at 1262, 1267.  Each of the four challenged independent claims includes the limitation "plurality of carrier aggregated transmit signals."  The Federal Circuit's mandate issued on September 17, 2021.  Paper 32.

We subsequently issued an order in each case authorizing post-remand briefing tailored narrowly to addressing whether we properly construed "plurality of carrier aggregated transmit signals," and to addressing the applicability of our construction of "plurality of carrier aggregated transmit signals" to the asserted prior art disclosures.  Paper 35, 2.  Petitioner filed opening briefs (Paper 36, "Pet. Remand Br."), Patent Owner filed responsive briefs (Paper 38, "PO Remand Resp."), Petitioner filed reply briefs (Paper 41, "Pet. Remand Reply"), and Patent Owner filed sur-reply briefs (Paper 48, "PO Remand Sur-reply").

We have considered the record anew by reviewing the parties' positions on remand.  For the reasons that follow, we determine that

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Petitioner has shown by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 of the '675 patent are unpatentable.

## II. BACKGROUND

### A. Related Proceedings

Prior to institution, the parties identified various matters involving the '675 patent, including a federal district court case, an International Trade Commission ("ITC") investigation, as well as the six petitions for *inter partes* review identified above. Pet. 1–2; Paper 5, 2. Since the entry of our institution decisions, Patent Owner has asserted that "[t]he '675 patent is currently not involved in any litigation beyond the PTAB." PO Resp. 16. Petitioner has not stated otherwise.

The six *inter partes* review cases that the parties identified are IPR2018-01326, IPR2018-01327, IPR2018-01328, IPR2018-01329, IPR2018-01330, and IPR2018-01340. Pet. 1–2; Paper 5, 2. These cases can be divided into two sets of cases, where the first set of cases includes IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340. These four cases involve prior art challenges based on Yu[5] as a primary reference. The second set of cases includes IPR2018-01328 and IPR2018-01330, which involve prior art challenges based on Chen[6] as a primary reference. As noted above, this Decision addresses only the first set of cases.

---

[5] Yu, EP 2442440 A1, published Apr. 18, 2012 (Ex. 1004).
[6] W. Chen et al., Hybrid Envelope Tracking for Efficiency Enhancement in Concurrent Dual-Band PAs, 54 Microwave & Optical Tech. Letters 662 (2012) (IPR2018-01328, Ex. 1212).

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

The second set of cases is addressed in a separate decision on remand entered concurrently with this Decision.

### B.  The '675 Patent

The '675 patent describes power tracking for generating a power supply voltage for a circuit, such as an amplifier, that processes multiple transmit signals sent simultaneously.  Ex. 1001, 1:8–10, 1:35–38.  Figure 5, which is reproduced below, illustrates a transmit module with power tracking for all transmit signals according to the '675 patent.  *Id.* at 1:65–67.



*FIG. 5*

In particular, Figure 5 shows transmit module 500, which includes K transmit circuits 540a to 540k that can simultaneously process K transmit

6

**Appx168**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

signals, with each transmit circuit processing one transmit signal. *Id.* at 6:34–37. Transmit module 500 also includes summer 552, power amplifier ("PA") 560, duplexer 570, and power tracking supply generator (or voltage generator) 580. *Id.* at 6:37–39.

Inphase (I) and quadrature (Q) samples for a transmit signal are provided to both a transmit circuit and voltage generator 580. Ex. 1001, 6:42–44. For example, transmit circuit 540a receives $I_1$ and $Q_1$ samples for a first transmit signal and generates a first upconverted radio frequency ("RF") signal for the first transmit signal. *Id.* at 6:40–42. Within transmit circuit 540a, the $I_1$ and $Q_1$ samples are converted to I and Q analog signals by digital-to-analog converters (DACs) 542a and 543a. *Id.* at 6:44–46. The I and Q analog signals are then filtered by lowpass filters 544a and 545a, amplified by amplifiers 546a and 547a, upconverted from baseband to RF by mixers 548a and 549a, and summed by summer 550a to generate the first upconverted RF signal. *Id.* at 6:46–50.

The other transmit circuits operate similarly. Ex. 1001, 6:54–57. Summer 552 receives all upconverted RF signals from the transmit circuits, sums the upconverted RF signals, and provides a modulated RF signal to PA 560. *Id.* at 6:59–62.

Within voltage generator 580, power tracker 582 receives $I_1$ to $I_K$ samples and $Q_1$ to $Q_K$ samples for all transmit signals being sent simultaneously. Ex. 1001, 6:63–65. Power tracker 582 then computes a digital power tracking signal based on the I and Q samples for these transmit signals and provides the digital power tracking signal to DAC 584. *Id.* at 6:65–7:1, 8:6–32. DAC 584 converts the digital power tracking signal to

7

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

analog and provides the analog power tracking signal to power supply generator 586. *Id.* at 7:1–4, Fig. 5. Power supply generator 586 generates a power supply voltage for PA 560. *Id.* at 7:6–8.

Once PA 560 receives both the modulated RF signal from summer 552 and the power supply voltage from power supply generator 586, PA 560 amplifies the modulated RF signal using the power supply voltage. Ex. 1001, 7:8–11. PA 560 then provides an output RF signal for all the transmit signals being sent simultaneously. *Id.* at 7:11–12. The output RF signal is routed through duplexer 570 and transmitted via antenna 590. *Id.* at 7:12–14.

## C. Illustrative Claim

Petitioner challenges claims 1–15, 17–25, and 27–33 of the '675 patent, all for our consideration on remand. Claims 1, 18, 28, and 33 are independent. Claim 1 is illustrative of the challenged claims and includes the subject matter the Federal Circuit instructed us to reconsider on remand:

1. An apparatus comprising:

a power tracker configured to determine a single power tracking signal based on a plurality of inphase (I) and quadrature (Q) components of a plurality of carrier aggregated transmit signals being sent simultaneously, wherein the power tracker receives the plurality of I and Q components corresponding to the plurality of carrier aggregated transmit signals and generates the single power tracking signal based on a combination of the plurality of I and Q components, wherein the plurality of carrier aggregated transmit signals comprise Orthogonal Frequency Division Multiplexing (OFDM) or Single Carrier Frequency Division Multiple Access (SC-FDMA) signals;

8

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

> a power supply generator configured to generate a single power supply voltage based on the single power tracking signal; and

> a power amplifier configured to receive the single power supply voltage and the plurality of carrier aggregated transmit signals being sent simultaneously to produce a single output radio frequency (RF) signal.

### D. Instituted Grounds of Unpatentability

As discussed above, we instituted *inter partes* review based on all grounds raised in the four petitions addressed here. Inst. Dec.; 1327-Paper 8; 1329-Paper 8; 1340-Paper 8. The instituted grounds are as follows.

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–6, 11, 17–22, 27, 33[7] | 103 | Yu, Wang[8] |
| 7–10, 28–32[9] | 103 | Yu, Wang, Choi[10] |
| 12[11] | 103 | Yu, Wang, Eliezer[12] |
| 13–15, 23–25[13] | 103 | Yu, Wang, Dahlman[14] |

---

[7] Petitioner challenges claims 1–6 and 18–22 in IPR2018-01326, and claims 11, 17, 27, and 33 in IPR2018-01327.

[8] Wang et al., *Design of Wide-Bandwidth Envelope-Tracking Power Amplifiers for OFDM Applications*, 53 IEEE Transactions on Microwave Theory & Techniques 1244 (2005) (Ex. 1005).

[9] Petitioner challenges claims 7–10 in IPR2018-01327, claims 28–30 in IPR2018-01329, and claims 31 and 32 in IPR2018-01340.

[10] Jinsung Choi et al., *Envelope Tracking Power Amplifier Robust to Battery Depletion*, 2010 IEEE MTT-S Int'l Microwave Symposium Digest 1074 (2010) (1327-Ex. 1108, at Ex. A).

[11] Petitioner challenges claim 12 in IPR2018-01327.

[12] Eliezer, US 2009/0004981 A1, published Jan. 1, 2009 (1327-Ex. 1111).

[13] Petitioner challenges claims 13–15 and 23–25 in IPR2018-01327.

[14] Erik Dahlman et al., 4G LTE / LTE-ADVANCED FOR MOBILE BROADBAND 11–12, 19, 27, 103–104, 132–135, 205, 347–351, 355–358, 389 (2011) (Ex. 1006). The same paper is entered in IPR2018-01327 as Exhibit 1106.

9

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

In support of its petitions, Petitioner relied on a declaration (Ex. 1003) as well as a reply declaration (Ex. 1031) of David Choi, Ph.D.  Patent Owner submitted with its responses a declaration of Tim Williams, Ph.D. (Ex. 2001[15]).  The transcripts of the depositions of Dr. Choi are entered in the record as Exhibits 2006 and 2007, and the transcript of the deposition of Dr. Williams is entered in the record as Exhibit 1030.

## III. ANALYSIS

### A. Final Written Decisions

Our discussion of the final written decisions focuses on our previous construction of the claim term "plurality of carrier aggregated transmit signals," as recited in challenged independent claims 1, 18, 28, and 33.  In the final written decisions, we began our analysis by addressing the parties' arguments regarding the construction of that term.  Final Dec. 17–24.  Based on our review of the claims and specification of the '675 patent, we disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires signals comprising transmissions on *component* carriers.  *Id.* at 19–20.  We explained that the '675 patent explicitly defines "carrier aggregation" as "operation on multiple carriers," and that it also explicitly defines "[a] transmit signal" as "a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc."  *Id.* (citing Ex. 1001, 2:63–64, 3:60–62).  We

---

[15] Patent Owner has included the designation "Ex. 2002" on each page of Dr. Williams's declaration.  Because the declaration is entered in the record as Exhibit 2001, we cite Exhibit 2001 when referring to the declaration.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

further determined that these definitions refer broadly to signals comprising transmissions on carriers. *Id.* at 20.

We also disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires signals *from a single terminal*. Final Dec. 20–22. We explained that the claim language recites nothing about signals from a single terminal. *Id.* at 21. We additionally explained that although the '675 patent discloses examples and embodiments where signals are from a single terminal, the specification does not limit "carrier aggregated transmit signals" to those examples and embodiments. *Id.* (citing Ex. 1001, 14:21–25 (stating that the "disclosure is not intended to be limited to the examples and designs described")). We further noted that the '675 patent teaches that a wireless device "'may send and/or receive transmissions' on multiple carriers according to various combinations of bands and band groups." *Id.* at 21–22 (citing Ex. 1001, 3:1–35). We found this to be consistent with Dahlman, extrinsic evidence regarding carrier aggregation, which Patent Owner cited as teaching that multiple carriers "are aggregated and jointly used for transmission *to/from* a single terminal." *Id.* at 22 (citing Ex. 1006, 104 (cited by PO Resp. 15)).

Lastly, we disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires extended bandwidth for a user transmission from a single terminal. Final Dec. 22. We explained that the claim language recites nothing about extended transmission bandwidth, and that although the '675 patent discloses an example where carrier aggregation provides extended transmission bandwidth, it does not limit "carrier aggregated transmit signals" to that example. *Id.* (citing Ex. 1001, 2:65–67

11

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

("Wireless device 110 *may* be configured with up to 5 carriers in one or two bands in LTE[16] Release 11.") (emphasis added)).

Turning to Petitioner's proposed construction for the term "plurality of carrier aggregated transmit signals," we noted its similar requirement of increasing the bandwidth for a user. Final Dec. 22. As with Patent Owner, we disagreed with Petitioner in this regard for the same reasons discussed above. *Id.* We additionally noted that Petitioner's counsel conceded during oral argument that this requirement "does not come specifically from the specification," and that Petitioner would not object to eliminating the requirement. *Id.* at 22–23 (citing Tr. 10:22–11:17).

We also disagreed with Petitioner that the term "plurality of carrier aggregated transmit signals" requires "signals for transmission . . . at the same time." Final Dec. 23. We explained that the claim recites "a plurality of carrier aggregated transmit signals being sent simultaneously," and that requiring signals for transmission *at the same time* would render the claim language "being sent simultaneously" redundant and superfluous. *Id.*

In summary, we concluded that the broadest reasonable interpretation of the claim term "plurality of carrier aggregated transmit signals" is "signals for transmission on multiple carriers." Final Dec. 23. We stated that "[o]ur construction is consistent with the '675 patent, which defines the term 'carrier aggregation' as 'operation on multiple carriers' and the term '[a] transmit signal' as 'a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" *Id.* (citing Ex. 1001, 2:63–64, 3:60–62). We additionally noted that "[o]ur construction

---

[16] LTE stands for Long Term Evolution. Ex. 1001, 2:21.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

also encompasses, but is not limited to, Patent Owner's proposed construction." *Id.*

After providing a brief overview of Yu, we addressed whether Petitioner demonstrated by a preponderance of the evidence that the teachings in Yu account for the "plurality of carrier aggregated transmit signals," as recited in each of independent claims 1, 18, 28, and 33. Final Dec. 31–36. In particular, consistent with our construction of the claim term "plurality of carrier aggregated transmit signals," we agreed with Petitioner that Yu's signals S1 and S2 are transmitted on multiple carriers at the same time because the signals are upconverted to different intermediate frequencies, where the difference in frequencies is maintained when the signals are subsequently summed and when they are upconverted again to different RF center frequencies. *Id.* at 36 (citing Pet. 42–44 (citing Ex. 1004 ¶ 48); Ex. 1004 ¶¶ 32, 57). We also credited the testimony of Petitioner's declarant Dr. Choi on this particular issue. *Id.* (citing Pet. 42–44 (citing Ex. 1003 ¶¶ 101–104)). As to Patent Owner's argument challenging Petitioner's showing for the recited "plurality of carrier aggregated transmit signals," we disagreed because Patent Owner relied on its proposed construction, which we determined "is overly narrow and improperly requires signals from a single terminal as well as providing extended transmission bandwidth for a user transmission from a single terminal." *Id.* at 58 (citing PO Resp. 40).

13

**Appx175**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

## B. The Federal Circuit's Remand Decision

Our discussion of the Federal Circuit's remand decision focuses only on the court's analysis regarding our construction of the recited "plurality of carrier aggregated transmit signals." On appeal to the Federal Circuit, Patent Owner argued that "it was not afforded notice of, or an adequate opportunity to respond to, the Board's construction of 'a plurality of carrier aggregated transmit signals.'" *Qualcomm*, 6 F.4th at 1262. The Federal Circuit agreed with Patent Owner that we "violated [Patent Owner's] procedural rights with respect to the 'plurality of carrier aggregated transmit signals' limitation." *Id.* The Federal Circuit explained that "the Board may adopt a claim construction of a disputed term that neither party proposes without running afoul of the [Administrated Procedure Act]." *Id.* As to the case here, however, the Federal Circuit pointed out that "the issue of whether increased bandwidth was a required part of the claim construction was not in dispute." *Id.* at 1262–63. That is, "[t]he Board's construction of 'a plurality of carrier aggregated transmit signals' diverged from the agreed-upon increased bandwidth requirement for the term." *Id.* at 1263. The Federal Circuit further noted that "[w]hile the Board did not change theories midstream or depart from a construction it previously adopted, it is still difficult to imagine either party anticipating that this agreed-upon matter of claim construction was a moving target," and that "unlike with disputed terms, it is unreasonable to expect parties to brief or argue agreed-upon matters of claim construction." *Id.* at 1263. The Federal Circuit counseled that "the Board needed to provide notice of and an adequate opportunity to respond to its

14

**Appx176**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

construction," which "departed from the agreed-upon increased bandwidth
requirement." *Id.* at 1263, 1265.

The Federal Circuit disagreed with Petitioner that the oral hearing
provided Patent Owner notice and an opportunity to respond. *Qualcomm*, 6
F.4th at 1263–64. The Federal Circuit explained that the panel's comment
during the hearing that it would think about whether the increased bandwidth
requirement is necessary "did not *provide* [Patent Owner] notice that the
Board might depart from the increased bandwidth requirement," where
"[t]he Board did not announce a construction, criticize the parties' agreed-
upon requirement, ask any follow-up questions to [Petitioner], or ask any
related questions to [Patent Owner]." *Id.* at 1264. The Federal Circuit
further explained that "[t]he hearing also did not provide an adequate
opportunity to respond" because the Board did not provide a theory or
rationale for departing from the agreed-upon requirement to which Patent
Owner could have responded, it did not ask Patent Owner questions about
the requirement, and it did not request additional briefing after the hearing.
*Id.* at 1264–65. The Federal Circuit added that Patent Owner did not have
an opportunity to introduce evidence addressing why an ordinarily skilled
artisan would have understood that the claim term "plurality of carrier
aggregated transmit signals" requires signals that increase bandwidth. *Id.* at
1265.

The Federal Circuit also disagreed with Petitioner that Patent Owner's
option to seek rehearing after receiving notice through the final written
decisions provided an adequate opportunity to respond. *Qualcomm*, 6 F.4th
at 1263, 1265. The Federal Circuit explained that "a party need not seek

15

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

rehearing in order to seek relief from a Board decision on appeal." *Id.* at
1265.  The Federal Circuit acknowledged that "it may have been a more
efficient use of resources had [Patent Owner] sought rehearing," but stated
that Patent Owner "was not required to do so." *Id.*

 Without deciding whether Patent Owner must show prejudice, as
Petitioner argued, the Federal Circuit further reasoned that Patent Owner had
made a sufficient showing.  *Qualcomm*, 6 F.4th at 1263 & n.3.  The Federal
Circuit explained that Patent Owner "argued throughout the IPR proceedings
that the prior art did not disclose the increased bandwidth requirement," and
that "[b]y removing that requirement, the Board eliminated an element on
which [Petitioner] bore the burden of proof." *Id.*  The Federal Circuit
additionally explained that "without notice of the Board's elimination of the
increased bandwidth requirement, [Patent Owner] had no reason to brief that
requirement or establish an evidentiary record supporting it, particularly
given the limited word count and breadth of issues in these IPRs." *Id.* at
1263–64.

 Accordingly, the Federal Circuit determined that we did not provide
Patent Owner adequate notice of and opportunity to respond to our claim
construction of "plurality of carrier aggregated transmit signals," vacated our
final written decisions, and remanded for further proceedings.  *Qualcomm*, 6
F.4th at 1267.

## *C.  Claim Construction*

 The claim construction standard applicable to these *inter partes*
review proceedings is the broadest reasonable interpretation in light of the

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

patent specification. *See* 37 C.F.R. § 42.100(b) (2018); *Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard).[17]   Under this standard, claim terms generally are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  That is, we give words "their plain meaning" unless, however, it is "inconsistent with the specification and prosecution history." *Arista Networks, Inc. v. Cisco Sys., Inc.*, 908 F.3d 792, 796–98 (Fed. Cir. 2018) (rejecting construction as "overly broad, even under the broadest reasonable interpretation standard"); *see also Personalized Media Comm'cns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) ("[T]he Board's interpretation must be reasonable in light of the specification, prosecution history, and the understanding of one skilled in the art.").

In view of the Federal Circuit's remand decision, we address the parties' arguments on remand as to whether we properly construed the claim

---

[17] The revised claim construction standard for interpreting claims in *inter partes* review proceedings as set forth in the final rule published October 11, 2018, does not apply to these proceedings because the new "rule is effective on November 13, 2018 and applies to all IPR, PGR and CBM petitions filed on or after the effective date."  Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (codified at 37 C.F.R. § 42.100(b) (2019)).  The petitions here were filed on July 3, 2018.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

term "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers."[18]

The term "plurality of carrier aggregated transmit signals" appears in each of challenged independent claims 1, 18, 28, and 33, as well as several dependent claims. Petitioner originally proposed that we construe this term to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." Pet. 32. On remand, however, Petitioner argues that we properly construed the term to mean, more broadly, "signals for transmission on multiple carriers." Pet. Remand Br. 7–12. As support, Petitioner contends that "the '675 patent provides explicit definitions for this claim term, by stating that 'carrier aggregation . . . *is* operation on multiple carriers' and 'a transmit signal *is* a signal comprising a transmission on one

---

[18] Referring to Petitioner's opening briefs, Patent Owner asserts that, "[c]ontrary to the Board's Order dated November 1, 2021 (Paper 35 ('Order') in IPR2018-01326), Petitioner filed six substantively different briefs, which collectively exceed the 20-page limit set by the Order." PO Remand Resp. n.1. Patent Owner does not identify any differences. We have reviewed Petitioner's six opening briefs, and they appear to be substantively similar except for the discussions as to the applicability of our previous construction of "plurality of carrier aggregated transmit signals" to the asserted prior art disclosures. *Compare, e.g.*, Pet. Remand Br., *with, e.g.*, IPR2018-01328, Paper 33. In that regard, the briefs in IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340 focus on Yu's disclosures, whereas the briefs in IPR2018-01328 and IPR2018-01330 focus on Chen's disclosures. Pet. Remand Br. 13–16; IPR2018-01328, Paper 33, 12–14. If the six briefs each included the discussions regarding both Yu and Chen, the briefs would be substantively the same, and the sum total of pages for each brief would be less than twenty. Pet. Remand Br. 1–16 (brief, including Yu discussion, comprising about sixteen pages); IPR2018-01328, Paper 33, 12–14 (Chen discussion comprising about two pages). Thus, it is harmless for us to consider Petitioner's opening briefs.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

or more carriers, a transmission on one or more frequency channels, etc.'"
*Id.* at 7 (quoting Ex. 1001, 2:63–64, 3:60–62). Petitioner asserts that "[t]he
Federal Circuit has recognized that the use of the term 'is' or similar
language can 'signify that a patentee is serving as its own lexicographer.'"
*Id.* (quoting *Sinorgchem Co., Shandong v. USITC*, 511 F.3d 1132, 1136
(Fed. Cir. 2007)).

Petitioner also points to various other portions of the specification.
Pet. Remand Br. 9. For example, Petitioner cites the teaching that "[c]arrier
aggregation may also be referred to as multi-carrier operation." *Id.* (citing
Ex. 1001, 2:64–65). Petitioner additionally cites the teaching that "[i]ntra-
band [carrier aggregation] refers to operation on multiple carriers within the
same band," and "[i]nter-band [carrier aggregation] refers to operation on
multiple carriers in different bands." *Id.* (citing Ex. 1001, 3:1–5).
According to Petitioner, these teachings "confirm[] the accuracy of the
Board's construction under the broadest reasonable interprterion standard."
*Id.*

Petitioner acknowledges that our previous construction is broader than
the construction it originally proposed in the petitions. Pet. Remand Br. 10.
In particular, our construction omits two requirements from Petitioner's
originally-proposed construction, namely, signals for transmission *at the
same time* and *increasing the bandwidth for a user*. *Id.* Petitioner explains
that it originally "proposed its construction in an effort to minimize
disputes," noting that its "construction was actually the Patent Owner's
construction in the earlier ITC proceeding." *Id.* Petitioner contends,
however, "[t]he Board properly omitted the limitation 'to increase the

**Appx181**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

bandwidth for a user' because, as the Board explained, the claim language says nothing about increasing bandwidth for a user." *Id.* at 10–11 (citing Final Dec. 22). Petitioner further asserts that "while the '675 patent ***does*** include an example of carrier aggregation increasing bandwidth, it ***does not*** expressly limit carrier aggregation to this purpose." *Id.* at 11 (citing Ex. 1001, 2:65–67 ("Wireless device 110 ***may*** be configured with up to 5 carriers in one or two bands in LTE Release 11.") (emphasis added)).

Petitioner adds that "the Board properly omitted the limitation 'at the same time'" because claim 1 recites "a plurality of carrier aggregated transmit signals being sent simultaneously," and requiring signals for transmission *at the same time* "would render superfluous the claim language 'being sent simultaneously.'" Pet. Remand Br. 11–12; *see id.* at 9 n.6.

Patent Owner responds that the term "carrier aggregated transmit signals" instead carries its ordinary and customary meaning, which Petitioner originally proposed in its petitions: "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." PO Remand Resp. 2, 9; *see also* Pet. 32. Patent Owner contends that "[w]hile it is true that transmission of signals on multiple carriers is an attribute of carrier aggregation, the [person having ordinary skill in the art] would have further understood the term to mean that the multiple component carriers are aggregated (*i.e.*, combined) to increase the bandwidth for a user." PO Remand Resp. 9 (internal citation omitted). As support, Patent Owner relies on the '675 patent, its prosecution history file, as well as extrinsic evidence.

Starting with the '675 patent, Patent Owner asserts that the specification "specifically describes an example of a user device (*i.e.*,

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

wireless device 110) that 'supports carrier aggregation' by being 'configured with up to 5 carriers in one or two bands [in LTE Release 11].'"  PO Remand Resp. 10 (quoting Ex. 1001, 2:63–67).  To illustrate, Patent Owner asserts that "user devices of earlier LTE systems were limited to the 20 MHz bandwidth of a single channel," whereas "the carrier aggregation introduced in LTE Release 11 enables a user device to aggregate up to five of these 20 MHz channels as component carriers of a single virtual channel having a bandwidth of up to 100 MHz." *Id.* (citing Ex. 1001, 2:59–60, 65–67, Figs. 2A–2D).  Patent Owner notes that "[t]he '675 patent further explains that LTE carriers may be aggregated from frequency bands listed in 3GPP TS (Technical Specification) 36.101," a 3GPP[19] technical report that Patent Owner points to specifically for describing carrier aggregation as "[a]ggregation of two or more component carriers in order to support wider transmission bandwidths." *Id.* at 11 (citing Ex. 1001, 2:58–62; quoting Ex. 2011, 14 (3GPP technical report)).

Moving on to the prosecution history of the '675 patent, Patent Owner asserts that the Examiner applied a U.S. publication, namely, the Chen publication,[20] in an Office action because it "discloses a plurality of carrier aggregated transmit signals." PO Remand Resp. 11 (quoting Ex. 1002, 266–279 (Office action, July 2, 2015)).  According to Patent Owner, the Chen publication "makes clear that its multi-carrier aggregation provides increased bandwidth." *Id.*  Patent Owner relies on the Chen publication's

---

[19] 3GPP stands for 3rd Generation Partnership Project.  Ex. 2011 (cover).
[20] Chen, U.S. Publication No. 2012/0321018 A1, published Dec. 20, 2012 (Ex. 2012).  The Chen publication is different than Chen, which is an asserted reference in the related cases not addressed here.

21

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

teaching that the "bandwidth of a signal constantly increases due to multi-carrier applications." *Id.* (quoting Ex. 2012 ¶ 4).

As to extrinsic evidence, Patent Owner points to teachings across various patents and publications to support its proposed construction on remand. PO Remand Resp. 12–13 (citing Ex. 2015, 6; Ex. 2016; Ex. 2017, 3:20–22; Ex. 2018, 3:27–62). For example, Patent Owner asserts that "U.S. Patent No. 9,161,254 teaches that carrier aggregation is a 'technique for providing additional bandwidth capacity to wireless devices' by 'aggregat[ing] . . . multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE).'" *Id.* at 12 (quoting Ex. 2017, 3:19–22[21]). Patent Owner also asserts that "a 2013 Qualcomm document states that '[c]arrier aggregation, as the name suggests, combines multiple carriers (a.k.a. channels) at the device to provide a bigger data pipe to the user.'" *Id.* (quoting Ex. 2015, 6).

With respect to our previous construction (which is Petitioner's proposed construction on remand), Patent Owner contends that it "is wrong because it reads 'aggregated' out of the term 'carrier aggregated transmit signals.'" PO Remand Resp. 13. Patent Owner asserts that "[a]ggregation refers to the process of combining constituent parts into a single thing." *Id.* (citing Ex. 2029 (dictionary defining "aggregation" as "the collecting of units . . . into a mass or whole")). Patent Owner further asserts that an ordinarily skilled artisan "would not have understood 'carrier aggregation' to be equivalent to any generic 'transmission on multiple carriers' because

---

[21] Patent Owner cites Exhibit 2017, lines 20 through 22, but the quoted language appears at lines 19 through 22.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

nothing is being aggregated when disparate signals are transmitted on different carriers to separate destinations." *Id.* at 14.

Patent Owner further contends "there is no lexicography" here, contrary to Petitioner's position. PO Remand Resp. 2 (capitalization and emphasis omitted); *see also* Pet. Remand Br. 7. Patent Owner asserts that "[w]hen the '675 patent sought to define a term, it used a very specific format, *i.e.*, putting the defined term in quotations marks, followed by the phrase 'is used herein to mean,' followed by the definition in quotation marks." PO Remand Resp. 3. For example, Patent Owner directs us to where the specification states, "The word 'exemplary' is used herein to mean 'serving as an example, instance, or illustration.'" *Id.* (citing Ex. 1001, 2:10–11). Patent Owner further asserts that "[n]one of the statements [Petitioner] relies on for the term 'carrier aggregated transmit signals' resembles this format" because "neither of [Petitioner's] citations employs the phrase 'is used herein to mean'" or "uses quotation marks for the term or its purported definition." *Id.* at 4 (citing Ex. 1001, 2:63–54, 3:60–62). As discussed above, Petitioner cites the '675 patent's statement that "carrier aggregation . . . is operation on multiple carriers" as well as its statement that "[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc." Pet. Remand Br. 7 (quoting Ex. 1001, 2:63–64, 3:60–62). According to Patent Owner, "[t]hese departures from the '675 patent's distinctive definitional format show that the patentee did not intend these statements to redefine the plain and ordinary meaning of 'carrier aggregated transmit signals.'" PO Remand Resp. 4; *see also id.* at 8 (characterizing "the

23

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

'675 patent's statement 'carrier aggregation . . . is operation on multiple carriers' [a]s nothing more than a generalized introduction to carrier aggregation, highlighting one aspect of it").

Patent Owner also urges that, "[t]aken together, the [person having ordinary skill in the art] would recognize that neither statement is definitional" because they additionally are inconsistent. PO Remand Resp. 5–6 (citing Ex. 1001, 2:63–64, 3:60–62); PO Remand Sur-reply 6–7. Patent Owner points out in particular that one statement "has a broader scope than the [other statement], encompassing transmission on *one or more* general frequencies rather than *multiple carriers*," and "is open-ended via its use of the word 'etc.'" PO Remand Resp. 6; *see also* PO Remand Sur-reply 6 ("For example, . . . 'transmit signals' includes transmission on ***one*** carrier, while 'carrier aggregation' is limited to implementations utilizing ***multiple*** carriers."). *Compare* Ex. 1001, 2:63–64 ("carrier aggregation . . . is operation on multiple carriers"), *with* Ex. 1001, 3:60–62 ("[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.").

Lastly, Patent Owner directs our attention to another Board decision in a different case, IPR2019-00128, in which, according to Patent Owner, the parties "litigated nearly the same issue that is now before the Board," namely, "the correct construction of the term 'carrier aggregation.'" PO Remand Resp. 14 (citing Ex. 2026). In that decision, the Board determined that "carrier aggregation" requires, in part, providing higher bandwidth. Ex. 2026, 24–26. The Board relied on intrinsic evidence in that case, including a technical report cited in the patent specification and a reference

24

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

relied on during prosecution. *Id.* Patent Owner asserts that the technical report cited there is the same 3GPP technical report cited in the '675 patent regarding LTE Release 11. PO Remand Resp. 17 (citing Ex. 1001, 2:60–67; Ex. 2026, 24).

In reply, Petitioner addresses Patent Owner's arguments regarding Petitioner's reliance on the '675 patent's two statements that "carrier aggregation . . . is operation on multiple carriers" and "[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc." Ex. 1001, 2:63–64, 3:60–62. Petitioner reiterates that "the Federal Circuit *has* found that 'is' can signal lexicography," and has further "held that specific or even explicit definitional formats are *not* required." Pet. Remand Reply 2; *see also id.* at 4 (asserting that "Patent Owner's argument . . . is contradicted by the Federal Circuit's holdings that the word 'is' may define a term"). Petitioner also asserts that "operation on multiple carriers" is a "definition [that] is in the 'Detailed Description' of the purported invention," rather than "a generalized introduction to carrier aggregation," contrary to Patent Owner's position. *Id.* at 4. As to Patent Owner's emphasis on the way the '675 patent defines "exemplary," Petitioner counters that "the alleged 'definitional format' . . . is merely a legal boilerplate definition of 'exemplary,'" a word that "is not a technical claim term." *Id.* at 3.

Regarding Patent Owner's characterization of the two statements as inconsistent with each other, Petitioner responds that Patent Owner "relies on a misquote of the definition of 'transmit signals'" and "omits the word 'channels.'" Pet. Remand Reply 3–4. Petitioner asserts that "[t]he actual

**Appx187**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

phrases in that definition—'transmission on one or more carriers' and 'transmission on one or more frequency channels'—which Patent Owner's own expert confirmed is 'reasonable'—are consistent and closely related because a carrier is transmitted on a frequency *channel*." *Id.* at 4 (citing Ex. 1001, 3:60–62; Ex. 1044 ¶¶ 10–17; Ex. 1041, 15:8–16:4). Petitioner further asserts that "Patent Owner also cites the 'etc.' in the definition but fails to identify what else is signaled by that language." *Id.*

Turning to Patent Owner's proposed construction of "plurality of carrier aggregated transmit signals," Petitioner argues that "Patent Owner seeks to import 'to increase the bandwidth for a user.'" Pet. Remand Reply 5. Petitioner contends that the "added language is improper because it imports an ***objective*** or potential ***result or benefit*** of carrier aggregation, not what carrier aggregation ***is***." *Id.* (citing *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1355 (Fed. Cir. 2014)). Petitioner adds that "increased signal bandwidth is only a ***potential*** result of carrier aggregation which may not occur." *Id.* at 6. As support, Petitioner relies on Dr. Choi's testimony in his reply declaration on remand. *Id.* at 6 n.5 (citing Ex. 1044 ¶¶ 18–29). To illustrate, Dr. Choi testifies,

> So, for example, . . . one component carrier from each of Band 1 and Band 18 can be carrier aggregated. . . . [I]n Band 1, carriers with 5, 10, 15, and 20 MHz bandwidths are available for aggregation . . . , while in Band 18, carriers with 5, 10, or 15 MHz are available for aggregation . . . .

> As one example where carrier aggregation would not result in increased bandwidth, ***aggregating a 5 MHz carrier from Band 1 . . . with a 5 MHz carrier from Band 18 . . . would only result in 10 MHz, which does not result in increased bandwidth compared with the bandwidth of a single, non-aggregated,***

26

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

> *carrier*, for instance, a single 20 MHz carrier in Band 1 . . . a
> single 15 MHz carrier in Band 1, or a single 15 MHz carrier in
> Band 18, etc.

Ex. 1044 ¶¶ 24–25.

Petitioner further contends that neither the specification, the prosecution history, nor the extrinsic evidence of record supports Patent Owner's proposed construction.  Pet. Remand Reply 6–7.  Referring to the specification, Petitioner asserts that it "states that multiple transmissions on different carriers '*may* have increased envelope bandwidth,'" its "discussion of Figures 2A–2D, cited by Patent Owner . . . does not mention increasing bandwidth," its "discussion of the LTE specification . . . mentions only that frequency bands may cover up to 200 MHz and 35 bands are supported in Release 11," and it "does not incorporate the statement in 3GPP TS 36.101 about 'carrier aggregation' quoted by Patent Owner."  *Id.* at 6 (citing Ex. 1001, 2:58–62, 6:10–12).  As for the prosecution history, Petitioner asserts that "[n]either the Examiner nor the applicant made *any* such argument or suggestion" about understanding "that increasing bandwidth for a user is a required part of the construction of 'carrier aggregated transmit signals.'"  *Id.* at 6–7.  Petitioner also notes that the Examiner never cited paragraph 4 of the Chen publication on which Patent Owner relies.  *Id.* at 7.  With respect to the extrinsic evidence, Petitioner asserts that it was not cited or considered during prosecution.  *Id.*  Petitioner adds that "[w]here, as here, the claim term is defined in the patent, reliance on such extrinsic evidence is improper."  *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584–85 (Fed. Cir. 1996)).

27

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Also, Petitioner contends that "Patent Owner wrongly criticizes the Board's construction for allegedly 'read[ing] "aggregated" out of the term'" because "the claims already state that the claimed apparatus 'produce[s] a single output radio frequency (RF) signal.'" Pet. Remand Reply 7 (citing Ex. 1044 ¶¶ 30–33).

Lastly, Petitioner contends that the Board's construction of "carrier aggregation" in the other decision, in IPR2019-00128, should not dictate our decision here because the construction there "***excludes*** 'for a user,' and relies on several prior art references not relevant here." Pet. Remand Reply 8. Petitioner also submits, "More importantly, [the] Board's construction here is consistent with the ALJ's construction of the same term in the associated ITC investigation as 'simultaneous operation on multiple carriers,' whereas the [other] construction—currently on appeal—is not." *Id.* (citing Ex. 1042, 37–42). Petitioner asserts that "[t]he ALJ's construction and reasoning expressly rejected the inclusion of 'to increase the bandwidth for a user.'" *Id.* (citing Ex. 1042, 37–42).

Patent Owner counters that "increased user bandwidth is the necessary purpose of carrier aggregation," and that "Dr. Choi fails to show that carrier aggregation does not always increase the bandwidth of a user." PO Remand Sur-reply 2. Referring to Dr. Choi's example discussed above (*see also* Ex. 1044 ¶ 25), Patent Owner asserts that "[a]ggregating *two 5-MHz carriers* necessarily increases the bandwidth for a user as compared to a *single 5-MHz carrier* allocated to the user and Dr. Choi admits this." PO Remand Sur-reply 2 (citing Ex. 2030, 28:2–24 ("So I think you're asking me if you were to aggregate these two 5-megahertz carriers for a resultant total

28

**Appx190**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

aggregated bandwidth of 10 megahertz, would that be greater than if you were just to have a single 5-megahertz carrier. And the answer's, obviously, yes because ten is greater than five.")). Patent Owner adds that during prosecution "[t]he applicant amended the claims based on the prior art to recite 'carrier *aggregated* transmit signals' (Ex. 1002 at 237), and the increased bandwidth requirement gives meaning to the explicitly recited 'aggregat[ion].'" *Id.* at 2–3. Patent Owner states that "[p]ointing to other language in the claim as allegedly establishing the 'aggregating' concept," as Petitioner does, "would cause the word 'aggregated,' where it is recited in the claim, to be superfluous." *Id.* at 5 (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)).

   With respect to Petitioner's contention that Patent Owner's proposed construction on remand is unsupported by the specification, the prosecution history, and the extrinsic evidence, Patent Owner responds that Petitioner "point[s] to no counter-examples where increased bandwidth for a user is not present." PO Remand Sur-reply 3. Patent Owner also notes Petitioner "does not even attempt to show" that the statement in the 3GPP technical report describing carrier aggregation as "[a]ggregation of two or more component carriers in order to support wider transmission bandwidths" is "wrong or inconsistent with the [person having ordinary skill in the art's] understanding of the term." *Id.*; *see also id.* at 4 (stating "[Petitioner's] only counter to [Patent Owner's] evidence that the Examiner understood 'carrier aggregation' to increase the bandwidth of a user is that [Patent Owner] cited Chen paragraph [0004], whereas the Examiner specifically cited paragraph [0007]"); *id.* at 4 (stating "[Petitioner's] further criticism that

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

[Patent Owner's] 'external documents' were not 'cited or considered during prosecution' just means that they are extrinsic evidence" (internal citation omitted)).

Patent Owner further maintains its position that there is no lexicography in this case. PO Remand Sur-reply 6–8. Patent Owner adds that Petitioner "cites no authority for the proposition that two alleged definitions can be combined to yield lexicography for a disputed claim term." *Id.* at 7. Lastly, Patent Owner notes that "there is no rule forbidding generalized introductions in a patent's detailed description." *Id.* at 8.

On the record now before us, we determine that our previous construction of "plurality of carrier aggregated transmit signals" (i.e., "signals for transmission on multiple carriers") is overly broad. As Petitioner points out, the '675 patent "stat[es] that 'carrier aggregation . . . *is* operation on multiple carriers' and 'a transmit signal *is* a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" Pet. Remand Br. 7 (quoting Ex. 1001, 2:63–64, 3:60–62). Read together in isolation, we agree with Petitioner that these statements in the specification say "carrier aggregated transmit signals" means "signals for transmission on multiple carriers." Our construction, however, must also take into account the prosecution history. *See Personalized Media*, 952 F.3d at 1340. The prosecution history "facilitates claim construction by revealing the intended meaning and scope of technical terms and may even trump the weight of specification language in some circumstances." *TDM Am., LLC v. U.S.*, 85 Fed. Cl. 774, 788 (2009) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir.

30

1999)).  For example, "an applicant's amendment accompanied by explanatory remarks can define a claim term by demonstrating what the applicant meant by the amendment." *Personalized Media*, 952 F.3d at 1340. Thus, "like the specification, the prosecution history can act like a dictionary." *Hemphill v. McNeil-PPC, Inc.*, 25 F. App'x 915, 918 (Fed. Cir. 2001) (non-precedential).

Here, during prosecution of the '675 patent, the applicant amended independent claim 1 to recite "a plurality of different transmit signals" as well as "a power amplifier to receive . . . the plurality of different transmit signals . . . and to produce a single output RF signal."  Ex. 1002, 189 (Amendment, Nov. 12, 2014).  The applicant later amended claim 1 again solely to replace "a plurality of *different* transmit signals" with "a plurality of *carrier aggregated* transmit signals," and remarked to the Examiner that "[i]t is Applicant's understanding that the above amendments place all claims in a condition for allowance."  *Id.* at 237, 246 (Amendment, March 6, 2015).  The applicant similarly amended the other independent claims during prosecution.  *Id.* at 191–194, 240–241, 243–244.

Based on the applicant's amendments, we agree with Patent Owner that maintaining our previous construction of "plurality of carrier aggregated transmit signals" as "signals for transmission on multiple carriers" would ignore the word "aggregated."  *See* PO Remand Resp. 13–14.  The amendment limiting the recited signals to "carrier aggregated" signals indicates that the claims require something more than just signals for transmission on multiple carriers; otherwise, the claims would encompass signals that are *not* carrier aggregated.  *See, e.g.*, Ex. 1001, 6:10–12

("Multiple transmit signals may be sent on different frequencies (e.g., different carriers) and hence *may* have increased envelope bandwidth." (emphasis added)) (cited by Pet. Remand Reply 6); Ex. 1002, 189, 237 (application claims reciting *different* transmit signals before being amended to recite *carrier aggregated* transmit signals).  Thus, our previous construction of "plurality of carrier aggregated transmit signals," though consistent with the specification language, is broader than the applicant's intended meaning and scope of the term as illuminated by the prosecution history.

We note Petitioner's contention that the claim limitation "produc[ing] a single output radio frequency (RF) signal" accounts for the claim term "aggregated."  Pet. Remand Reply 7.  As discussed above, however, that limitation was already included in the claims before the applicant amended them to require "carrier aggregated" signals.  *Compare* Ex. 1002, 189 (Amendment, Nov. 12, 2014), *with id.* at 237 (Amendment, March 6, 2015). Thus, if producing a single output RF signal were to account for "aggregated," as Petitioner urges, then "aggregated" would be rendered superfluous.  *See Dig.-Vending Servs. Int'l, LLC v. Univ. of Phx., Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (noting "the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered superfluous").

We turn now to Patent Owner's proposed construction on remand, namely, "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user," which can be divided into three parts: (1) "signals for transmission on multiple carriers," (2) "at the same time,"

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

(3) "to increase the bandwidth for a user." PO Remand Resp. 9. The parties' dispute in this regard addresses primarily the third part of Patent Owner's proposed construction, centering on whether the broadest reasonable interpretation of "plurality of carrier aggregated transmit signals" requires increasing bandwidth.[22] *See* Pet. Remand Br. 10–12; PO Remand Resp. 9–18; Pet. Remand Reply 5–8; PO Remand Sur-reply 1–5. We determine that the intrinsic evidence supports this aspect of Patent Owner's proposed construction.

"[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence," and "when prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (quoting *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000)) (other

---

[22] Petitioner does not dispute the first part of Patent Owner's proposed construction. *See* Pet. Remand Br. 7 ("The Board construed the claim term 'plurality of carrier aggregated transmit signals' to mean 'signals for transmission on multiple carriers.' This construction is correct." (internal citation omitted)). With respect to the second part of the construction, we note Petitioner's contention that our previous construction properly omitted "at the same time." *See id.* at 11–12. Determining whether "plurality of carrier aggregated transmit signals" requires this aspect of Patent Owner's proposed construction, however, is not necessary to resolve any controversy here. *See Vivid Techs.*, 200 F.3d at 803 (explaining that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy").

33

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

citations omitted). Thus, for the third part of Patent Owner's proposed
construction, we rely on the 3GPP technical report cited in the '675 patent,
as well as the Chen publication, which was cited in the prosecution history
of the '675 patent. The 3GPP technical report defines "[c]arrier
aggregation" as "[a]ggregation of two or more component carriers in order
to *support wider transmission bandwidths*." Ex. 2011, 14 (emphasis added)
(cited by Ex. 1001, 2:60–62 ('675 patent)). The Chen publication
additionally states that the "*bandwidth of a signal constantly increases* due
to multi-carrier applications." Ex. 2012 ¶ 4 (emphasis added) (cited by
Ex. 1002, 270 (Office Action, July 2, 2015)).

The teachings in both the 3GPP technical report and the Chen
publication are consistent with contemporaneous extrinsic evidence
introduced into the record on remand. For example, as discussed above,
Patent Owner directs us to U.S. Patent No. 9,161,254, which states that
"[o]ne technique for providing additional bandwidth capacity to wireless
devices is through the use [of] carrier aggregation of multiple smaller
bandwidths to form a virtual wideband channel at a wireless device (e.g.,
UE)." Ex. 2017, 3:19–22 (quoted in PO Remand Resp. 12); *see also id.* at
3:49–51 ("Carrier aggregation . . . enable[s] more bandwidth to be
obtained.") (cited by PO Remand Resp. 12). The application for that patent
was filed in May 2013, just three months after the application for the
'675 patent was filed. Ex. 1001, code (22); Ex. 2017, code (22). Similarly,
Patent Owner draws our attention to a 2013 Qualcomm paper, which states
that "[c]arrier aggregation, as the name suggests, combines multiple carriers

34

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

. . . at the device to provide a bigger data pipe to the user." Ex. 2015, 6 (quoted in PO Remand Resp. 12).

We note Petitioner's contention that the passage in the Chen publication on which Patent Owner relies was never cited by the Examiner. *See* Pet. Remand Reply 7. That passage provides additional support for the definition of carrier aggregation that is provided in the 3GPP technical report, however, and is therefore relevant to our analysis here. *See V-Formation*, 401 F.3d at 1311; *see also* Ex. 1002, 278 (the Examiner advising the applicant during prosecution "to fully consider the [cited] references in their entirety as potentially teaching all or part of the claimed invention, as well as the context of the passage as taught by the prior art or disclosed by the Examiner"). Moreover, contrary to Petitioner's position, that neither the Examiner nor the applicant explicitly expressed an understanding that carrier aggregation requires increasing bandwidth does not change what is taught in the 3GPP technical report or in the Chen publication, both part of the intrinsic evidence. *See* Pet. Remand Reply 6–7 (Petitioner arguing that "the file history does not support Patent Owner's argument that the Examiner 'understood' that increasing bandwidth for a user is a required part of the construction of 'carrier aggregated transmit signals'" because "[n]either the Examiner nor the applicant made ***any*** such argument or suggestion").

We further note Petitioner's contention that the third part of Patent Owner's proposed construction, increasing bandwidth, "is improper because it imports an objective or potential result or benefit of carrier aggregation, not what carrier aggregation is." Pet. Remand Reply 5 (emphases omitted). Petitioner relies on *Braintree*, a Federal Circuit case in which the court

35

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

rejected the argument that "purgation" means cleansing, even though "the specification . . . indicates that a dosage amount is 'effective' only if it produces a clean colon in preparation for a colonoscopy." *Braintree*, 749 F.3d at 1354–55. The court explained that "while cleansing is the goal specifically articulated in the specification, it is not a claim requirement," where the claims "only require that the compositions 'induce' (i.e., bring about or start) diarrhea," rather than "achiev[e] a fully cleansed colon." *Id.*

Petitioner's reliance on *Braintree* is misplaced. The facts here are different. Specifically, the claims of the '675 patent require *carrier aggregated* transmit signals. The 3GPP technical report noted above, which is part of the intrinsic evidence, defines "carrier aggregation" as "[a]ggregation of two or more component carriers in order *to support wider transmission bandwidths*." Ex. 2011, 14 (emphasis added); *see also* Ex. 2012 ¶ 4 (Chen publication, also part of the intrinsic evidence, stating that the "*bandwidth of a signal constantly increases* due to multi-carrier applications" (emphasis added)). Thus, carrier aggregation *is* the aggregation of two or more carriers in order *to support wider transmission bandwidths*. As discussed above, the extrinsic evidence supports this definition. *See* Ex. 2015, 6 ("Carrier aggregation, as the name suggests, combines multiple carriers . . . at the device to provide a bigger data pipe to the user."); Ex. 2017, 3:19–22 ("One technique for providing additional bandwidth capacity to wireless devices is through the use [of] carrier aggregation of multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE)."), 49–51 ("Carrier aggregation . . . enable[es] more bandwidth to be obtained.").

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Dr. Choi's example about aggregating two 5 MHz carriers from different bands also supports this definition. *See* Ex. 1044 ¶¶ 24–25 (cited by Pet. Remand Reply 6 n.5). Dr. Choi states that the aggregation of two 5 MHz carriers, which would provide a bandwidth of 10 MHz, "does not result in increased bandwidth compared with the bandwidth of a single, non-aggregated, carrier, for instance, a single 20 MHz carrier." *Id.* ¶ 25 (emphasis omitted). As Patent Owner points out, however, such aggregation "necessarily increases the bandwidth for a user as compared to a *single 5-MHz carrier* allocated to the user." PO Remand Sur-reply 2. We agree with Patent Owner's reasoning in this regard. *See* Ex. 2011, 14 (defining "[c]arrier aggregation" as "[a]ggregation of two or more *component* carriers in order *to support wider transmission bandwidths*" (emphases added)). Indeed, Dr. Choi testified at his deposition on remand, "So I think you're asking me if you were to *aggregate these two 5-megahertz carriers for a resultant total aggregated bandwidth of 10 megahertz*, would that be greater than if you were just to have a single 5-megahertz carrier. And the answer's, obviously, yes because ten is greater than five." Ex. 2030, 28:2–24 (emphasis added) (cited by PO Remand Sur-reply 2). Consistently, Dr. Choi also previously testified in his reply declaration during trial,

> LTE explicitly allows for transmission of *two aggregated 1.4 MHz signals*, even though the standard can also transmit a single 20 MHz carrier, which provides much higher bandwidth than the *combined bandwidth of 2.8 MHz*. . . . [C]arrier aggregation can achieve higher data rates and can increase the overall capacity of wireless networks by allowing network operators to exploit fragmented spectrum allocations. . . . *Aggregating two narrow band signals could do precisely that—increasing bandwidth by using fragmented spectrum allocations*.

37

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Ex. 1031 ¶ 25 (emphases added) (cited by PO Remand Sur-reply 2).

In view of the foregoing, we adopt Patent Owner's proposed construction of "plurality of carrier aggregated transmit signals" on remand (which is the same construction that Petitioner originally proposed in its petitions), namely, "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user."[23] *See* PO Remand Resp. 9; Pet. 32. For the reasons given above, our construction is supported by the intrinsic evidence. *See, e.g.*, Ex. 1001, 2:60–67, 3:60–62 ('675 patent); Ex. 1002, 189, 237, 246 (prosecution history file); Ex. 2011, 14 (3GPP technical report); Ex. 2012 ¶ 4 (Chen publication). Our construction also is consistent with relevant extrinsic evidence. *See, e.g.*, Ex. 2015, 6; Ex. 2017, 3:19–22, 3:49–51. Further, our construction reflects Petitioner's proposed language on remand, "signals for transmission on multiple carriers," as well as portions of the specification cited by Petitioner. *See* Pet. Remand Br. 7 (citing Ex. 1001, 2:63–64, 3:60–62).

### D. *Obviousness Based on Yu*

Petitioner asserts that claims 1–6, 11, 17–22, 27, and 33 would have been obvious over Yu and Wang; claims 7–10 and 28–32 would have been

---

[23] As previously noted, determining whether "plurality of carrier aggregated transmit signals" requires the second part of Patent Owner's proposed construction, "at the same time," is not necessary to resolve any controversy here. *See Vivid Techs.*, 200 F.3d at 803. We explain below it is undisputed that the asserted prior art teaches this aspect of Patent Owner's proposed construction. *See infra* Part III.D.2.a.ii. The outcome of our obviousness analysis would thus be the same whether or not our construction requires "at the same time."

obvious over Yu, Wang, and Choi; claim 12 would have been obvious over Yu, Wang, and Eliezer; and claims 13–15 and 23–25 would have been obvious over Yu, Wang, and Dahlman.  Pet. 35–75; 1327-Paper 3, 12–79; 1329-Paper 3, 24–79; 1340-Paper 3, 22–75.  Patent Owner opposes.  PO Resp. 30–41.  For the reasons explained below, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 would have been obvious over the asserted grounds.

We start with an overview of Yu.  As the issues in dispute all turn on the teachings and suggestions of Yu, we do not address the substance of Wang, Choi, Eliezer, or Dahlman.

### 1. Overview of Yu

Yu states that its "inventive principle may be considered as an extension to the known principle of envelope-tracking amplifiers, which determine an envelope signal of the radio frequency signal to be amplified, and which control the voltage supply to the power amplifier depending on said envelope signal."  Ex. 1004 ¶ 8.  Figure 1, which is reproduced below, illustrates a power amplifier system according to Yu.  *Id.* ¶ 33.

Fig. 1



39

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

As Figure 1 shows, Yu's power amplifier system includes signal processing unit SP, control unit 100, and power amplifier PA. *Id.* ¶¶ 33, 37–38. Input signals S1 and S2 are forwarded to signal processing unit SP, which transforms the input signals into radio frequency signal $S_{RF}$. *Id.* ¶ 37. Power amplifier PA is configured to amplify radio frequency signal $S_{RF}$, which is fed to an input of power amplifier PA. *Id.* ¶ 33. Power amplifier PA comprises power amplifier supply voltage module PA'. *Id.* ¶ 35. Power amplifier supply voltage module PA' is configured to modify supply voltage Vsup, which is applied to power amplifier PA. *Id.*

Control unit 100 is used to control the operation of power amplifier PA and its supply voltage module PA'. Ex. 1004 ¶ 38. Control unit 100 has digital signal processing means DSP, which derive control signal CTRL based on input signals S1 and S2. *Id.* According to Yu, by deriving control signal CTRL in this way, "an improved supply voltage control for the power amplifier PA as compared to conventional envelope tracking systems may be obtained, especially in such cases, where more than one input signal S1, S2, . . . is to be processed to obtain said RF signal $S_{RF}$." *Id.* ¶ 39.

### 2. Analysis

As discussed above, the Federal Circuit explained in its remand decision that we "needed to provide notice of and an adequate opportunity to respond to [our] construction" of the claim limitation "plurality of carrier aggregated transmit signals," and then it remanded for further proceedings. *Qualcomm*, 6 F.4th at 1263, 1267. Our analysis here thus focuses on

40

**Appx202**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

whether the asserted prior art teaches or suggests the limitation "plurality of carrier aggregated transmit signals" in view of our construction on remand. We incorporate our prior analysis of other aspects of the challenged claims, which do not turn on the resolution of our construction on remand. *See* Final Dec.; 1327-Paper 30; 1329-Paper 30; 1340-Paper 30.

### a. Independent Claims 1, 18, 28, and 33

Each of independent claims 1, 18, 28, and 33 recites, in relevant part, "plurality of carrier aggregated transmit signals." As discussed above, we construe "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." *Supra* Part III.C. This construction can be divided into three parts: (1) "signals for transmission on multiple carriers," (2) "at the same time," (3) "to increase the bandwidth for a user." We address each part of the construction in turn.

### i. "signals for transmission on multiple carriers"

In its opening brief on remand, Petitioner maintains its position set forth in the petitions that Yu teaches signals for transmission on multiple carriers. *Compare* Pet. 41–44, *with* Pet. Remand Br. 13–16. Petitioner identifies Yu's input signals S1 and S2 as "carrier aggregated transmit signals." Pet. Remand Br. 13 (citing Pet. 41–44); *see also* Pet. 42 ("Signals S1 and S2 form 'carrier aggregated transmit signals.'"). To illustrate, Petitioner provides an annotated version of Figure 3 of Yu, which is reproduced below. Pet. Remand Br. 13–14; *see also* Pet. 43.

41

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2



Fig. 3

Figure 3 of Yu, as annotated by Petitioner, is a signal flow diagram. *See* Ex. 1004 ¶¶ 32, 57. Petitioner asserts that signals S1 and S2 are upconverted to different intermediate frequencies, as shown in the red box. Pet. Remand Br. 14 (citing Ex. 1004 ¶ 48); *accord* Pet. 43. Petitioner further asserts that the difference in frequencies is maintained when the signals are subsequently summed by adder a1, as shown in the blue box, and when they are upconverted again to different RF center frequencies, as shown in the yellow box. Pet. Remand Br. 14–15; *see also* Pet. 43–44. Petitioner contends that "Figure 3 shows that Yu's signals S1 and S2 are transmitted on multiple carriers at the same time," therefore satisfying the first part of our construction of "plurality of carrier aggregated transmit signals," namely, "signals for transmission on multiple carriers." Pet. Remand Br. 15; *see also* Pet. 42–44. Petitioner relies on Dr. Choi's testimony from his declaration submitted in support of the petitions. Pet. Remand Br. 15–16 (citing Ex. 1003 ¶¶ 100–103).

Petitioner adds that "Figure 4 [of Yu] also shows that signals S1 and S2 are signals for transmission on multiple carriers," pointing specifically to

42

**Appx204**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

"the frequency diagram to the left of the PA show[ing] signals S1 and S2 being transmitted on different carrier frequencies." Pet. 44; *see also* Pet. Remand Br. 15–16 (providing an analysis for Figure 4 of Yu that is similar to the analysis for Figure 3 of Yu).

Patent Owner does not dispute Petitioner's showing for this aspect of our construction. *See* PO Remand Resp. 19–20; PO Resp. 40–41.

Based on the record before us, we are persuaded that Yu teaches signals for transmission on multiple carriers.

### ii.  "at the same time"

As discussed above, Petitioner argues on remand that "plurality of carrier aggregated transmit signals" does not require the second part of our construction, "at the same time." Pet. Remand Br. 7, 11–12. In its opening brief, however, Petitioner nonetheless asserts that "Figure 3 [of Yu] shows that Yu's signals S1 and S2 are transmitted on multiple carriers *at the same time*." *Id.* at 15 (emphasis added); *see also id.* at 14 (Petitioner's annotated version of Yu's Figure 3). This is consistent with Petitioner's position set forth in its petitions, where Petitioner "applie[d] the construction, 'signals for transmission on multiple carriers at the same time to increase the bandwidth for a user,'" which is the same as our construction on remand. Pet. 41–43. In particular, Petitioner argued in its petitions that "Yu's transmit signals S1 and S2 are sent simultaneously." *Id.* at 41. As support, Petitioner pointed to Yu's teaching of "simultaneously process[ing] various input signals." Ex. 1004 ¶ 15 (cited by Pet. 42). Yu explains that "both input signals may simultaneously be processed by the digital signal

processing means," which "performs per se known signal processing techniques to transform the various input signals S1, S2, . . . into the radio frequency signal $S_{RF}$." *Id.* ¶¶ 16, 37 (cited by Pet. 42).

Patent Owner does not dispute Petitioner's showing for this aspect of our construction. *See* PO Remand Resp. 19–20; PO Resp. 40–41.

Based on the record before us, we are persuaded that Yu teaches signals for transmission on multiple carriers *at the same time*.

### iii. "to increase the bandwidth for a user"

Petitioner also argues on remand that "plurality of carrier aggregated transmit signals" does not require the third part of our construction, "to increase the bandwidth for a user." Pet. Remand Br. 7, 10–11. In its petitions, however, Petitioner "applie[d] the construction, 'signals for transmission on multiple carriers at the same time to increase the bandwidth for a user.'" Pet. 41–43. As noted above, this construction is the same as our construction on remand. We thus consider the parties' arguments during trial.

In the petitions, Petitioner contends that an ordinarily skilled artisan "would have understood Yu's method of aggregating multiple signals on different frequencies increases the bandwidth for a user, allowing more information to be transmitted per unit of time." Pet. 44. As support, Petitioner directs us to where Yu states that "both input signals may simultaneously be processed by the digital signal processing means." *Id.* (citing Ex. 1004 ¶ 16); *see also* Ex. 1004 ¶ 15 ("This advantageously enables to simultaneously process various input signals according to different

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

communications standards . . . .") (cited by Pet. 44).  Petitioner relies on the declaration testimony of Dr. Choi.  Pet. 44 (citing Ex. 1003 ¶ 104).

Petitioner further notes in the petitions that "Patent Owner has argued in the ITC that Yu does not disclose an increase of bandwidth 'for a user' because Yu is allegedly directed to transmissions by a base station, not by a mobile device."  Pet. 44 n.6.  Petitioner asserts that "Yu, however, states expressly that its PA 'may e.g. be employed in wireless communications systems such as base stations of cellular communications networks *or wireless transceivers of mobile terminals and the like*.'"  *Id.* at 44–45 n.6 (quoting Ex. 1004 ¶ 34 (emphasis added in Pet.)).  Petitioner thus contends that, "even if Yu were directed to base stations and the claims were limited to mobile devices, it would have been obvious to a [person of ordinary skill in the art] to take advantage of Yu's invention in a mobile device."  *Id.* at 45 n.6.  Petitioner relies on the declaration testimony of Dr. Choi.  *Id.* (citing Ex. 1003 ¶ 104 n.4).

In its responses, Patent Owner counters that "Yu's Figure 3 and Figure 4 embodiments describe base station technology that is processing signals provided by different users."  PO Resp. 40.  According to Patent Owner, "[i]n providing a system that 'simultaneously process[es] various input signals *according to different communication standards*, which have completely different target frequency ranges, with only one power amplifier,' Yu's base station is processing signals from different users," which "fails to disclose '*signals from a single terminal* utilizing multiple component carriers *which provide extended transmission bandwidth for a*

45

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

*user transmission* from the single terminal.'" *Id.* Patent Owner relies on the declaration testimony of Dr. Williams. *Id.* (citing Ex. 2001 ¶¶ 112–113).

Patent Owner adds that "the Figure 3 and Figure 4 base station implementations . . . are not appropriate for use in mobile terminals." PO Resp. 23. Patent Owner recognizes Yu's teaching that "its power amplifier embodiments may 'be employed in wireless communications systems such as base stations of cellular communications networks or wireless transceivers of mobile terminals,'" but contends that "due to power constraints, no mobile terminal at the critical date could implement power amplifiers that cover the bandwidth described with respect to Yu Figures 3 and 4." *Id.* at 23–24 (quoting Ex. 1004 ¶ 34). Patent Owner also states that "Figure 2 of Yu discloses a mobile-terminal-appropriate system for controlling a supply voltage of a power amplifier," and that "[i]t is noteworthy that [Petitioner] does not cite to Figure 2 as disclosing any claim limitations." *Id.* at 23. Patent Owner relies on the declaration testimony of Dr. Williams. *Id.* at 23–24 (citing Ex. 2001 ¶¶ 65–68).

Petitioner replies that "Patent Owner's argument relies entirely on the assumptions that (1) 'user' in this claim construction refers only to an individual mobile device owner, and (2) Yu is inapplicable because Figures 3 and 4 from Yu are limited to transmissions by base stations," both of which Petitioner says "are wrong." Pet. Reply 21. Regarding the first assumption, Petitioner contends that "[i]f a base station is processing two signals, then it is undisputed that the bandwidth for that user, i.e., the base station, is increased." *Id.*

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

As to the second assumption, Petitioner contends that carrier aggregation "is not, in ordinary usage, limited to the transmission of signals by a wireless device to a base station, *i.e.*, it is not limited to 'uplink' transmissions." Pet. Reply 21. As support, Petitioner directs us to where Dahlman describes carrier aggregation as "multiple component carriers [that] are aggregated and jointly used for *transmission to/from a single terminal*." Ex. 1006, 104 (emphasis added & original emphasis omitted) (cited by Pet. Reply 21–22). In other words, according to Dahlman, "component carriers can be aggregated for the downlink and uplink." *Id.* (cited by Pet. Reply 22). Petitioner also notes that Patent Owner stated at the ITC *Markman* hearing that "carrier aggregation . . . can be used in both the uplink and downlink a[s] it exists in systems, and the patent is really agnostic as to that." Pet. Reply 22 (quoting Ex. 1029, 143:17–19); *see also* Ex. 1030, 45:5–12 (Dr. Williams's deposition transcript) (cited by Pet. Reply 22).

With respect to Petitioner's user argument, Patent Owner responds that it "is inconsistent with the plain and ordinary meaning of 'user' and contradicted by the '675 patent and other evidence of record." PO Sur-reply 21–22. As support, Patent Owner asserts that "the '675 patent uses the term 'user equipment (UE)' to refer to a wireless device 110, as depicted in Fig. 1," whereas "the base stations 130, 132 of Fig. 1 are only referred to as 'base stations,'" never as "users" or "user equipment." *Id.* at 22 (citing Ex. 1001, 2:28–34, Fig. 1). In particular, the '675 patent teaches that its "[w]ireless device 110 may also be referred to as a user equipment (UE), a mobile station, a terminal, an access terminal, a subscriber unit, a station,

etc." Ex. 1001, 2:32–34.  Patent Owner also directs us to a 2010 3GPP technical paper that distinguishes between user equipment and base stations. PO Sur-reply 23 (citing Ex. 1036, 6 (listing technical reports titled "User Equipment (UE) radio transmission and reception" and "Base Station (BS) radio transmission and reception")).

Turning to Petitioner's uplink/downlink argument, Patent Owner counters that "in both the uplink and downlink scenarios, the bandwidth must be extended for a *single user terminal*." PO Sur-reply 23.  According to Patent Owner, "Yu does not disclose downlink carrier aggregation—*i.e.*, using a base station to simultaneously transmit multiple signals to a *single terminal* to increase the bandwidth for that terminal." *Id.*  Patent Owner asserts that "Yu discloses using its base station to transmit the two input signals S1 and S2 to multiple, different destination terminals simultaneously." *Id.* at 24.  Patent Owner further asserts that "[d]ownlink carrier aggregation had not yet been implemented as of January 2018— much less as of Yu's 2010 filing date—and Yu contains no teaching or suggestion of this theoretical system." *Id.* at 23–24.

Patent Owner adds that "Petitioner also rehashes its argument that Figures 3 and 4 of Yu are not limited to transmissions by base stations," and that "this is an improper new argument not made in the petition[s], and it is substantively wrong." PO Sur-reply 24.

On the record before us, we agree with Patent Owner that "user," in the construction applicable here, does not encompass a base station.  As Patent Owner points out, the '675 patent distinguishes between wireless device 110 (which may be referred to as a *user* equipment) and base

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

stations 130 and 132.  PO Sur-reply 22 (citing Ex. 1001, 2:32–34, Fig. 1).

To illustrate, Figure 1 of the '675 patent is reproduced below.



*FIG. 1*

Figure 1 shows a wireless device communicating with a wireless system.
Ex. 1001, 1:56–57.  Specifically, Figure 1 shows wireless device 110
communicating with wireless system 120 that includes base stations 130 and
132.  *Id.* at 2:19–20, 28–30.  Extrinsic evidence supports this distinction
between wireless device 110 (e.g., user equipment) and a base station.  *See*
Ex. 1036, 6 (cited by PO Sur-reply 23).  Accordingly, the third part of our
construction, "to increase the bandwidth for a user," does not encompass
increasing the bandwidth for a base station.

Both parties, however, acknowledge Yu's teaching that its power
amplifier "may e.g. be employed in wireless communications systems such
as base stations of cellular communications networks or wireless
transceivers of mobile terminals and the like."  Ex. 1004 ¶ 34 (cited by

49

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Pet. 44–45 n.6; PO Sur-reply 23).  Based on this teaching in Yu, we agree
with Petitioner that even if Figures 3 and 4 of Yu are directed to base
stations (which we do not determine), "it would have been obvious to a
[person of ordinary skill in the art] to take advantage of Yu's invention in a
mobile device."  Pet. 45 n.6; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S.
398, 417 (2007) ("[I]f a technique has been used to improve one device, and
a person of ordinary skill in the art would recognize that it would improve
similar devices in the same way, using the technique is obvious unless its
actual application is beyond his or her skill.").  Indeed, Patent Owner asserts
that "Yu discloses three embodiments for implementing its functionality
across Figures 2–4," and that "Figure 2 of Yu discloses a mobile-terminal-
appropriate system for controlling a supply voltage of a power amplifier."
*See* PO Resp. 23.

    We note Patent Owner's contention that the base station
implementations depicted in Figures 3 and 4 of Yu "are not appropriate for
use in mobile terminals."  PO Resp. 23; *see id.* at 23–24.  Even if that were
true, "[t]he test for obviousness is not whether the features of a secondary
reference [or embodiment] may be bodily incorporated into the structure of
the primary reference [or embodiment]." *In re Keller*, 642 F.2d 413, 425
(Fed. Cir. 1981).  Instead, "the test is what the combined teachings . . .
would have suggested to those of ordinary skill in the art." *Id.*  Moreover,
"[a] person of ordinary skill is also a person of ordinary creativity, not an
automaton." *KSR*, 550 U.S. at 421.  Thus, a person of ordinary skill would
have made any necessary modifications so that a mobile device could
appropriately implement Yu's power amplifier.  This is supported by Patent

50

**Appx212**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Owner's assertion that "Figure 2 of Yu discloses a mobile-terminal-
appropriate system for controlling a supply voltage of a power amplifier."
*See* PO Resp. 23.

We further note Patent Owner's contention that downlink carrier
aggregation had not been implemented as of Yu's filing date in 2010. PO
Sur-reply 23–24. Even if this were true, it is of no moment in the context of
a mobile device implementation of Yu's power amplifier, where the signals
are processed by the mobile device, not the base station.

In addition, we note Patent Owner's emphasis on requiring extended
bandwidth for a *single* user terminal. *See* PO Resp. 40 (arguing Yu's
"fail[ure] to disclose '*signals from a single terminal* utilizing multiple
component carriers *which provide extended transmission bandwidth for a
user transmission* from the single terminal'"); PO Sur-reply 23 (arguing "the
bandwidth must be extended for a *single user terminal*"). Patent Owner's
arguments in this regard are based on its proposed construction of "plurality
of carrier aggregated transmit signals" during trial, namely, "signals from a
single terminal utilizing multiple component carriers which provide
extended transmission bandwidth for a user transmission from the single
terminal." PO Resp. 16. Patent Owner's proposed construction on remand,
however, does not require increasing bandwidth for a "single terminal."
Accordingly, Patent Owner's arguments do not undermine Petitioner's
showing as to the third part of our construction (which is the same as Patent
Owner's proposed construction on remand). We nevertheless note that in
the context of the mobile device implementation of Yu's power amplifier,

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

processing the signals simultaneously in the mobile device would increase the bandwidth for the mobile device, i.e., a single terminal.

Lastly, we note Patent Owner's contention that Petitioner's "argument that Figures 3 and 4 of Yu are not limited to transmissions by base stations . . . is an improper new argument not made in the petition[s], and it is substantively wrong." PO Sur-reply 24. As discussed above, however, our analysis accounts for the possibility that Figures 3 and 4 are directed to base stations. Moreover, we disagree that Petitioner's argument is improper and new because Petitioner's argument is in response to Patent Owner's argument that "Yu's Figure 3 and Figure 4 embodiments describe base station technology." *See* PO Resp. 40. Accordingly, Petitioner's argument is appropriate. *See* 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the . . . patent owner response.").

For the reasons given above, we are persuaded that Petitioner's proposed modification of Yu, which provides a mobile device implementation of Yu's power amplifier, teaches the third part of our construction, "to increase the bandwidth for a user." Based on Yu's teaching that its power amplifier may be used in base stations or mobile devices (Ex. 1004 ¶ 34), we also are persuaded that an ordinarily skilled artisan would have had reason to modify Yu's base station implementations of the power amplifier to provide a mobile device implementation of the power amplifier. *See KSR*, 550 U.S. at 418 ("[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."). As noted above, "if a technique has been used to improve one device, and a person of ordinary skill in the art would

52

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 417.

### iv. Remaining Limitations

As we explained above, the Federal Circuit instructs us to address the limitation "plurality of carrier aggregated transmit signals."  Accordingly, we do not address the other limitations recited in independent claims 1, 18, 28, and 33 for purposes of this Decision.  We note that, in our final decisions, we were persuaded that the asserted references teach the other limitations, and that an ordinarily skilled artisan would have had reason to combine the teachings in those references.  Final Dec. 64; 1327-Paper 30, 80; 1329-Paper 30, 82; 1340-Paper 30, 86.  As mentioned above, we incorporate our prior analysis as to the other limitations recited in independent claims 1, 18, 28, and 33.

### b.  Dependent Claims 2–15, 17, 19–25, 27, and 29–32

Because the Federal Circuit instructs us to address the limitation "plurality of carrier aggregated transmit signals," which appears in each of the independent claims, we do not address the dependent claims for purposes of this Decision.  Although several dependent claims recite "plurality of carrier aggregated transmit signals," the parties do not argue the dependent claims separately in this regard.  We note that, in our final decisions, we were persuaded that the asserted references teach the limitations recited in the dependent claims, and that an ordinarily skilled artisan would have had

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

reason to combine the teachings of those references. Final Dec. 64; 1327-Paper 30, 80; 1329-Paper 30, 82; 1340-Paper 30, 86. As mentioned above, we incorporate our prior analysis as to the limitations recited in the dependent claims.

### 3. Summary

In view of the foregoing, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 would have been obvious over the asserted prior art. We determine in particular that Petitioner has demonstrated by a preponderance of the evidence that claims 1–6, 11, 17–22, 27, and 33 would have been obvious over Yu and Wang; claims 7–10 and 28–32 would have been obvious over Yu, Wang, and Choi; claim 12 would have been obvious over Yu, Wang, and Eliezer; and claims 13–15 and 23–25 would have been obvious over Yu, Wang, and Dahlman.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

## IV. CONCLUSION[24]

On remand, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 of the '675 patent are unpatentable as follows.

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–6, 11, 17–22, 27, 33 | 103 | Yu, Wang | 1–6, 11, 17–22, 27, 33 | |
| 7–10, 28–32 | 103 | Yu, Wang, Choi | 7–10, 28–32 | |
| 12 | 103 | Yu, Wang, Eliezer | 12 | |
| 13–15, 23–25 | 103 | Yu, Wang, Dahlman | 13–15, 23–25 | |
| **Overall Outcome** | | | 1–15, 17–25, 27–33 | |

## V. ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1–15, 17–25, and 27–33 of the '675 patent are held *unpatentable*; and

---

[24] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

FURTHER ORDERED that, because this Decision on Remand amounts to a final written decision, parties to the proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

David Cavanaugh
Richard Goldenberg
Theodoros Konstantakopoulos
Louis Tompros
Kathryn Zalewski
WILMER CUTLER PICKERING HALE & DORR LLP
David.cavanaugh@wilmerhale.com
Richard.goldenberg@wilmerhale.com
Louis.tompros@wilmerhale.com
Theodoros.konstantakopoulos@wilmerhale.com
Kathryn.zalewski@wilmerhale.com

For PATENT OWNER:

Matthew Johnson
Joseph Sauer
David Cochran
David Maiorana
Richard Graham
Joshua Nightingale
JONES DAY
mwjohnson@jonesday.com
jmsauer@jonesday.com
dcochran@jonesday.com
dmaiorana@jonesday.com
ragraham@jonesday.com
jrnightingale@jonesday.com

Trials@uspto.gov                                            Paper 46
571.272.7822                                      Date: March 23, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

INTEL CORPORATION,
Petitioner,

v.

QUALCOMM INCORPORATED,
Patent Owner.
————————

IPR2018-01326
IPR2018-01327
IPR2018-01329
IPR2018-01340[1]
Patent 9,608,675 B2
————————

Before MICHELLE N. WORMMEESTER, AMANDA F. WIEKER, and
SCOTT B. HOWARD, *Administrative Patent Judges*.

WORMMEESTER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision on Remand
Determining All Challenged Claims Unpatentable
*35 U.S.C. §§ 144, 318*

---

[1] This Decision addresses issues that are identical in each of the identified
cases.  We exercise our discretion to issue this Decision to be filed in each
case.  The parties may not use this style heading in subsequent papers.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

## I.  INTRODUCTION

We address these four cases on remand after a consolidated decision for six related cases, including these four cases, by the U.S. Court of Appeals for the Federal Circuit in *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256 (Fed. Cir. 2021) (*see* Paper 33[2]).

As background, Intel Corporation[3] ("Petitioner") petitioned for six *inter partes* reviews challenging the validity of U.S. Patent No. 9,608,675 B2 (Ex. 1001, "the '675 patent").  This Decision addresses only four of those *inter partes* reviews, namely, IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340.[4]  Petitioner filed petitions requesting *inter partes* review of claims 1–15, 17–25, and 27–33 of the '675 patent across these four cases.  Paper 2 ("Petition" or "Pet.") (requesting review of claims 1–6 and 18–22); 1327-Paper 3 (requesting review of claims 7–15, 17, 23–25, 27, and 33); 1329-Paper 3 (requesting review of claims 28–30); 1340-Paper 3 (requesting review of claims 31 and 32).  Qualcomm Incorporated ("Patent Owner") filed preliminary responses.  Paper 7; 1327-Paper 7; 1329-Paper 7; 1340-Paper 7.  Pursuant to 35 U.S.C. § 314, we instituted *inter partes* reviews as to all the challenged claims and all the

---

[2] Unless otherwise noted, papers and exhibits refer to IPR2018-01326. Papers and exhibits preceded by "1327-" refer to IPR2018-01327.  Papers and exhibits preceded by "1329-" refer to IPR2018-01329.  Papers and exhibits preceded by "1340-" refer to IPR2018-01340.

[3] Intel Corporation identifies itself and Apple Inc. ("Apple") as real parties in interest.  Paper 2, 1.

[4] We address the other two *inter partes* reviews, IPR2018-01328 and IPR2018-01330, in a separate decision on remand entered concurrently with this Decision.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

grounds of unpatentability raised in the petitions. Paper 8 ("Institution Decision" or "Inst. Dec."); 1327-Paper 8; 1329-Paper 8; 1340-Paper 8.

During trial, Patent Owner filed responses. Paper 14 ("Response" or "PO Resp."); 1327-Paper 14; 1329-Paper 14; 1340-Paper 14. Petitioner filed replies. Paper 16 ("Reply" or "Pet. Reply"); 1327-Paper 16; 1329-Paper 16; 1340-Paper 16. Patent Owner filed sur-replies. Paper 19 ("Sur-reply" or "PO Sur-reply"); 1327-Paper 19; 1329-Paper 19; 1340-Paper 19. On October 9, 2019, we conducted a consolidated oral hearing for all six related cases, including the four cases addressed in this Decision. A copy of the transcript is included in the record. Paper 29 ("Tr."). With our authorization (*see* Paper 26), the parties subsequently filed additional briefs on the meaning of the claim term "generates the single power tracking signal based on a combination of the plurality of I and Q components." Paper 27 (Patent Owner's brief); Paper 28 (Petitioner's brief).

Pursuant to 35 U.S.C. § 318(a), we issued final written decisions in the four cases addressed here. Paper 30 ("Final Written Decision" or "Final Dec."); 1327-Paper 30; 1329-Paper 30; 1340-Paper 30. We determined that Petitioner demonstrated by a preponderance of the evidence that all challenged claims, namely, claims 1–15, 17–25, and 27–33 of the '675 patent, are unpatentable. Final Dec. 64; 1327-Paper 30, 80–81; 1329-Paper 30, 82; 1340-Paper 30, 86–87. Patent Owner appealed our determinations that these challenged claims are unpatentable to the Federal Circuit. Paper 31; 1327-Paper 31; 1329-Paper 31; 1340-Paper 31.

In its remand decision, the Federal Circuit addressed Patent Owner's arguments that "it was not afforded notice of, or an adequate opportunity to

3

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

respond to, the Board's construction of 'a plurality of carrier aggregated transmit signals,'" as well as Patent Owner's arguments "challeng[ing] the Board's construction of the power tracker limitation," which refers to the claim term "means for determining a single power tracking signal." *Qualcomm*, 6 F.4th at 1262.  The power tracker limitation appears in just one of four challenged independent claims, namely, claim 28, and the Federal Circuit "s[aw] no error" in our construction of that limitation.  *Id.*  The Federal Circuit, however, agreed that "the Board violated [Patent Owner's] procedural rights with respect to the 'plurality of carrier aggregated transmit signals' limitation," vacated our final written decisions, and remanded for further proceedings.  *Id.* at 1262, 1267.  Each of the four challenged independent claims includes the limitation "plurality of carrier aggregated transmit signals."  The Federal Circuit's mandate issued on September 17, 2021.  Paper 32.

We subsequently issued an order in each case authorizing post-remand briefing tailored narrowly to addressing whether we properly construed "plurality of carrier aggregated transmit signals," and to addressing the applicability of our construction of "plurality of carrier aggregated transmit signals" to the asserted prior art disclosures.  Paper 35, 2.  Petitioner filed opening briefs (Paper 36, "Pet. Remand Br."), Patent Owner filed responsive briefs (Paper 38, "PO Remand Resp."), Petitioner filed reply briefs (Paper 41, "Pet. Remand Reply"), and Patent Owner filed sur-reply briefs (Paper 48, "PO Remand Sur-reply").

We have considered the record anew by reviewing the parties' positions on remand.  For the reasons that follow, we determine that

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Petitioner has shown by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 of the '675 patent are unpatentable.

## II. BACKGROUND

### A. Related Proceedings

Prior to institution, the parties identified various matters involving the '675 patent, including a federal district court case, an International Trade Commission ("ITC") investigation, as well as the six petitions for *inter partes* review identified above. Pet. 1–2; Paper 5, 2. Since the entry of our institution decisions, Patent Owner has asserted that "[t]he '675 patent is currently not involved in any litigation beyond the PTAB." PO Resp. 16. Petitioner has not stated otherwise.

The six *inter partes* review cases that the parties identified are IPR2018-01326, IPR2018-01327, IPR2018-01328, IPR2018-01329, IPR2018-01330, and IPR2018-01340. Pet. 1–2; Paper 5, 2. These cases can be divided into two sets of cases, where the first set of cases includes IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340. These four cases involve prior art challenges based on Yu[5] as a primary reference. The second set of cases includes IPR2018-01328 and IPR2018-01330, which involve prior art challenges based on Chen[6] as a primary reference. As noted above, this Decision addresses only the first set of cases.

---

[5] Yu, EP 2442440 A1, published Apr. 18, 2012 (Ex. 1004).

[6] W. Chen et al., Hybrid Envelope Tracking for Efficiency Enhancement in Concurrent Dual-Band PAs, 54 Microwave & Optical Tech. Letters 662 (2012) (IPR2018-01328, Ex. 1212).

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

The second set of cases is addressed in a separate decision on remand entered concurrently with this Decision.

### B. The '675 Patent

The '675 patent describes power tracking for generating a power supply voltage for a circuit, such as an amplifier, that processes multiple transmit signals sent simultaneously. Ex. 1001, 1:8–10, 1:35–38. Figure 5, which is reproduced below, illustrates a transmit module with power tracking for all transmit signals according to the '675 patent. *Id.* at 1:65–67.



*FIG. 5*

In particular, Figure 5 shows transmit module 500, which includes K transmit circuits 540a to 540k that can simultaneously process K transmit

**Appx274**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

signals, with each transmit circuit processing one transmit signal. *Id.* at 6:34–37. Transmit module 500 also includes summer 552, power amplifier ("PA") 560, duplexer 570, and power tracking supply generator (or voltage generator) 580. *Id.* at 6:37–39.

Inphase (I) and quadrature (Q) samples for a transmit signal are provided to both a transmit circuit and voltage generator 580. Ex. 1001, 6:42–44. For example, transmit circuit 540a receives $I_1$ and $Q_1$ samples for a first transmit signal and generates a first upconverted radio frequency ("RF") signal for the first transmit signal. *Id.* at 6:40–42. Within transmit circuit 540a, the $I_1$ and $Q_1$ samples are converted to I and Q analog signals by digital-to-analog converters (DACs) 542a and 543a. *Id.* at 6:44–46. The I and Q analog signals are then filtered by lowpass filters 544a and 545a, amplified by amplifiers 546a and 547a, upconverted from baseband to RF by mixers 548a and 549a, and summed by summer 550a to generate the first upconverted RF signal. *Id.* at 6:46–50.

The other transmit circuits operate similarly. Ex. 1001, 6:54–57. Summer 552 receives all upconverted RF signals from the transmit circuits, sums the upconverted RF signals, and provides a modulated RF signal to PA 560. *Id.* at 6:59–62.

Within voltage generator 580, power tracker 582 receives $I_1$ to $I_K$ samples and $Q_1$ to $Q_K$ samples for all transmit signals being sent simultaneously. Ex. 1001, 6:63–65. Power tracker 582 then computes a digital power tracking signal based on the I and Q samples for these transmit signals and provides the digital power tracking signal to DAC 584. *Id.* at 6:65–7:1, 8:6–32. DAC 584 converts the digital power tracking signal to

7

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

analog and provides the analog power tracking signal to power supply

generator 586. *Id.* at 7:1–4, Fig. 5. Power supply generator 586 generates a

power supply voltage for PA 560. *Id.* at 7:6–8.

Once PA 560 receives both the modulated RF signal from

summer 552 and the power supply voltage from power supply

generator 586, PA 560 amplifies the modulated RF signal using the power

supply voltage. Ex. 1001, 7:8–11. PA 560 then provides an output RF

signal for all the transmit signals being sent simultaneously. *Id.* at 7:11–12.

The output RF signal is routed through duplexer 570 and transmitted via

antenna 590. *Id.* at 7:12–14.

### *C. Illustrative Claim*

Petitioner challenges claims 1–15, 17–25, and 27–33 of the '675

patent, all for our consideration on remand. Claims 1, 18, 28, and 33 are

independent. Claim 1 is illustrative of the challenged claims and includes

the subject matter the Federal Circuit instructed us to reconsider on remand:

1. An apparatus comprising:

> a power tracker configured to determine a single power
> tracking signal based on a plurality of inphase (I) and
> quadrature (Q) components of a plurality of carrier
> aggregated transmit signals being sent simultaneously,
> wherein the power tracker receives the plurality of I and Q
> components corresponding to the plurality of carrier
> aggregated transmit signals and generates the single power
> tracking signal based on a combination of the plurality of
> I and Q components, wherein the plurality of carrier
> aggregated transmit signals comprise Orthogonal
> Frequency Division Multiplexing (OFDM) or Single
> Carrier Frequency Division Multiple Access (SC-FDMA)
> signals;

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

> a power supply generator configured to generate a single power supply voltage based on the single power tracking signal; and

> a power amplifier configured to receive the single power supply voltage and the plurality of carrier aggregated transmit signals being sent simultaneously to produce a single output radio frequency (RF) signal.

### D. Instituted Grounds of Unpatentability

As discussed above, we instituted *inter partes* review based on all grounds raised in the four petitions addressed here.  Inst. Dec.; 1327-Paper 8; 1329-Paper 8; 1340-Paper 8.  The instituted grounds are as follows.

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–6, 11, 17–22, 27, 33[7] | 103 | Yu, Wang[8] |
| 7–10, 28–32[9] | 103 | Yu, Wang, Choi[10] |
| 12[11] | 103 | Yu, Wang, Eliezer[12] |
| 13–15, 23–25[13] | 103 | Yu, Wang, Dahlman[14] |

---

[7] Petitioner challenges claims 1–6 and 18–22 in IPR2018-01326, and claims 11, 17, 27, and 33 in IPR2018-01327.

[8] Wang et al., *Design of Wide-Bandwidth Envelope-Tracking Power Amplifiers for OFDM Applications*, 53 IEEE Transactions on Microwave Theory & Techniques 1244 (2005) (Ex. 1005).

[9] Petitioner challenges claims 7–10 in IPR2018-01327, claims 28–30 in IPR2018-01329, and claims 31 and 32 in IPR2018-01340.

[10] Jinsung Choi et al., *Envelope Tracking Power Amplifier Robust to Battery Depletion*, 2010 IEEE MTT-S Int'l Microwave Symposium Digest 1074 (2010) (1327-Ex. 1108, at Ex. A).

[11] Petitioner challenges claim 12 in IPR2018-01327.

[12] Eliezer, US 2009/0004981 A1, published Jan. 1, 2009 (1327-Ex. 1111).

[13] Petitioner challenges claims 13–15 and 23–25 in IPR2018-01327.

[14] Erik Dahlman et al., 4G LTE / LTE-ADVANCED FOR MOBILE BROADBAND 11–12, 19, 27, 103–104, 132–135, 205, 347–351, 355–358, 389 (2011) (Ex. 1006).  The same paper is entered in IPR2018-01327 as Exhibit 1106.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

In support of its petitions, Petitioner relied on a declaration (Ex. 1003) as well as a reply declaration (Ex. 1031) of David Choi, Ph.D.  Patent Owner submitted with its responses a declaration of Tim Williams, Ph.D. (Ex. 2001[15]).  The transcripts of the depositions of Dr. Choi are entered in the record as Exhibits 2006 and 2007, and the transcript of the deposition of Dr. Williams is entered in the record as Exhibit 1030.

## III. ANALYSIS

### A. Final Written Decisions

Our discussion of the final written decisions focuses on our previous construction of the claim term "plurality of carrier aggregated transmit signals," as recited in challenged independent claims 1, 18, 28, and 33.  In the final written decisions, we began our analysis by addressing the parties' arguments regarding the construction of that term.  Final Dec. 17–24.  Based on our review of the claims and specification of the '675 patent, we disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires signals comprising transmissions on *component* carriers.  *Id.* at 19–20.  We explained that the '675 patent explicitly defines "carrier aggregation" as "operation on multiple carriers," and that it also explicitly defines "[a] transmit signal" as "a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc."  *Id.* (citing Ex. 1001, 2:63–64, 3:60–62).  We

---

[15] Patent Owner has included the designation "Ex. 2002" on each page of Dr. Williams's declaration.  Because the declaration is entered in the record as Exhibit 2001, we cite Exhibit 2001 when referring to the declaration.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

further determined that these definitions refer broadly to signals comprising transmissions on carriers. *Id.* at 20.

We also disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires signals *from a single terminal*. Final Dec. 20–22. We explained that the claim language recites nothing about signals from a single terminal. *Id.* at 21. We additionally explained that although the '675 patent discloses examples and embodiments where signals are from a single terminal, the specification does not limit "carrier aggregated transmit signals" to those examples and embodiments. *Id.* (citing Ex. 1001, 14:21–25 (stating that the "disclosure is not intended to be limited to the examples and designs described")). We further noted that the '675 patent teaches that a wireless device "'may send and/or receive transmissions' on multiple carriers according to various combinations of bands and band groups." *Id.* at 21–22 (citing Ex. 1001, 3:1–35). We found this to be consistent with Dahlman, extrinsic evidence regarding carrier aggregation, which Patent Owner cited as teaching that multiple carriers "are aggregated and jointly used for transmission *to/from* a single terminal." *Id.* at 22 (citing Ex. 1006, 104 (cited by PO Resp. 15)).

Lastly, we disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires extended bandwidth for a user transmission from a single terminal. Final Dec. 22. We explained that the claim language recites nothing about extended transmission bandwidth, and that although the '675 patent discloses an example where carrier aggregation provides extended transmission bandwidth, it does not limit "carrier aggregated transmit signals" to that example. *Id.* (citing Ex. 1001, 2:65–67

11

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

("Wireless device 110 *may* be configured with up to 5 carriers in one or two bands in LTE[16] Release 11.") (emphasis added)).

Turning to Petitioner's proposed construction for the term "plurality of carrier aggregated transmit signals," we noted its similar requirement of increasing the bandwidth for a user. Final Dec. 22. As with Patent Owner, we disagreed with Petitioner in this regard for the same reasons discussed above. *Id.* We additionally noted that Petitioner's counsel conceded during oral argument that this requirement "does not come specifically from the specification," and that Petitioner would not object to eliminating the requirement. *Id.* at 22–23 (citing Tr. 10:22–11:17).

We also disagreed with Petitioner that the term "plurality of carrier aggregated transmit signals" requires "signals for transmission . . . at the same time." Final Dec. 23. We explained that the claim recites "a plurality of carrier aggregated transmit signals being sent simultaneously," and that requiring signals for transmission *at the same time* would render the claim language "being sent simultaneously" redundant and superfluous. *Id.*

In summary, we concluded that the broadest reasonable interpretation of the claim term "plurality of carrier aggregated transmit signals" is "signals for transmission on multiple carriers." Final Dec. 23. We stated that "[o]ur construction is consistent with the '675 patent, which defines the term 'carrier aggregation' as 'operation on multiple carriers' and the term '[a] transmit signal' as 'a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" *Id.* (citing Ex. 1001, 2:63–64, 3:60–62). We additionally noted that "[o]ur construction

---

[16] LTE stands for Long Term Evolution. Ex. 1001, 2:21.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

also encompasses, but is not limited to, Patent Owner's proposed construction." *Id.*

After providing a brief overview of Yu, we addressed whether Petitioner demonstrated by a preponderance of the evidence that the teachings in Yu account for the "plurality of carrier aggregated transmit signals," as recited in each of independent claims 1, 18, 28, and 33. Final Dec. 31–36. In particular, consistent with our construction of the claim term "plurality of carrier aggregated transmit signals," we agreed with Petitioner that Yu's signals S1 and S2 are transmitted on multiple carriers at the same time because the signals are upconverted to different intermediate frequencies, where the difference in frequencies is maintained when the signals are subsequently summed and when they are upconverted again to different RF center frequencies. *Id.* at 36 (citing Pet. 42–44 (citing Ex. 1004 ¶ 48); Ex. 1004 ¶¶ 32, 57). We also credited the testimony of Petitioner's declarant Dr. Choi on this particular issue. *Id.* (citing Pet. 42–44 (citing Ex. 1003 ¶¶ 101–104)). As to Patent Owner's argument challenging Petitioner's showing for the recited "plurality of carrier aggregated transmit signals," we disagreed because Patent Owner relied on its proposed construction, which we determined "is overly narrow and improperly requires signals from a single terminal as well as providing extended transmission bandwidth for a user transmission from a single terminal." *Id.* at 58 (citing PO Resp. 40).

13

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

### *B. The Federal Circuit's Remand Decision*

Our discussion of the Federal Circuit's remand decision focuses only on the court's analysis regarding our construction of the recited "plurality of carrier aggregated transmit signals." On appeal to the Federal Circuit, Patent Owner argued that "it was not afforded notice of, or an adequate opportunity to respond to, the Board's construction of 'a plurality of carrier aggregated transmit signals.'" *Qualcomm*, 6 F.4th at 1262. The Federal Circuit agreed with Patent Owner that we "violated [Patent Owner's] procedural rights with respect to the 'plurality of carrier aggregated transmit signals' limitation." *Id.* The Federal Circuit explained that "the Board may adopt a claim construction of a disputed term that neither party proposes without running afoul of the [Administrated Procedure Act]." *Id.* As to the case here, however, the Federal Circuit pointed out that "the issue of whether increased bandwidth was a required part of the claim construction was not in dispute." *Id.* at 1262–63. That is, "[t]he Board's construction of 'a plurality of carrier aggregated transmit signals' diverged from the agreed-upon increased bandwidth requirement for the term." *Id.* at 1263. The Federal Circuit further noted that "[w]hile the Board did not change theories midstream or depart from a construction it previously adopted, it is still difficult to imagine either party anticipating that this agreed-upon matter of claim construction was a moving target," and that "unlike with disputed terms, it is unreasonable to expect parties to brief or argue agreed-upon matters of claim construction." *Id.* at 1263. The Federal Circuit counseled that "the Board needed to provide notice of and an adequate opportunity to respond to its

14

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

construction," which "departed from the agreed-upon increased bandwidth requirement." *Id.* at 1263, 1265.

The Federal Circuit disagreed with Petitioner that the oral hearing provided Patent Owner notice and an opportunity to respond. *Qualcomm*, 6 F.4th at 1263–64. The Federal Circuit explained that the panel's comment during the hearing that it would think about whether the increased bandwidth requirement is necessary "did not *provide* [Patent Owner] notice that the Board might depart from the increased bandwidth requirement," where "[t]he Board did not announce a construction, criticize the parties' agreed-upon requirement, ask any follow-up questions to [Petitioner], or ask any related questions to [Patent Owner]." *Id.* at 1264. The Federal Circuit further explained that "[t]he hearing also did not provide an adequate opportunity to respond" because the Board did not provide a theory or rationale for departing from the agreed-upon requirement to which Patent Owner could have responded, it did not ask Patent Owner questions about the requirement, and it did not request additional briefing after the hearing. *Id.* at 1264–65. The Federal Circuit added that Patent Owner did not have an opportunity to introduce evidence addressing why an ordinarily skilled artisan would have understood that the claim term "plurality of carrier aggregated transmit signals" requires signals that increase bandwidth. *Id.* at 1265.

The Federal Circuit also disagreed with Petitioner that Patent Owner's option to seek rehearing after receiving notice through the final written decisions provided an adequate opportunity to respond. *Qualcomm*, 6 F.4th at 1263, 1265. The Federal Circuit explained that "a party need not seek

15

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

rehearing in order to seek relief from a Board decision on appeal." *Id.* at 1265. The Federal Circuit acknowledged that "it may have been a more efficient use of resources had [Patent Owner] sought rehearing," but stated that Patent Owner "was not required to do so." *Id.*

Without deciding whether Patent Owner must show prejudice, as Petitioner argued, the Federal Circuit further reasoned that Patent Owner had made a sufficient showing. *Qualcomm*, 6 F.4th at 1263 & n.3. The Federal Circuit explained that Patent Owner "argued throughout the IPR proceedings that the prior art did not disclose the increased bandwidth requirement," and that "[b]y removing that requirement, the Board eliminated an element on which [Petitioner] bore the burden of proof." *Id.* The Federal Circuit additionally explained that "without notice of the Board's elimination of the increased bandwidth requirement, [Patent Owner] had no reason to brief that requirement or establish an evidentiary record supporting it, particularly given the limited word count and breadth of issues in these IPRs." *Id.* at 1263–64.

Accordingly, the Federal Circuit determined that we did not provide Patent Owner adequate notice of and opportunity to respond to our claim construction of "plurality of carrier aggregated transmit signals," vacated our final written decisions, and remanded for further proceedings. *Qualcomm*, 6 F.4th at 1267.

## C. Claim Construction

The claim construction standard applicable to these *inter partes* review proceedings is the broadest reasonable interpretation in light of the

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

patent specification.  *See* 37 C.F.R. § 42.100(b) (2018); *Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard).[17]  Under this standard, claim terms generally are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  That is, we give words "their plain meaning" unless, however, it is "inconsistent with the specification and prosecution history." *Arista Networks, Inc. v. Cisco Sys., Inc.*, 908 F.3d 792, 796–98 (Fed. Cir. 2018) (rejecting construction as "overly broad, even under the broadest reasonable interpretation standard"); *see also Personalized Media Comm'cns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) ("[T]he Board's interpretation must be reasonable in light of the specification, prosecution history, and the understanding of one skilled in the art.").

In view of the Federal Circuit's remand decision, we address the parties' arguments on remand as to whether we properly construed the claim

---

[17] The revised claim construction standard for interpreting claims in *inter partes* review proceedings as set forth in the final rule published October 11, 2018, does not apply to these proceedings because the new "rule is effective on November 13, 2018 and applies to all IPR, PGR and CBM petitions filed on or after the effective date."  Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (codified at 37 C.F.R. § 42.100(b) (2019)).  The petitions here were filed on July 3, 2018.

17

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

term "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers."[18]

The term "plurality of carrier aggregated transmit signals" appears in each of challenged independent claims 1, 18, 28, and 33, as well as several dependent claims. Petitioner originally proposed that we construe this term to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." Pet. 32. On remand, however, Petitioner argues that we properly construed the term to mean, more broadly, "signals for transmission on multiple carriers." Pet. Remand Br. 7–12. As support, Petitioner contends that "the '675 patent provides explicit definitions for this claim term, by stating that 'carrier aggregation . . . *is* operation on multiple carriers' and 'a transmit signal *is* a signal comprising a transmission on one

---

[18] Referring to Petitioner's opening briefs, Patent Owner asserts that, "[c]ontrary to the Board's Order dated November 1, 2021 (Paper 35 ('Order') in IPR2018-01326), Petitioner filed six substantively different briefs, which collectively exceed the 20-page limit set by the Order." PO Remand Resp. n.1. Patent Owner does not identify any differences. We have reviewed Petitioner's six opening briefs, and they appear to be substantively similar except for the discussions as to the applicability of our previous construction of "plurality of carrier aggregated transmit signals" to the asserted prior art disclosures. *Compare, e.g.*, Pet. Remand Br., *with, e.g.*, IPR2018-01328, Paper 33. In that regard, the briefs in IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340 focus on Yu's disclosures, whereas the briefs in IPR2018-01328 and IPR2018-01330 focus on Chen's disclosures. Pet. Remand Br. 13–16; IPR2018-01328, Paper 33, 12–14. If the six briefs each included the discussions regarding both Yu and Chen, the briefs would be substantively the same, and the sum total of pages for each brief would be less than twenty. Pet. Remand Br. 1–16 (brief, including Yu discussion, comprising about sixteen pages); IPR2018-01328, Paper 33, 12–14 (Chen discussion comprising about two pages). Thus, it is harmless for us to consider Petitioner's opening briefs.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

or more carriers, a transmission on one or more frequency channels, etc.'"
*Id.* at 7 (quoting Ex. 1001, 2:63–64, 3:60–62). Petitioner asserts that "[t]he
Federal Circuit has recognized that the use of the term 'is' or similar
language can 'signify that a patentee is serving as its own lexicographer.'"
*Id.* (quoting *Sinorgchem Co., Shandong v. USITC*, 511 F.3d 1132, 1136
(Fed. Cir. 2007)).

Petitioner also points to various other portions of the specification.
Pet. Remand Br. 9. For example, Petitioner cites the teaching that "[c]arrier
aggregation may also be referred to as multi-carrier operation." *Id.* (citing
Ex. 1001, 2:64–65). Petitioner additionally cites the teaching that "[i]ntra-
band [carrier aggregation] refers to operation on multiple carriers within the
same band," and "[i]nter-band [carrier aggregation] refers to operation on
multiple carriers in different bands." *Id.* (citing Ex. 1001, 3:1–5).
According to Petitioner, these teachings "confirm[] the accuracy of the
Board's construction under the broadest reasonable interprterion standard."
*Id.*

Petitioner acknowledges that our previous construction is broader than
the construction it originally proposed in the petitions. Pet. Remand Br. 10.
In particular, our construction omits two requirements from Petitioner's
originally-proposed construction, namely, signals for transmission *at the
same time* and *increasing the bandwidth for a user*. *Id.* Petitioner explains
that it originally "proposed its construction in an effort to minimize
disputes," noting that its "construction was actually the Patent Owner's
construction in the earlier ITC proceeding." *Id.* Petitioner contends,
however, "[t]he Board properly omitted the limitation 'to increase the

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

bandwidth for a user' because, as the Board explained, the claim language says nothing about increasing bandwidth for a user." *Id.* at 10–11 (citing Final Dec. 22). Petitioner further asserts that "while the '675 patent ***does*** include an example of carrier aggregation increasing bandwidth, it ***does not*** expressly limit carrier aggregation to this purpose." *Id.* at 11 (citing Ex. 1001, 2:65–67 ("Wireless device 110 ***may*** be configured with up to 5 carriers in one or two bands in LTE Release 11.") (emphasis added)).

Petitioner adds that "the Board properly omitted the limitation 'at the same time'" because claim 1 recites "a plurality of carrier aggregated transmit signals being sent simultaneously," and requiring signals for transmission *at the same time* "would render superfluous the claim language 'being sent simultaneously.'" Pet. Remand Br. 11–12; *see id.* at 9 n.6.

Patent Owner responds that the term "carrier aggregated transmit signals" instead carries its ordinary and customary meaning, which Petitioner originally proposed in its petitions: "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." PO Remand Resp. 2, 9; *see also* Pet. 32. Patent Owner contends that "[w]hile it is true that transmission of signals on multiple carriers is an attribute of carrier aggregation, the [person having ordinary skill in the art] would have further understood the term to mean that the multiple component carriers are aggregated (*i.e.*, combined) to increase the bandwidth for a user." PO Remand Resp. 9 (internal citation omitted). As support, Patent Owner relies on the '675 patent, its prosecution history file, as well as extrinsic evidence.

Starting with the '675 patent, Patent Owner asserts that the specification "specifically describes an example of a user device (*i.e.*,

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

wireless device 110) that 'supports carrier aggregation' by being 'configured with up to 5 carriers in one or two bands [in LTE Release 11].'" PO Remand Resp. 10 (quoting Ex. 1001, 2:63–67). To illustrate, Patent Owner asserts that "user devices of earlier LTE systems were limited to the 20 MHz bandwidth of a single channel," whereas "the carrier aggregation introduced in LTE Release 11 enables a user device to aggregate up to five of these 20 MHz channels as component carriers of a single virtual channel having a bandwidth of up to 100 MHz." *Id.* (citing Ex. 1001, 2:59–60, 65–67, Figs. 2A–2D). Patent Owner notes that "[t]he '675 patent further explains that LTE carriers may be aggregated from frequency bands listed in 3GPP TS (Technical Specification) 36.101," a 3GPP[19] technical report that Patent Owner points to specifically for describing carrier aggregation as "[a]ggregation of two or more component carriers in order to support wider transmission bandwidths." *Id.* at 11 (citing Ex. 1001, 2:58–62; quoting Ex. 2011, 14 (3GPP technical report)).

Moving on to the prosecution history of the '675 patent, Patent Owner asserts that the Examiner applied a U.S. publication, namely, the Chen publication,[20] in an Office action because it "discloses a plurality of carrier aggregated transmit signals." PO Remand Resp. 11 (quoting Ex. 1002, 266–279 (Office action, July 2, 2015)). According to Patent Owner, the Chen publication "makes clear that its multi-carrier aggregation provides increased bandwidth." *Id.* Patent Owner relies on the Chen publication's

---

[19] 3GPP stands for 3rd Generation Partnership Project. Ex. 2011 (cover).
[20] Chen, U.S. Publication No. 2012/0321018 A1, published Dec. 20, 2012 (Ex. 2012). The Chen publication is different than Chen, which is an asserted reference in the related cases not addressed here.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

teaching that the "bandwidth of a signal constantly increases due to multi-carrier applications." *Id.* (quoting Ex. 2012 ¶ 4).

As to extrinsic evidence, Patent Owner points to teachings across various patents and publications to support its proposed construction on remand.  PO Remand Resp. 12–13 (citing Ex. 2015, 6; Ex. 2016; Ex. 2017, 3:20–22; Ex. 2018, 3:27–62).  For example, Patent Owner asserts that "U.S. Patent No. 9,161,254 teaches that carrier aggregation is a 'technique for providing additional bandwidth capacity to wireless devices' by 'aggregat[ing] . . . multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE).'"  *Id.* at 12 (quoting Ex. 2017, 3:19–22[21]).  Patent Owner also asserts that "a 2013 Qualcomm document states that '[c]arrier aggregation, as the name suggests, combines multiple carriers (a.k.a. channels) at the device to provide a bigger data pipe to the user.'"  *Id.* (quoting Ex. 2015, 6).

With respect to our previous construction (which is Petitioner's proposed construction on remand), Patent Owner contends that it "is wrong because it reads 'aggregated' out of the term 'carrier aggregated transmit signals.'"  PO Remand Resp. 13.  Patent Owner asserts that "[a]ggregation refers to the process of combining constituent parts into a single thing."  *Id.* (citing Ex. 2029 (dictionary defining "aggregation" as "the collecting of units . . . into a mass or whole")).  Patent Owner further asserts that an ordinarily skilled artisan "would not have understood 'carrier aggregation' to be equivalent to any generic 'transmission on multiple carriers' because

---

[21] Patent Owner cites Exhibit 2017, lines 20 through 22, but the quoted language appears at lines 19 through 22.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

nothing is being aggregated when disparate signals are transmitted on different carriers to separate destinations." *Id.* at 14.

Patent Owner further contends "there is no lexicography" here, contrary to Petitioner's position. PO Remand Resp. 2 (capitalization and emphasis omitted); *see also* Pet. Remand Br. 7. Patent Owner asserts that "[w]hen the '675 patent sought to define a term, it used a very specific format, *i.e.*, putting the defined term in quotations marks, followed by the phrase 'is used herein to mean,' followed by the definition in quotation marks." PO Remand Resp. 3. For example, Patent Owner directs us to where the specification states, "The word 'exemplary' is used herein to mean 'serving as an example, instance, or illustration.'" *Id.* (citing Ex. 1001, 2:10–11). Patent Owner further asserts that "[n]one of the statements [Petitioner] relies on for the term 'carrier aggregated transmit signals' resembles this format" because "neither of [Petitioner's] citations employs the phrase 'is used herein to mean'" or "uses quotation marks for the term or its purported definition." *Id.* at 4 (citing Ex. 1001, 2:63–54, 3:60–62). As discussed above, Petitioner cites the '675 patent's statement that "carrier aggregation . . . is operation on multiple carriers" as well as its statement that "[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc." Pet. Remand Br. 7 (quoting Ex. 1001, 2:63–64, 3:60–62). According to Patent Owner, "[t]hese departures from the '675 patent's distinctive definitional format show that the patentee did not intend these statements to redefine the plain and ordinary meaning of 'carrier aggregated transmit signals.'" PO Remand Resp. 4; *see also id.* at 8 (characterizing "the

23

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

'675 patent's statement 'carrier aggregation . . . is operation on multiple carriers' [a]s nothing more than a generalized introduction to carrier aggregation, highlighting one aspect of it").

Patent Owner also urges that, "[t]aken together, the [person having ordinary skill in the art] would recognize that neither statement is definitional" because they additionally are inconsistent.  PO Remand Resp. 5–6 (citing Ex. 1001, 2:63–64, 3:60–62); PO Remand Sur-reply 6–7. Patent Owner points out in particular that one statement "has a broader scope than the [other statement], encompassing transmission on *one or more* general frequencies rather than *multiple carriers*," and "is open-ended via its use of the word 'etc.'"  PO Remand Resp. 6; *see also* PO Remand Sur-reply 6 ("For example, . . . 'transmit signals' includes transmission on *one* carrier, while 'carrier aggregation' is limited to implementations utilizing *multiple* carriers.").  *Compare* Ex. 1001, 2:63–64 ("carrier aggregation . . . is operation on multiple carriers"), *with* Ex. 1001, 3:60–62 ("[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.").

Lastly, Patent Owner directs our attention to another Board decision in a different case, IPR2019-00128, in which, according to Patent Owner, the parties "litigated nearly the same issue that is now before the Board," namely, "the correct construction of the term 'carrier aggregation.'"  PO Remand Resp. 14 (citing Ex. 2026).  In that decision, the Board determined that "carrier aggregation" requires, in part, providing higher bandwidth. Ex. 2026, 24–26.  The Board relied on intrinsic evidence in that case, including a technical report cited in the patent specification and a reference

24

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

relied on during prosecution. *Id.* Patent Owner asserts that the technical report cited there is the same 3GPP technical report cited in the '675 patent regarding LTE Release 11. PO Remand Resp. 17 (citing Ex. 1001, 2:60–67; Ex. 2026, 24).

In reply, Petitioner addresses Patent Owner's arguments regarding Petitioner's reliance on the '675 patent's two statements that "carrier aggregation . . . is operation on multiple carriers" and "[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc." Ex. 1001, 2:63–64, 3:60–62. Petitioner reiterates that "the Federal Circuit *has* found that 'is' can signal lexicography," and has further "held that specific or even explicit definitional formats are *not* required." Pet. Remand Reply 2; *see also id.* at 4 (asserting that "Patent Owner's argument . . . is contradicted by the Federal Circuit's holdings that the word 'is' may define a term"). Petitioner also asserts that "operation on multiple carriers" is a "definition [that] is in the 'Detailed Description' of the purported invention," rather than "a generalized introduction to carrier aggregation," contrary to Patent Owner's position. *Id.* at 4. As to Patent Owner's emphasis on the way the '675 patent defines "exemplary," Petitioner counters that "the alleged 'definitional format' . . . is merely a legal boilerplate definition of 'exemplary,'" a word that "is not a technical claim term." *Id.* at 3.

Regarding Patent Owner's characterization of the two statements as inconsistent with each other, Petitioner responds that Patent Owner "relies on a misquote of the definition of 'transmit signals'" and "omits the word 'channels.'" Pet. Remand Reply 3–4. Petitioner asserts that "[t]he actual

25

**Appx293**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

phrases in that definition—'transmission on one or more carriers' and 'transmission on one or more frequency channels'—which Patent Owner's own expert confirmed is 'reasonable'—are consistent and closely related because a carrier is transmitted on a frequency *channel*." *Id.* at 4 (citing Ex. 1001, 3:60–62; Ex. 1044 ¶¶ 10–17; Ex. 1041, 15:8–16:4). Petitioner further asserts that "Patent Owner also cites the 'etc.' in the definition but fails to identify what else is signaled by that language." *Id.*

Turning to Patent Owner's proposed construction of "plurality of carrier aggregated transmit signals," Petitioner argues that "Patent Owner seeks to import 'to increase the bandwidth for a user.'" Pet. Remand Reply 5. Petitioner contends that the "added language is improper because it imports an ***objective*** or potential ***result or benefit*** of carrier aggregation, not what carrier aggregation ***is***." *Id.* (citing *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1355 (Fed. Cir. 2014)). Petitioner adds that "increased signal bandwidth is only a ***potential*** result of carrier aggregation which may not occur." *Id.* at 6. As support, Petitioner relies on Dr. Choi's testimony in his reply declaration on remand. *Id.* at 6 n.5 (citing Ex. 1044 ¶¶ 18–29). To illustrate, Dr. Choi testifies,

> So, for example, . . . one component carrier from each of Band 1 and Band 18 can be carrier aggregated. . . . [I]n Band 1, carriers with 5, 10, 15, and 20 MHz bandwidths are available for aggregation . . . , while in Band 18, carriers with 5, 10, or 15 MHz are available for aggregation . . . .

> As one example where carrier aggregation would not result in increased bandwidth, ***aggregating a 5 MHz carrier from Band 1 . . . with a 5 MHz carrier from Band 18 . . . would only result in 10 MHz, which does not result in increased bandwidth compared with the bandwidth of a single, non-aggregated,***

26

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

> ***carrier***, for instance, a single 20 MHz carrier in Band 1 . . . a single 15 MHz carrier in Band 1, or a single 15 MHz carrier in Band 18, etc.

Ex. 1044 ¶¶ 24–25.

Petitioner further contends that neither the specification, the prosecution history, nor the extrinsic evidence of record supports Patent Owner's proposed construction. Pet. Remand Reply 6–7. Referring to the specification, Petitioner asserts that it "states that multiple transmissions on different carriers '***may*** have increased envelope bandwidth,'" its "discussion of Figures 2A–2D, cited by Patent Owner . . . does not mention increasing bandwidth," its "discussion of the LTE specification . . . mentions only that frequency bands may cover up to 200 MHz and 35 bands are supported in Release 11," and it "does not incorporate the statement in 3GPP TS 36.101 about 'carrier aggregation' quoted by Patent Owner." *Id.* at 6 (citing Ex. 1001, 2:58–62, 6:10–12). As for the prosecution history, Petitioner asserts that "[n]either the Examiner nor the applicant made ***any*** such argument or suggestion" about understanding "that increasing bandwidth for a user is a required part of the construction of 'carrier aggregated transmit signals.'" *Id.* at 6–7. Petitioner also notes that the Examiner never cited paragraph 4 of the Chen publication on which Patent Owner relies. *Id.* at 7. With respect to the extrinsic evidence, Petitioner asserts that it was not cited or considered during prosecution. *Id.* Petitioner adds that "[w]here, as here, the claim term is defined in the patent, reliance on such extrinsic evidence is improper." *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584–85 (Fed. Cir. 1996)).

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Also, Petitioner contends that "Patent Owner wrongly criticizes the Board's construction for allegedly 'read[ing] "aggregated" out of the term'" because "the claims already state that the claimed apparatus 'produce[s] a single output radio frequency (RF) signal.'" Pet. Remand Reply 7 (citing Ex. 1044 ¶¶ 30–33).

Lastly, Petitioner contends that the Board's construction of "carrier aggregation" in the other decision, in IPR2019-00128, should not dictate our decision here because the construction there "*excludes* 'for a user,' and relies on several prior art references not relevant here." Pet. Remand Reply 8. Petitioner also submits, "More importantly, [the] Board's construction here is consistent with the ALJ's construction of the same term in the associated ITC investigation as 'simultaneous operation on multiple carriers,' whereas the [other] construction—currently on appeal—is not." *Id.* (citing Ex. 1042, 37–42). Petitioner asserts that "[t]he ALJ's construction and reasoning expressly rejected the inclusion of 'to increase the bandwidth for a user.'" *Id.* (citing Ex. 1042, 37–42).

Patent Owner counters that "increased user bandwidth is the necessary purpose of carrier aggregation," and that "Dr. Choi fails to show that carrier aggregation does not always increase the bandwidth of a user." PO Remand Sur-reply 2. Referring to Dr. Choi's example discussed above (*see also* Ex. 1044 ¶ 25), Patent Owner asserts that "[a]ggregating *two 5-MHz carriers* necessarily increases the bandwidth for a user as compared to a *single 5-MHz carrier* allocated to the user and Dr. Choi admits this." PO Remand Sur-reply 2 (citing Ex. 2030, 28:2–24 ("So I think you're asking me if you were to aggregate these two 5-megahertz carriers for a resultant total

28

**Appx296**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

aggregated bandwidth of 10 megahertz, would that be greater than if you were just to have a single 5-megahertz carrier.  And the answer's, obviously, yes because ten is greater than five.")).  Patent Owner adds that during prosecution "[t]he applicant amended the claims based on the prior art to recite 'carrier *aggregated* transmit signals' (Ex. 1002 at 237), and the increased bandwidth requirement gives meaning to the explicitly recited 'aggregat[ion].'"  *Id.* at 2–3.  Patent Owner states that "[p]ointing to other language in the claim as allegedly establishing the 'aggregating' concept," as Petitioner does, "would cause the word 'aggregated,' where it is recited in the claim, to be superfluous."  *Id.* at 5 (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)).

With respect to Petitioner's contention that Patent Owner's proposed construction on remand is unsupported by the specification, the prosecution history, and the extrinsic evidence, Patent Owner responds that Petitioner "point[s] to no counter-examples where increased bandwidth for a user is not present."  PO Remand Sur-reply 3.  Patent Owner also notes Petitioner "does not even attempt to show" that the statement in the 3GPP technical report describing carrier aggregation as "[a]ggregation of two or more component carriers in order to support wider transmission bandwidths" is "wrong or inconsistent with the [person having ordinary skill in the art's] understanding of the term."  *Id.*; *see also id.* at 4 (stating "[Petitioner's] only counter to [Patent Owner's] evidence that the Examiner understood 'carrier aggregation' to increase the bandwidth of a user is that [Patent Owner] cited Chen paragraph [0004], whereas the Examiner specifically cited paragraph [0007]"); *id.* at 4 (stating "[Petitioner's] further criticism that

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

[Patent Owner's] 'external documents' were not 'cited or considered during prosecution' just means that they are extrinsic evidence" (internal citation omitted)).

Patent Owner further maintains its position that there is no lexicography in this case. PO Remand Sur-reply 6–8. Patent Owner adds that Petitioner "cites no authority for the proposition that two alleged definitions can be combined to yield lexicography for a disputed claim term." *Id.* at 7. Lastly, Patent Owner notes that "there is no rule forbidding generalized introductions in a patent's detailed description." *Id.* at 8.

On the record now before us, we determine that our previous construction of "plurality of carrier aggregated transmit signals" (i.e., "signals for transmission on multiple carriers") is overly broad. As Petitioner points out, the '675 patent "stat[es] that 'carrier aggregation . . . *is* operation on multiple carriers' and 'a transmit signal *is* a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" Pet. Remand Br. 7 (quoting Ex. 1001, 2:63–64, 3:60–62). Read together in isolation, we agree with Petitioner that these statements in the specification say "carrier aggregated transmit signals" means "signals for transmission on multiple carriers." Our construction, however, must also take into account the prosecution history. *See Personalized Media*, 952 F.3d at 1340. The prosecution history "facilitates claim construction by revealing the intended meaning and scope of technical terms and may even trump the weight of specification language in some circumstances." *TDM Am., LLC v. U.S.*, 85 Fed. Cl. 774, 788 (2009) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir.

30

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

1999)).  For example, "an applicant's amendment accompanied by
explanatory remarks can define a claim term by demonstrating what the
applicant meant by the amendment." *Personalized Media*, 952 F.3d at 1340.
Thus, "like the specification, the prosecution history can act like a
dictionary." *Hemphill v. McNeil-PPC, Inc.*, 25 F. App'x 915, 918 (Fed. Cir.
2001) (non-precedential).

Here, during prosecution of the '675 patent, the applicant amended
independent claim 1 to recite "a plurality of different transmit signals" as
well as "a power amplifier to receive . . . the plurality of different transmit
signals . . . and to produce a single output RF signal."  Ex. 1002, 189
(Amendment, Nov. 12, 2014).  The applicant later amended claim 1 again
solely to replace "a plurality of *different* transmit signals" with "a plurality
of *carrier aggregated* transmit signals," and remarked to the Examiner that
"[i]t is Applicant's understanding that the above amendments place all
claims in a condition for allowance." *Id.* at 237, 246 (Amendment, March 6,
2015).  The applicant similarly amended the other independent claims during
prosecution. *Id.* at 191–194, 240–241, 243–244.

Based on the applicant's amendments, we agree with Patent Owner
that maintaining our previous construction of "plurality of carrier aggregated
transmit signals" as "signals for transmission on multiple carriers" would
ignore the word "aggregated." *See* PO Remand Resp. 13–14.  The
amendment limiting the recited signals to "carrier aggregated" signals
indicates that the claims require something more than just signals for
transmission on multiple carriers; otherwise, the claims would encompass
signals that are *not* carrier aggregated. *See, e.g.*, Ex. 1001, 6:10–12

31

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

("Multiple transmit signals may be sent on different frequencies (e.g., different carriers) and hence *may* have increased envelope bandwidth." (emphasis added)) (cited by Pet. Remand Reply 6); Ex. 1002, 189, 237 (application claims reciting *different* transmit signals before being amended to recite *carrier aggregated* transmit signals). Thus, our previous construction of "plurality of carrier aggregated transmit signals," though consistent with the specification language, is broader than the applicant's intended meaning and scope of the term as illuminated by the prosecution history.

We note Petitioner's contention that the claim limitation "produc[ing] a single output radio frequency (RF) signal" accounts for the claim term "aggregated." Pet. Remand Reply 7. As discussed above, however, that limitation was already included in the claims before the applicant amended them to require "carrier aggregated" signals. *Compare* Ex. 1002, 189 (Amendment, Nov. 12, 2014), *with id.* at 237 (Amendment, March 6, 2015). Thus, if producing a single output RF signal were to account for "aggregated," as Petitioner urges, then "aggregated" would be rendered superfluous. *See Dig.-Vending Servs. Int'l, LLC v. Univ. of Phx., Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (noting "the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered superfluous").

We turn now to Patent Owner's proposed construction on remand, namely, "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user," which can be divided into three parts: (1) "signals for transmission on multiple carriers," (2) "at the same time,"

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

(3) "to increase the bandwidth for a user." PO Remand Resp. 9. The parties' dispute in this regard addresses primarily the third part of Patent Owner's proposed construction, centering on whether the broadest reasonable interpretation of "plurality of carrier aggregated transmit signals" requires increasing bandwidth.[22] *See* Pet. Remand Br. 10–12; PO Remand Resp. 9–18; Pet. Remand Reply 5–8; PO Remand Sur-reply 1–5. We determine that the intrinsic evidence supports this aspect of Patent Owner's proposed construction.

"[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence," and "when prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (quoting *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000)) (other

---

[22] Petitioner does not dispute the first part of Patent Owner's proposed construction. *See* Pet. Remand Br. 7 ("The Board construed the claim term 'plurality of carrier aggregated transmit signals' to mean 'signals for transmission on multiple carriers.' This construction is correct." (internal citation omitted)). With respect to the second part of the construction, we note Petitioner's contention that our previous construction properly omitted "at the same time." *See id.* at 11–12. Determining whether "plurality of carrier aggregated transmit signals" requires this aspect of Patent Owner's proposed construction, however, is not necessary to resolve any controversy here. *See Vivid Techs.*, 200 F.3d at 803 (explaining that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy").

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

citations omitted). Thus, for the third part of Patent Owner's proposed
construction, we rely on the 3GPP technical report cited in the '675 patent,
as well as the Chen publication, which was cited in the prosecution history
of the '675 patent. The 3GPP technical report defines "[c]arrier
aggregation" as "[a]ggregation of two or more component carriers in order
to *support wider transmission bandwidths*." Ex. 2011, 14 (emphasis added)
(cited by Ex. 1001, 2:60–62 ('675 patent)). The Chen publication
additionally states that the "*bandwidth of a signal constantly increases* due
to multi-carrier applications." Ex. 2012 ¶ 4 (emphasis added) (cited by
Ex. 1002, 270 (Office Action, July 2, 2015)).

The teachings in both the 3GPP technical report and the Chen
publication are consistent with contemporaneous extrinsic evidence
introduced into the record on remand. For example, as discussed above,
Patent Owner directs us to U.S. Patent No. 9,161,254, which states that
"[o]ne technique for providing additional bandwidth capacity to wireless
devices is through the use [of] carrier aggregation of multiple smaller
bandwidths to form a virtual wideband channel at a wireless device (e.g.,
UE)." Ex. 2017, 3:19–22 (quoted in PO Remand Resp. 12); *see also id.* at
3:49–51 ("Carrier aggregation . . . enable[es] more bandwidth to be
obtained.") (cited by PO Remand Resp. 12). The application for that patent
was filed in May 2013, just three months after the application for the
'675 patent was filed. Ex. 1001, code (22); Ex. 2017, code (22). Similarly,
Patent Owner draws our attention to a 2013 Qualcomm paper, which states
that "[c]arrier aggregation, as the name suggests, combines multiple carriers

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

. . . at the device to provide a bigger data pipe to the user." Ex. 2015, 6
(quoted in PO Remand Resp. 12).

We note Petitioner's contention that the passage in the Chen
publication on which Patent Owner relies was never cited by the Examiner.
*See* Pet. Remand Reply 7. That passage provides additional support for the
definition of carrier aggregation that is provided in the 3GPP technical
report, however, and is therefore relevant to our analysis here. *See V-
Formation*, 401 F.3d at 1311; *see also* Ex. 1002, 278 (the Examiner advising
the applicant during prosecution "to fully consider the [cited] references in
their entirety as potentially teaching all or part of the claimed invention, as
well as the context of the passage as taught by the prior art or disclosed by
the Examiner"). Moreover, contrary to Petitioner's position, that neither the
Examiner nor the applicant explicitly expressed an understanding that carrier
aggregation requires increasing bandwidth does not change what is taught in
the 3GPP technical report or in the Chen publication, both part of the
intrinsic evidence. *See* Pet. Remand Reply 6–7 (Petitioner arguing that "the
file history does not support Patent Owner's argument that the Examiner
'understood' that increasing bandwidth for a user is a required part of the
construction of 'carrier aggregated transmit signals'" because "[n]either the
Examiner nor the applicant made ***any*** such argument or suggestion").

We further note Petitioner's contention that the third part of Patent
Owner's proposed construction, increasing bandwidth, "is improper because
it imports an objective or potential result or benefit of carrier aggregation,
not what carrier aggregation is." Pet. Remand Reply 5 (emphases omitted).
Petitioner relies on *Braintree*, a Federal Circuit case in which the court

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

rejected the argument that "purgation" means cleansing, even though "the specification . . . indicates that a dosage amount is 'effective' only if it produces a clean colon in preparation for a colonoscopy." *Braintree*, 749 F.3d at 1354–55. The court explained that "while cleansing is the goal specifically articulated in the specification, it is not a claim requirement," where the claims "only require that the compositions 'induce' (i.e., bring about or start) diarrhea," rather than "achiev[e] a fully cleansed colon." *Id.*

Petitioner's reliance on *Braintree* is misplaced. The facts here are different. Specifically, the claims of the '675 patent require *carrier aggregated* transmit signals. The 3GPP technical report noted above, which is part of the intrinsic evidence, defines "carrier aggregation" as "[a]ggregation of two or more component carriers in order *to support wider transmission bandwidths*." Ex. 2011, 14 (emphasis added); *see also* Ex. 2012 ¶ 4 (Chen publication, also part of the intrinsic evidence, stating that the "*bandwidth of a signal constantly increases* due to multi-carrier applications" (emphasis added)). Thus, carrier aggregation *is* the aggregation of two or more carriers in order *to support wider transmission bandwidths*. As discussed above, the extrinsic evidence supports this definition. *See* Ex. 2015, 6 ("Carrier aggregation, as the name suggests, combines multiple carriers . . . at the device to provide a bigger data pipe to the user."); Ex. 2017, 3:19–22 ("One technique for providing additional bandwidth capacity to wireless devices is through the use [of] carrier aggregation of multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE)."), 49–51 ("Carrier aggregation . . . enable[es] more bandwidth to be obtained.").

**Appx304**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Dr. Choi's example about aggregating two 5 MHz carriers from different bands also supports this definition. *See* Ex. 1044 ¶¶ 24–25 (cited by Pet. Remand Reply 6 n.5). Dr. Choi states that the aggregation of two 5 MHz carriers, which would provide a bandwidth of 10 MHz, "does not result in increased bandwidth compared with the bandwidth of a single, non-aggregated, carrier, for instance, a single 20 MHz carrier." *Id.* ¶ 25 (emphasis omitted). As Patent Owner points out, however, such aggregation "necessarily increases the bandwidth for a user as compared to a *single 5-MHz carrier* allocated to the user." PO Remand Sur-reply 2. We agree with Patent Owner's reasoning in this regard. *See* Ex. 2011, 14 (defining "[c]arrier aggregation" as "[a]ggregation of two or more *component* carriers in order *to support wider transmission bandwidths*" (emphases added)). Indeed, Dr. Choi testified at his deposition on remand, "So I think you're asking me if you were to *aggregate these two 5-megahertz carriers for a resultant total aggregated bandwidth of 10 megahertz*, would that be greater than if you were just to have a single 5-megahertz carrier. And the answer's, obviously, yes because ten is greater than five." Ex. 2030, 28:2–24 (emphasis added) (cited by PO Remand Sur-reply 2). Consistently, Dr. Choi also previously testified in his reply declaration during trial,

> LTE explicitly allows for transmission of *two aggregated 1.4 MHz signals*, even though the standard can also transmit a single 20 MHz carrier, which provides much higher bandwidth than the *combined bandwidth of 2.8 MHz*. . . . [C]arrier aggregation can achieve higher data rates and can increase the overall capacity of wireless networks by allowing network operators to exploit fragmented spectrum allocations. . . . *Aggregating two narrow band signals could do precisely that—increasing bandwidth by using fragmented spectrum allocations*.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Ex. 1031 ¶ 25 (emphases added) (cited by PO Remand Sur-reply 2).

In view of the foregoing, we adopt Patent Owner's proposed construction of "plurality of carrier aggregated transmit signals" on remand (which is the same construction that Petitioner originally proposed in its petitions), namely, "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user."[23]  *See* PO Remand Resp. 9; Pet. 32.  For the reasons given above, our construction is supported by the intrinsic evidence.  *See, e.g.*, Ex. 1001, 2:60–67, 3:60–62 ('675 patent); Ex. 1002, 189, 237, 246 (prosecution history file); Ex. 2011, 14 (3GPP technical report); Ex. 2012 ¶ 4 (Chen publication).  Our construction also is consistent with relevant extrinsic evidence.  *See, e.g.*, Ex. 2015, 6; Ex. 2017, 3:19–22, 3:49–51.  Further, our construction reflects Petitioner's proposed language on remand, "signals for transmission on multiple carriers," as well as portions of the specification cited by Petitioner.  *See* Pet. Remand Br. 7 (citing Ex. 1001, 2:63–64, 3:60–62).

### *D. Obviousness Based on Yu*

Petitioner asserts that claims 1–6, 11, 17–22, 27, and 33 would have been obvious over Yu and Wang; claims 7–10 and 28–32 would have been

---

[23] As previously noted, determining whether "plurality of carrier aggregated transmit signals" requires the second part of Patent Owner's proposed construction, "at the same time," is not necessary to resolve any controversy here.  *See Vivid Techs.*, 200 F.3d at 803.  We explain below it is undisputed that the asserted prior art teaches this aspect of Patent Owner's proposed construction.  *See infra* Part III.D.2.a.ii.  The outcome of our obviousness analysis would thus be the same whether or not our construction requires "at the same time."

38

**Appx306**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

obvious over Yu, Wang, and Choi; claim 12 would have been obvious over
Yu, Wang, and Eliezer; and claims 13–15 and 23–25 would have been
obvious over Yu, Wang, and Dahlman.  Pet. 35–75; 1327-Paper 3, 12–79;
1329-Paper 3, 24–79; 1340-Paper 3, 22–75.  Patent Owner opposes.  PO
Resp. 30–41.  For the reasons explained below, we determine that Petitioner
has demonstrated by a preponderance of the evidence that claims 1–15, 17–
25, and 27–33 would have been obvious over the asserted grounds.

We start with an overview of Yu.  As the issues in dispute all turn on
the teachings and suggestions of Yu, we do not address the substance of
Wang, Choi, Eliezer, or Dahlman.

### 1. Overview of Yu

Yu states that its "inventive principle may be considered as an
extension to the known principle of envelope-tracking amplifiers, which
determine an envelope signal of the radio frequency signal to be amplified,
and which control the voltage supply to the power amplifier depending on
said envelope signal."  Ex. 1004 ¶ 8.  Figure 1, which is reproduced below,
illustrates a power amplifier system according to Yu.  *Id.* ¶ 33.

Fig. 1



39

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

As Figure 1 shows, Yu's power amplifier system includes signal processing unit SP, control unit 100, and power amplifier PA. *Id.* ¶¶ 33, 37–38. Input signals S1 and S2 are forwarded to signal processing unit SP, which transforms the input signals into radio frequency signal $S_{RF}$. *Id.* ¶ 37. Power amplifier PA is configured to amplify radio frequency signal $S_{RF}$, which is fed to an input of power amplifier PA. *Id.* ¶ 33. Power amplifier PA comprises power amplifier supply voltage module PA'. *Id.* ¶ 35. Power amplifier supply voltage module PA' is configured to modify supply voltage Vsup, which is applied to power amplifier PA. *Id.*

Control unit 100 is used to control the operation of power amplifier PA and its supply voltage module PA'. Ex. 1004 ¶ 38. Control unit 100 has digital signal processing means DSP, which derive control signal CTRL based on input signals S1 and S2. *Id.* According to Yu, by deriving control signal CTRL in this way, "an improved supply voltage control for the power amplifier PA as compared to conventional envelope tracking systems may be obtained, especially in such cases, where more than one input signal S1, S2, . . . is to be processed to obtain said RF signal $S_{RF}$." *Id.* ¶ 39.

## 2. Analysis

As discussed above, the Federal Circuit explained in its remand decision that we "needed to provide notice of and an adequate opportunity to respond to [our] construction" of the claim limitation "plurality of carrier aggregated transmit signals," and then it remanded for further proceedings. *Qualcomm*, 6 F.4th at 1263, 1267. Our analysis here thus focuses on

40

**Appx308**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

whether the asserted prior art teaches or suggests the limitation "plurality of carrier aggregated transmit signals" in view of our construction on remand. We incorporate our prior analysis of other aspects of the challenged claims, which do not turn on the resolution of our construction on remand. *See* Final Dec.; 1327-Paper 30; 1329-Paper 30; 1340-Paper 30.

### a. Independent Claims 1, 18, 28, and 33

Each of independent claims 1, 18, 28, and 33 recites, in relevant part, "plurality of carrier aggregated transmit signals." As discussed above, we construe "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." *Supra* Part III.C. This construction can be divided into three parts: (1) "signals for transmission on multiple carriers," (2) "at the same time," (3) "to increase the bandwidth for a user." We address each part of the construction in turn.

### i. "signals for transmission on multiple carriers"

In its opening brief on remand, Petitioner maintains its position set forth in the petitions that Yu teaches signals for transmission on multiple carriers. *Compare* Pet. 41–44, *with* Pet. Remand Br. 13–16. Petitioner identifies Yu's input signals S1 and S2 as "carrier aggregated transmit signals." Pet. Remand Br. 13 (citing Pet. 41–44); *see also* Pet. 42 ("Signals S1 and S2 form 'carrier aggregated transmit signals.'"). To illustrate, Petitioner provides an annotated version of Figure 3 of Yu, which is reproduced below. Pet. Remand Br. 13–14; *see also* Pet. 43.

41

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Fig. 3



Figure 3 of Yu, as annotated by Petitioner, is a signal flow diagram. *See* Ex. 1004 ¶¶ 32, 57. Petitioner asserts that signals S1 and S2 are upconverted to different intermediate frequencies, as shown in the red box. Pet. Remand Br. 14 (citing Ex. 1004 ¶ 48); *accord* Pet. 43. Petitioner further asserts that the difference in frequencies is maintained when the signals are subsequently summed by adder a1, as shown in the blue box, and when they are upconverted again to different RF center frequencies, as shown in the yellow box. Pet. Remand Br. 14–15; *see also* Pet. 43–44. Petitioner contends that "Figure 3 shows that Yu's signals S1 and S2 are transmitted on multiple carriers at the same time," therefore satisfying the first part of our construction of "plurality of carrier aggregated transmit signals," namely, "signals for transmission on multiple carriers." Pet. Remand Br. 15; *see also* Pet. 42–44. Petitioner relies on Dr. Choi's testimony from his declaration submitted in support of the petitions. Pet. Remand Br. 15–16 (citing Ex. 1003 ¶¶ 100–103).

Petitioner adds that "Figure 4 [of Yu] also shows that signals S1 and S2 are signals for transmission on multiple carriers," pointing specifically to

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

"the frequency diagram to the left of the PA show[ing] signals S1 and S2 being transmitted on different carrier frequencies." Pet. 44; *see also* Pet. Remand Br. 15–16 (providing an analysis for Figure 4 of Yu that is similar to the analysis for Figure 3 of Yu).

Patent Owner does not dispute Petitioner's showing for this aspect of our construction. *See* PO Remand Resp. 19–20; PO Resp. 40–41.

Based on the record before us, we are persuaded that Yu teaches signals for transmission on multiple carriers.

### ii.  "at the same time"

As discussed above, Petitioner argues on remand that "plurality of carrier aggregated transmit signals" does not require the second part of our construction, "at the same time." Pet. Remand Br. 7, 11–12. In its opening brief, however, Petitioner nonetheless asserts that "Figure 3 [of Yu] shows that Yu's signals S1 and S2 are transmitted on multiple carriers *at the same time*." *Id.* at 15 (emphasis added); *see also id.* at 14 (Petitioner's annotated version of Yu's Figure 3). This is consistent with Petitioner's position set forth in its petitions, where Petitioner "applie[d] the construction, 'signals for transmission on multiple carriers at the same time to increase the bandwidth for a user,'" which is the same as our construction on remand. Pet. 41–43. In particular, Petitioner argued in its petitions that "Yu's transmit signals S1 and S2 are sent simultaneously." *Id.* at 41. As support, Petitioner pointed to Yu's teaching of "simultaneously process[ing] various input signals." Ex. 1004 ¶ 15 (cited by Pet. 42). Yu explains that "both input signals may simultaneously be processed by the digital signal

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

processing means," which "performs per se known signal processing techniques to transform the various input signals S1, S2, . . . into the radio frequency signal S$_{RF}$." *Id.* ¶¶ 16, 37 (cited by Pet. 42).

Patent Owner does not dispute Petitioner's showing for this aspect of our construction. *See* PO Remand Resp. 19–20; PO Resp. 40–41.

Based on the record before us, we are persuaded that Yu teaches signals for transmission on multiple carriers *at the same time*.

### iii. "to increase the bandwidth for a user"

Petitioner also argues on remand that "plurality of carrier aggregated transmit signals" does not require the third part of our construction, "to increase the bandwidth for a user." Pet. Remand Br. 7, 10–11. In its petitions, however, Petitioner "applie[d] the construction, 'signals for transmission on multiple carriers at the same time to increase the bandwidth for a user.'" Pet. 41–43. As noted above, this construction is the same as our construction on remand. We thus consider the parties' arguments during trial.

In the petitions, Petitioner contends that an ordinarily skilled artisan "would have understood Yu's method of aggregating multiple signals on different frequencies increases the bandwidth for a user, allowing more information to be transmitted per unit of time." Pet. 44. As support, Petitioner directs us to where Yu states that "both input signals may simultaneously be processed by the digital signal processing means." *Id.* (citing Ex. 1004 ¶ 16); *see also* Ex. 1004 ¶ 15 ("This advantageously enables to simultaneously process various input signals according to different

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

communications standards . . . .") (cited by Pet. 44).  Petitioner relies on the
declaration testimony of Dr. Choi.  Pet. 44 (citing Ex. 1003 ¶ 104).

Petitioner further notes in the petitions that "Patent Owner has argued
in the ITC that Yu does not disclose an increase of bandwidth 'for a user'
because Yu is allegedly directed to transmissions by a base station, not by a
mobile device."  Pet. 44 n.6.  Petitioner asserts that "Yu, however, states
expressly that its PA 'may e.g. be employed in wireless communications
systems such as base stations of cellular communications networks *or
wireless transceivers of mobile terminals and the like*.'"  *Id.* at 44–45 n.6
(quoting Ex. 1004 ¶ 34 (emphasis added in Pet.)).  Petitioner thus contends
that, "even if Yu were directed to base stations and the claims were limited
to mobile devices, it would have been obvious to a [person of ordinary skill
in the art] to take advantage of Yu's invention in a mobile device."  *Id.* at 45
n.6.  Petitioner relies on the declaration testimony of Dr. Choi.  *Id.* (citing
Ex. 1003 ¶ 104 n.4).

In its responses, Patent Owner counters that "Yu's Figure 3 and
Figure 4 embodiments describe base station technology that is processing
signals provided by different users."  PO Resp. 40.  According to Patent
Owner, "[i]n providing a system that 'simultaneously process[es] various
input signals *according to different communication standards*, which have
completely different target frequency ranges, with only one power
amplifier,' Yu's base station is processing signals from different users,"
which "fails to disclose '*signals from a single terminal* utilizing multiple
component carriers *which provide extended transmission bandwidth for a*

45

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

*user transmission* from the single terminal.'" *Id.* Patent Owner relies on the declaration testimony of Dr. Williams. *Id.* (citing Ex. 2001 ¶¶ 112–113).

Patent Owner adds that "the Figure 3 and Figure 4 base station implementations . . . are not appropriate for use in mobile terminals." PO Resp. 23. Patent Owner recognizes Yu's teaching that "its power amplifier embodiments may 'be employed in wireless communications systems such as base stations of cellular communications networks or wireless transceivers of mobile terminals,'" but contends that "due to power constraints, no mobile terminal at the critical date could implement power amplifiers that cover the bandwidth described with respect to Yu Figures 3 and 4." *Id.* at 23–24 (quoting Ex. 1004 ¶ 34). Patent Owner also states that "Figure 2 of Yu discloses a mobile-terminal-appropriate system for controlling a supply voltage of a power amplifier," and that "[i]t is noteworthy that [Petitioner] does not cite to Figure 2 as disclosing any claim limitations." *Id.* at 23. Patent Owner relies on the declaration testimony of Dr. Williams. *Id.* at 23–24 (citing Ex. 2001 ¶¶ 65–68).

Petitioner replies that "Patent Owner's argument relies entirely on the assumptions that (1) 'user' in this claim construction refers only to an individual mobile device owner, and (2) Yu is inapplicable because Figures 3 and 4 from Yu are limited to transmissions by base stations," both of which Petitioner says "are wrong." Pet. Reply 21. Regarding the first assumption, Petitioner contends that "[i]f a base station is processing two signals, then it is undisputed that the bandwidth for that user, i.e., the base station, is increased." *Id.*

**Appx314**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

As to the second assumption, Petitioner contends that carrier aggregation "is not, in ordinary usage, limited to the transmission of signals by a wireless device to a base station, *i.e.*, it is not limited to 'uplink' transmissions." Pet. Reply 21. As support, Petitioner directs us to where Dahlman describes carrier aggregation as "multiple component carriers [that] are aggregated and jointly used for *transmission to/from a single terminal*." Ex. 1006, 104 (emphasis added & original emphasis omitted) (cited by Pet. Reply 21–22). In other words, according to Dahlman, "component carriers can be aggregated for the downlink and uplink." *Id.* (cited by Pet. Reply 22). Petitioner also notes that Patent Owner stated at the ITC *Markman* hearing that "carrier aggregation . . . can be used in both the uplink and downlink a[s] it exists in systems, and the patent is really agnostic as to that." Pet. Reply 22 (quoting Ex. 1029, 143:17–19); *see also* Ex. 1030, 45:5–12 (Dr. Williams's deposition transcript) (cited by Pet. Reply 22).

With respect to Petitioner's user argument, Patent Owner responds that it "is inconsistent with the plain and ordinary meaning of 'user' and contradicted by the '675 patent and other evidence of record." PO Sur-reply 21–22. As support, Patent Owner asserts that "the '675 patent uses the term 'user equipment (UE)' to refer to a wireless device 110, as depicted in Fig. 1," whereas "the base stations 130, 132 of Fig. 1 are only referred to as 'base stations,'" never as "users" or "user equipment." *Id.* at 22 (citing Ex. 1001, 2:28–34, Fig. 1). In particular, the '675 patent teaches that its "[w]ireless device 110 may also be referred to as a user equipment (UE), a mobile station, a terminal, an access terminal, a subscriber unit, a station,

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

etc." Ex. 1001, 2:32–34.  Patent Owner also directs us to a 2010 3GPP

technical paper that distinguishes between user equipment and base stations.

PO Sur-reply 23 (citing Ex. 1036, 6 (listing technical reports titled "User

Equipment (UE) radio transmission and reception" and "Base Station (BS)

radio transmission and reception")).

Turning to Petitioner's uplink/downlink argument, Patent Owner

counters that "in both the uplink and downlink scenarios, the bandwidth

must be extended for a *single user terminal*."  PO Sur-reply 23.  According

to Patent Owner, "Yu does not disclose downlink carrier aggregation—*i.e.*,

using a base station to simultaneously transmit multiple signals to a *single

terminal* to increase the bandwidth for that terminal."  *Id.*  Patent Owner

asserts that "Yu discloses using its base station to transmit the two input

signals S1 and S2 to multiple, different destination terminals

simultaneously."  *Id.* at 24.  Patent Owner further asserts that "[d]ownlink

carrier aggregation had not yet been implemented as of January 2018—

much less as of Yu's 2010 filing date—and Yu contains no teaching or

suggestion of this theoretical system."  *Id.* at 23–24.

Patent Owner adds that "Petitioner also rehashes its argument that

Figures 3 and 4 of Yu are not limited to transmissions by base stations," and

that "this is an improper new argument not made in the petition[s], and it is

substantively wrong."  PO Sur-reply 24.

On the record before us, we agree with Patent Owner that "user," in

the construction applicable here, does not encompass a base station.  As

Patent Owner points out, the '675 patent distinguishes between wireless

device 110 (which may be referred to as a *user* equipment) and base

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

stations 130 and 132.  PO Sur-reply 22 (citing Ex. 1001, 2:32–34, Fig. 1).

To illustrate, Figure 1 of the '675 patent is reproduced below.



*FIG. 1*

Figure 1 shows a wireless device communicating with a wireless system.
Ex. 1001, 1:56–57.  Specifically, Figure 1 shows wireless device 110
communicating with wireless system 120 that includes base stations 130 and
132.  *Id.* at 2:19–20, 28–30.  Extrinsic evidence supports this distinction
between wireless device 110 (e.g., user equipment) and a base station.  *See*
Ex. 1036, 6 (cited by PO Sur-reply 23).  Accordingly, the third part of our
construction, "to increase the bandwidth for a user," does not encompass
increasing the bandwidth for a base station.

Both parties, however, acknowledge Yu's teaching that its power
amplifier "may e.g. be employed in wireless communications systems such
as base stations of cellular communications networks or wireless
transceivers of mobile terminals and the like."  Ex. 1004 ¶ 34 (cited by

49

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Pet. 44–45 n.6; PO Sur-reply 23). Based on this teaching in Yu, we agree with Petitioner that even if Figures 3 and 4 of Yu are directed to base stations (which we do not determine), "it would have been obvious to a [person of ordinary skill in the art] to take advantage of Yu's invention in a mobile device." Pet. 45 n.6; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007) ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."). Indeed, Patent Owner asserts that "Yu discloses three embodiments for implementing its functionality across Figures 2–4," and that "Figure 2 of Yu discloses a mobile-terminal-appropriate system for controlling a supply voltage of a power amplifier." *See* PO Resp. 23.

We note Patent Owner's contention that the base station implementations depicted in Figures 3 and 4 of Yu "are not appropriate for use in mobile terminals." PO Resp. 23; *see id.* at 23–24. Even if that were true, "[t]he test for obviousness is not whether the features of a secondary reference [or embodiment] may be bodily incorporated into the structure of the primary reference [or embodiment]." *In re Keller*, 642 F.2d 413, 425 (Fed. Cir. 1981). Instead, "the test is what the combined teachings . . . would have suggested to those of ordinary skill in the art." *Id.* Moreover, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421. Thus, a person of ordinary skill would have made any necessary modifications so that a mobile device could appropriately implement Yu's power amplifier. This is supported by Patent

50

**Appx318**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

Owner's assertion that "Figure 2 of Yu discloses a mobile-terminal-appropriate system for controlling a supply voltage of a power amplifier." *See* PO Resp. 23.

We further note Patent Owner's contention that downlink carrier aggregation had not been implemented as of Yu's filing date in 2010. PO Sur-reply 23–24. Even if this were true, it is of no moment in the context of a mobile device implementation of Yu's power amplifier, where the signals are processed by the mobile device, not the base station.

In addition, we note Patent Owner's emphasis on requiring extended bandwidth for a *single* user terminal. *See* PO Resp. 40 (arguing Yu's "fail[ure] to disclose '*signals from a single terminal* utilizing multiple component carriers *which provide extended transmission bandwidth for a user transmission* from the single terminal'"); PO Sur-reply 23 (arguing "the bandwidth must be extended for a *single user terminal*"). Patent Owner's arguments in this regard are based on its proposed construction of "plurality of carrier aggregated transmit signals" during trial, namely, "signals from a single terminal utilizing multiple component carriers which provide extended transmission bandwidth for a user transmission from the single terminal." PO Resp. 16. Patent Owner's proposed construction on remand, however, does not require increasing bandwidth for a "single terminal." Accordingly, Patent Owner's arguments do not undermine Petitioner's showing as to the third part of our construction (which is the same as Patent Owner's proposed construction on remand). We nevertheless note that in the context of the mobile device implementation of Yu's power amplifier,

51

**Appx319**

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

processing the signals simultaneously in the mobile device would increase the bandwidth for the mobile device, i.e., a single terminal.

Lastly, we note Patent Owner's contention that Petitioner's "argument that Figures 3 and 4 of Yu are not limited to transmissions by base stations . . . is an improper new argument not made in the petition[s], and it is substantively wrong."  PO Sur-reply 24.  As discussed above, however, our analysis accounts for the possibility that Figures 3 and 4 are directed to base stations.  Moreover, we disagree that Petitioner's argument is improper and new because Petitioner's argument is in response to Patent Owner's argument that "Yu's Figure 3 and Figure 4 embodiments describe base station technology."  *See* PO Resp. 40.  Accordingly, Petitioner's argument is appropriate.  *See* 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the . . . patent owner response.").

For the reasons given above, we are persuaded that Petitioner's proposed modification of Yu, which provides a mobile device implementation of Yu's power amplifier, teaches the third part of our construction, "to increase the bandwidth for a user."  Based on Yu's teaching that its power amplifier may be used in base stations or mobile devices (Ex. 1004 ¶ 34), we also are persuaded that an ordinarily skilled artisan would have had reason to modify Yu's base station implementations of the power amplifier to provide a mobile device implementation of the power amplifier.  *See KSR*, 550 U.S. at 418 ("[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.").  As noted above, "if a technique has been used to improve one device, and a person of ordinary skill in the art would

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 417.

### iv. Remaining Limitations

As we explained above, the Federal Circuit instructs us to address the limitation "plurality of carrier aggregated transmit signals."  Accordingly, we do not address the other limitations recited in independent claims 1, 18, 28, and 33 for purposes of this Decision.  We note that, in our final decisions, we were persuaded that the asserted references teach the other limitations, and that an ordinarily skilled artisan would have had reason to combine the teachings in those references.  Final Dec. 64; 1327-Paper 30, 80; 1329-Paper 30, 82; 1340-Paper 30, 86.  As mentioned above, we incorporate our prior analysis as to the other limitations recited in independent claims 1, 18, 28, and 33.

### b.  Dependent Claims 2–15, 17, 19–25, 27, and 29–32

Because the Federal Circuit instructs us to address the limitation "plurality of carrier aggregated transmit signals," which appears in each of the independent claims, we do not address the dependent claims for purposes of this Decision.  Although several dependent claims recite "plurality of carrier aggregated transmit signals," the parties do not argue the dependent claims separately in this regard.  We note that, in our final decisions, we were persuaded that the asserted references teach the limitations recited in the dependent claims, and that an ordinarily skilled artisan would have had

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

reason to combine the teachings of those references.  Final Dec. 64; 1327-Paper 30, 80; 1329-Paper 30, 82; 1340-Paper 30, 86.  As mentioned above, we incorporate our prior analysis as to the limitations recited in the dependent claims.

### *3. Summary*

In view of the foregoing, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 would have been obvious over the asserted prior art.  We determine in particular that Petitioner has demonstrated by a preponderance of the evidence that claims 1–6, 11, 17–22, 27, and 33 would have been obvious over Yu and Wang; claims 7–10 and 28–32 would have been obvious over Yu, Wang, and Choi; claim 12 would have been obvious over Yu, Wang, and Eliezer; and claims 13–15 and 23–25 would have been obvious over Yu, Wang, and Dahlman.

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

## IV. CONCLUSION[24]

On remand, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–15, 17–25, and 27–33 of the '675 patent are unpatentable as follows.

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–6, 11, 17–22, 27, 33 | 103 | Yu, Wang | 1–6, 11, 17–22, 27, 33 | |
| 7–10, 28–32 | 103 | Yu, Wang, Choi | 7–10, 28–32 | |
| 12 | 103 | Yu, Wang, Eliezer | 12 | |
| 13–15, 23–25 | 103 | Yu, Wang, Dahlman | 13–15, 23–25 | |
| **Overall Outcome** | | | 1–15, 17–25, 27–33 | |

## V.  ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1–15, 17–25, and 27–33 of the '675 patent are held *unpatentable*; and

---

[24] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.  See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2018-01326, IPR2018-01327
IPR2018-01329, IPR2018-01340
Patent 9,608,675 B2

FURTHER ORDERED that, because this Decision on Remand amounts to a final written decision, parties to the proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

David Cavanaugh
Richard Goldenberg
Theodoros Konstantakopoulos
Louis Tompros
Kathryn Zalewski
WILMER CUTLER PICKERING HALE & DORR LLP
David.cavanaugh@wilmerhale.com
Richard.goldenberg@wilmerhale.com
Louis.tompros@wilmerhale.com
Theodoros.konstantakopoulos@wilmerhale.com
Kathryn.zalewski@wilmerhale.com

For PATENT OWNER:

Matthew Johnson
Joseph Sauer
David Cochran
David Maiorana
Richard Graham
Joshua Nightingale
JONES DAY
mwjohnson@jonesday.com
jmsauer@jonesday.com
dcochran@jonesday.com
dmaiorana@jonesday.com
ragraham@jonesday.com
jrnightingale@jonesday.com

(12) **United States Patent**

Dorosenco

(10) Patent No.: **US 9,608,675 B2**

(45) Date of Patent: **Mar. 28, 2017**

(54) **POWER TRACKER FOR MULTIPLE TRANSMIT SIGNALS SENT SIMULTANEOUSLY**

(71) Applicant: **QUALCOMM Incorporated**, San Diego, CA (US)

(72) Inventor: **Alexander Dorosenco**, San Diego, CA (US)

(73) Assignee: **QUALCOMM INCORPORATED**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 134 days.

(21) Appl. No.: **13/764,328**

(22) Filed: **Feb. 11, 2013**

(65) **Prior Publication Data**

US 2014/0226748 A1    Aug. 14, 2014

(51) **Int. Cl.**
| | |
|---|---|
| *H04B 1/04* | (2006.01) |
| *H04W 52/52* | (2009.01) |
| *H03F 1/02* | (2006.01) |
| *H03F 3/195* | (2006.01) |
| *H03F 3/21* | (2006.01) |
| *H03F 3/24* | (2006.01) |
| *H03F 3/68* | (2006.01) |

(52) **U.S. Cl.**
CPC ............. *H04B 1/04* (2013.01); *H03F 1/0227* (2013.01); *H03F 3/195* (2013.01); *H03F 3/211* (2013.01); *H03F 3/245* (2013.01); *H03F 3/68* (2013.01); *H04W 52/52* (2013.01); *H03F 2200/336* (2013.01); *H03F 2200/462* (2013.01)

(58) **Field of Classification Search**
CPC . H04B 1/04; H04B 1/69; H04B 1/707; H04B 7/00; H04B 7/005; H03F 1/34; H03F 3/68; H03F 3/217; H03G 3/20; H04K 1/10; H04L 27/14

USPC .......... 330/84, 127, 251; 370/210, 319, 338; 375/135, 146, 219, 257, 260, 295, 297; 455/69, 101, 522

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,009,090 A | * | 12/1999 | Oishi et al. | ................... 370/342 |
| 7,092,683 B2 | * | 8/2006 | Tanaka et al. | ................ 455/108 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 2476393 A | 6/2011 |
| GB | 2488380 A | 8/2012 |

OTHER PUBLICATIONS

International Search Report and Written Opinion—PCT/US2014/013805—ISAEPO—Mar. 20, 2014.

*Primary Examiner* — Shawkat M Ali

(74) *Attorney, Agent, or Firm* — Haynes and Boone, LLP

(57) **ABSTRACT**

Techniques for generating a power tracking supply voltage for a circuit (e.g., a power amplifier) are disclosed. The circuit may process multiple transmit signals being sent simultaneously on multiple carriers at different frequencies. In one exemplary design, an apparatus includes a power tracker and a power supply generator. The power tracker determines a power tracking signal based on inphase (I) and quadrature (Q) components of a plurality of transmit signals being sent simultaneously. The power supply generator generates a power supply voltage based on the power tracking signal. The apparatus may further include a power amplifier (PA) that amplifies a modulated radio frequency (RF) signal based on the power supply voltage and provides an output RF signal.

**33 Claims, 10 Drawing Sheets**



**US 9,608,675 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,995,567 | B2 * | 3/2015 | Rofougaran et al. | 375/297 |
| 2006/0264186 | A1 * | 11/2006 | Akizuki | H03C 5/00 |
| | | | | 455/108 |
| 2008/0139140 | A1 * | 6/2008 | Matero et al. | 455/114.3 |
| 2010/0291963 | A1 | 11/2010 | Patel et al. | |
| 2011/0142156 | A1 * | 6/2011 | Haartsen | 375/271 |
| 2011/0151806 | A1 * | 6/2011 | Kenington | 455/101 |
| 2011/0193629 | A1 | 8/2011 | Hou et al. | |
| 2012/0033656 | A1 | 2/2012 | De Maaijer | |
| 2012/0039418 | A1 | 2/2012 | Vaisanen | |
| 2012/0214423 | A1 | 8/2012 | Wallace | |
| 2012/0229208 | A1 * | 9/2012 | Wimpenny et al. | 330/127 |
| 2012/0321018 | A1 * | 12/2012 | Chen et al. | 375/296 |
| 2012/0326686 | A1 * | 12/2012 | Dai et al. | 323/283 |
| 2012/0326783 | A1 | 12/2012 | Mathe et al. | |
| 2014/0111275 | A1 * | 4/2014 | Khlat et al. | 330/124 R |
| 2014/0199949 | A1 * | 7/2014 | Nagode et al. | 455/73 |

* cited by examiner



FIG. 1

Case: 22-1824    Document: 15    Page: 299    Filed: 11/07/2022



FIG. 2A

FIG. 2B

FIG. 2C

FIG. 2D



*FIG. 3*

Case: 22-1824        Document: 15        Page: 301        Filed: 11/07/2022



*FIG. 4*

Case: 22-1824     Document: 15     Page: 302     Filed: 11/07/2022



*FIG. 5*

Case: 22-1824    Document: 15    Page: 303    Filed: 11/07/2022



*FIG. 6*



Power
Tracking
Signal *712*

Output RF Signal *710*

*FIG. 7A*



Power
Tracking
Signal *722*

Output RF Signal *720*

*FIG. 7B*



*FIG. 8*

Case: 22-1824    Document: 15    Page: 306    Filed: 11/07/2022



*FIG. 9*



*FIG. 10*

US 9,608,675 B2

1

**POWER TRACKER FOR MULTIPLE TRANSMIT SIGNALS SENT SIMULTANEOUSLY**

BACKGROUND

I. Field

The present disclosure relates generally to electronics, and more specifically to techniques for generating a power supply voltage for a circuit such as an amplifier.

II. Background

A wireless device (e.g., a cellular phone or a smartphone) in a wireless communication system may transmit and receive data for two-way communication. The wireless device may include a transmitter for data transmission and a receiver for data reception. For data transmission, the transmitter may process (e.g., encode and modulate) data to generate output samples. The transmitter may further condition (e.g., convert to analog, filter, amplify, and frequency upconvert) the output samples to generate a modulated radio frequency (RF) signal, amplify the modulated RF signal to obtain an output RF signal having the proper transmit power level, and transmit the output RF signal via an antenna to a base station. For data reception, the receiver may obtain a received RF signal via the antenna and may amplify and process the received RF signal to recover data sent by the base station.

The transmitter typically includes a power amplifier (PA) to provide high transmit power for the output RF signal. The power amplifier should be able to provide high transmit power and have high power-added efficiency (PAE).

SUMMARY

Techniques for generating a power tracking supply voltage for a circuit (e.g., a power amplifier) that processes multiple transmit signals sent simultaneously are disclosed herein. The multiple transmit signals may comprise transmissions sent simultaneously on multiple carriers at different frequencies.

In one exemplary design, an apparatus includes a power tracker and a power supply generator. The power tracker determines a power tracking signal based on inphase (I) and quadrature (Q) components of a plurality of transmit signals being sent simultaneously, as described below. The power supply generator generates a power supply voltage based on the power tracking signal. The apparatus may further include a power amplifier that amplifies a modulated RF signal based on the power supply voltage and provides an output RF signal.

Various aspects and features of the disclosure are described in further detail below.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a wireless device communicating with a wireless system.

FIGS. 2A to 2D show four examples of carrier aggregation.

FIG. 3 shows a block diagram of the wireless device in FIG. 1.

FIG. 4 shows a transmit module comprising a separate power amplifier with separate power tracking for each transmit signal.

FIGS. 5 and 6 show two designs of a transmit module comprising a single power amplifier with power tracking for all transmit signals.

2

FIGS. 7A and 7B show power tracking for two and three transmit signals, respectively.

FIGS. 8 and 9 show a design of a power supply generator with power tracking.

FIG. 10 shows a process for generating a power supply voltage with power tracking.

DETAILED DESCRIPTION

The word "exemplary" is used herein to mean "serving as an example, instance, or illustration." Any design described herein as "exemplary" is not necessarily to be construed as preferred or advantageous over other designs.

Techniques for generating a power tracking supply voltage for a circuit (e.g., a power amplifier) that processes multiple transmit signals sent simultaneously are disclosed herein. The techniques may be used for various electronic devices such as wireless communication devices.

FIG. 1 shows a wireless device 110 communicating with a wireless communication system 120. Wireless system 120 may be a Long Term Evolution (LTE) system, a Code Division Multiple Access (CDMA) system, a Global System for Mobile Communications (GSM) system, a wireless local area network (WLAN) system, or some other wireless system. A CDMA system may implement Wideband CDMA (WCDMA), CDMA 1X, Time Division Synchronous CDMA (TD-SCDMA), or some other version of CDMA. For simplicity, FIG. 1 shows wireless system 120 including two base stations 130 and 132 and one system controller 140. In general, a wireless system may include any number of base stations and any set of network entities.

Wireless device 110 may also be referred to as a user equipment (UE), a mobile station, a terminal, an access terminal, a subscriber unit, a station, etc. Wireless device 110 may be a cellular phone, a smartphone, a tablet, a wireless modem, a personal digital assistant (PDA), a handheld device, a laptop computer, a smartbook, a netbook, a cordless phone, a wireless local loop (WLL) station, a Bluetooth device, etc. Wireless device 110 may be capable of communicating with wireless system 120. Wireless device 110 may also be capable of receiving signals from broadcast stations (e.g., a broadcast station 134), signals from satellites (e.g., a satellite 150) in one or more global navigation satellite systems (GNSS), etc. Wireless device 110 may support one or more radio technologies for wireless communication such as LTE, WCDMA, CDMA 1X, TD-SCDMA, GSM, 802.11, etc.

Wireless device 110 may be able to operate in low-band (LB) covering frequencies lower than 1000 megahertz (MHz), mid-band (MB) covering frequencies from 1000 MHz to 2300 MHz, and/or high-band (HB) covering frequencies higher than 2300 MHz. For example, low-band may cover 698 to 960 MHz, mid-band may cover 1475 to 2170 MHz, and high-band may cover 2300 to 2690 MHz and 3400 to 3800 MHz. Low-band, mid-band, and high-band refer to three groups of bands (or band groups), with each band group including a number of frequency bands (or simply, "bands"). Each band may cover up to 200 MHz and may include one or more carriers. Each carrier may cover up to 20 MHz in LTE. LTE Release 11 supports 35 bands, which are referred to as LTE/UMTS bands and are listed in 3GPP TS 36.101.

Wireless device 110 may support carrier aggregation, which is operation on multiple carriers. Carrier aggregation may also be referred to as multi-carrier operation. Wireless device 110 may be configured with up to 5 carriers in one or two bands in LTE Release 11.

US 9,608,675 B2

3

In general, carrier aggregation (CA) may be categorized into two types—intra-band CA and inter-band CA. Intra-band CA refers to operation on multiple carriers within the same band. Inter-band CA refers to operation on multiple carriers in different bands.

FIG. 2A shows an example of contiguous intra-band CA. In the example shown in FIG. 2A, wireless device 110 is configured with three contiguous carriers in one band in low-band. Wireless device 110 may send and/or receive transmissions on the three contiguous carriers in the same band.

FIG. 2B shows an example of non-contiguous intra-band CA. In the example shown in FIG. 2B, wireless device 110 is configured with three non-contiguous carriers in one band in low-band. The carriers may be separated by 5 MHz, 10 MHz, or some other amount. Wireless device 110 may send and/or receive transmissions on the three non-contiguous carriers in the same band.

FIG. 2C shows an example of inter-band CA in the same band group. In the example shown in FIG. 2C, wireless device 110 is configured with three carriers in two bands in low-band. Wireless device 110 may send and/or receive transmissions on the three carriers in different bands in the same band group.

FIG. 2D shows an example of inter-band CA in different band groups. In the example shown in FIG. 2D, wireless device 110 is configured with three carriers in two bands in different band groups, which include two carriers in one band in low-band and one carrier in another band in mid-band. Wireless device 110 may send and/or receive transmissions on the three carriers in different bands in different band groups.

FIGS. 2A to 2D show four examples of carrier aggregation. Carrier aggregation may also be supported for other combinations of bands and band groups.

FIG. 3 shows a block diagram of an exemplary design of wireless device 110 in FIG. 1. In this exemplary design, wireless device 110 includes a data processor/controller 310, a transceiver 320 coupled to a primary antenna 390, and a transceiver 322 coupled to a secondary antenna 392. Transceiver 320 includes K transmitters $330pa$ to $330pk$, L receivers $380pa$ to $380pl$, and an antenna interface circuit 370 to support multiple bands, carrier aggregation, multiple radio technologies, etc. K and L may each be any integer value of one or greater. Transceiver 322 includes M transmitters $330sa$ to $330sm$, N receivers $380sa$ to $380sn$, and an antenna interface circuit 372 to support multiple bands, carrier aggregation, multiple radio technologies, receive diversity, multiple-input multiple-output (MIMO) transmission, etc. M and N may each be any integer value of one or greater.

In the exemplary design shown in FIG. 3, each transmitter 330 includes a transmit circuit 340 and a power amplifier (PA) 360. For data transmission, data processor 310 processes (e.g., encodes and symbol maps) data to be transmitted to obtain modulation symbols. Data processor 310 further processes the modulation symbols (e.g., for OFDM, SC-FDMA, CDMA, or some other modulation technique) and provides I and Q samples for each transmit signal to be sent by wireless device 110. A transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc. Data processor 310 provides the I and Q samples for one or more transmit signals to one or more selected transmitters. The description below assumes that transmitter $330pa$ is a transmitter selected to send one transmit signal. Within transmitter $330pa$, transmit circuit $340pa$ converts I and Q samples

4

to I and Q analog output signals, respectively. Transmit circuit $340pa$ further amplifies, filters, and upconverts the I and Q analog output signals from baseband to RF and provides a modulated RF signal. Transmit circuit $340pa$ may include digital-to-analog converters (DACs), amplifiers, filters, mixers, matching circuits, an oscillator, a local oscillator (LO) generator, a phase-locked loop (PLL), etc. A PA $360pa$ receives and amplifies the modulated RF signal and provides an output RF signal having the proper transmit power level. The output RF signal is routed through antenna interface circuit 370 and transmitted via antenna 390. Antenna interface circuit 370 may include one or more filters, duplexers, diplexers, switches, matching circuits, directional couplers, etc. Each remaining transmitter 330 in transceivers 320 and 322 may operate in similar manner as transmitter $330pa$.

In the exemplary design shown in FIG. 3, each receiver 380 includes a low noise amplifier (LNA) 382 and a receive circuit 384. For data reception, antenna 390 receives signals from base stations and/or other transmitter stations and provides a received RF signal, which is routed through antenna interface circuit 370 and provided to a selected receiver. The description below assumes that receiver $380pa$ is the selected receiver. Within receiver $380pa$, an LNA $382pa$ amplifies the received RF signal and provides an amplified RF signal. A receive circuit $384pa$ downconverts the amplified RF signal from RF to baseband, amplifies and filters the downconverted signal, and provides an analog input signal to data processor 310. Receive circuit $384pa$ may include mixers, filters, amplifiers, matching circuits, an oscillator, an LO generator, a PLL, etc. Each remaining receiver 380 in transceivers 320 and 322 may operate in similar manner as receiver $380pa$.

FIG. 3 shows an exemplary design of transmitters 330 and receivers 380. A transmitter and a receiver may also include other circuits not shown in FIG. 3, such as filters, matching circuits, etc. All or a portion of transceivers 320 and 322 may be implemented on one or more analog integrated circuits (ICs), RF ICs (RFICs), mixed-signal ICs, etc. For example, transmit circuits 340, LNAs 382, and receive circuits 384 may be implemented on one module, which may be an RFIC, etc. Antenna interface circuits 370 and 372 and PAs 360 may be implemented on another module, which may be a hybrid module, etc. The circuits in transceivers 320 and 322 may also be implemented in other manners.

Data processor/controller 310 may perform various functions for wireless device 110. For example, data processor 310 may perform processing for data being transmitted via transmitters 330 and data being received via receivers 380. Controller 310 may control the operation of transmit circuits 340, PAs 360, LNAs 382, receive circuits 384, antenna interface circuits 370 and 372, or a combination thereof. A memory 312 may store program codes and data for data processor/controller 310. Data processor/controller 310 may be implemented on one or more application specific integrated circuits (ASICs) and/or other ICs.

Wireless device 110 may send multiple transmit signals simultaneously. In one design, the multiple transmit signals may be for transmissions on multiple contiguous or non-contiguous carriers with intra-band CA, e.g., as shown in FIG. 2A or 2B. For example, each transmit signal may comprise a transmission sent on one carrier. In another design, the multiple transmit signals may be for transmissions on multiple frequency channels to the same wireless system. In yet another design, the multiple transmit signals may be for transmissions sent to different wireless systems (e.g., LTE and WLAN). In any case, data to be sent in each

US 9,608,675 B2

5

transmit signal may be processed (e.g., encoded, symbol mapped, and modulated) separately to generate I and Q samples for that transmit signal. Each transmit signal may be conditioned by a respective transmit circuit **340** and amplified by a respective PA **360** to generate an output RF signal for that transmit signal.

A PA may receive a modulated RF signal and a power supply voltage and may generate an output RF signal. The output RF signal typically tracks the modulated RF signal and has a time-varying envelope. The power supply voltage should be higher than the amplitude of the output RF signal at all times in order to avoid clipping the output RF signal, which would then cause intermodulation distortion (IMD) that may degrade performance. The difference between the power supply voltage and the envelope of the output RF signal represents wasted power that is dissipated by the PA instead of delivered to an output load.

It may be desirable to generate a power supply voltage for a PA such that good performance and good efficiency can be obtained. This may be achieved by generating the power supply voltage for the PA with power tracking so that the power supply voltage can track the envelope of an output RF signal from the PA.

FIG. **4** shows a design of a transmit module **400** supporting simultaneous transmission of multiple (K) transmit signals with a separate PA and separate power tracking for each transmit signal. Transmit module **400** includes K transmitters **430a** to **430k** that can simultaneously process K transmit signals, with each transmitter **430** processing one transmit signal. Each transmitter **430** includes a transmit circuit **440**, a PA **460**, and a power tracking supply generator **480**.

Transmitter **430a** receives $I_1$ and $Q_1$ samples for a first transmit signal and generates a first output RF signal for the first transmit signal. The $I_1$ and $Q_1$ samples are provided to both transmit circuit **440a** and voltage generator **480a**. Within transmit circuit **440a**, the $I_1$ and $Q_1$ samples are converted to I and Q analog signals by DACs **442a** and **443a**, respectively. The I analog signal is filtered by a lowpass filter **444a**, amplified by an amplifier (Amp) **446a**, and upconverted from baseband to RF by a mixer **448a**. Similarly, the Q analog signal is filtered by a lowpass filter **445a**, amplified by an amplifier **447a**, and upconverted from baseband to RF by a mixer **449a**. Mixers **448a** and **449a** perform upconversion for the first transmit signal based on I and Q LO signals (ILO$_1$ and QLO$_1$) at a center RF frequency of the first transmit signal. A summer **450a** sums the I and Q upconverted signals from mixers **448a** and **449a** to obtain a modulated RF signal, which is provided to PA **460a**.

Within voltage generator **480a**, a power tracker **482a** receives the $I_1$ and $Q_1$ samples for the first transmit signal, computes the power of the first transmit signal based on the $I_1$ and $Q_1$ samples, and provides a digital power tracking signal to a DAC **484a**. DAC **484a** converts the digital power tracking signal to analog and provides an analog power tracking signal. A power supply generator **486a** receives the analog power tracking signal and generates a power supply voltage for PA **460a**. PA **460a** amplifies the modulated RF signal from transmit circuit **440a** using the power supply voltage from voltage generator **486a** and provides the first output RF signal for the first transmit signal.

Each remaining transmitter **430** may similarly process I and Q samples for a respective transmit signal and may provide an output RF signal for the transmit signal. Up to K PAs **460a** to **460k** may provide up to K output RF signals at different RF frequencies for up to K transmit signals being

6

sent simultaneously. A summer **462** receives the output RF signals being sent simultaneously, sums the output RF signals, and provides a final output RF signal, which is routed through a duplexer **470** and transmitted via an antenna **490**.

As shown in FIG. **4**, power tracking may be used to improve the efficiency of PAs **460a** to **460k**. Each transmit signal may be processed by a respective transmitter **430** using a separate sets of mixers **448** and **449** and PA **460**. Multiple transmit signals may be sent on different frequencies (e.g., different carriers) and hence may have increased envelope bandwidth. The increased envelope bandwidth may be addressed by using a separate transmitter **430** for each transmit signal. Each transmitter **430** may then handle the envelope bandwidth of one transmit signal. However, operating multiple transmitters **430** concurrently for multiple transmit signals may result in more circuits, higher power consumption, and increased cost, all of which are undesirable.

In an aspect of the present disclosure, a single PA with power tracking may be used to generate a single output RF signal for multiple transmit signals being sent simultaneously. A single power supply voltage may be generated for the PA to track the power of all transmit signals being sent simultaneously. This may reduce the number of circuit components, reduce power consumption, and provide other advantages.

FIG. **5** shows a design of a transmit module **500** supporting simultaneous transmission of multiple (K) transmit signals with a single PA and power tracking for all transmit signals. Transmit module **500** performs frequency upconversion separately for each transmit signal in the analog domain and sums the resultant upconverted RF signals for all transmit signals. Transmit module **500** includes K transmit circuits **540a** to **540k** that can simultaneously process K transmit signals, with each transmit circuit **540** processing one transmit signal. Transmit module **500** further includes a summer **552**, a PA **560**, a duplexer **570**, and a power tracking supply generator **580**.

Transmit circuit **540a** receives $I_1$ and $Q_1$ samples for a first transmit signal and generates a first upconverted RF signal for the first transmit signal. The $I_1$ and $Q_1$ samples are provided to both transmit circuit **540a** and voltage generator **580**. Within transmit circuit **540a**, the $I_1$ and $Q_1$ samples are converted to I and Q analog signals by DACs **542a** and **543a**, respectively. The I and Q analog signals are filtered by lowpass filters **544a** and **545a**, amplified by amplifiers **546a** and **547a**, upconverted from baseband to RF by mixers **548a** and **549a**, and summed by a summer **550a** to generate the first upconverted RF signal. Mixers **548a** and **549a** perform upconversion for the first transmit signal based on I and Q LO signals at a center RF frequency of the first transmit signal.

Each remaining transmit circuit **540** may similarly process I and Q samples for a respective transmit signal and may provide an upconverted RF signal for the transmit signal. Up to K transmit circuits **540a** to **540k** may provide up to K upconverted RF signals at different RF frequencies for up to K transmit signals being sent simultaneously. A summer **552** receives the upconverted RF signals from transmit circuits **540a** to **540k**, sums the upconverted RF signals, and provides a modulated RF signal to PA **560**.

Within voltage generator **580**, a power tracker **582** receives $I_1$ to $I_K$ samples and $Q_1$ to $Q_K$ samples for all transmit signals being sent simultaneously. Power tracker **582** computes the overall power of all transmit signals based on the I and Q samples for these transmit signals and

US 9,608,675 B2

7
8

provides a digital power tracking signal to a DAC 584. DAC 584 converts the digital power tracking signal to analog and provides an analog power tracking signal for all transmit signals. Although not shown in FIG. 5, a lowpass filter may receive and filter an output signal from DAC 584 and provide the analog power tracking signal. A power supply generator 586 receives the analog power tracking signal and generates a power supply voltage for PA 560.

PA 560 amplifies the modulated RF signal from summer 552 using the power supply voltage from supply generator 586. PA 560 provides an output RF signal for all transmit signals being sent simultaneously. The output RF signal is routed through duplexer 570 and transmitted via antenna 590.

FIG. 6 shows a design of a transmit module 502 supporting simultaneous transmission of multiple (K) transmit signals with a single PA and power tracking for all transmit signals. Transmit module 502 digitally upconverts each transmit signal to an intermediate frequency (IF) in the digital domain, sums the resultant upconverted IF signals for all transmit signals, and performs frequency upconversion from IF to RF for all transmit signals together in the analog domain. Transmit module 502 includes a digital modulator 520, a transmit circuit 540, PA 560, duplexer 570, and power tracking supply generator 580.

Digital modulator 520 receives I and Q samples for all transmit signals and generates a modulated IF signal for all transmit signals. Within digital modulator 520, the $I_1$ and $Q_1$ samples for the first transmit signal are upconverted to a first IF frequency by multipliers 522a and 523a, respectively, based on $C_{I1}$ and $C_{Q1}$ digital LO signals. The I and Q samples for each remaining transmit signal are upconverted to a different IF frequency by multipliers 522 and 523, respectively, for that transmit signal. The IF frequencies of the K transmit signals may be selected based on the final RF frequencies of the K transmit signals. A summer 524 sums the outputs of all K multipliers 522a to 522k and provides an I modulated signal. Similarly, a summer 525 sums the outputs of all K multipliers 523a to 523k and provides a Q modulated signal. The I and Q modulated signals from summers 524 and 525 form the modulated IF signal for all transmit signals.

Transmit circuit 540 receives I and Q modulated signals from digital modulator 520 and generates a modulated RF signal for all transmit signals. Within transmit circuit 540, the I and Q modulated signals are converted to I and Q analog signals by DACs 542 and 543, respectively. The I and Q analog signals are filtered by lowpass filters 544 and 545, amplified by amplifiers 546 and 547, upconverted from IF to RF by mixers 548 and 549, and summed by a summer 550 to generate the modulated RF signal. Mixers 548 and 549 perform upconversion for the modulated IF signal based on I and Q LO signals at a suitable frequency so that the K transmit signals are upconverted to their proper RF frequencies.

Power tracking voltage generator 580 receives the $I_1$ to $I_K$ samples and the $Q_1$ to $Q_K$ samples for all transmit signals being sent simultaneously. Voltage generator 580 generates a power supply voltage for PA 560 based on the I and Q samples. PA 560 amplifies the modulated RF signal from transmit circuit 540 using the power supply voltage from supply generator 580. PA 560 provides an output RF signal for all transmit signals being sent simultaneously. The output RF signal is routed through duplexer 570 and transmitted via antenna 590.

FIGS. 5 and 6 show two exemplary designs of a transmit module supporting simultaneous transmission of multiple

transmit signals with a single PA and power tracking for all transmit signals. Multiple transmit signals may also be sent with a single PA and power tracking in other manners. For example, polar modulation may be used instead of quadrature modulation, which is shown in FIGS. 5 and 6.

Power tracker 582 may compute the digital power tracking signal based on the I and Q samples for all transmit signals in various manners. In one design, the digital power tracking signal may be computed as follows:

$$p(t) = \sqrt{K}\sqrt{I_1^2(t) + Q_1^2(t) + \ldots + I_K^2(t) + Q_K^2(t)}, \qquad \text{Eq (1)}$$

where $I_k(t)$ and $Q_k(t)$ denote the I and Q samples for the k-th transmit signal in sample period t, for $k = 1, \ldots, K$, and

p(t) denotes the digital power tracking signal in sample period t.

The quantity $I_k^2(t) + Q_k^2(t)$ denotes the power of the k-th transmit signal in sample period t. In the design shown in equation (1), the powers of all transmit signals are summed to obtain an overall power. The digital power tracking signal is then obtained by taking the square root of the overall power. The scaling factor of $\sqrt{K}$ accounts for conversion between power and voltage.

In another design, the digital power tracking signal may be computed as follows:

$$p(t) = \sqrt{I_1^2(t) + Q_1^2(t)} + \ldots + \sqrt{I_K^2(t) + Q_K^2(t)}. \qquad \text{Eq (2)}$$

The quantity $\sqrt{I_k^2(t) + Q_k^2(t)}$ denotes the voltage of the k-th transmit signal in sample period t. In the design shown in equation (2), the voltage of each transmit signal is first computed, and the voltages of all transmit signals are then summed to obtain the digital power tracking signal.

Equations (1) and (2) are two exemplary designs of computing the digital power tracking signal based on the I and Q samples for all transmit signals being sent simultaneously. The digital power tracking signal computed in equation (1) or (2) has a bandwidth that approximates the bandwidth of the widest transmit signal (instead of the overall bandwidth of all transmit signals being sent simultaneously). Having the bandwidth of the power tracking signal being smaller than a modulation bandwidth may allow for a more efficient power tracking circuitry and may also result in less noise being injected into PA 560 via the power supply.

The digital power tracking signal may also be computed based on the I and Q samples of the transmit signals in other manners, e.g., based on other equations or functions. In one design, the digital power tracking signal may be generated based on the I and Q samples for all transmit signals, without any filtering, e.g., as shown in equation (1) or (2). In another design, the digital power tracking signal may be filtered, e.g., with a lowpass filter having similar characteristics as lowpass filters 544 and 545 in transmit circuit 540.

In one design, the digital power tracking signal may be computed in the same manner (e.g., based on the same equation) regardless of the number of transmit signals being sent simultaneously. In another design, the digital power tracking signal may be computed in different manners (e.g., based on different equations) depending on the number of transmit signals being sent simultaneously. The digital power tracking signal may also be computed in different manners depending on other factors such as the transmit power levels of different transmit signals.

The techniques described herein for generating a power tracking supply voltage for multiple transmit signals may be used for various modulation techniques. For example, the techniques may be used to generate a power tracking supply

US 9,608,675 B2

9 | 10

voltage for multiple transmit signals sent simultaneously using orthogonal frequency division multiplexing (OFDM), SC-FDMA, CDMA, or some other modulation techniques. The techniques may also be used to generate a tracking power supply voltage for any number of transmit signals being sent simultaneously.

FIG. 7A shows an example of power tracking for two transmit signals sent on two non-contiguous carriers with SC-FDMA, e.g., for non-contiguous intra-band CA shown in FIG. 2B. The two transmit signals are sent on two carriers separated by a 25 MHz gap, with each carrier having a bandwidth of 10 MHz. A plot 710 shows an output RF signal comprising the two transmit signals and provided by PA 560 in FIG. 5 or 6. A plot 712 shows a power tracking signal provided by power tracker 582 in FIG. 5 or 6. The power tracking signal is computed based on I and Q samples for the two transmit signals in accordance with equation (1). As shown in FIG. 7A, the power tracking signal closely follows the envelope of the output RF signal. Hence, good performance and high efficiency may be achieved for PA 560.

FIG. 7B shows an example of power tracking for three transmit signals sent on three non-contiguous carriers with OFDM, e.g., for non-contiguous intra-band CA. The three transmit signals are sent on three carriers, with each carrier having a bandwidth of 5 MHz and being separated by a 15 MHz gap to another carrier. A plot 720 shows an output RF signal comprising the three transmit signals and provided by PA 560 in FIG. 5 or 6. A plot 722 shows a power tracking signal provided by power tracker 582 in FIG. 5 or 6. The power tracking signal is computed based on I and Q samples for the three transmit signals in accordance with equation (1). As shown in FIG. 7B, the power tracking signal follows the envelope of the output RF signal. Hence, good performance and high efficiency may be achieved for PA 560.

It can be shown that a power tracking supply voltage may also be generated for multiple transmit signals sent on multiple carriers with CDMA. In general, the power tracking supply voltage can closely follow the envelope of the output RF signal when two transmit signals are sent simultaneously, e.g., as shown in FIG. 7A. The power tracking supply voltage can approximate the envelope of the output RF signal when more than two transmit signals are sent simultaneously, e.g., as shown in FIG. 7B.

Power supply generator 586 may generate a power supply voltage for PA 560 based on a power tracking signal in various manners. Power supply generator 586 should generate the power supply voltage in an efficient manner in order to conserve battery power of wireless device 110.

FIG. 8 shows a design of power supply generator 586 in FIGS. 5 and 6. In this design, power supply generator 586 includes a power tracking amplifier (PT Amp) 810, a switcher 820, a boost converter 830, and an inductor 822. Switcher 820 may also be referred to as a switching-mode power supply (SMPS). Switcher 820 receives a battery voltage ($V_{BAT}$) and provides a first supply current ($I_{SW}$) comprising DC and low frequency components at node A. Inductor 822 stores current from switcher 820 and provides the stored current to node A on alternating cycles. Boost converter 830 receives the $V_{BAT}$ voltage and generates a boosted supply voltage ($V_{BOOST}$) that is higher than the $V_{BAT}$ voltage. Power tracking amplifier 810 receives the analog power tracking signal at its signal input, receives the $V_{BAT}$ voltage and the $V_{BOOST}$ voltage at its two power supply inputs, and provides a second supply current ($I_{PT}$) comprising high frequency components at node A. The PA supply current ($I_{PA}$) provided to power amplifier 560 includes the $I_{SW}$ current from switcher 820 and the $I_{PT}$ current from power tracking amplifier 810. Power tracking amplifier 810 also provides the proper PA supply voltage ($V_{PA}$) at Node A for PA 560. The various circuits in power supply generator 586 are described in further detail below.

FIG. 9 shows a schematic diagram of a design of power tracking amplifier 810 and switcher 820 within power supply generator 586 in FIG. 8. Within power tracking amplifier 810, an operational amplifier (op-amp) 910 has its non-inverting input receiving the power tracking signal, its inverting input coupled to an output of power tracking amplifier 810 (which is node X), and its output coupled to an input of a class AB driver 912. Driver 912 has its first output (R1) coupled to the gate of a P-channel metal oxide semiconductor (PMOS) transistor 914 and its second output (R2) coupled to the gate of an N-channel metal oxide semiconductor (NMOS) transistor 916. NMOS transistor 916 has its drain coupled to node X and its source coupled to circuit ground. PMOS transistor 914 has its drain coupled to node X and its source coupled to the drains of PMOS transistors 918 and 920. PMOS transistor 918 has its gate receiving a C1control signal and its source receiving the $V_{BOOST}$ voltage. PMOS transistor 920 has its gate receiving a C2control signal and its source receiving the $V_{BAT}$ voltage.

A current sensor 824 is coupled between node X and node A and senses the $I_{PT}$ current provided by power tracking amplifier 810. Sensor 824 passes most of the $I_{PT}$ current to node A and provides a small fraction of the $I_{PT}$ current as a sensed current ($I_{SEN}$) to switcher 820.

Within switcher 820, a current sense amplifier 930 has its input coupled to current sensor 824 and its output coupled to an input of a switcher driver 932. Driver 932 has its first output (S1) coupled to the gate of a PMOS transistor 934 and its second output (S2) coupled to the gate of an NMOS transistor 936. NMOS transistor 936 has its drain coupled to an output of switcher 820 (which is node Y) and its source coupled to circuit ground. PMOS transistor 934 has its drain coupled to node Y and its source receiving the $V_{BAT}$ voltage. Inductor 822 is coupled between node A and node Y.

Switcher 820 operates as follows. Switcher 820 is in an ON state when current sensor 824 senses a high output current from power tracking amplifier 810 and provides a low sensed voltage to driver 932. Driver 932 then provides a low voltage to the gate of PMOS transistor 934 and a low voltage to the gate of NMOS transistor 936. PMOS transistor 934 is turned ON and couples the $V_{BAT}$ voltage to inductor 822, which stores energy from the $V_{BAT}$ voltage. The current through inductor 822 rises during the ON state, with the rate of the rise being dependent on (i) the difference between the $V_{BAT}$ voltage and the $V_{PA}$ voltage at node A and (ii) the inductance of inductor 822. Conversely, switcher 820 is in an OFF state when current sensor 824 senses a low output current from power tracking amplifier 810 and provides a high sensed voltage to driver 932. Driver 932 then provides a high voltage to the gate of PMOS transistor 934 and a high voltage to the gate of NMOS transistor 936. NMOS transistor 936 is turned ON, and inductor 822 is coupled between node A and circuit ground. The current through inductor 822 falls during the OFF state, with the rate of the fall being dependent on the $V_{PA}$ voltage at node A and the inductance of inductor 822. The $V_{BAT}$ voltage thus provides current to PA 560 via inductor 822 during the ON state, and inductor 120 provides its stored energy to PA 560 during the OFF state.

Power tracking amplifier 810 operates as follows. When the power tracking signal increases, the output of op-amp 910 increases, the R1 output of driver 912 decreases and the R2 output of driver 912 decreases until NMOS transistor

11

916 is almost turned OFF, and the output of power tracking amplifier **810** increases. The converse is true when the power tracking signal decreases. The negative feedback from the output of power tracking amplifier **810** to the inverting input of op-amp **910** results in power tracking amplifier **810** having unity gain. Hence, the output of power tracking amplifier **810** follows the power tracking signal, and the $V_{PA}$ voltage is approximately equal to the power tracking signal. Driver **912** may be implemented with a class AB amplifier to improve efficiency, so that large output currents can be supplied even though the bias current in transistors **914** and **916** is low.

In one design, power tracking amplifier **810** operates based on the $V_{BOOST}$ voltage only when needed and based on the $V_{BAT}$ voltage during the remaining time in order to improve efficiency. For example, power tracking amplifier **810** may provide approximately 85% of the power based on the $V_{BAT}$ voltage and only approximately 15% of the power based on the $V_{BOOST}$ voltage. When a high $V_{PA}$ voltage is needed for PA **560** due to a large envelope of the output RF signal, the C1 control signal is at logic low, and the C2 control signal is at logic high. In this case, boost converter **830** is enabled and generates the $V_{BOOST}$ voltage, PMOS transistor **918** is turned ON and provides the $V_{BOOST}$ voltage to the source of PMOS transistor **914**, and PMOS transistor **920** is turned OFF. Conversely, when a light $V_{PA}$ voltage is not needed for PA **560**, the C1 control signal is at logic high, and the C2 control signal is at logic low. In this case, boost converter **830** is disabled, PMOS transistor **918** is turned OFF, and PMOS transistor **920** is turned ON and provides the $V_{BAT}$ voltage to the source of PMOS transistor **914**.

A control signal generator **940** receives the power tracking signal and the $V_{BAT}$ voltage and generates the C1 and C2 control signals. The C1 control signal is complementary to the C2 control signal. In one design, generator **940** generates the C1 and C2 control signals to select the $V_{BOOST}$ voltage for power tracking amplifier **910** when the magnitude of the power tracking signal exceeds a first threshold. The first threshold may be a fixed threshold or may be determined based on the $V_{BAT}$ voltage. In another design, generator **940** generates the C1 and C2 control signals to select the $V_{BOOST}$ voltage for power tracking amplifier **910** when the magnitude of the power tracking signal exceeds the first threshold and the $V_{BAT}$ voltage is below a second threshold. Generator **940** may also generate the C1 and C2 signals based on other signals, other voltages, and/or other criteria.

Switcher **820** has high efficiency and delivers a majority of the supply current for PA **560**. Power tracking amplifier **810** operates as a linear stage and has relatively high bandwidth (e.g., in the MHz range). Switcher **820** operates to reduce the output current from power tracking amplifier **810**, which improves overall efficiency.

FIG. **9** shows an exemplary design of switcher **820** and power tracking amplifier **810** in FIG. **1**. Switcher **820** and power tracking amplifier **810** may also be implemented in other manners. For example, power tracking amplifier **810** may be implemented as described in U.S. Pat. No. 6,300,826, entitled "Apparatus and Method for Efficiently Amplifying Wideband Envelope Signals," issued Oct. 9, 2001.

In an exemplary design, an apparatus (e.g., an integrated circuit, a wireless device, a circuit module, etc.) may comprise a power tracker and a power supply generator. The power tracker (e.g., power tracker **582** in FIG. **5**) may determine a power tracking signal based on I and Q components (e.g., I and Q samples) of a plurality of transmit signals being sent simultaneously. The power supply gen-

12

erator (e.g., power supply generator **586** in FIG. **5**) may generate a power supply voltage based on the power tracking signal.

In one design, the power tracker may determine an overall power of the plurality of transmit signals based on the I and Q components of the plurality of transmit signals, e.g., as $I_1^2(t)+Q_1^2(t)+\ldots +I_K^2(t)+Q_K^2(t)$. The power tracker may then determine the power tracking signal based on the overall power of the plurality of transmit signals, e.g., as shown in equation (1). In another design, the power tracker may determine the power of each transmit signal based on the I and Q components of that transmit signal, e.g., as $I_k^2(t)+Q_k^2(t)$ for the k-th transmit signal. The power tracker may then determine the power tracking signal based on the powers of the plurality of transmit signals, e.g., as shown in equation (2). The power tracker may determine a voltage of each transmit signal based on the power of the transmit signal, e.g., as $\sqrt{I_k^2(t)+Q_k^2(t)}$. The power tracker may then determine the power tracking signal based on voltages of the plurality of transmit signals, e.g., as shown in equation (2). The power tracker may also determine the power tracking signal based on the I and Q components of the plurality of transmit signals in other manners. In one design, the plurality of transmit signals may be sent on a plurality of carriers at different frequencies. The power tracking signal may have a bandwidth that is smaller than an overall bandwidth of the plurality of carriers.

In one design, the apparatus may comprise a plurality of transmit circuits and a summer, e.g., as shown in FIG. **5**. The plurality of transmit circuits (e.g., transmit circuits **540a** to **540k**) may receive the I and Q components of the plurality of transmit signals and may provide a plurality of upconverted RF signals. Each transmit circuit may upconvert I and Q components of one transmit signal and provide a corresponding upconverted RF signal. The summer (e.g., summer **552**) may sum the plurality of upconverted RF signals and provide a modulated RF signal. In another design, the apparatus may comprise a transmit circuit (e.g., transmit circuit **540** in FIG. **6**) that may receive a modulated IF signal for the plurality of transmit signals and provide a modulated RF signal. The modulated IF signal may be generated (e.g., by digital modulator **520** in FIG. **6**) based on the I and Q components of the plurality of transmit signals. In an exemplary design, the apparatus may further comprise a PA (e.g., PA **560** in FIGS. **5** and **6**) that may amplify the modulated RF signal based on the power supply voltage and provide an output RF signal.

In an exemplary design, the power supply generator may comprise a power tracking amplifier (e.g., power tracking amplifier **810** in FIGS. **8** and **9**) that may receive the power tracking signal and generate the power supply voltage. The power supply generator may further comprise a switcher and/or a boost converter. The switcher (e.g., switcher **820** in FIGS. **8** and **9**) may sense a first current (e.g., the $I_{PT}$ current) from the power tracking amplifier and provide a second current (e.g., the $I_{SW}$ current) for the power supply voltage based on the sensed first current. The boost converter (e.g., boost converter **830** in FIGS. **8** and **9**) may receive a battery voltage and provide a boosted voltage for the power tracking amplifier. The power tracking amplifier may operate based on the boosted voltage or the battery voltage.

FIG. **10** shows a design of a process **1000** for generating a power supply voltage with power tracking. A power tracking signal may be determined based on I and Q components of a plurality of transmit signals being sent simultaneously (block **1012**). In one design of block **1012**, an

US 9,608,675 B2

13 14

overall power of the plurality of transmit signals may be determined based on the I and Q components of the plurality of transmit signals. The power tracking signal may then be determined based on the overall power of the plurality of transmit signals, e.g., as shown in equation (1). In another design of block **1012**, the power of each transmit signal may be determined based on the I and Q components of the transmit signal. The power tracking signal may then be determined based on the powers of the plurality of transmit signals, e.g., as shown in equation (2).

A power supply voltage may be generated based on the power tracking signal (block **1014**). In one design, the power supply voltage may be generated with a amplifier (e.g., amplifier **810** in FIG. **9**) that tracks the power tracking signal. The power supply voltage may also be generated based on a switcher and/or a boost converter.

A modulated RF signal may be generated based on the I and Q components of the plurality of transmit signals (block **1016**). In one design, I and Q components of each transmit signal may be upconverted to obtain a corresponding upconverted RF signal. A plurality of upconverted RF signals for the plurality of transmit signals may then be summed to obtain the modulated RF signal, e.g., as shown in FIG. **5**. In another design, a modulated IF signal may be generated based on the I and Q components of the plurality of transmit signals, e.g., as shown in FIG. **6**. The modulated IF signal may then be upconverted to obtain the modulated RF signal. In any case, the modulated RF signal may be amplified with a PA (e.g., PA **560** in FIGS. **5** and **6**) operating based on the power supply voltage to obtain an output RF signal (block **1018**).

The power tracker and power supply generator described herein may be implemented on an IC, an analog IC, an RFIC, a mixed-signal IC, an ASIC, a printed circuit board (PCB), an electronic device, etc. The power tracker and power supply generator may also be fabricated with various IC process technologies such as complementary metal oxide semiconductor (CMOS), NMOS, PMOS, bipolar junction transistor (BJT), bipolar-CMOS (BiCMOS), silicon germanium (SiGe), gallium arsenide (GaAs), etc.

An apparatus implementing the power tracker and/or power supply generator described herein may be a stand-alone device or may be part of a larger device. A device may be (i) a stand-alone IC, (ii) a set of one or more ICs that may include memory ICs for storing data and/or instructions, (iii) an RFIC such as an RF receiver (RFR) or an RF transmitter/receiver (RTR), (iv) an ASIC such as a mobile station modem (MSM), (v) a module that may be embedded within other devices, (vi) a receiver, cellular phone, wireless device, handset, or mobile unit, (vii) etc.

In one or more exemplary designs, the functions described may be implemented in hardware, software, firmware, or any combination thereof. If implemented in software, the functions may be stored on or transmitted over as one or more instructions or code on a computer-readable medium. Computer-readable media includes both computer storage media and communication media including any medium that facilitates transfer of a computer program from one place to another. A storage media may be any available media that can be accessed by a computer. By way of example, and not limitation, such computer-readable media can comprise RAM, ROM, EEPROM, CD-ROM or other optical disk storage, magnetic disk storage or other magnetic storage devices, or any other medium that can be used to carry or store desired program code in the form of instructions or data structures and that can be accessed by a computer. Also, any connection is properly termed a com-

puter-readable medium. For example, if the software is transmitted from a website, server, or other remote source using a coaxial cable, fiber optic cable, twisted pair, digital subscriber line (DSL), or wireless technologies such as infrared, radio, and microwave, then the coaxial cable, fiber optic cable, twisted pair, DSL, or wireless technologies such as infrared, radio, and microwave are included in the definition of medium. Disk and disc, as used herein, includes compact disc (CD), laser disc, optical disc, digital versatile disc (DVD), floppy disk and blu-ray disc where disks usually reproduce data magnetically, while discs reproduce data optically with lasers. Combinations of the above should also be included within the scope of computer-readable media.

The previous description of the disclosure is provided to enable any person skilled in the art to make or use the disclosure. Various modifications to the disclosure will be readily apparent to those skilled in the art, and the generic principles defined herein may be applied to other variations without departing from the scope of the disclosure. Thus, the disclosure is not intended to be limited to the examples and designs described herein but is to be accorded the widest scope consistent with the principles and novel features disclosed herein.

What is claimed is:

1. An apparatus comprising:

a power tracker configured to determine a single power tracking signal based on a plurality of inphase (I) and quadrature (Q) components of a plurality of carrier aggregated transmit signals being sent simultaneously, wherein the power tracker receives the plurality of I and Q components corresponding to the plurality of carrier aggregated transmit signals and generates the single power tracking signal based on a combination of the plurality of I and Q components, wherein the plurality of carrier aggregated transmit signals comprise Orthogonal Frequency Division Multiplexing (OFDM) or Single Carrier Frequency Division Multiple Access (SC-FDMA) signals;

a power supply generator configured to generate a single power supply voltage based on the single power tracking signal; and

a power amplifier configured to receive the single power supply voltage and the plurality of carrier aggregated transmit signals being sent simultaneously to produce a single output radio frequency (RF) signal.

2. The apparatus of claim **1**, wherein the power tracker is configured to:

determine an overall power of the plurality of carrier aggregated transmit signals based on the I and Q components of the plurality of carrier aggregated transmit signals, and

determine the single power tracking signal based on the overall power of the plurality of carrier aggregated transmit signals.

3. The apparatus of claim **1**, wherein the power tracker is configured to:

determine a power of each transmit signal in the plurality of carrier aggregated transmit signals based on the I and Q components of each transmit signal, and

determine the single power tracking signal based on a sum of said power of each transmit signal of the plurality of carrier aggregated transmit signals.

4. The apparatus of claim **1**, wherein the power tracker is configured to:

15

determine a power of each transmit signal in the plurality of carrier aggregated transmit signals based on the I and Q components of each transmit signal,

determine a voltage of each transmit signal based on the power of each transmit signal, and

determine the single power tracking signal based on said voltage of each transmit signal of the plurality of carrier aggregated transmit signals.

**5.** The apparatus of claim **1**, further comprising:

a plurality of transmit circuits configured to receive the I and Q components of the plurality of carrier aggregated transmit signals and provide a plurality of upconverted RF signals, each transmit circuit configured to upconvert I and Q components of one of the plurality of carrier aggregated transmit signals and provide a corresponding upconverted RF signal, and

a summer configured to sum the plurality of upconverted RF signals and provide the plurality of carrier aggregated transmit signals to the power amplifier.

**6.** The apparatus of claim **1**, further comprising:

a transmit circuit configured to receive a modulated intermediate frequency (IF) signal and provide the plurality of carrier aggregated transmit signals to the power amplifier, the modulated IF signal being generated based on the I and Q components of the plurality of carrier aggregated transmit signals.

**7.** The apparatus of claim **1**, the power supply generator comprising:

a power tracking amplifier configured to receive the power tracking signal and generate the power supply voltage.

**8.** The apparatus of claim **7**, the power supply generator further comprising:

a switcher configured to sense a first current from the power tracking amplifier and provide a second current for the power supply voltage based on the sensed first current.

**9.** The apparatus of claim **7**, the power supply generator further comprising:

a boost converter configured to receive a battery voltage and provide a boosted voltage for the power tracking amplifier.

**10.** The apparatus of claim **9**, wherein the power tracking amplifier operates based on the boosted voltage or the battery voltage.

**11.** The apparatus of claim **1**, wherein the plurality of carrier aggregated transmit signals are sent on a plurality of carriers at different frequencies.

**12.** The apparatus of claim **11**, wherein the single power tracking signal has a bandwidth that is smaller than an overall bandwidth of the plurality of carriers.

**13.** The apparatus of claim **1**, wherein the carrier aggregated transmit signals are intra-band carrier aggregated transmit signals.

**14.** The apparatus of claim **13**, wherein the intra-band carrier aggregated transmit signals are contiguous.

**15.** The apparatus of claim **13**, wherein the intra-band carrier aggregated transmit signals are non-contiguous.

**16.** The apparatus of claim **1**, wherein the power tracker is configured to determine the single power tracking signal based on functions comprising:

squaring each of the plurality of inphase (I) and quadrature (Q) components to produce a plurality of $I^2$ and $Q^2$ values;

summing the plurality of $I^2$ and $Q^2$ values to produce an overall power; and

taking the square root of the overall power.

16

**17.** The apparatus of claim **1**, wherein the power tracker is configured to determine the single power tracking signal based on functions comprising:

calculating $\sqrt{I_k^2(t)+Q_k^2(t)}$ corresponding to K inphase (I) and quadrature (Q) components to produce K voltages; and

summing the K voltages.

**18.** A method comprising:

determining a single power tracking signal based on a plurality of inphase (I) and quadrature (Q) components of a plurality of carrier aggregated transmit signals being sent simultaneously, wherein a power tracker receives the plurality of I and Q components corresponding to the plurality of carrier aggregated transmit signals and generates the single power tracking signal based on a combination of the plurality of I and Q components, wherein the plurality of carrier aggregated transmit signals comprise Orthogonal Frequency Division Multiplexing (OFDM) or Single Carrier Frequency Division Multiple Access (SC-FDMA) signals;

generating a single power supply voltage based on the single power tracking signal; and

receiving the single power supply voltage and the plurality of carrier aggregated transmit signals being sent simultaneously in a power amplifier and producing a single output radio frequency (RF) signal.

**19.** The method of claim **18**, wherein the determining the single power tracking signal comprises:

determining an overall power of the plurality of carrier aggregated transmit signals based on the I and Q components of the plurality of carrier aggregated transmit signals, and

determining the single power tracking signal based on the overall power of the plurality of carrier aggregated transmit signals.

**20.** The method of claim **18**, wherein the determining the single power tracking signal comprises:

determining a power of each transmit signal in the plurality of carrier aggregated transmit signals based on the I and Q components of each transmit signal, and

determining the single power tracking signal based on a sum of said power of each transmit signal of the plurality of carrier aggregated transmit signals.

**21.** The method of claim **18**, further comprising:

receiving the I and Q components of the plurality of carrier aggregated transmit signals in a plurality of transmit circuits and providing a plurality of upconverted RF signals from the plurality of transmit circuits, each transmit circuit upconverting I and Q components of one of the plurality of carrier aggregated transmit signals and providing a corresponding upconverted RF signal, and

summing the plurality of upconverted RF signals and providing the plurality of carrier aggregated transmit signals to the power amplifier.

**22.** The method of claim **18**, further comprising:

receiving a modulated intermediate frequency (IF) signal in a transmit circuit and providing the plurality of carrier aggregated transmit signals to the power amplifier from the transmit circuit, the modulated IF signal being generated based on the I and Q components of the plurality of carrier aggregated transmit signals.

**23.** The method of claim **18**, wherein the carrier aggregated transmit signals are intra-band carrier aggregated transmit signals.

US 9,608,675 B2

17 18

**24**. The method of claim **23**, wherein the intra-band carrier aggregated transmit signals are contiguous.

**25**. The method of claim **23** wherein the intra-band carrier aggregated transmit signals are non-contiguous.

**26**. The method of claim **18**, wherein determining the single power tracking signal comprises:

squaring each of the plurality of inphase (I) and quadrature (Q) components to produce a plurality of $I^2$ and $Q^2$ values;

summing the plurality of $I^2$ and $Q^2$ values to produce an overall power; and

taking the square root of the overall power.

**27**. The method of claim **18**, wherein determining the single power tracking signal comprises:

calculating $\sqrt{I_k^2(t)+Q_k^2(t)}$ corresponding to K inphase (I) and quadrature (Q) components to produce K voltages; and

summing the voltages.

**28**. An apparatus comprising:

means for determining a single power tracking signal based on a plurality of inphase (I) and quadrature (Q) components of a plurality of carrier aggregated transmit signals being sent simultaneously, wherein a power tracker receives the plurality of I and Q components corresponding to the plurality of carrier aggregated transmit signals and generates the single power tracking signal based on a combination of the plurality of I and Q components, wherein the plurality of carrier aggregated transmit signals comprise Orthogonal Frequency Division Multiplexing (OFDM) or Single Carrier Frequency Division Multiple Access (SC-FDMA) signals;

means for generating a single power supply voltage based on the single power tracking signal; and

means for receiving the single power supply voltage and the plurality of carrier aggregated transmit signals being sent simultaneously and producing a single output radio frequency (RF) signal.

**29**. The apparatus of claim **28**, wherein the means for determining the single power tracking signal comprises:

means for determining an overall power of the plurality of carrier aggregated transmit signals based on the I and Q components of the plurality of carrier aggregated transmit signals, and

means for determining the single power tracking signal based on the overall power of the plurality of carrier aggregated transmit signals.

**30**. The apparatus of claim **28**, wherein the means for determining the single power tracking signal comprises:

means for determining a power of each transmit signal in the plurality of carrier aggregated transmit signals based on the I and Q components of each transmit signal, and

means for determining the single power tracking signal based on a sum of said power of each transmit signal of the plurality of carrier aggregated transmit signals.

**31**. The apparatus of claim **28**, further comprising:

means for receiving the I and Q components of the plurality of carrier aggregated transmit signals and separately upconverting the I and Q components of the plurality of carrier aggregated transmit signals to provide a plurality of upconverted RF signals, and

means for summing the plurality of upconverted RF signals and providing the plurality of carrier aggregated transmit signals to a power amplifier.

**32**. The apparatus of claim **28**, further comprising:

means for receiving a modulated intermediate frequency (IF) signal and providing the plurality of carrier aggregated transmit signals to a power amplifier, the modulated IF signal being generated based on the I and Q components of the plurality of carrier aggregated transmit signals.

**33**. A non-transitory computer-readable medium comprising instructions, that when executed by a processor, cause the processor to:

determine a single power tracking signal based on a plurality of inphase (I) and quadrature (Q) components of a plurality of carrier aggregated transmit signals being sent simultaneously, wherein a power tracker receives the plurality of I and Q components corresponding to the plurality of carrier aggregated transmit signals and generates the single power tracking signal based on a combination of the plurality of I and Q components, wherein the plurality of carrier aggregated transmit signals comprise Orthogonal Frequency Division Multiplexing (OFDM) or Single Carrier Frequency Division Multiple Access (SC-FDMA) signals;

generate a single power supply voltage based on the single power tracking signal; and

receive the single power supply voltage and the plurality of carrier aggregated transmit signals being sent simultaneously in a power amplifier to produce a single output radio frequency (RF) signal.

\* \* \* \* \*