Nos. 2022-1824, -1825, -1826, -1828, -1829, -1830

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

QUALCOMM INCORPORATED,

*Appellant*,

*v.*

INTEL CORPORATION,

*Cross-Appellant.*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2018-01326, IPR2018-01327, IPR2018-01328, IPR2018-01329, IPR2018-01330, IPR2018-01340

## BRIEF FOR CROSS-APPELLANT INTEL CORPORATION

DAVID L. CAVANAUGH
THOMAS G. SAUNDERS
TODD C. ZUBLER
GARY M. FOX
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

KATHRYN D. ZALEWSKI
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA  94306
(650) 858-6000

February 15, 2023

LOUIS W. TOMPROS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Attorneys for Cross-Appellant Intel Corporation*

## PATENT CLAIMS AT ISSUE

1.  An apparatus comprising:

a power tracker configured to determine a single power tracking
signal based on a plurality of inphase (I) and quadrature (Q)
components of a plurality of carrier aggregated transmit signals
being sent simultaneously, wherein the power tracker receives
the plurality of I and Q components corresponding to the
plurality of carrier aggregated transmit signals and generates the
single power tracking signal based on a combination of the
plurality of I and Q components, wherein the plurality of carrier
aggregated transmit signals comprise Orthogonal Frequency
Division Multiplexing (OFDM) or Single Carrier Frequency
Division Multiple Access (SC-FDMA) signals;

a power supply generator configured to generate a single power
supply voltage based on the single power tracking signal; and

a power amplifier configured to receive the single power supply
voltage and the plurality of carrier aggregated transmit signals
being sent simultaneously to produce a single output radio
frequency (RF) signal.

Appx343(14:28-48).

# CERTIFICATE OF INTEREST

Counsel for Cross-Appellant Intel Corporation certifies the following:

**1.     Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Intel Corporation.

**2.     Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

There are no other real parties in interest for the represented entity.  Apple Inc. is identified as a real party in interest in the underlying *inter partes* reviews.

**3.     Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4.     Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

WILMER CUTLER PICKERING HALE AND DORR LLP:  Richard Goldenberg, Theodoros Konstantakopoulos.

**5.     Related Cases**.  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

None.

**6.    Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None.

Dated:  February 15, 2023

/s/ Louis W. Tompros

Louis W. Tompros
Wilmer Cutler Pickering
    Hale and Dorr llp
60 State Street
Boston, MA  02109
(617) 526-6000

# TABLE OF CONTENTS

Page

PATENT CLAIMS AT ISSUE

CERTIFICATE OF INTEREST ................................................................... i

TABLE OF AUTHORITIES ..................................................... vii

STATEMENT OF RELATED CASES ................................................... 1

JURISDICTIONAL STATEMENT ................................................... 1

INTRODUCTION .................................................................... 2

STATEMENT OF ISSUES ON APPEAL ............................................. 4

STATEMENT OF THE CASE........................................................ 5

RESPONSE TO QUALCOMM'S APPEALS ....................................... 6

STATEMENT OF FACTS ........................................................... 6

    A.    Technological Background ....................................... 6

        1.    Radio Frequency Power Amplifiers ...................... 6

        2.    Power Supplies For RF Power Amplifiers ................ 7

        3.    Power/Envelope Tracking........................... 9

        4.    Carrier Aggregation .............................. 11

        5.    I/Q Signal Processing............................... 12

    B.    The '675 Patent ............................................ 13

        1.    The Alleged Problems In The Art......................... 13

        2.    The Alleged Inventions In The '675 Patent............... 15

    C.    The Yu Reference.......................................... 17

D.    Procedural History ................................................................19

    1.    Initial Proceedings Before The Board ......................................19

    2.    First Round Of Consolidated Appeals Before This
        Court ..........................................................................................21

    3.    Remand Proceedings Before The Board ....................................22

SUMMARY OF THE ARGUMENT ....................................................................25

ARGUMENT ................................................................................................27

I.    SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FACTUAL
    FINDINGS REGARDING YU'S DISCLOSURES ........................................27

    A.    The '675 Claims Are Not Limited To Mobile Devices,
        As The Board Assumed ..............................................................28

    B.    Contrary To Qualcomm's Assertions, The Board's
        Decision On Remand Does Not Rest On A Single
        Sentence In Yu ...........................................................................29

    C.    The Board's Factual Findings Are Supported By
        Substantial Evidence .................................................................31

    D.    Qualcomm Fails To Show A Lack Of Substantial
        Evidence Supporting The Board's Factual Findings ..................33

II.    THE BOARD CORRECTLY HELD THAT THE CHALLENGED CLAIMS
    ARE UNPATENTABLE FOR OBVIOUSNESS ON THE YU GROUNDS ..................37

    A.    Qualcomm Tries To Hold Intel To An Improperly
        Heightened Standard For Obviousness ......................................38

    B.    Qualcomm Has Not Established That The Board's
        Ultimate Obviousness Determination Was Incorrect ..................41

III.    ALTERNATIVELY, THE BOARD'S LATEST CONSTRUCTION OF THE
    "PLURALITY" TERM IS OVERLY NARROW, AND THE
    CHALLENGED CLAIMS ARE UNPATENTABLE UNDER THE PROPER
    CONSTRUCTION ..............................................................................45

A.   The Board's First Construction Of The "Plurality" Term
     Was The Broadest Reasonable Interpretation .....................................45

B.   The Claim Construction Analysis In The Board's Final
     Written Decision On Remand Is Faulty .............................................50

     1.   The Board's original construction is supported by
          definitions in the patent specification .......................................51

     2.   The Board's original construction does not read
          "aggregated" out of the claims.................................................53

     3.   The intrinsic evidence does not require a
          construction including "to increase the bandwidth
          for a user".............................................................................55

     4.   The extrinsic evidence does not support a
          construction including "to increase the bandwidth
          for a user".............................................................................58

C.   Under The Proper Construction Of The "Plurality" Term,
     All Challenged Claims Are Unpatentable For
     Obviousness.............................................................................61

INTEL'S CONDITIONAL APPEALS ....................................................63

STATEMENT OF FACTS ....................................................................64

A.   The Chen Reference ........................................................64

B.   The Board's Final Written Decision On Remand In The
     Chen IPRs.......................................................................66

SUMMARY OF THE ARGUMENT ........................................................67

ARGUMENT ....................................................................................68

I.    STANDARD OF REVIEW....................................................................68

II.   THE BOARD'S LATEST CONSTRUCTION OF THE "PLURALITY"
      TERM IS OVERLY NARROW................................................................69

III.    UNDER THE BROADEST REASONABLE INTERPRETATION OF THE
        "PLURALITY" TERM, ALL CHALLENGED CLAIMS ARE
        UNPATENTABLE FOR OBVIOUSNESS ON THE CHEN GROUNDS ....................... 69

IV.     EVEN UNDER THE BOARD'S NARROWER CONSTRUCTION, THE
        BOARD ERRED IN CONCLUDING THAT CHEN DOES NOT
        DISCLOSE A "PLURALITY OF CARRIER AGGREGATED TRANSMIT
        SIGNALS" .................................................................................................... 72

V.      INTEL HAS STANDING TO APPEAL FROM THE CHEN IPRs ............................ 75

        A.    This Court Has Repeatedly Held That Intel Has Standing ................. 76

        B.    Intel Suffers An Injury In Fact ............................................................ 76

              1.    Intel faces the risk that Qualcomm will allege
                    infringement ............................................................................... 77

              2.    Intel's past, current, and future sales of its
                    SMARTi™ chips demonstrate the risk of possible
                    infringement allegations ............................................................ 78

        C.    Intel Satisfies The Remaining Requirements For
              Standing .............................................................................................. 79

CONCLUSION ....................................................................................................... 80

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abbott Laboratories v. Andrx Pharmaceuticals, Inc.*,
   473 F.3d 1196 (Fed. Cir. 2007) ...........................................51

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) ...........................................40

*Altaire Pharmaceuticals, Inc. v. Paragon Bioteck, Inc.*,
   889 F.3d 1274 (Fed. Cir. 2018) ...........................................79

*Arendi S.A.R.L. v. Apple Inc.*,
   832 F.3d 1355 (Fed. Cir. 2016) ...........................................41

*Belden Inc. v. Berk-Tek LLC*,
   805 F.3d 1064 (Fed. Cir. 2015) ...........................................69

*Braintree Laboratories, Inc. v. Novel Laboratories, Inc.*,
   749 F.3d 1349 (Fed. Cir. 2014) ...........................................57

*Broadcom Corp. v. Emulex Corp.*,
   732 F.3d 1325 (Fed. Cir. 2013) ...........................................39

*C.R. Bard, Inc. v. United States Surgical Corp.*,
   388 F.3d 858 (Fed. Cir. 2004) ...........................................58

*Digital-Vending Services International, LLC v. University of Phoenix, Inc.*,
   672 F.3d 1270 (Fed. Cir. 2012) ...................................50, 54

*DSS Technology Management, Inc. v. Apple Inc.*,
   885 F.3d 1367 (Fed. Cir. 2018) ...........................................41

*E.I. DuPont de Nemours & Co. v. Synvina C.V.*,
   904 F.3d 996 (Fed. Cir. 2018) ...........................................80

*Emerson Electric Co. v. SIPCO, LLC*,
   No. 2021-1881, 2022 WL 1548866 (Fed. Cir. May 17, 2022)..........................50

*Grit Energy Solutions, LLC v. Oren Technologies, LLC*,
   957 F.3d 1309 (Fed. Cir. 2020) .............................75, 76, 77, 79

*In re Jolley,*
  308 F.3d 1317 (Fed. Cir. 2002) ........................................................37

*In re Keller,*
  642 F.2d 413 (C.C.P.A. 1981) ..........................................................44

*In re Van Os,*
  844 F.3d 1359 (Fed. Cir. 2017) ........................................................45

*Intel Corp. v. Qualcomm Inc.,*
  21 F.4th 784 (Fed. Cir. 2021) ...........................................................76

*Intel Corp. v. Qualcomm Inc.,*
  21 F.4th 801 (Fed. Cir. 2021) ...............................................68, 69, 76

*Intel Corp. v. Qualcomm Inc.,*
  IPR2018-01326, 2019 WL 206511 (P.T.A.B. Jan. 15, 2019) .............5

*Intel Corp. v. Qualcomm Inc.,*
  IPR2018-01327, 2019 WL 210796 (P.T.A.B. Jan. 15, 2019) .............5

*Intel Corp. v. Qualcomm Inc.,*
  IPR2018-01329, 2019 WL 210804 (P.T.A.B. Jan. 15, 2019) .............5

*Intel Corp. v. Qualcomm Inc.,*
  IPR2018-01330, 2019 WL 210807 (P.T.A.B. Jan. 15, 2019) .............5

*Intel Corp. v. Qualcomm Inc.,*
  IPR2018-01340, 2019 WL 206556 (P.T.A.B. Jan. 15, 2019) .............5

*Intel Corp. v. Qualcomm Inc.,*
  Nos. 2020-2092, 2020-2093, 2022 WL 880681 (Fed. Cir. Mar. 24, 2022) .......76

*JTEKT Corp. v. GKN Automotive Ltd.,*
  898 F.3d 1217 (Fed. Cir. 2018) ........................................................76

*KSR International Co. v. Teleflex Inc.,*
  550 U.S. 398 (2007).........................................................................35

*Laitram Corp. v. NEC Corp.,*
  163 F.3d 1342 (Fed. Cir. 1998) ........................................................49

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) ...................................................48

*Personal Web Technologies, LLC v. Apple, Inc.*,
  848 F.3d 987 (Fed. Cir. 2017) .........................................38, 39, 44

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) .....................20, 34, 47, 58

*Princeton Vanguard, LLC v. Frito-Lay North America, Inc.*,
  786 F.3d 960 (Fed. Cir. 2015) ...................................................42

*Qualcomm Inc. v. Intel Corp.*,
  6 F.4th 1256 (Fed. Cir. 2021) ...........................................5, 21, 63, 71

*Randall Manufacturing v. Rea*,
  733 F.3d 1355 (Fed. Cir. 2013) ..................................................69

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001) .............................................48, 55

*Sinorgchem Co. v. International Trade Commission*,
  511 F.3d 1132 (Fed. Cir. 2007) ..................................................51

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)..................................................................75

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
  655 F.3d 1364 (Fed. Cir. 2011) ............................................35, 38

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
  574 U.S. 318 (2015)..................................................................69

*Velander v. Garner*,
  348 F.3d 1359 (Fed. Cir. 2003) ..................................................42

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ....................................................47

## STATUTES, REGULATIONS, AND RULES

28 U.S.C. § 1295(a)(4)(A) ...............................................................2

35 U.S.C.
    § 103.................................................................................................21
    § 141(c) ......................................................................................2, 75
    § 316(c) ...........................................................................................1
    § 316(e) .........................................................................................40
    § 319................................................................................................2

37 C.F.R. § 42.100(b) (2018)................................................................20

Fed. Cir. R. 28.1(d) ...............................................................................5

**STATEMENT OF RELATED CASES**

U.S. Patent No. 9,608,675 (the "'675 patent") is at issue in all six of the *inter partes* review ("IPR") proceedings on review in these consolidated appeals.  On July 27, 2021, this Court (Chief Judge Moore, joined by Judges Reyna and Stoll) issued an opinion regarding a first round of consolidated appeals from the same six IPRs.  *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256 (Fed. Cir. 2021) (Nos. 2020-1589, 2020-1590, 2020-1591, 2020-1592, 2020-1593, 2020-1594).  No other appeals in or from the same IPRs were previously before this Court or any other appellate court.

Qualcomm previously asserted the '675 patent in two prior proceedings:  *In re Certain Mobile Elec. Devices & Radio Frequency & Processing Components Thereof*, No. 337-TA-1065 (U.S. Int'l Trade Comm'n), and *Qualcomm Inc. v. Apple Inc.*, No. 3:17-cv-1375 (S.D. Cal.).  Both of those cases have been resolved.

**JURISDICTIONAL STATEMENT**

The Patent Trial and Appeal Board had jurisdiction under 35 U.S.C. § 316(c).  The Board issued its final written decisions on remand on March 23, 2022.  Appx1; Appx113.  Qualcomm appealed from the final written decision on remand in IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340 on May 24, 2022.  Appx20300-20302; Appx20360-20362; Appx20420-20422; Appx20480-20482.  Intel timely appealed from the final written decision on

remand in IPR2018-01328 and IPR2018-01330 on May 25, 2022.  Appx20540-20542; Appx20596-20598.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).  *See also* 35 U.S.C. §§ 141(c), 319.

## INTRODUCTION

The Patent Trial and Appeal Board has twice concluded that Cross-Appellant Intel Corporation[1] has shown that the challenged '675 claims are unpatentable for obviousness.  The Board first concluded that the '675 claims were unpatentable under its construction of the claim term "plurality of carrier aggregated transmit signals" as "signals for transmission on multiple carriers."  After this Court determined that Appellant Qualcomm Incorporated did not have a sufficient opportunity to address the Board's construction, the parties further litigated the construction on remand.  In a second set of final written decisions, the Board adopted Qualcomm's narrower construction of the "plurality" term—"signals for transmission on multiple carriers at the same time to increase the bandwidth for a user"—and again found the challenged '675 claims unpatentable over the Yu prior art reference.

---

[1] Intel is identified as the "Cross-Appellant" in accordance with the Court's order consolidating these six appeals.  ECF No. 2.  However, Intel is not pursuing a cross-appeal from the same final written decision on remand that Qualcomm is appealing.  Intel is properly viewed as the appellee in Nos. 2022-1824, 2022-1825, 2022-1826, and 2022-1828, and as the appellant in Nos. 2022-1829 and 2022-1830.

In reaching its conclusion, the Board noted that Qualcomm did not dispute that the prior art discloses "signals for transmission on multiple carriers at the same time." The ***sole*** dispute in these appeals is whether Yu also discloses "to increase the bandwidth for a user." Relying on explicit teachings in Yu—specifically, Yu's teaching that its technology is appropriate for mobile devices ***and*** Yu's disclosure of at least one embodiment directed to a mobile device implementation (Figure 2)—the Board correctly found that it would have been obvious to a person of ordinary skill in the art to take advantage of Yu's power amplifier in a mobile device.

The Board's decision is supported by substantial evidence, and Qualcomm's arguments should be rejected. Qualcomm's appeals focus on two main premises: (1) the Board improperly relied on a ***single*** statement in Yu to support its conclusions; and (2) the Board allegedly ignored Qualcomm's expert. Both premises are incorrect. Qualcomm glosses over aspects of the Board's final written decision on remand, including the Board's reliance on the embodiment in Figure 2. And as the factfinder, the Board was entitled to give little weight to Qualcomm's unpersuasive expert testimony. The Board's decision should be affirmed.

## STATEMENT OF ISSUES ON APPEAL

Qualcomm's appeals raise the following issues:

1. Whether claims 1-15, 17-25, and 27-33 of the '675 patent (as construed by the Board **on remand**) are unpatentable for obviousness over Yu and other references.

2. In the alternative, whether the challenged '675 claims (as originally construed by the Board **in its first set of final written decisions**) are unpatentable for obviousness over Yu and other references.

Intel's conditional appeals present the following issues:

3. Whether claims 1-3, 5, 7-15, 17-21, 23-25, and 27-30 of the '675 patent (as originally construed by the Board **in its first set of final written decisions**) are unpatentable for obviousness over Chen and other references.

4. Whether the challenged '675 claims (as construed by the Board **on remand**) are unpatentable for obviousness over Chen and other references.

5. Whether Intel has Article III standing to pursue appeals from the IPRs based on Chen, where Intel faces the risk that Qualcomm will allege infringement of the '675 patent based on Intel's sales of products to third parties.

## STATEMENT OF THE CASE[2]

Intel filed six petitions for *inter partes* reviews of the '675 patent. Appx1221; Appx4263; Appx7537; Appx10832; Appx14098; Appx17376. The Board instituted reviews on all six petitions. *E.g.*, Appx1341.[3] After a combined oral hearing for all six IPRs, *see* Appx1639, the Board issued final written decisions holding all challenged claims unpatentable. Appx367-431; Appx432-513; Appx514-594; Appx595-677; Appx678-763; Appx764-851.

This Court vacated the Board's first set of final written decisions and remanded for further proceedings. *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256 (Fed. Cir. 2021). Following supplemental briefing, the Board issued one final written decision on remand covering IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340 (the "Yu IPRs") and a separate final written decision on remand covering IPR2018-01328 and IPR2018-01330 (the "Chen IPRs"). Appx1; Appx113.

---

[2] Because Intel disagrees with Qualcomm's statements of the case and facts, Intel includes its own versions of those sections in this brief. *See* Fed. Cir. R. 28.1(d).

[3] *See generally Intel Corp. v. Qualcomm Inc.*, IPR2018-01326, 2019 WL 206511 (P.T.A.B. Jan. 15, 2019); *Intel Corp. v. Qualcomm Inc.*, IPR2018-01327, 2019 WL 210796 (P.T.A.B. Jan. 15, 2019); *Intel Corp. v. Qualcomm Inc.*, IPR2018-01329, 2019 WL 210804 (P.T.A.B. Jan. 15, 2019); *Intel Corp. v. Qualcomm Inc.*, IPR2018-01330, 2019 WL 210807 (P.T.A.B. Jan. 15, 2019); *Intel Corp. v. Qualcomm Inc.*, IPR2018-01340, 2019 WL 206556 (P.T.A.B. Jan. 15, 2019).

In the Chen IPRs, the Board concluded on remand that Intel has not shown that the purported inventions in claims 1-3, 5, 7-15, 17-21, 23-25, and 27-30 of the '675 patent would have been obvious over Chen[4] and other prior art references. Appx161.  But in the Yu IPRs, the Board concluded on remand that Intel has shown that the purported inventions in claims 1-15, 17-25, and 27-33 of the '675 patent would have been obvious over Yu[5] and other prior art references.  Appx55.

## RESPONSE TO QUALCOMM'S APPEALS

## STATEMENT OF FACTS

### A.    Technological Background

The '675 patent discloses a technique for transmitting multiple radio frequency ("RF") signals simultaneously, using just one power amplifier and one power tracking supply generator.  It involves concepts that are well-understood in the fields of electronics and data transmission:  carrier aggregation and the use of a power tracker circuit to generate a single power tracking signal.

### 1.    Radio Frequency Power Amplifiers

In wireless communications, mobile devices (such as smartphones) exchange information (such as phone calls and text messages) with base stations

---

[4] W. Chen et al., *Hybrid Envelope Tracking for Efficiency Enhancement in Concurrent Dual-Band PAs*, 54 Microwave & Optical Tech. Letters 662 (Mar. 2012); Appx2851.

[5] Xin Yu et al., EP 2442440 A1 (published Apr. 18, 2012); Appx2469.

that connect the mobile devices to a wider network. This information is transmitted using RF signals. To reach a base station or a mobile device, an RF signal requires a certain amount of power. Mobile devices and base stations therefore commonly contain a component known as a "power amplifier" ("PA") that increases the power of the RF signal to a level sufficient to reach the receiving base station or mobile device. Typically, the farther a device moves from a base station, the more power amplification is needed to ensure successful transmission. Appx2357.

## 2. Power Supplies For RF Power Amplifiers

To amplify a signal, an RF power amplifier needs a supply of power, and the supplied power must be large enough to support the output signal and to avoid distortion. For example, in the prior art structure shown below, the power amplifier receives a "Fixed Supply" voltage:



Appx2358. The supply voltage allows the power amplifier to transmit an output signal ("RF_OUT") based on the input signal ("RF_IN") that the power amplifier receives. *Id.*

Many different techniques for generating a supply voltage for a power amplifier were known in the prior art. One such technique used a power supply generator (specifically, a battery) to generate a fixed supply voltage that was greater than or equal to the power required for any particular transmission. Appx2358.

Although using a fixed power supply allowed transmissions at the desired power levels, it wasted power when the transmitted RF signal required less power than provided by the power supply generator. For example, in the figure below, the blue waveform represents the transmitted RF signal, and the fixed supply is the border along the top of the red rectangle. The red area represents wasted power that the power amplifier dissipates as heat:



Appx2358-2359.

### 3.     Power/Envelope Tracking

Power tracking (or envelope tracking) is a technique known in the prior art for providing power to an RF power amplifier for efficient operation. The principle of power/envelope tracking is to make the power supply voltage track the power (amplitude) of the signal to be transmitted. *See* Appx339(5:18-23). By continuously adjusting the power supply voltage to track the power of the transmit signal, power/envelope tracking improves the amplifier's efficiency. Appx2359-2360.

The figure below demonstrates a basic implementation of power/envelope tracking from the prior art:



Appx2360. The power amplifier receives an RF input signal to be transmitted. The "Supply Modulator" receives an "Envelope" signal (also known as a "power tracking signal") that tracks the RF input signal's envelope (the boundary of the RF signal's amplitude). The Supply Modulator then supplies to the power amplifier a

voltage (the "Modulated Supply") that is based on the envelope signal. The power amplifier uses this variable supply voltage to efficiently and accurately amplify the RF input signal. *Id.*

The figure below shows why power/envelope tracking is an efficient technique for amplifying RF signals:



Appx2361. In the figure, the light blue, rapidly oscillating waveform is the transmitted RF signal, and the dark blue shaded area indicates the envelope of the transmitted RF signal. The outer boundary of the red waveform indicates the magnitude of the variable supply voltage. The power increases and decreases as the power of the RF signal increases and decreases. The amount of power wasted as dissipated heat (indicated by the red area) is therefore significantly lower than if a fixed supply voltage were applied. *Id.*

### 4.    Carrier Aggregation

In mobile communications, a carrier signal (often known simply as a "carrier") is used to transmit information contained in an input signal (*e.g.*, a voice call or text message).  A carrier is a high-frequency waveform (typically in the shape of a sine wave) that is modulated (or modified) with the input signal, allowing the information in the input signal to be wirelessly transmitted.  For example, in one basic form of modulation called amplitude modulation (shown below), the information of an input signal is modulated onto a carrier, resulting in a modified signal in which the amplitude reflects the information in the input signal. Appx2361-2362.



Appx2362.

Carrier aggregation involves simultaneously transmitting data on a number of carriers.[6]  The carriers are amplified by one or more power amplifiers before wireless transmission.  Carrier aggregation can achieve higher data rates and increase the overall capacity of wireless networks, allowing network operators to exploit fragmented spectrum allocations.  Appx2364.

### 5.    I/Q Signal Processing

I/Q signal processing is a method for efficiently and reliably transmitting digital data (streams of 1's and 0's) via an analog waveform, which can subsequently be used to modulate an RF carrier signal.  In I/Q signal processing, digital data is converted into two analog waveforms:  a cosine waveform and a sine waveform.  The cosine waveform is called the in-phase ("I") component, and the sine waveform is called the quadrature ("Q") component.  These I and Q components can be transmitted via an RF carrier such that the underlying data is transmitted very efficiently:  Two or more bits of data can be transmitted per transmit interval of an I/Q waveform.  Appx2367.

To transmit data using I/Q signal processing, the digital data is first converted into analog I/Q waveforms.  Following this conversion, each I/Q component is then upconverted to a higher RF frequency by a mixer.  The mixer

---

[6] Transmissions from mobile devices to base stations are called "uplink," and transmissions from base stations to mobile devices are called "downlink."  *See* Appx47-48.

combines each I/Q component with an RF carrier signal provided by one or more local oscillators.  This process modulates the RF carrier signals by the I/Q signals.  The upconverted I/Q components are then aggregated by a summer to produce the desired RF signal for transmission.  These concepts were all well-known in the prior art by the time of the alleged invention.  Appx2367-2368.

### B.    The '675 Patent

The '675 patent issued from an application filed on February 11, 2013, and does not claim an earlier priority date.  The patent issued on March 28, 2017.  Appx325.

### 1.    The Alleged Problems In The Art

According to the '675 patent, transmitting multiple transmit signals previously required the use of multiple transmitters.  For example, as illustrated in Figure 4 of the '675 patent, mobile devices designed for transmitting multiple signals implemented power tracking using a separate power amplifier and a separate power tracking circuit for each carrier:



FIG. 4

Appx2368; *see also* Appx330.  In this figure, the I/Q components of multiple

signals (numbered 1 through *K*, highlighted in green) are transmitted.  Each signal

is processed by its own transmitter 430 (430*a*-430*k*, highlighted in orange), each of

which includes a transmit circuit 440 (440*a*-440*k*, outlined in purple).  Each signal

also has its own power tracking supply generator 480 (480*a*-480*k*, outlined in

yellow) and its own power amplifier 460 (460*a*-460*k*, highlighted in pink).

Appx339(5:24-32, 5:63-65); Appx2368-2369.  The '675 patent criticizes this

architecture as undesirable because it requires more circuits, consumes more

power, and increases costs.  Appx339(6:16-19).

## 2.    The Alleged Inventions In The '675 Patent

The '675 patent proposes to solve these alleged problems by transmitting multiple signals using a single power amplifier with a single power tracking supply generator.  Appx339(6:20-25).  The patent asserts that this approach can "reduce the number of circuit components, reduce power consumption, and provide other advantages."  Appx339(6:25-27).

Figure 5 of the '675 patent illustrates one architecture implementing this approach:



Appx2370; *see also* Appx331.  Figure 5 shows transmit module 500 that includes *K* number of transmit circuits 540*a*-540*k* (outlined in purple) that simultaneously process the I/Q components of *K* transmit signals (highlighted in green).

Appx339(6:34-37). Each transmit circuit receives the I and Q samples and generates upconverted RF signals at mixers 548 and 549, which are then combined by summer 550 to generate one upconverted RF signal per transmit circuit. Appx339(6:40-57). Summer 552 receives the upconverted RF signals from transmit circuits 540*a*-540*k*, sums the upconverted RF signals, and provides a single modulated RF signal to a single power amplifier 560 (highlighted in pink). Appx339(6:59-62).

The power amplifier is powered by a single power tracking supply generator 580 (outlined in yellow). The power tracking supply generator receives the I and Q samples ($I_1$ to $I_K$, and $Q_1$ to $Q_K$) for all $K$ transmit signals being sent simultaneously. Appx339(6:37-39, 6:63-65). Power tracker 582 (highlighted in darker blue) determines the overall power of all transmit signals based on their I and Q samples and provides a digital power tracking signal to a digital-to-analog converter ("DAC") 584. Appx339-340(6:65-7:1). The converter is coupled to a power supply generator 586 (highlighted in lighter blue), which generates a single power supply voltage for power amplifier 560. Appx340(7:6-8). The power amplifier then uses the power supply voltage from the power supply generator to amplify the single modulated RF signal from summer 552. Appx340(7:9-12).

### C.    The Yu Reference

Yu is undisputedly prior art to the '675 patent. Yu involves "an extension to the known principle of envelope-tracking amplifiers." Appx2470. Like the '675 patent, Yu teaches generating a single RF signal from at least two input signals. Yu discloses that the input signals are also used by digital signal processing means to determine a control signal. The control signal is used to generate a supply voltage for a single power amplifier, which outputs an amplified RF signal. Appx2469. According to Yu, such a system is inventive because it "efficiently obtain[s] a control signal suitable for controlling the supply voltage of [the] power amplifier." Appx2470. The system is also advantageous because it does not require a "dedicated" power amplifier for each input signal, but rather has "only one transmitter with one single power amplifier." Appx2475.

Figure 1 of Yu illustrates an example of the described system:



Appx2469.  This figure shows that at least two input signals ("S1," "S2," etc.) are sent to a signal processing unit ("SP"), which converts the input signals into an RF signal ("$S_{RF}$") that is sent to a single power amplifier ("PA").  Control unit 100 controls the operation of the power amplifier.  The control unit contains digital signal processing means ("DSP"), which derives a control signal ("CTRL") based on the input signals.  The control signal is then sent to a power amplifier supply voltage module ("PA'").  The power amplifier supply voltage module generates a supply voltage ("$V_{sup}$"), which is then applied to the power amplifier.  The power amplifier ultimately generates an amplified RF signal ("$S_{RFa}$").  Appx2472-2473.

Yu expressly teaches that its technology can be implemented in both mobile devices and base stations.  Appx2472 ("The power amplifier PA may e.g. be employed in wireless communications systems such as base stations of cellular communications networks or wireless transceivers of mobile terminals and the like.").  Yu also acknowledges that "those skilled in the art will be able to devise various arrangements that, although not explicitly described or shown [in Yu], embody the principles of the invention."  Appx2475.

### D.    Procedural History

### 1.    Initial Proceedings Before The Board

On July 3, 2018, Intel filed six IPR petitions against the '675 patent. *E.g.*, Appx1221.[7]  In the petitions, Intel proposed that the term "plurality of carrier aggregated transmit signals," which appears in all independent claims, should be construed to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user."  Appx1255.  In its preliminary responses, Qualcomm did not propose constructions of any claim terms, including the "plurality" term at issue here.  Appx1329.[8]  For all six petitions, the Board instituted IPRs of all challenged claims on all asserted grounds.  Appx1341.  The Board did not construe the "plurality" term in its institution decisions.  Appx1349.

Qualcomm's post-institution patent owner responses proposed construing the "plurality" term to mean "signals from a single terminal utilizing multiple component carriers which provide extended transmission bandwidth for a user transmission from the single terminal."  Appx1414.

In reply, Intel explained how Qualcomm's narrower construction defied basic principles of claim construction.  Qualcomm had proposed "signals for

---

[7] This brief often cites only the filings in IPR2018-01326 when they are exemplary.

[8] For simplicity, this brief refers to "plurality of carrier aggregated transmit signals" as the "plurality" term.

transmission on multiple carriers at the same time to increase the bandwidth for a user" during an earlier ITC investigation, *e.g.*, Appx3366, in which claim construction follows the standard set out in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). When Intel filed its IPR petitions, claim construction in IPRs was governed by the "broadest reasonable interpretation" ("BRI") standard. Appx373 (citing 37 C.F.R. § 42.100(b) (2018)). Given the difference between the applicable standards, Qualcomm could not explain how a ***narrower*** construction of the "plurality" term before the Board could be the ***broadest*** reasonable interpretation of that term. Appx1456-1457.

In its sur-reply, Qualcomm acknowledged that its construction would add three limitations that were not otherwise contained in the claims. *See* Appx1495. Because the "from a single terminal" portion of Qualcomm's construction was unsupportable, Qualcomm offered to modify its construction to read "to/from a single terminal." *See* Appx1496.

At the oral hearing, the Board expressed disagreement with both parties' proposed constructions of the "plurality" term. In particular, the Board was troubled by the portions of the constructions that required increasing (or extending) bandwidth for a user. *See* Appx1649.

On January 14, 2020, the Board issued six final written decisions determining that all challenged claims of the '675 patent (*i.e.*, claims 1-15, 17-25,

and 27-33) are unpatentable under the pre-America Invents Act version of

35 U.S.C. § 103.  *E.g.*, Appx430.  The Board adopted a construction of "plurality

of carrier aggregated transmit signals" that was different from both parties'

proposals.  The Board rejected Qualcomm's proposed construction as "overly

narrow" in several respects.  Appx385-388.  The Board concluded that the

"plurality" term should be construed under the BRI standard as "signals for

transmission on multiple carriers."  Appx389.

### 2.    First Round Of Consolidated Appeals Before This Court

On appeal, Qualcomm pressed only two issues:  (1) whether the Board

violated the Administrative Procedure Act by failing to give Qualcomm notice of

or an opportunity to respond to the Board's construction of the "plurality" term;

and (2) whether the Board erred in construing a means-plus-function term in claim

28.  *Qualcomm*, 6 F.4th at 1262 & n.2.  On the latter issue, the Court saw "no

error."  *Id.*

On the former issue, however, the Court agreed with Qualcomm that the

Board failed to provide Qualcomm with notice of and an opportunity to respond to

the Board's construction of the "plurality" term.  *Qualcomm*, 6 F.4th at 1265.

Accordingly, the Court vacated the Board's final written decisions in the six IPRs

and remanded for further proceedings.  *Id.* at 1267.

### 3. Remand Proceedings Before The Board

On remand, the Board gave the parties an opportunity to respond to its construction of the "plurality" term. Specifically, the Board asked for the parties' input on two issues: "(1) whether the Board properly construed the claim term 'plurality of carrier aggregated transmit signals' to mean 'signals for transmission on multiple carriers,' and (2) the applicability of the Board's construction of 'plurality of carrier aggregated transmit signals' to the asserted prior art disclosures." Appx20020.

In its opening supplemental brief, Intel explained why the Board's construction of the "plurality" term was correct. *See* Appx20034-20039. In response, Qualcomm changed positions yet again, abandoned the overly narrow construction of the "plurality" term that it first presented to the Board, and reverted to the construction it had proposed before the ITC. *See* Appx20161. Qualcomm did not address the applicability of the ***Board's*** construction to the prior art, as the Board requested, Appx20020, but rather the applicability of only ***its own***, newly proposed construction, Appx20170-20172; Appx20295. Because Qualcomm had failed to address the applicability of the Board's construction, Intel pointed out in its reply that Qualcomm effectively "concede[d] that the challenged claims are unpatentable under [the Board's] construction." Appx20186; *see also* Appx20193. In its sur-reply, Qualcomm never rebutted this argument. *See* Appx20295.

On March 23, 2022, the Board issued two final written decisions on remand, including one focused on the Yu IPRs.  Appx1-56.  The Board began its analysis by revisiting its construction of the "plurality" term and decided that its initial construction was "overly broad."  Appx30.  Thus, the Board agreed with Qualcomm that "plurality of carrier aggregated transmit signals" should be construed to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user."  Appx38.

Qualcomm did not dispute that Yu discloses "signals for transmission on multiple carriers" (Appx43) or that Yu discloses signals that are transmitted "at the same time" (Appx44).  Qualcomm disputed only that Yu discloses the "to increase the bandwidth for a user" portion of the Board's construction.  *See* Appx44-46.

The Board concluded that a base station does not qualify as a "user" for purposes of "to increase the bandwidth for a user."  Appx48.  The Board noted, however, that Yu explicitly teaches that its power amplifier "may e.g. be employed in wireless communications systems such as base stations of cellular communications networks or ***wireless transceivers of mobile terminals*** and the like," as both parties had acknowledged.  Appx49 (citing Appx2472).[9]  The Board declined to decide whether Figures 3 and 4 of Yu are directed to base stations.

---

[9] All emphasis added throughout this brief, except where otherwise noted.

Appx50.  The Board reasoned that even if Figures 3 and 4 were directed to base stations, "it would have been obvious to a [person of ordinary skill in the art] to take advantage of Yu's invention in a mobile device," and that "a person of ordinary skill would have made any necessary modifications so that a mobile device could appropriately implement Yu's power amplifier."  Appx50.  The Board noted that this conclusion "is supported by [Qualcomm's] assertion that 'Figure 2 of Yu discloses a mobile-terminal-appropriate system for controlling a supply voltage of a power amplifier.'"  Appx50-51 (quoting Appx1421).  The Board also found that "[b]ased on Yu's teaching that its power amplifier may be used in base stations or mobile devices," a person of ordinary skill in the art "would have had reason to modify Yu's base station implementations of the power amplifier to provide a mobile device implementation of the power amplifier."  Appx52.

Additionally, the Board noted that Qualcomm's contention that downlink carrier aggregation had not been implemented as of Yu's filing date was "of no moment in the context of a mobile device implementation of Yu's power amplifier, where the signals are processed by the mobile device, not the base station."  Appx51.  The Board also rejected Qualcomm's emphasis on extending bandwidth for a ***single*** user terminal because that limitation was not part of Qualcomm's proposed construction on remand.  *Id*.  Nevertheless, the Board noted that "in the

context of the mobile device implementation of Yu's power amplifier, processing the signals simultaneously in the mobile device would increase the bandwidth for the mobile device, i.e., a single terminal." Appx51-52.

Thus, the Board agreed with Intel that "it would have been obvious to a [person of ordinary skill in the art] to take advantage of Yu's invention in a mobile device." Appx50 (quoting Appx1268). Because the Board had already determined that the prior art teaches all other claim limitations and that a person of ordinary skill would have been motivated to combine Yu with other prior art references, Appx53, the Board concluded that Intel has shown by a preponderance of the evidence that claims 1-5, 17-25, and 27-33 of the '675 patent are unpatentable for obviousness on the Yu grounds. Appx55.

These consolidated appeals followed.

## SUMMARY OF THE ARGUMENT

The Board rightly found that a person of ordinary skill in the art would have been motivated to modify the implementations in Figures 3 and 4 of Yu to arrive at a mobile device implementation of the invention claimed in the '675 patent. That finding was based on the Board's mistaken assumptions that the "user" in its construction of the "plurality" term limits the claims to mobile devices and that Figures 3 and 4 of Yu are base station implementations (which the Board declined to determine). Even under those assumptions, however, the factual findings

underlying the Board's obviousness determination are supported by substantial evidence *in Yu itself*, including: (1) an explicit teaching in paragraph 34 that Yu's power amplifier may be used in mobile devices, and (2) at least one embodiment directed to mobile devices, as Qualcomm concedes. Qualcomm fails to explain how the Board's factual findings regarding Yu's disclosures lack substantial evidence.

The Court should reject Qualcomm's challenges to additional aspects of the Board's obviousness analysis. Qualcomm tries to hold Intel to a higher standard than this Court's obviousness precedents require. This Court has explained that the Board's obligation to explain its obviousness analysis necessarily depends on context. The context here involves prior art with an explicit teaching directing a person of ordinary skill to the claimed inventions.

Qualcomm's other arguments are unavailing. The Board did not rely on "ordinary creativity" to supply any missing claim limitation. As the factfinder in this case, the Board acted well within its discretion to discount the testimony of Qualcomm's expert. The Board also appropriately rejected Qualcomm's arguments based on the "bodily incorporation" of different embodiments in the prior art. And under the circumstances of this case, the Board fairly and correctly addressed reasonable expectation of success as part of its motivation-to-combine

analysis.  The Board's final written decision on remand for the Yu IPRs should be affirmed.

The Court can also affirm on the alternative ground that the Board's revised construction of "plurality of carrier aggregated transmit signals" is unduly narrow under the applicable BRI standard.  In its first set of final written decisions, the Board correctly construed the "plurality" term to mean "signals for transmission on multiple carriers."  That construction is the broadest reasonable interpretation, and it is supported by both intrinsic and extrinsic evidence.  Under that construction, Qualcomm does not dispute that the challenged '675 claims are unpatentable for obviousness.

## ARGUMENT

## I.    SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FACTUAL FINDINGS REGARDING YU'S DISCLOSURES

The crux of the dispute is whether substantial evidence supports the Board's finding that Yu discloses increasing bandwidth for a user, as required by the Board's latest construction of the "plurality" term.  *See* Appx44-53.  The Board mistakenly interpreted the claims as limited to mobile devices, but even under that interpretation, Yu discloses the implementation of its power amplifier in mobile devices.  The Board correctly concluded that a person of ordinary skill in the art would read Yu as making that disclosure, expressly relying on both Yu's disclosure of at least one embodiment of a power amplifier in a mobile device (as

shown in Figure 2) and paragraph 34, which contemplates modifying Figures 3 and 4 (to the extent necessary) for use in mobile devices. *See* Appx50-53.

Qualcomm repeatedly faults the Board for supposedly relying on a "single sentence" in Yu's paragraph 34 while downplaying the Board's express reliance on the mobile device implementation in Yu's Figure 2. Qualcomm also complains that the Board failed to credit its expert. Both arguments lack merit.

## A. The '675 Claims Are Not Limited To Mobile Devices, As The Board Assumed

In its final written decision on remand, the Board assumed that Figures 3 and 4 of Yu are directed to base stations and focused its obviousness analysis on modifying those embodiments to arrive at mobile device implementations. Appx50. This approach is necessarily based on an interpretation of the claims as limited to mobile devices. Although the Board did not expressly state that the claims are so limited, it essentially imported that requirement into the claims with an overly restrictive interpretation of the "for a user" language that is at odds with the claims and Qualcomm's own statements about the patent. *See* Appx49-50.

Importing a mobile device limitation is incorrect for several reasons: (1) it prioritizes the construction over the claim language itself, which has no such limitation; (2) it is based solely on a generic description of a wireless system as shown in Figure 1 of the patent, *see* Appx49; (3) it ignores the broadest reasonable interpretation of the claims; (4) it does not account for the increase in bandwidth

for a user (*i.e.*, a mobile device) that occurs on the downlink if the base station uses

carrier aggregation (such as with streaming movies to a mobile device); and (5) in

the ITC, Qualcomm expressly stated that the patent is "agnostic" with respect to

coverage of uplink versus downlink transmissions.  Appx47.  A mobile device

limitation is also at odds with the Board's previous rejection of "to increase the

bandwidth for a user" because it is not in the claims or required by the

specification.  Appx388.

For these reasons, Intel maintains that the claims are not limited to mobile

devices, and for the reasons discussed in Intel's briefing before the Board, Figures

3 and 4 of Yu are not limited to base station implementations.  *See* Appx1470-

1471.  As explained below, however, Qualcomm's arguments still fail even

assuming that the claims are limited to mobile devices and that Figures 3 and 4 are

directed to base station implementations.

### B.    Contrary To Qualcomm's Assertions, The Board's Decision On Remand Does Not Rest On A Single Sentence In Yu

Qualcomm repeatedly asserts throughout its brief that the Board relied on a

"single sentence" in Yu to support its conclusions.  Qualcomm Br. 3, 4, 22, 23, 27,

28, 34, 37, 53.  Indeed, Qualcomm's appeals from the Yu IPRs are based almost

entirely on this assertion.  But this assertion is simply wrong.

Before the Board, Qualcomm argued that Yu's Figures 3 and 4 disclose

using a base station, and that a base station does not qualify as a "user."  *See*

Appx44-49.  Although the Board agreed with Qualcomm that a base station is not a

"user" for purposes of its latest construction of the "plurality" term, the Board

concluded that, even if Figures 3 and 4 are base station implementations (which it

did not determine), it would have been obvious to a person of ordinary skill in the

art to modify those implementations to employ them in a mobile device.  Appx49-

50.  In doing so, the Board relied on Qualcomm's own admissions that paragraph

34 teaches that Yu's power amplifier may be used in both base stations and mobile

devices and that Figure 2 of Yu describes a mobile device implementation.

Appx49-51.  As discussed below, Figure 2 and Figure 3 overlap in substantial

respects.

The Board made clear that it was relying on this mobile device

implementation when it dismissed as irrelevant Qualcomm's arguments that

downlink carrier aggregation had not been implemented at the time of Yu's filing

and that Yu does not disclose increasing bandwidth "for a single user terminal."

Appx51 (emphasis omitted).  For example, the Board noted that Qualcomm's

argument about downlink carrier aggregation was "of no moment" in the mobile

device implementation of Yu's power amplifier.  *Id.*  The Board also noted that "in

the context of the mobile device implementation of Yu's power amplifier," the

bandwidth of a single terminal (*i.e.*, the mobile device) would be increased.

Appx51-52.  The Board then concluded that for all these reasons, the mobile device implementation would "increase the bandwidth for a user."  Appx52.

Tellingly, Qualcomm does not address the Board's reliance on Yu's disclosure of a mobile device implementation of the power amplifier in Figure 2 until page 50 of its brief.  And Qualcomm cites that disclosure only to argue that its expert refuted the Board's conclusion.  But the expert's disagreement with the Board's conclusion does not change the fact that the Board found that Figure 2 discloses a mobile device implementation.

### C.    The Board's Factual Findings Are Supported By Substantial Evidence

Between Figure 2 and paragraph 34, there is substantial evidence to support the Board's finding that "it would have been obvious to a [person of ordinary skill in the art] to take advantage of Yu's invention in a mobile device."  Appx50-52 (quoting Appx1268).  Qualcomm has not shown otherwise.

Paragraph 34 expressly states that Yu's power amplifier "may e.g. be employed in wireless communications systems such as base stations of cellular communications networks or *wireless transceivers of mobile terminals*" (*i.e.*, mobile devices), and "the like."  Appx2472.  As the Board noted, even Qualcomm acknowledged this disclosure.  Appx49.

Moreover, Yu's implementations shown in Figure 2 (the mobile device) and Figures 3 and 4 (purportedly base stations) are very similar, though they differ in

how the control signal "CTRL" is obtained.  Specifically, in the Figure 2

implementation, both input signals "S1" and "S2" are shifted to intermediate

frequencies "$S_{IF1}$" and "$S_{IF2}$," respectively, which are added together to obtain

"$S_{IF12}$."  Appx2473.  The absolute value of $S_{IF12}$ is then determined and used to

determine the control signal.  Appx2473-2474.  In the Figure 3 implementation, the

absolute values of input signals S1 and S2 are separately determined (without first

being shifted to intermediate frequencies and added).  Appx2474.  Those absolute

values are then added and used to determine the control signal.  *Id.*  In both

implementations, the signal processing flows are the same.  The implementation in

Figure 4 discloses the same method of determining the control signal but offers an

alternative signal processing (or upconversion) method.  *Id.*

Although Figures 3 and 4 may be implemented to handle larger frequency

spacings, any modification contemplated by paragraph 34 would entail only

narrowing the frequency spacings in Figures 3 and 4 to those appropriate for

mobile devices, which would have been well within the purview of a skilled

artisan.  *See* Appx2475 (Yu's power amplifier can "handl[e] a plurality of different

frequency bands … with different frequency spacings Δf").  These disclosures

amply support the Board's factual findings.

**D.    Qualcomm Fails To Show A Lack Of Substantial Evidence Supporting The Board's Factual Findings**

In arguing that the Board's findings are not supported by substantial evidence, Qualcomm presents a laundry list of complaints.  None holds water.

First, Qualcomm improperly attempts to limit the applicability of the statement in Yu's paragraph 34 and ignores the Board's reliance on the disclosure in Figure 2.  Specifically, Qualcomm argues that, in context, paragraph 34 means something different from what it says.  *See* Qualcomm Br. 28 ("[T]he sentence reflects Yu's disclosure of three separate embodiments for controlling a power amplifier—one that is for a mobile device (Figure 2), and two others that could only be implemented in base stations (Figures 3 and 4)." (emphases omitted)).  But paragraph 34 does not make any distinctions between implementations for mobile devices and implementations for base stations, nor does it describe any of the figures as limited to specific implementations.  Rather, paragraph 34 broadly says that "***the*** power amplifier PA" (not different types of power amplifiers) may be used across different communications systems without referring to any specific embodiment.  Appx2472.  The antecedent basis for "***the*** power amplifier PA" is found in paragraph 33, which states that "Figure 1 depicts a power amplifier system comprising a power amplifier PA."  *Id.*  Figure 1 is described in paragraphs 64 through 66 as encompassing Figures 2-4.  Appx2476.  These disclosures

confirm that paragraph 34 applies to **all** the embodiments shown in Figures 2, 3, and 4.

Given the broad applicability of paragraph 34, a person of ordinary skill in the art would have understood the disclosure to be applicable to a wide array of implementations. That conclusion is bolstered by Yu's disclosure of at least one **actual** implementation of Yu's power amplifier in a mobile device in Figure 2 and the accompanying discussion, which the Board twice cited to support its findings. Appx50-51. The whole point of paragraph 34 is to emphasize the flexibility of Yu's technology.

Second, in an attempt to avoid Yu's explicit disclosures, Qualcomm relies (at 30, 32-33) on the testimony of its expert. Of course, the Board was not obligated to credit Qualcomm's self-serving expert testimony—nor should it have, given Yu's unambiguous disclosure that its power amplifier may be flexibly used in both base stations and mobile devices. *See, e.g.*, *Phillips*, 415 F.3d at 1318 (noting that expert testimony is "generated at the time of and for the purpose of litigation" and can therefore "suffer from bias"). And despite Qualcomm's protestations (at 31), the Board did not "ignor[e] Dr. Williams's analysis." The Board cited Dr. Williams's testimony and acknowledged Qualcomm's reliance on it. Appx172; Appx208. The Board just rejected Dr. Williams's opinion as unpersuasive given the clarity of Yu's disclosures, as it was entitled to do.

Third, Qualcomm further argues (at 31-32) that paragraph 34 is only "aspirational" because it includes the word "may." But Qualcomm's citation to *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364 (Fed. Cir. 2011), is misplaced. In that case, one of the prior art references used the word "may" to speculate about mere possibilities for generating certain chemical compounds. *Id.* at 1375-1376. Here, in context, paragraph 34 uses "may" to mean "can" in disclosing that Yu's power amplifier is usable in both base stations and mobile devices—as evidenced by Yu's actual disclosure of both mobile device and base station implementations. *See* Appx2472.

Fourth, Qualcomm takes issue (at 34-36) with the Board's citation to *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007), for the following proposition: "[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." Appx50. This Court should reject Qualcomm's three objections to that citation:

- Qualcomm first argues (at 34-35) that Intel somehow forfeited reliance on *KSR* by not quoting the "similar devices" proposition in its IPR petitions. But Intel has always argued that the '675 claims are unpatentable for obviousness based on the teachings of Yu and other

references.  *See, e.g.*, Appx1227.  Qualcomm can hardly complain about the Board's citation to the leading Supreme Court opinion on obviousness.

- Qualcomm next contends (at 35) that "the Board did not explain why a base station and a mobile device are allegedly 'similar devices' as it relates to" the '675 patent's technology.  But Yu itself amply demonstrates the similarities between base stations and mobile devices.  For example, Yu explains that its power amplifiers use basic concepts and components, including supply voltages, power amplifier supply voltage modules, envelope tracking, RF signals, and control signals.  Appx2472-2473.  Yu does not distinguish between the use of these components in base stations and the use of the same components in mobile devices.  *See* Qualcomm Br. 29 (showing side-by-side views of base station and mobile device implementations in Figures 2-4 with many overlapping components).

- Finally, Qualcomm argues (at 36) that "substantial record evidence contradicts any 'similar devices in the same way' theory."  Here, Qualcomm's argument is based on the wrong legal standard.  The question is not whether substantial evidence supports Qualcomm's preferred alternative factual findings, but rather whether Qualcomm has

shown a *lack* of substantial evidence supporting the factual findings that the Board actually made. *See In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002) ("[W]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence.").

Lastly, Qualcomm suggests (at 36-38) that a comparison between the Yu grounds and the Chen grounds demonstrates deficiencies in Intel's obviousness showing on the Yu grounds. Although the Board's claim construction analysis in the final written decisions on remand is the same for both the Yu grounds and the Chen grounds, the prior art references are different, and the Board's analysis of whether the prior art discloses the '675 claim limitations is independent. As the Board recognized, clear disclosure of mobile device implementations appears in Yu's paragraph 34.

## II.  THE BOARD CORRECTLY HELD THAT THE CHALLENGED CLAIMS ARE UNPATENTABLE FOR OBVIOUSNESS ON THE YU GROUNDS

Qualcomm raises a host of other challenges to the Board's obviousness analysis in Section II of its opening brief. None has merit.

### A.    Qualcomm Tries To Hold Intel To An Improperly Heightened Standard For Obviousness

At a high level, Qualcomm's obviousness arguments can be distilled into a single complaint:  The Board supposedly did not make necessary factual findings or otherwise do enough to support its determination that the challenged '675 claims are unpatentable for obviousness.

Qualcomm overstates what the Board must do to support its obviousness determination.  Qualcomm first relies (at 38) on *Star Scientific* for the proposition that obviousness "involves more than a motivation to modify the prior art to achieve the claimed invention."  But this Court's obviousness analysis in *Star Scientific* focused on the same inquiries that the Board focused on in this case. Notably, the *Star Scientific* Court principally examined the prior art's disclosure (or nondisclosure) of all the claim limitations and motivation to combine the prior art references.  *See* 655 F.3d at 1375-1376.[10]  The Board's approach here was consistent with this Court's approach to obviousness.  As this Court has explained, the "amount of explanation" by the Board required to meet the obviousness standard "necessarily depends on context."  *Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 994 (Fed. Cir. 2017).  In a case such as this one, where the

---

[10] In *Star Scientific*, the Court also examined objective indicia of nonobviousness, which the parties have not litigated in these IPRs.  *See* 655 F.3d at 1376.

prior art explicitly contains a motivation to arrive at the claimed "inventions," substantially less explanation is required.

According to Qualcomm, the Board was also required to make a finding on "why the prior art references would have worked together."  Qualcomm Br. 38 (quoting *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1335 (Fed. Cir. 2013)). Even taking that principle as true, it does not apply here.  On remand, the Board found a motivation to modify the purported base station implementations in Yu in light of the other disclosures ***in the same reference*** to arrive at the alleged inventions in the '675 patent.  The Board's final written decision at issue here therefore did not turn on combining disclosures from multiple references.

Qualcomm also cites (at 38) *Personal Web* as purportedly requiring the petitioner to show a reasonable expectation of success that is separate from *Broadcom*'s requirement to show that the prior art references would have worked together.  But that is not correct.  Both cases state that a showing of how the combination of prior art references would work together supports a conclusion that a person of ordinary skill would have had a reasonable expectation of success in combining the references, not that separate factual findings are required.  *See Personal Web*, 848 F.3d at 994; *Broadcom*, 732 F.3d at 1335.  In any event, as explained above, these appeals do not involve combining two or more references.

Similarly, Qualcomm argues that the Board failed to make "an evidence-based articulation of 'how specific references could be combined' and 'how any specific combination would operate or read on the asserted claims.'"  Qualcomm Br. 39-40 (emphases omitted) (quoting *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012)).  As a preliminary matter, Qualcomm fundamentally misunderstands the disputed issue when it refers to "how specific references could be combined."  On remand, the Board relied solely on Yu.  *See* Appx44-53.  Regardless, even if *ActiveVideo* applied here, that case does not require the detailed articulation that Qualcomm desires.  In that case, this Court affirmed the district court's judgment of no invalidity as a matter of law because the defendant's expert witness offered only conclusory testimony regarding obviousness that was insufficient to satisfy the defendant's burden of presenting clear and convincing evidence of invalidity.  *ActiveVideo*, 694 F.3d at 1327-1328.  That is not the evidentiary standard that applies in IPR proceedings; a petitioner need show unpatentability by only a preponderance of the evidence. 35 U.S.C. § 316(e).  Furthermore, the expert's testimony about motivation to combine in *ActiveVideo* was especially poor:  He testified that the motivation to combine was simply to "build something better," which could apply in every obviousness case.  *See* 694 F.3d at 1328.  That testimony is a far cry from the

evidence here, which includes Yu's explicit teaching to use its technology in mobile devices.

### B.    Qualcomm Has Not Established That The Board's Ultimate Obviousness Determination Was Incorrect

In arguing (at 42-44) that the Board's invocation of "ordinary creativity" is insufficient to support its obviousness analysis, Qualcomm analogizes this case to *DSS Technology Management, Inc. v. Apple Inc.*, 885 F.3d 1367 (Fed. Cir. 2018). But *DSS* has no application here. As Qualcomm acknowledges, in *DSS*, the Board erred by relying on "ordinary creativity" to supply a claim limitation that was ***absent*** from the prior art. *Id.* at 1374. This Court has warned that ordinary creativity and common sense typically should not be invoked to provide missing claim limitations in obviousness analyses. *E.g.*, *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361-1362 (Fed. Cir. 2016). Here, however, the Board merely cited *KSR* for the unremarkable proposition that a person of ordinary skill in the art is "also a person of ordinary creativity, not an automaton." Appx50. The Board never used "ordinary creativity" to supply a missing claim limitation. *See id.* Indeed, there is no claim limitation missing. Although Qualcomm argues that the Board used ordinary creativity to supply the "plurality" term, it does not dispute that Yu discloses simultaneously transmitted signals. *See* Appx41-44. Nor does Qualcomm dispute that paragraph 34 of Yu expressly teaches that the invention could be implemented in ***both*** mobile devices and base stations, or that Yu

discloses **both** types of implementations.  *See* Appx1421.  As discussed above,

these implementations overlap substantially.  Because Yu discloses all the

constituent parts of "increasing the bandwidth for a user," the only question is

whether it would have been obvious to modify Figures 3 and 4 of Yu in light of the

other teachings in Yu, **not** whether a person of ordinary skill in the art would use

ordinary creativity to supply a missing limitation.  Accordingly, *DSS* and *Arendi*

do not apply here.

Next, a significant portion of Qualcomm's argument (at 44-51) involves

recounting its expert testimony supposedly showing that Yu's Figures 3 and 4

could not be modified to produce mobile device implementations.  As Intel

explained above, the Board did not ignore Dr. Williams's testimony, as Qualcomm

suggests.  *See* Appx172; Appx208.  And it was well within the Board's discretion

to give little weight to such testimony.  *See Velander v. Garner*, 348 F.3d 1359,

1371 (Fed. Cir. 2003) ("It is within the discretion of the trier of fact to give each

item of evidence such weight as it feels appropriate.").  The Board's decision to do

so especially makes sense given that Yu contemplates modifying frequency

spacings.  *See* Appx2475.  Ultimately, the Board took into account evidence that

both "justifies and detracts" from its opinion by weighing Yu's explicit disclosures

as more important than Dr. Williams's contradictory testimony.  *See Princeton*

*Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015).

Qualcomm also faults Intel (at 48) for deciding, during supplemental briefing on remand, not to submit additional evidence to the Board in the form of declarations regarding the applicability of the latest construction of the "plurality" term to the prior art. Qualcomm ignores that Intel would have been in violation of the Board's order governing the remand proceedings if it had tried to do what Qualcomm now suggests. On remand, the Board authorized the parties to submit evidence regarding only the applicability of the Board's first, broader construction of the "plurality" term. Appx20020-20021. The Board did not authorize submission of evidence regarding the applicability of the latest construction of the "plurality" term. *See id.*

Moreover, Qualcomm contends (at 51-53) that the Board unfairly portrayed Qualcomm's arguments about Figures 3 and 4 as resting on the "bodily incorporation" of one embodiment into another. *See* Appx50. But that is exactly what they do. Qualcomm's arguments and Dr. Williams's testimony are based on the hypothetical incorporation of the components of Figures 3 and 4 in a mobile device. *See* Appx1422 (arguing that the power amplifier from Figures 3 and 4 "must necessarily be for use in a base station" because of bulkiness of associated "microstrip lines" and cost of "gallium-nitride (GaN) device with a high supply voltage"); Appx3985 (asserting that the power amplifier of Figures 3 and 4 would have been "too large" for a mobile device). The Board rightly concluded that

Qualcomm's focus on whether components in Figures 3 and 4 could be bodily incorporated into a mobile device implementation is improper, and that the proper inquiry is "what the combined teachings … would have suggested to those of ordinary skill in the art."  Appx50 (quoting *In re Keller*, 642 F.2d 413, 425 (C.C.P.A. 1981)).  The Board correctly found that a person of ordinary skill in the art would have made the necessary modifications to implement the power amplifier in a mobile device.  *Id.*  Indeed, paragraph 34 of Yu makes clear that modifying the implementations of Figures 3 and 4 was well within the know-how of a person of ordinary skill in the art.

Finally, Qualcomm argues (at 53-56) that the Board erred by failing to make an explicit statement about reasonable expectation of success.  Again, Qualcomm takes too rigid a view of the obviousness inquiry.  In *Personal Web*, this Court referred to a single requirement for the patent challenger to show motivation to combine with a reasonable expectation of success.  *See* 848 F.3d at 991, 993.  As the Court further explained, the Board's obligation to show its work for that requirement "necessarily depends on context."  *Id.* at 994.  Here, it was reasonable for the Board to treat reasonable expectation of success as subsumed within the motivation-to-combine inquiry, especially when the parties had never separately litigated reasonable expectation of success.  That especially makes sense given the prior art in this case because Yu contains purported base station implementations,

at least one mobile device implementation, and an explicit motivation to modify

the purported base station implementations for mobile devices.  *See* Appx2472.

When all the relevant disclosures are located within a single prior art reference,

there is undoubtedly a reasonable expectation of success.[11]

### III.    ALTERNATIVELY, THE BOARD'S LATEST CONSTRUCTION OF THE "PLURALITY" TERM IS OVERLY NARROW, AND THE CHALLENGED CLAIMS ARE UNPATENTABLE UNDER THE PROPER CONSTRUCTION

The Board's final written decision on remand may alternatively be affirmed

if this Court concludes that the Board construed the "plurality" term too narrowly

under the "broadest reasonable interpretation" standard.  Applying the broader

interpretation of the "plurality" term that the Board adopted in the first set of final

written decisions, the challenged '675 claims are undisputedly unpatentable.

### A.    The Board's First Construction Of The "Plurality" Term Was The Broadest Reasonable Interpretation

The Board initially construed "plurality of carrier aggregated transmit

signals" to mean "signals for transmission on multiple carriers."  Appx389.  That

construction was based on two definitions in the '675 specification:  (1) "carrier

aggregation" means "operation on multiple carriers"; and (2) a "transmit signal"

---

[11] If the Court agrees with Qualcomm that some aspect of the Board's final written decision on remand for the Yu IPRs is inadequate, that would not be a basis for this Court to reverse in the Yu IPRs.  Under those circumstances, at most the Court should vacate the Board's latest final written decision and remand.  *See In re Van Os*, 844 F.3d 1359, 1362 (Fed. Cir. 2017).

means "a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc." *Id.* Although the Board subsequently narrowed its construction on remand, the Board's first, broader construction was reasonable.

The Board's reasoning in its earlier final written decisions illustrates why the Board's first construction of the "plurality" term was correct. In those decisions, the Board considered several requirements that Qualcomm proposed as part of its first construction of the "plurality" term: "signals from a single terminal utilizing multiple component carriers which provide extended transmission bandwidth for a user transmission from the single terminal." The Board properly rejected the requirements in Qualcomm's original construction as "overly narrow" and inconsistent with the definitions in the patent. Appx385-386.

First, Qualcomm asserted that the "plurality" term requires "multiple component carriers." *See* Appx385-386. The Board explained why the insertion of the word "component" does not comport with explicit definitions in the '675 specification. The '675 patent defines "carrier aggregation" as "operation on ***multiple carriers***." Appx337(2:63-64). The '675 patent also defines a "transmit signal" as "a signal comprising a transmission on ***one or more carriers***, a transmission on one or more frequency channels, etc." Appx338(3:60-62). When combined, those two definitions provide the meaning of the phrase "carrier

aggregated transmit signals."[12]  Those definitions are controlling.  *See, e.g.*, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("The specification acts as a dictionary when it expressly defines terms used in the claims[.]").  The definitions in the '675 patent do not refer to "***component carriers***"; they refer more generally to "carriers."  It does not matter that another prior art reference, Dahlman,[13] refers to "component carriers" when describing carrier aggregation.  *See* Appx21072.  That reference to "component carriers" in the extrinsic evidence is not enough to override the '675 patent's explicit definitions.  *See Phillips*, 415 F.3d at 1316 ("The specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs.").  Thus, the Board correctly rejected the "component carriers" requirement in Qualcomm's original construction of the "plurality" term.

Next, Qualcomm argued that the "plurality" term requires signals "from a single terminal."  *See* Appx386.  The Board's first set of final written decisions correctly explained why the "plurality" term does not include this requirement

---

[12] Beyond these four words, the only other language in the term under construction is "plurality of."  There has never been any dispute that "plurality of" simply means "multiple" or "more than one," as is customary in patent drafting.

[13] Erik Dahlman et al., *4G LTE/LTE-Advanced for Mobile Broadband* (2011); Appx21011.

under the broadest reasonable interpretation. Notably, "the claim language itself recites nothing about signals from a single terminal." Appx387. And even if the '675 specification discusses embodiments in which signals are from a single terminal, "reading a limitation from the written description into the claims" is "one of the cardinal sins of patent law." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("[T]his court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."). Moreover, the '675 patent repeatedly states that wireless devices "may send and/or receive transmissions" when employing various types of carrier aggregation. Appx338(3:9-11, 3:16-18, 3:22-24, 3:30-32). Those teachings refute Qualcomm's initial insistence that signals must always be transmitted ***from*** terminals and not sent ***to*** terminals.[14] Accordingly, the Board's first set of final written decisions rightly rejected the "from a single terminal" aspect of Qualcomm's initial claim construction.

---

[14] Because Qualcomm's initial insistence on this point was unsustainable, during briefing before the Board, Qualcomm offered to amend its proposed construction to read "to/from a single terminal" rather than just "from a single terminal." Appx1496.

Third, the Board appropriately rejected Qualcomm's argument that the "plurality" term requires providing "extended transmission bandwidth for a user from a single terminal," as well as the similar phrase "increasing bandwidth for a user" in Intel's construction.[15]  The Board correctly reasoned that "[t]he claim language recites nothing about extended transmission bandwidth" or "increasing the bandwidth for a user." Appx388.[16]  Once again, adding limitations to the claims during claim construction is generally improper (particularly under the "broadest reasonable interpretation" framework). *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("[I]t is the ***claims***, not the written description, which define the scope of the patent right." (emphasis in original)). That remains true even though the '675 specification discusses an example in which carrier aggregation operates to extend transmission bandwidth. *See* Appx388 (citing Appx337(2:65-67)).  In fact, the '675 patent specifically acknowledges that its specification is not intended to be limiting. Appx343(14:21-25).  For this reason, the '675 patent's inclusion of an embodiment in which carrier

---

[15] In doing so, the Board acknowledged Intel's amenability to eliminating this language because it does not come from the specification, as Intel discussed at the oral hearing.  Appx389.

[16] As discussed above, on remand, the Board implicitly morphed the phrase "for a user"—which it had previously recognized was not in the claims—into a broader requirement that the claims are limited to mobile devices.

aggregation extends transmission bandwidth does not necessarily mean that carrier aggregation must always extend transmission bandwidth.

Finally, the Board explained that the "at the same time" portion of Intel's initial construction was redundant. Appx389. Different claim language requires that the carrier aggregated transmit signals be "sent simultaneously." Appx343(14:31-32). So the "plurality" term need not be construed to require simultaneity. *See Digital-Vending Servs. Int'l, LLC v. University of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (noting "the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered superfluous").

In sum, the Board's rejection of these limitations was correct under the BRI standard. *See, e.g.*, *Emerson Elec. Co. v. SIPCO, LLC*, No. 2021-1881, 2022 WL 1548866, at *2 (Fed. Cir. May 17, 2022) (holding that Board erred in construing claim term under BRI standard to include negative limitation). In the first set of final written decisions, the Board arrived at the "plurality" term's broadest reasonable interpretation: "signals for transmission on multiple carriers."

## B. The Claim Construction Analysis In The Board's Final Written Decision On Remand Is Faulty

In its final written decision on remand, the Board unnecessarily and incorrectly modified its construction of the "plurality" term. According to the Board, "plurality of carrier aggregated transmit signals" means "signals for

transmission on multiple carriers at the same time to increase the bandwidth for a user." Appx38. Neither the intrinsic evidence nor the extrinsic evidence supports the Board's new construction.

### 1.    The Board's original construction is supported by definitions in the patent specification

For the "plurality" term, the most notable aspects of the intrinsic evidence are the '675 patent's two relevant definitions. The '675 patent explicitly states that "carrier aggregation … *is* operation on multiple carriers," Appx337(2:63-64), and that a "transmit signal *is* a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.," Appx338(3:60-62). As this Court has explained, the word "is" often signifies that "a patentee is serving as its own lexicographer." *Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (quoting *Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1210 (Fed. Cir. 2007)). As discussed above, in its first set of final written decisions, the Board properly rejected additional limitations as inconsistent with these definitions.

Teachings in the '675 patent also confirm that the specification's statements regarding carrier aggregation and transmit signals provide definitions for those terms. For example, the '675 patent states that "[c]arrier aggregation may also be referred to as multi-carrier operation." Appx337(2:64-65); *see also* Appx338(3:2-4) ("Intra-band [carrier aggregation] refers to operation on multiple carriers within

the same band."); Appx338(3:4-5) ("Inter-band [carrier aggregation] refers to

operation on multiple carriers in different bands.").  The '675 patent consistently

uses "carrier aggregation" to mean "operation on multiple carriers," precisely as

the specification defines that term.

Similarly, the '675 patent includes teachings about transmit signals that

reinforce the patent's definition of that term.  For example, the '675 patent explains

that multiple "transmit signals" can "comprise transmissions sent simultaneously

on multiple carriers at different frequencies."  Appx337(1:38-40); *see also*

Appx337(2:14-17) ("Techniques for generating a power tracking supply voltage

for a circuit (e.g., a power amplifier) that processes multiple transmit signals sent

simultaneously are disclosed herein."); Appx338(4:57-60) ("Wireless device 110

may send multiple transmit signals simultaneously.  In one design, the multiple

transmit signals may be for transmissions on multiple contiguous or non-

contiguous carriers with intra-band [carrier aggregation.]"); Appx338(4:62-65)

("In another design, the multiple transmit signals may be for transmissions on

multiple frequency channels to the same wireless system.").  Again, the '675 patent

consistently uses the term "transmit signal" to refer to one or more carriers, in a

manner that tracks the definition provided in the specification.

Thus, as the Board originally recognized, the statements in the specification

about carrier aggregation and transmit signals explicitly "say [that] 'carrier

aggregated transmit signals' means 'signals for transmission on multiple carriers.'"
Appx30.

### 2. The Board's original construction does not read "aggregated" out of the claims

The Board deviated from that straightforward construction in its final written decision on remand because that construction purportedly reads the term "aggregated" out of the claims. *See* Appx30-32. The Board focused on the applicant's amendment of the independent claims, changing "a plurality of *different* transmit signals" to "a plurality of *carrier aggregated* transmit signals." Appx31. According to the Board, that amendment demonstrates that "carrier aggregated" means more than transmit signals on multiple carriers. Appx31-32. But neither the Board nor Qualcomm ever explained the reasons for this amendment, and Qualcomm never provided any evidence that the amendment was intended to substantively narrow the claim scope. *See* Appx31-32; Appx20163-20164.

In any event, "aggregated" is not read out of the claims in the Board's first construction of the "plurality" term. That construction is pulled from the '675 patent's explicit definitions of "carrier *aggregation*" and "transmit signal." The construction is intended to reflect the meaning of carrier aggregation, not to ignore it. Additionally, the Board's original construction does not read "aggregated" out of the claims because the claims recite that the apparatus "produce[s] a single

output radio frequency (RF) signal." Appx343(14:47-48). This "single output" language demonstrates that the claims require carrier aggregation, as Intel's expert explained. Appx20855-20857. The Board rejected this argument, reasoning that interpreting the "single output" language in this manner would render "aggregated" as "superfluous." Appx32 (citing *Digital-Vending Servs.*, 672 F.3d at 1275). But there is nothing unusual about these two claim elements reinforcing each other: "carrier aggregated" describes the ***relationship*** between the transmit signals, and "single output" describes the ***result*** caused by that relationship. The reinforcing nature of these claims elements is unsurprising given that carrier aggregation and a single output are key features of the '675 patent. *See* Appx325.

To support its reasoning that its original construction reads "aggregated" out of the claims, the Board also cited the following disclosure in the '675 patent: "Multiple transmit signals may be sent on different frequencies (e.g., different carriers) and hence ***may*** have increased envelope bandwidth." Appx32 (emphasis in Board decision) (quoting Appx339(6:10-12)). According to the Board, that disclosure underscores that "the claims require something more than just signals for transmission on multiple carriers." Appx31. But if anything, that disclosure underscores Intel's interpretation of the claims. Multiple transmit signals "***may*** have increased envelope bandwidth," but they do not ***necessarily*** have increased bandwidth. Indeed, even the Board admitted that "neither the Examiner nor the

applicant explicitly expressed an understanding that carrier aggregation requires increasing bandwidth." Appx35.  Importing such a requirement from the specification into the claims is improper.  *See SciMed Life Sys.*, 242 F.3d at 1340.

### 3.    The intrinsic evidence does not require a construction including "to increase the bandwidth for a user"

To support its inclusion of the phrase "to increase the bandwidth for a user" in its latest construction of the "plurality" term, the Board relied on two other pieces of intrinsic evidence.  This reliance was incorrect and ultimately resulted in an improper and unsupported importation of an objective or benefit into the claims.

First, the Board relied on the 3GPP technical report.[17]  The 3GPP technical report defines carrier aggregation as "[a]ggregation of two or more component carriers in order to support wider transmission bandwidths." Appx20822.  Of course, the 3GPP technical report defines carrier aggregation for the purposes of that report, not for the purposes of the '675 patent, which contains its own definition of carrier aggregation.  And even taking the 3GPP technical report's definition of carrier aggregation on its own terms, carrier aggregation ***may*** (and often does) support wider transmission bandwidths.  The point is that carrier aggregation ***need not*** widen transmission bandwidths under all conceivable circumstances.

---

[17] 3GPP Technical Specification 36.101, 3rd Generation Partnership Project (2012); Appx20808.

The Board also relied on a publication by Dong Chen (the "Chen publication").[18] The Chen publication states that "[a] bandwidth of a signal constantly increases due to multi-carrier applications." Appx20895. But the examiner never relied on this paragraph of the Chen publication, so at most, it is tangentially relevant. To be sure, the office action that cited the Chen publication included boilerplate language telling the applicant "to fully consider the [cited] references in their entirety." Appx2151. But even upon a full consideration of the Chen publication, the applicant never would have thought that language about multi-carrier applications buried in the Chen publication would override specific discussion of multiple carriers in the '675 patent's written description.

Finally, the Board improperly imported an objective or potential result or benefit of carrier aggregation into the claims when it incorporated "to increase the bandwidth for a user" into the construction. Qualcomm admitted that increased signal bandwidth is "the ***result*** of carrier aggregation." Appx20169. Likewise, Qualcomm's expert opined that the "objective" of carrier aggregation is "to provide a combined higher bandwidth channel." Appx21183; *see also* Appx20707

---

[18] Dong Chen et al., U.S. Publication No. 2012/0321018 A1 (published Dec. 20, 2012); Appx20886. This Chen publication is not the same as the Chen reference that serves as the basis for Intel's -1328 and -1330 IPR petitions.

(expert testifying that increasing bandwidth is "objective," "result," and "benefit" of carrier aggregation).

This Court has explained that it is improper to import an objective or potential result or benefit into the claims when the claims do not contain such a requirement. In *Braintree Laboratories, Inc. v. Novel Laboratories, Inc.*, 749 F.3d 1349, 1353 (Fed. Cir. 2014), the Court considered claims that required "purgation" of a patient's colon to prepare for a colonoscopy. The defendant argued that "purgation" meant a full "cleansing" of the colon, not just "an evacuation of a copious amount of stool," as the district court had construed the term. *Id.* at 1354. This Court rejected that argument because the claims did not "contain language that require[d] achieving a fully cleansed colon for a colonoscopy." *Id.* at 1355. Although cleansing was "the goal specifically articulated in the specification" of the asserted patent, cleansing was "not a claim requirement." *Id.*

The same analysis applies here with full force. There is no dispute that increasing bandwidth is the ***goal***, not a characteristic, of carrier aggregation. *See* Appx20169; Appx21183; Appx20707. Even if that goal is "specifically articulated in the specification" of the '675 patent, *see Braintree*, 749 F.3d at 1355, increasing bandwidth does not appear as a requirement in the claims. Reading such a requirement into the claims is therefore improper.

The Board incorrectly concluded that Intel's reliance on *Braintree* was "misplaced." Appx36. According to the Board, the "facts here are different" because the '675 claims "require carrier aggregated transmit signals." Appx147 (emphasis omitted). That is analytically indistinct from saying that the claims in *Braintree* required "purgation." And yet this Court was clear that the goal behind purgation was not a claim limitation, just as increasing bandwidth is not a limitation in the '675 claims. Moreover, the Board's discussion of *Braintree* completely skips over the '675 patent's definitions of carrier aggregation and transmit signals, instead relying entirely on extrinsic evidence. *See* Appx36. The Board's interpretation of the extrinsic evidence is not persuasive, as discussed below. Regardless, the extrinsic evidence does not trump the intrinsic evidence. *See, e.g.*, *Phillips*, 415 F.3d at 1319 ("[E]xtrinsic evidence … is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) ("[E]vidence extrinsic to the patent document … is less significant than the intrinsic record in determining the 'legally operative meaning of disputed claim language.'").

> **4.    The extrinsic evidence does not support a construction including "to increase the bandwidth for a user"**

The extrinsic evidence supports the Board's first construction of the "plurality" term and does not support including "to increase the bandwidth for a

user" in the construction.  For instance, Intel's expert, Dr. Choi, was clear in his latest declaration:  "While carrier aggregation can increase the bandwidth, it need not do so."  Appx20849; *see also* Appx20850 ("[C]arrier aggregation does not necessarily result in, or guarantee, increased bandwidth."); Appx20854 ("Increased bandwidth is not a defining characteristic of carrier aggregation.").  Dr. Choi's position on remand was consistent with his position earlier in the proceedings.  *See* Appx2364 ("Carrier aggregation *can* achieve higher data rates and *can* increase the overall capacity of wireless networks[.]").  Specifically, Dr. Choi explained that aggregating two 5 MHz carriers from different bands "would only result in 10 MHz," which is not increased bandwidth when "compared with the bandwidth of a single, non-aggregated" carrier at 15 or 20 MHz, as shown in the Long Term Evolution ("LTE") specification.  Appx20852-20853 (emphasis omitted).

Yet the Board inexplicably credited Qualcomm's argument that aggregation of two 5 MHz carriers from different bands "necessarily increases the bandwidth for a user as compared to a *single 5-MHz carrier*."  Appx37 (emphasis in original) (quoting Appx20289).  That argument does not actually address Dr. Choi's opinion comparing two aggregated 5 MHz carriers to a *single, non-aggregated 15 or 20 MHz carrier*.  Even if Qualcomm can devise a hypothetical scenario in which carrier aggregation results in increased bandwidth, that does not undermine Dr.

Choi's explanation of an alternative scenario in which carrier aggregation does ***not*** necessarily result in increased bandwidth.

The Board relied on additional extrinsic evidence, but that evidence does not support its construction on remand. The first is U.S. Patent No. 9,161,254 ("Han"), assigned to Intel. Appx20929. Han states that "[o]ne technique for providing additional bandwidth capacity to wireless devices is through the use of carrier aggregation of multiple smaller bandwidths to form a virtual wideband channel at a wireless device." Appx20944(3:19-22); *see also* Appx20944(3:49-51) ("Carrier aggregation provides a broader choice to the wireless devices, enabling more bandwidth to be obtained."). Like the other discussions of carrier aggregation in the intrinsic evidence and in Dr. Choi's testimony, Han's discussion of carrier aggregation is consistent with Intel's position. Carrier aggregation ***may*** provide broader choices to wireless devices as one technique for increasing bandwidth, but nothing in Han states that carrier aggregation always requires increased bandwidth.

The Board also relied on a 2013 Qualcomm paper[19] as alleged support for its new construction of the "plurality" term. The 2013 Qualcomm paper states that "[c]arrier aggregation, as the name suggests, combines multiple carriers (a.k.a.

---

[19] Qualcomm, Inc., Strategies to Win in LTE and Evolve to LTE Advanced (Sept. 2013); Appx20919.

channels) at the device to provide a bigger data pipe to the user." Appx20924. Even if carrier aggregation provides a bigger data pipe, nothing in the 2013 Qualcomm paper states that carrier aggregation must necessarily result in the flow of more data though the bigger data pipe.

Like the intrinsic evidence, the extrinsic evidence supports construing "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers." That construction is the broadest reasonable interpretation of the "plurality" term.

### C. Under The Proper Construction Of The "Plurality" Term, All Challenged Claims Are Unpatentable For Obviousness

The Board's first set of final written decisions correctly concluded that Yu in combination with another prior art reference, Wang,[20] discloses a "plurality of carrier aggregated transmit signals," if that term is construed to mean "signals for transmission on multiple carriers." Specifically, the Board acknowledged Intel's argument that Yu's signals S1 and S2 correspond to the '675 patent's carrier aggregated transmit signals. Appx400; *see also* Appx1264-1267. As Dr. Choi explained, Yu illustrates how signals S1 and S2 are transmitted at different frequencies, so Yu discloses multiple carriers. *See* Appx2395-2396. The Board

---

[20] Feipeng Wang et al., *Design of Wide-Bandwidth Envelope-Tracking Power Amplifiers for OFDM Applications*, 53 IEEE Transactions on Microwave Theory & Techniques 1244 (2005); Appx2483.

credited Intel's argument and Dr. Choi's testimony as persuasive.  Appx404 ("Based on Petitioner's argument and evidence, we are persuaded that the proposed combination of Yu and Wang teaches the recited power tracker limitations in claim 1.").  Qualcomm has never challenged this conclusion, even when the Board specifically gave it an opportunity to do so on remand.  Instead, Qualcomm chose to re-argue only the applicability of its own narrower construction to the prior art.  *See* Appx20170-20172; Appx20020.

In the first set of final written decisions, the Board rightly rejected Qualcomm's argument that Yu and Wang do not disclose the "carrier aggregated" portion of "carrier aggregated transmit signals."  As the Board explained, Qualcomm's argument depended on Qualcomm's first construction of the "plurality" term, which inappropriately included limitations that are not recited in the claims.  Appx424-426.  Because Qualcomm's argument was based on an incorrect claim construction, it did not "undermine [Intel]'s showing that the combination of Yu and Wang teaches the recited carrier aggregated transmit signals."  Appx426.

Qualcomm's other arguments against obviousness also failed.  The Board appropriately rejected Qualcomm's overly rigid view that Yu and Wang are technologically incompatible.  *See* Appx426-429.  Because Yu and Wang disclose the limitations recited in the '675 patent, including a "plurality of carrier

aggregated transmit signals," and because a person of ordinary skill in the art would have been motivated to combine those references, the Board correctly concluded that claims 1-6, 11, and 17-22, 27, and 33 are unpatentable for obviousness over Yu and Wang. Appx430; Appx511. The Board also correctly concluded that claims 7-10, 12-15, 23-25, and 28-32 are unpatentable for obviousness over Yu and Wang in combination with other prior art references. Appx511; Appx676; Appx849. Notably, Qualcomm did not challenge these aspects of the Board's obviousness analysis in Qualcomm's first round of appeals. *See Qualcomm*, 6 F.4th at 1262 & n.2.

If this Court agrees with Intel that the Board's first construction of the "plurality" term is the broadest reasonable interpretation, Qualcomm has essentially conceded that it should lose. After this Court's prior decision, Qualcomm never argued on remand that Yu does not disclose "signals for transmission on multiple carriers," as it was invited to do. *See generally* Appx20150-20173. Thus, if "signals for transmission on multiple carriers" is the broadest reasonable interpretation of the "plurality" term, the Court can affirm the Board's final written decision on remand in the Yu IPRs on this alternative ground.

## INTEL'S CONDITIONAL APPEALS

Intel's appeals from the Chen IPRs are conditional on any ruling by this Court besides a full affirmance of the Board's final written decision on remand for

the Yu IPRs.  If the Court affirms in the appeals from the Yu IPRs, then it need not consider Intel's appeals from the Chen IPRs and may dismiss them as moot.  Intel presents the following facts and arguments in case the Court declines to affirm in Nos. 2022-1824, 2022-1825, 2022-1826, and 2022-1828.

## STATEMENT OF FACTS

In addition to the facts outlined above in response to Qualcomm's appeals, the following facts are relevant for Intel's conditional appeals from the Chen IPRs.

### A.    The Chen Reference

Chen is undisputedly prior art to the '675 patent.  Chen is a paper published in a technical journal that proposes a "hybrid envelope tracking scheme … for concurrent dual-band power amplifiers."  Appx2851.  A benefit of the proposed scheme is that it "results in a higher overall efficiency for the concurrent dual-band" power amplifier.  *Id.*

Figure 1 of Chen depicts an exemplary architecture of the proposed hybrid envelope tracking scheme:



**Figure 1**  Proposed hybrid ET scheme for concurrent dual-band PAs.

Appx2851.  In this figure, two input signals at different frequencies ("Input 1" and "Input 2") each follow two paths.  *Id.*  In the center of the figure, each input signal is sent to its own envelope detector ("Envelope Detector 1" and "Envelope Detector 2"), resulting in signal envelopes in dual bands ("$E_1(t)$" and "$E_2(t)$").  *Id.* A power weighting factor ("ε") is used to weigh the outputs of the envelope detectors, which are then summed by the "Envelope Combiner."  *Id.*  The output of the Envelope Combiner is then amplified by the "Envelope Amplifier" to give a modulated supply ("$E_D(t)$") for the power amplifier ("Dual-Band PA").  *Id.*

On the top and bottom of the figure, the input signals are also sent to their own delay lines ("Delay Line 1" and "Delay Line 2").  Appx2851.  The signals out of the delay lines are upconverted by "Upconverter 1" and "Upconverter 2" and

then summed together by the "Power Combiner" to generate one signal for the power amplifier. The power amplifier ultimately transmits one signal (the "Output"). *Id.*

The authors of Chen verified their proposed hybrid envelope tracking scheme by testing it with a base station implementation. *See* Appx2852; *see also* Appx7819. But nothing in Chen limits the proposed hybrid envelope tracking scheme to base stations. *See* Appx2851-2852.

## B.    The Board's Final Written Decision On Remand In The Chen IPRs

The Board issued its final written decision on remand in the Chen IPRs simultaneously with its final written decision on remand in the Yu IPRs. *See* Appx113-162; Appx219-268.[21] In the latest Chen decision, the Board's revised claim construction analysis for "plurality of carrier aggregated transmit signals" was the same as its claim construction analysis in the latest Yu decision. *Compare* Appx128-149, *with* Appx16-38.

The Board considered whether Chen discloses a "plurality of carrier aggregated transmit signals," as the Board newly construed that term. Qualcomm did not dispute that Chen discloses "signals for transmission on multiple carriers." Appx153. Nor did Qualcomm dispute that Chen discloses signals that are

---

[21] Because the Board issued one final written decision on remand for both of the Chen IPRs, this brief cites only the copy located at Appx113-162.

transmitted "at the same time." Appx154. Qualcomm disputed only that Chen discloses the "to increase the bandwidth for a user" portion of the Board's construction. *See* Appx154-155.

As it did in the Yu IPRs, the Board concluded that a base station does not qualify as a "user" for purposes of the "to increase the bandwidth for a user" portion of the Board's latest construction of the "plurality" term. Appx157. Because the authors of Chen validated their hybrid envelope tracking scheme with a base station implementation, Appx158, the Board determined that there was insufficient evidence in the record to conclude that Chen's teachings could also be applied to mobile devices. Appx159. The Board further determined that, even if Chen were not limited to base stations, the record did not reveal any reason why a person of ordinary skill in the art would have modified Chen to create a mobile device implementation of the hybrid envelope tracking scheme. *Id.* Thus, the Board concluded that Chen does not disclose a "plurality of carrier aggregated transmit signals." *See* Appx160.

Intel timely appealed. *See* Appx20540-20542; Appx20596-20598.

## SUMMARY OF THE ARGUMENT

For the same reasons explained above in response to Qualcomm's appeals from the Yu IPRs, the Board's original construction of "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple

carriers" was correct.  That broadest reasonable interpretation is supported by both the intrinsic and extrinsic evidence.

Under the correct construction of the "plurality" term, Chen discloses signals for transmission on multiple carriers.  Chen, in combination with the other prior art references discussed in Intel's petitions, discloses all other claim limitations, and a person of ordinary skill in the art would have been motivated to combine those references.  Thus, the challenged '675 claims are unpatentable for obviousness on the Chen grounds.

Even if this Court upholds the Board's new construction of the "plurality" term, Chen discloses a "plurality of carrier aggregated transmit signals."  Nothing in Chen limits the reference to base station implementations.

Lastly, Intel has standing to appeal from the Board's final written decision on remand in the Chen IPRs.  Under these circumstances, this Court has repeatedly held that Intel has standing.

## ARGUMENT

## I.    STANDARD OF REVIEW

Claim construction is ultimately a question of law, which this Court reviews de novo.  *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021).  In an appeal from the Board, this Court reviews the intrinsic-evidence aspects of claim construction de novo, and it reviews any underlying factual findings about

extrinsic evidence for substantial-evidence support. *Id.* (citing *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-332 (2015)).

Similarly, obviousness is ultimately a question of law that this Court reviews de novo. *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015). This Court reviews the Board's underlying factual findings, such as whether the prior art discloses a particular claim limitation, for substantial-evidence support. *Id.* (citing *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013)).

## II. THE BOARD'S LATEST CONSTRUCTION OF THE "PLURALITY" TERM IS OVERLY NARROW

As Intel explained above as part of its alternative argument for affirmance in the Yu IPRs, the Board erred when it replaced its first, broader construction of "plurality of carrier aggregated transmit signals" with a narrower construction on remand. *See supra* pp. 50-61. Intel's reasoning applies with full force to the Chen IPRs.

## III. UNDER THE BROADEST REASONABLE INTERPRETATION OF THE "PLURALITY" TERM, ALL CHALLENGED CLAIMS ARE UNPATENTABLE FOR OBVIOUSNESS ON THE CHEN GROUNDS

The Board's first set of final written decisions concluded that Chen and Wang disclose a "plurality of carrier aggregated transmit signals," if that term is construed to mean "signals for transmission on multiple carriers." Specifically, the Board acknowledged Intel's argument that Chen's Input 1 and Input 2 correspond to the '675 patent's carrier aggregated transmit signals. Appx548 (citing

Appx7563).  Chen describes Input 1 and Input 2 as "[t]wo single carrier wideband code division multiple access signals" operating at different frequencies. Appx2852.  As Dr. Choi explained, that disclosure means that Input 1 and Input 2 are from different carriers, so Chen necessarily discloses multiple carriers. Appx2395-2396.  The Board credited Intel's argument and Dr. Choi's testimony as persuasive.  Appx552 ("Based on Petitioner's argument and evidence, we are persuaded that the proposed combination of Chen and Wang teaches the recited power tracker limitations in claim 1."); *see also* Appx573.

In the first set of final written decisions, the Board rightly rejected Qualcomm's argument that the Chen and Wang combination does not disclose the "carrier aggregated" portion of "carrier aggregated transmit signals."  As the Board explained, Qualcomm's argument depended on Qualcomm's first construction of the "plurality" term, which inappropriately included limitations that are not recited in the claims.  Appx572-573.  Because Qualcomm's argument was based on an incorrect claim construction, it did not "undermine [Intel]'s showing that the combination of Chen and Wang teaches the recited carrier aggregated transmit signals."  Appx573.

Qualcomm's other arguments against obviousness also failed.  Qualcomm argued that a person of ordinary skill in the art would not have been motivated to combine Chen and Wang, but the Board appropriately rejected Qualcomm's overly

rigid view that Chen and Wang are technologically incompatible. *See* Appx577-580. Because Chen and Wang disclose the limitations recited in the '675 patent, including a "plurality of carrier aggregated transmit signals," and because a person of ordinary skill in the art would have been motivated to combine those references, the Board correctly concluded that claims 1-3, 5, 7, 11, 17-21, and 27 are unpatentable for obviousness over Chen and Wang. Appx580. The Board also correctly concluded that claims 8-10, 12, 13-15, 23-25, and 28-30 are unpatentable for obviousness over Chen and Wang in combination with other prior art references. Appx592; Appx762. Qualcomm did not challenge these aspects of the Board's obviousness analysis in Qualcomm's first round of appeals. *See Qualcomm*, 6 F.4th at 1262 & n.2.

If this Court holds that the Board's first construction of the "plurality" term is the broadest reasonable interpretation, Qualcomm has all but conceded that it should lose. After this Court's prior decision, Qualcomm never argued on remand that Chen does not disclose "signals for transmission on multiple carriers." *See generally* Appx20150-20173.[22] Thus, if this Court holds that "signals for

---

[22] On remand, as it did for the Yu grounds, Qualcomm argued that the challenged claims are not unpatentable only under ***its*** construction of the "plurality" term; Qualcomm never argued the applicability of ***the Board's*** original construction to the prior art. *See* Appx20170-20172. In reply, Intel pointed out that Qualcomm tacitly "concede[d] that the challenged claims are unpatentable under [the Board's first] construction." Appx20215; *see also* Appx20222. In its

transmission on multiple carriers" is the broadest reasonable interpretation of the "plurality" term, the Court should reverse in the Chen IPRs.

## IV. EVEN UNDER THE BOARD'S NARROWER CONSTRUCTION, THE BOARD ERRED IN CONCLUDING THAT CHEN DOES NOT DISCLOSE A "PLURALITY OF CARRIER AGGREGATED TRANSMIT SIGNALS"

Even if this Court agrees with the Board that the "plurality" term should be construed as "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user," the Board's decision should not stand. Under that construction, Chen still discloses a "plurality of carrier aggregated transmit signals."

Chen's Input 1 and Input 2 are signals for transmission on multiple carriers at the same time to increase the bandwidth for a user. Appx2395-2396. Chen describes a dual-band architecture in which signals in different frequencies are aggregated for transmission. Appx2851 ("[W]e propose for the first time a hybrid [envelope tracking] scheme for concurrent dual-band [power amplifiers], which combines the signal envelopes in dual bands."). The validation prototype disclosed in Chen uses "[t]wo single carrier wideband code division multiple access signals" at different frequencies (900 MHz and 2000 MHz), which indicates that they are from different (multiple) carriers. Appx2582. This method of aggregating

---

sur-reply, Qualcomm did not even attempt to rebut Intel's argument on that point. *See generally* Appx20288-20295.

multiple signals on different frequencies increases the bandwidth for a user, allowing more information to be transmitted per unit of time.  Appx2397.

The Board wrongly determined that Chen does not disclose the "to increase the bandwidth for a user" portion of the Board's new construction of the "plurality" term.  Appx160.  In particular, the Board faulted Intel for allegedly not pointing to anything in the record to support its contention that Chen is not limited to base stations, which the Board determined do not qualify as "users." Appx158.[23]  But while the authors of Chen validated their envelope tracking structure using a base station implementation, Chen contains no language that limits itself to base station implementations.  *See generally* Appx2851-2853.

Moreover, the Board overlooked Intel's record citations regarding mobile device implementations.  Notably, Intel explained that it would have been obvious to use orthogonal frequency division multiplexing ("OFDM"), as disclosed in Wang, in Chen's architecture to take advantage of the high data transmission rates that OFDM allows in mobile devices.  Appx7573-7576.  Even before the application that resulted in the '675 patent was filed, OFDM had been selected as

---

[23] As explained above, the Board tacitly and improperly transformed the phrase "for a user" in its own construction of the "plurality" term into a requirement that the claims are limited to mobile devices.  *See supra* pp. 28-29.

the transmission scheme for the 4G LTE standard for high-speed communications in mobile devices.  *See* Appx7575.

Intel further explained that prior art references involving power tracking for wireless transmissions (such as Chen) "frequently apply to both uplink and downlink transmission."  Appx7819.  For example, Yu teaches that its power tracking systems can be implemented in both mobile devices and base stations. *See* Appx2472.  Another prior art reference regarding power tracking, Wimpenny,[24] similarly explains that its "invention could be implemented in the network side of a mobile communication system, such as in a base station," even though its examples focus on "implementation in a handset of a mobile communication system."  Appx10293.  That interchangeability is equally true for Chen.  And during prosecution of the '675 patent, Qualcomm cited a prior art reference, Hou,[25] which focuses on power tracking for base stations.  Appx1877 (citing Appx10417).  Qualcomm should not be permitted to rely on the interchangeability of uplink and downlink technology and then argue against Intel doing the same.

---

[24] Gerard Wimpenny & Robert Henshaw, U.S. Patent Publication No. 2012/0229208 A1 (published Sept. 13, 2012); Appx10286.

[25] Zhaozheng Hou & Xujun Liu, U.S. Patent Publication No. 2011/0193629 A1 (published Aug. 11, 2011); Appx10417.

Chen discloses a "plurality of carrier aggregated transmit signals," including increased bandwidth for a user, and Qualcomm did not dispute the rest of the Board's obviousness analysis.  Accordingly, the Board's final written decision on remand in the Chen IPRs should be reversed.[26]

## V.   INTEL HAS STANDING TO APPEAL FROM THE CHEN IPRS

Article III standing has three elements:  The party invoking federal jurisdiction must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the [opposing party], and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To establish an injury in fact, an appellant "must typically show an invasion of a legally protected interest that is concrete, particularized, and actual or imminent, as opposed to merely conjectural or hypothetical."  *Grit Energy Sols., LLC v. Oren Techs., LLC*, 957 F.3d 1309, 1319 (Fed. Cir. 2020) (citing *Spokeo*, 578 U.S. at 339).  But because Congress authorized appeals from the Board's final written decisions in *inter partes* reviews, *see* 35 U.S.C. § 141(c), the appellant in such circumstances "need not 'meet all the normal standards for redressability and

---

[26] If the Court determines that the Board erred in its latest construction of the "plurality" term but that some factual issue remains to be resolved, the Court should at least vacate the Board's final written decision on remand for the Chen IPRs and remand for further proceedings.

immediacy.'" *JTEKT Corp. v. GKN Auto. Ltd.*, 898 F.3d 1217, 1219-1220 (Fed. Cir. 2018).

## A.    This Court Has Repeatedly Held That Intel Has Standing

Qualcomm previously sued Intel's customer Apple Inc. in two different forums, asserting in both cases that Apple devices incorporating Intel's SMARTi™ chips infringe Qualcomm's patents (including the '675 patent). *See infra* pp. 77-78. Under these circumstances, this Court has now held multiple times that Intel has standing to appeal the Board's patentability determinations. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 790 (Fed. Cir. 2021); *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021); *Intel Corp. v. Qualcomm Inc.*, Nos. 2020-2092, 2020-2093, 2022 WL 880681, at *3 (Fed. Cir. Mar. 24, 2022).

Because no facts related to the standing issue have materially changed, there is no reason for the Court to reach a different conclusion with respect to Intel's standing to pursue appeals related to the '675 patent.

## B.    Intel Suffers An Injury In Fact

"[T]o demonstrate the requisite injury in an appeal from a final written decision in an inter partes review," it is "generally sufficient for the appellant to show that it has engaged in, is engaging in, or will likely engage in 'activity that would give rise to a ***possible*** infringement suit.'" *Grit Energy*, 957 F.3d at 1319.

### 1. Intel faces the risk that Qualcomm will allege infringement

Intel faces a concrete, particularized, and sufficiently imminent risk that Qualcomm will allege infringement of the '675 patent because of Intel's manufacture and sale of SMARTi™ chips to Apple. *See Grit Energy*, 957 F.3d at 1319-1320 (holding that appellant had standing because appellee remained free to pursue claims of patent infringement against appellant). Qualcomm has already shown a willingness to sue by asserting the '675 patent against products containing SMARTi™ chips in Qualcomm's cases against Apple in the Southern District of California and before the ITC. Appx25396-25397.

While Intel was not named as a party in either of those actions, Qualcomm nevertheless prominently featured Intel's SMARTi™ RF chips throughout the cases. For example, in its initial claim construction brief before the ITC, Qualcomm asserted that Apple uses the claimed inventions in the '675 patent and four other patents "by selling phones where much of the infringing functionality comes from chips furnished by a competitor (Intel) to Qualcomm." Appx25040; *see also* Appx25006 (claim chart for infringement of '675 patent identifying "Intel PMB 5750 Multimode RF Transceiver"); Appx25388 (explaining that Intel PMB 5750 transceivers are SMARTi™ 5 transceivers). And in the district court case, Qualcomm accused devices "incorporating an Intel modem" of infringing patents

that it asserted alongside the '675 patent. Appx25236; Appx25271.[27] There is thus

a substantial risk that Qualcomm will allege direct infringement or indirect

infringement when SMARTi™ chips are used in customers' devices.

Intel has sold and continues to sell products that Qualcomm identified in its

infringement theories when it previously asserted the '675 patent. Appx25396-

25397. Intel's commercial activities and Qualcomm's litigation history create a

concrete, particularized, and sufficiently imminent risk that Intel will face

infringement accusations for the '675 patent.

> ### 2. Intel's past, current, and future sales of its SMARTi™ chips demonstrate the risk of possible infringement allegations

The threat that Qualcomm will allege infringement of the '675 patent is

especially concrete, particularized, and imminent because of Intel's past, present,

and future sales of SMARTi™ chips to Apple and other customers. "Past

activities, like present and potential future activities, can create a controversy

---

[27] Before Qualcomm submitted the memorandum cited here, Qualcomm and Apple agreed to drop all claims and counterclaims in the district court case related to the '675 patent. Appx25129-25131. Similarly, in the ITC investigation, Qualcomm agreed to drop the '675 patent before the ALJ could reach an initial determination on Apple's alleged infringement of that patent. Appx25120-25121; *see also* Appx25124-25125. Regardless of the decisions to narrow the disputes in those cases, both the district court case and the ITC investigation were focused on Apple products that specifically contain Intel's technology. And because no tribunal reached a decision on Apple's alleged infringement of the '675 patent, Intel faces uncertainty about its own activities with respect to the '675 patent.

between two parties." *Grit Energy*, 957 F.3d at 1320.  Intel has supplied RF chips to Apple and other customers for years.  *See* Appx25396-25397.

While Qualcomm and Apple have settled their disputes regarding the '675 patent, Intel is not a signatory to their settlement agreement.  That agreement is not in the record, and despite numerous opportunities, Qualcomm has not said that it has released any claims against Intel.  *See* Appx25001 (noting that Qualcomm declined to provide Intel with a covenant not to sue for infringement of the '675 patent).  Accordingly, Intel still faces risk based on its past supply to Apple.

Besides past sales, Intel has continued to sell SMARTi™ chips to Apple and other companies.  Although Intel sold part of its smartphone modem business to Apple, Intel has not yet exited the market entirely.  Appx25397.  Intel has continued and will continue to sell smartphone modems to Apple for prior versions of the iPhone that Apple continues to sell.  *Id.*  And Intel has sold and continues to sell modems to other customers besides Apple.  Appx25396-25397.  Intel's activities create a "real" and "imminent" threat that Qualcomm could assert the '675 patent against Intel.  *See Altaire Pharms., Inc. v. Paragon Bioteck, Inc.*, 889 F.3d 1274, 1282-1283 (Fed. Cir. 2018).

### C.    Intel Satisfies The Remaining Requirements For Standing

Intel's injury—the risk of infringement allegations—is fairly traceable to the '675 patent and would likely be redressed by this Court's favorable decision

holding all challenged claims unpatentable.  *See E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1005 (Fed. Cir. 2018) ("[T]here is no dispute that the risk of infringement liability is attributable to [the challenged] patent, and that the risk could be redressed by our review of the Board's decision[.]").  Thus, Intel has standing to pursue appeals from the Chen IPRs.

## CONCLUSION

For the foregoing reasons, the Court should affirm the Board's final written decision on remand in the Yu IPRs that claims 1-15, 17-25, and 27-33 of the '675 patent are unpatentable.  If the Court affirms in Nos. 2022-1824, 2022-1825, 2022-1826, and 2022-1828, then it may dismiss the appeals in Nos. 2022-1829 and 2022-1830 as moot.  If the Court does not fully affirm in Nos. 2022-1824, 2022-1825, 2022-1826, and 2022-1828, then it should hold that the Board erred in the Chen IPRs by determining that claims 1-3, 5, 7-15, 17-21, 23-25, and 27-30 are not unpatentable and accordingly reverse (or at least vacate) the Board's final written decision on remand in Nos. 2022-1829 and 2022-1830.

Respectfully submitted,

/s/ Louis W. Tompros

DAVID L. CAVANAUGH                         LOUIS W. TOMPROS
THOMAS G. SAUNDERS                         WILMER CUTLER PICKERING
TODD C. ZUBLER                                  HALE AND DORR LLP
GARY M. FOX                                60 State Street
WILMER CUTLER PICKERING                    Boston, MA  02109
   HALE AND DORR LLP                       (617) 526-6000
2100 Pennsylvania Avenue, NW
Washington, DC  20037                      *Attorneys for Cross-Appellant Intel*
(202) 663-6000                             *Corporation*

KATHRYN D. ZALEWSKI
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA  94306
(650) 858-6000

February 15, 2023

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Final Written Decision on Remand, Paper No. 46 (Mar. 23,
　　2022) [IPR2018-01328]................................................................... Appx113-162

Final Written Decision on Remand, Paper No. 46 (Mar. 23,
　　2022) [IPR2018-01330]................................................................... Appx219-268

Trials@uspto.gov                                                      Paper 46
571.272.7822                                               Date: March 23, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

INTEL CORPORATION,
Petitioner,

v.

QUALCOMM INCORPORATED,
Patent Owner.

———————

IPR2018-01328
IPR2018-01330[1]
Patent 9,608,675 B2

———————

Before MICHELLE N. WORMMEESTER, AMANDA F. WIEKER, and
SCOTT B. HOWARD, *Administrative Patent Judges*.

WORMMEESTER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision on Remand
Determining No Challenged Claims Unpatentable
*35 U.S.C. §§ 144, 318*

———————

[1] This Decision addresses issues that are identical in each of the identified cases. We exercise our discretion to issue this Decision to be filed in each case. The parties may not use this style heading in subsequent papers.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

## I.  INTRODUCTION

We address these two cases on remand after a consolidated decision for six related cases, including these two cases, by the U.S. Court of Appeals for the Federal Circuit in *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256 (Fed. Cir. 2021).

As background, Intel Corporation[2] ("Petitioner") petitioned for six *inter partes* reviews challenging the validity of U.S. Patent No. 9,608,675 B2 (Ex. 1201,[3] "the '675 patent").  This Decision addresses only two of those *inter partes* reviews, namely, IPR2018-01328 and IPR2018-01330.[4] Petitioner filed petitions requesting *inter partes* review of claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 of the '675 patent across these two cases. Paper 2 ("Petition" or "Pet.") (requesting review of claims 1–3, 5, 7–15, 17–21, 23–25, and 27); 1330-Paper 3 (requesting review of claims 28–30). Qualcomm Incorporated ("Patent Owner") filed preliminary responses. Paper 7; 1330-Paper 7.  Pursuant to 35 U.S.C. § 314, we instituted *inter partes* reviews as to all the challenged claims and all the grounds of unpatentability raised in the petitions.  Paper 8 ("Institution Decision" or "Inst. Dec."); 1330-Paper 8.

During trial, Patent Owner filed responses.  Paper 14 ("Response" or "PO Resp."); 1330-Paper 14.  Petitioner filed replies.  Paper 16 ("Reply" or

---

[2] Intel Corporation identifies itself and Apple Inc. ("Apple") as real parties in interest.  Paper 2, 1.

[3] Unless otherwise noted, papers and exhibits refer to IPR2018-01328. Papers and exhibits preceded by "1330-" refer to IPR2018-01330.

[4] We address the other four *inter partes* reviews, IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340, in a separate decision on remand entered concurrently with this Decision.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

"Pet. Reply"); 1330-Paper 16.  Patent Owner filed sur-replies.  Paper 19

("Sur-reply" or "PO Sur-reply"); 1330-Paper 19.  On October 9, 2019, we

conducted a consolidated oral hearing for all six related cases, including the

two cases addressed in this Decision.  A copy of the transcript is included in

the record.  Paper 29 ("Tr.").  With our authorization (*see* Paper 26), the

parties subsequently filed additional briefs on the meaning of the claim term

"generates the single power tracking signal based on a combination of the

plurality of I and Q components."  Paper 27 (Patent Owner's brief); Paper 28

(Petitioner's brief).

     Pursuant to 35 U.S.C. § 318(a), we issued final written decisions in

the two cases addressed here.  Paper 30 ("Final Written Decision" or "Final

Dec."); 1330-Paper 30.  We determined that Petitioner demonstrated by a

preponderance of the evidence that all challenged claims, namely, claims 1–

3, 5, 7–15, 17–21, 23–25, and 27–30 of the '675 patent, are unpatentable.

Final Dec. 79; 1330-Paper 30, 85.  Patent Owner appealed our

determinations that these challenged claims are unpatentable to the Federal

Circuit.  Paper 31; 1330-Paper 31.

     In its remand decision, the Federal Circuit addressed Patent Owner's

arguments that "it was not afforded notice of, or an adequate opportunity to

respond to, the Board's construction of 'a plurality of carrier aggregated

transmit signals,'" as well as Patent Owner's arguments "challeng[ing] the

Board's construction of the power tracker limitation," which refers to the

claim term "means for determining a single power tracking signal."

*Qualcomm*, 6 F.4th at 1262.  The power tracker limitation appears in just one

of four challenged independent claims, namely, claim 28, and the Federal

Circuit "s[aw] no error" in our construction of that limitation.  *Id.*  The

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Federal Circuit, however, agreed that "the Board violated [Patent Owner's] procedural rights with respect to the 'plurality of carrier aggregated transmit signals' limitation," vacated our final written decisions, and remanded for further proceedings. *Id.* at 1262, 1267. Each of the four challenged independent claims includes the limitation "plurality of carrier aggregated transmit signals." The Federal Circuit's mandate issued on September 17, 2021. *Qualcomm Inc. v. Intel Corp.*, No. 20-1589 (Fed. Cir. Sept. 17, 2021) (Document No. 63).

We subsequently issued an order in each case authorizing post-remand briefing tailored narrowly to addressing whether we properly construed "plurality of carrier aggregated transmit signals," and to addressing the applicability of our construction of "plurality of carrier aggregated transmit signals" to the asserted prior art disclosures. Paper 32, 2. Petitioner filed opening briefs (Paper 33, "Pet. Remand Br."), Patent Owner filed responsive briefs (Paper 35, "PO Remand Resp."), Petitioner filed reply briefs (Paper 38, "Pet. Remand Reply"), and Patent Owner filed sur-reply briefs (Paper 45, "PO Remand Sur-reply").

We have considered the record anew by reviewing the parties' positions on remand. For the reasons that follow, we determine that Petitioner has *not* shown by a preponderance of the evidence that claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 of the '675 patent are unpatentable.

## II. BACKGROUND

### A. Related Proceedings

Prior to institution, the parties identified various matters involving the '675 patent, including a federal district court case, an International Trade

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Commission ("ITC") investigation, as well as the six petitions for *inter partes* review identified above.  Pet. 2; Paper 4, 2.  Since the entry of our institution decisions, Patent Owner has asserted that "[t]he '675 patent is currently not involved in any litigation beyond the PTAB."  PO Resp. 16.  Petitioner has not stated otherwise.

The six *inter partes* review cases that the parties identified are IPR2018-01326, IPR2018-01327, IPR2018-01328, IPR2018-01329, IPR2018-01330, and IPR2018-01340.  Pet. 2; Paper 4, 2.  These cases can be divided into two sets of cases, where the first set of cases includes IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340.  These four cases involve prior art challenges based on Yu[5] as a primary reference.  The second set of cases includes IPR2018-01328 and IPR2018-01330, which involve prior art challenges based on Chen[6] as a primary reference.  As noted above, this Decision addresses only the second set of cases.  The first set of cases is addressed in a separate decision on remand entered concurrently with this Decision.

## B. The '675 Patent

The '675 patent describes power tracking for generating a power supply voltage for a circuit, such as an amplifier, that processes multiple transmit signals sent simultaneously.  Ex. 1201, 1:8–10, 1:35–38.  Figure 5,

---

[5] Yu, EP 2442440 A1, published Apr. 18, 2012 (IPR2018-01326, Ex. 1004).
[6] W. Chen et al., Hybrid Envelope Tracking for Efficiency Enhancement in Concurrent Dual-Band PAs, 54 Microwave & Optical Tech. Letters 662 (2012) (Ex. 1212).

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

which is reproduced below, illustrates a transmit module with power
tracking for all transmit signals according to the '675 patent. *Id.* at 1:65–67.



*FIG. 5*

In particular, Figure 5 shows transmit module 500, which includes K
transmit circuits 540a to 540k that can simultaneously process K transmit
signals, with each transmit circuit processing one transmit signal. *Id.* at
6:34–37. Transmit module 500 also includes summer 552, power amplifier
("PA") 560, duplexer 570, and power tracking supply generator (or voltage
generator) 580. *Id.* at 6:37–39.

Inphase (I) and quadrature (Q) samples for a transmit signal are
provided to both a transmit circuit and voltage generator 580. Ex. 1201,
6:42–44. For example, transmit circuit 540a receives $I_1$ and $Q_1$ samples for a
first transmit signal and generates a first upconverted radio frequency ("RF")

6

signal for the first transmit signal. *Id.* at 6:40–42. Within transmit circuit 540a, the $I_1$ and $Q_1$ samples are converted to I and Q analog signals by digital-to-analog converters (DACs) 542a and 543a. *Id.* at 6:44–46. The I and Q analog signals are then filtered by lowpass filters 544a and 545a, amplified by amplifiers 546a and 547a, upconverted from baseband to RF by mixers 548a and 549a, and summed by summer 550a to generate the first upconverted RF signal. *Id.* at 6:46–50.

The other transmit circuits operate similarly. Ex. 1201, 6:54–57. Summer 552 receives all upconverted RF signals from the transmit circuits, sums the upconverted RF signals, and provides a modulated RF signal to PA 560. *Id.* at 6:59–62.

Within voltage generator 580, power tracker 582 receives $I_1$ to $I_K$ samples and $Q_1$ to $Q_K$ samples for all transmit signals being sent simultaneously. Ex. 1201, 6:63–65. Power tracker 582 then computes a digital power tracking signal based on the I and Q samples for these transmit signals and provides the digital power tracking signal to DAC 584. *Id.* at 6:65–7:1, 8:6–32. DAC 584 converts the digital power tracking signal to analog and provides the analog power tracking signal to power supply generator 586. *Id.* at 7:1–4, Fig. 5. Power supply generator 586 generates a power supply voltage for PA 560. *Id.* at 7:6–8.

Once PA 560 receives both the modulated RF signal from summer 552 and the power supply voltage from power supply generator 586, PA 560 amplifies the modulated RF signal using the power supply voltage. Ex. 1201, 7:8–11. PA 560 then provides an output RF signal for all the transmit signals being sent simultaneously. *Id.* at 7:11–12.

7

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

The output RF signal is routed through duplexer 570 and transmitted via antenna 590. *Id.* at 7:12–14.

### C. Illustrative Claim

Petitioner challenges claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 of the '675 patent, all for our consideration on remand. Claims 1, 18, and 28 are independent. Claim 1 is illustrative of the challenged claims and includes the subject matter the Federal Circuit instructed us to reconsider on remand:

1. An apparatus comprising:

   a power tracker configured to determine a single power tracking signal based on a plurality of inphase (I) and quadrature (Q) components of a plurality of carrier aggregated transmit signals being sent simultaneously, wherein the power tracker receives the plurality of I and Q components corresponding to the plurality of carrier aggregated transmit signals and generates the single power tracking signal based on a combination of the plurality of I and Q components, wherein the plurality of carrier aggregated transmit signals comprise Orthogonal Frequency Division Multiplexing (OFDM) or Single Carrier Frequency Division Multiple Access (SC-FDMA) signals;

   a power supply generator configured to generate a single power supply voltage based on the single power tracking signal; and

   a power amplifier configured to receive the single power supply voltage and the plurality of carrier aggregated transmit signals being sent simultaneously to produce a single output radio frequency (RF) signal.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

### D. Instituted Grounds of Unpatentability

As discussed above, we instituted *inter partes* review based on all grounds raised in the two petitions addressed here.  Inst. Dec.; 1330-Paper 8.  The instituted grounds are as follows.

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–3, 5, 7, 11, 17–21, 27[7] | 103 | Chen, Wang[8] |
| 12[9] | 103 | Chen, Wang, Eliezer[10] |
| 8–10, 28–30[11] | 103 | Chen, Wang, Choi[12] |
| 13–15, 23–25[13] | 103 | Chen, Wang, Dahlman[14] |

In support of its petitions, Petitioner relied on a declaration (Ex. 1203) as well as a reply declaration (Ex. 1231) of David Choi, Ph.D.  Patent Owner submitted with its responses a declaration of Tim Williams, Ph.D. (Ex. 2002).  The transcripts of the depositions of Dr. Choi are entered in the record as Exhibits 2006 and 2007, and the transcript of the deposition of Dr. Williams is entered in the record as Exhibit 1230.

---

[7] Petitioner challenges claims 1–3, 5, 7, 11, 17–21, 27 in IPR2018-01328.

[8] Wang et al., *Design of Wide-Bandwidth Envelope-Tracking Power Amplifiers for OFDM Applications*, 53 IEEE Transactions on Microwave Theory & Techniques 1244 (2005) (Ex. 1205).

[9] Petitioner challenges claim 12 in IPR2018-01328.

[10] Eliezer, US 2009/0004981 A1, published Jan. 1, 2009 (Ex. 1211).

[11] Petitioner challenges claims 8–10 in IPR2018-01328, and claims 28–30 in IPR2018-01330.

[12] Jinsung Choi et al., *Envelope Tracking Power Amplifier Robust to Battery Depletion*, 2010 IEEE MTT-S Int'l Microwave Symposium Digest 1074 (2010) (Ex. 1208, at Ex. A).

[13] Petitioner challenges claims 13–15 and 23–25 in IPR2018-01328.

[14] Erik Dahlman et al., 4G LTE / LTE-ADVANCED FOR MOBILE BROADBAND 11–12, 19, 27, 103–104, 132–135, 205, 347–351, 355–358, 389 (2011) (Ex. 1206).

## III. ANALYSIS

### A. Final Written Decisions

Our discussion of the final written decisions focuses on our previous construction of the claim term "plurality of carrier aggregated transmit signals," as recited in challenged independent claims 1, 18, and 28. In the final written decisions, we began our analysis by addressing the parties' arguments regarding the construction of that term. Final Dec. 18–25. Based on our review of the claims and specification of the '675 patent, we disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires signals comprising transmissions on *component* carriers. *Id.* at 20–21. We explained that the '675 patent explicitly defines "carrier aggregation" as "operation on multiple carriers," and that it also explicitly defines "[a] transmit signal" as "a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc." *Id.* at 21 (citing Ex. 1201, 2:63–64, 3:60–62). We further determined that these definitions refer broadly to signals comprising transmissions on carriers. *Id.*

We also disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires signals *from a single terminal*. Final Dec. 21–23. We explained that the claim language recites nothing about signals from a single terminal. *Id.* at 22. We additionally explained that although the '675 patent discloses examples and embodiments where signals are from a single terminal, the specification does not limit "carrier aggregated transmit signals" to those examples and embodiments. *Id.* (citing Ex. 1201, 14:21–25 (stating that the "disclosure is not intended to be limited to the examples and designs described")). We further noted that the

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

'675 patent teaches that a wireless device "'may send and/or receive transmissions' on multiple carriers according to various combinations of bands and band groups." *Id.* at 22–23 (citing Ex. 1201, 3:1–35). We found this to be consistent with Dahlman, extrinsic evidence regarding carrier aggregation, which Patent Owner cited as teaching that multiple carriers "are aggregated and jointly used for transmission *to/from* a single terminal." *Id.* at 23 (citing Ex. 1206, 104 (cited by PO Resp. 15)).

Lastly, we disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires extended bandwidth for a user transmission from a single terminal. Final Dec. 23. We explained that the claim language recites nothing about extended transmission bandwidth, and that although the '675 patent discloses an example where carrier aggregation provides extended transmission bandwidth, it does not limit "carrier aggregated transmit signals" to that example. *Id.* (citing Ex. 1201, 2:65–67 ("Wireless device 110 *may* be configured with up to 5 carriers in one or two bands in LTE[15] Release 11.") (emphasis added)).

Turning to Petitioner's proposed construction for the term "plurality of carrier aggregated transmit signals," we noted its similar requirement of increasing the bandwidth for a user. Final Dec. 23. As with Patent Owner, we disagreed with Petitioner in this regard for the same reasons discussed above. *Id.* We additionally noted that Petitioner's counsel conceded during oral argument that this requirement "does not come specifically from the specification," and that Petitioner would not object to eliminating the requirement. *Id.* at 24 (citing Tr. 10:22–11:17).

---

[15] LTE stands for Long Term Evolution. Ex. 1201, 2:21.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

We also disagreed with Petitioner that the term "plurality of carrier aggregated transmit signals" requires "signals for transmission . . . at the same time." Final Dec. 24. We explained that the claim recites "a plurality of carrier aggregated transmit signals being sent simultaneously," and that requiring signals for transmission *at the same time* would render the claim language "being sent simultaneously" redundant and superfluous. *Id.*

In summary, we concluded that the broadest reasonable interpretation of the claim term "plurality of carrier aggregated transmit signals" is "signals for transmission on multiple carriers." Final Dec. 24. We stated that "[o]ur construction is consistent with the '675 patent, which defines the term 'carrier aggregation' as 'operation on multiple carriers' and the term '[a] transmit signal' as 'a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" *Id.* at 24–25 (citing Ex. 1201, 2:63–64, 3:60–62). We additionally noted that "[o]ur construction also encompasses, but is not limited to, Patent Owner's proposed construction." *Id.* at 25.

After providing a brief overview of Chen, we addressed whether Petitioner demonstrated by a preponderance of the evidence that the teachings in Chen account for the "plurality of carrier aggregated transmit signals," as recited in each of independent claims 1, 18, and 28. Final Dec. 32–37. In particular, consistent with our construction of the claim term "plurality of carrier aggregated transmit signals," we agreed with Petitioner that Chen's input signals 1 and 2 are transmitted on multiple carriers because the signals are "two single carrier wideband code division multiple access signals" that operate at different frequencies. *Id.* at 37 (citing Pet. 24 (citing Ex. 1212, 663)). We also credited the testimony of Petitioner's declarant

12

**Appx124**

Dr. Choi on this particular issue. *Id.* (citing Pet. 24 (citing Ex. 1203 ¶ 103)). As to Patent Owner's argument challenging Petitioner's showing for the recited "plurality of carrier aggregated transmit signals," we disagreed because Patent Owner relied on its proposed construction, which we determined "is overly narrow and improperly requires signals from a single terminal as well as providing extended transmission bandwidth for a user transmission from a single terminal." *Id.* at 59–60 (citing PO Resp. 46).

### B. The Federal Circuit's Remand Decision

Our discussion of the Federal Circuit's remand decision focuses only on the court's analysis regarding our construction of the recited "plurality of carrier aggregated transmit signals." On appeal to the Federal Circuit, Patent Owner argued that "it was not afforded notice of, or an adequate opportunity to respond to, the Board's construction of 'a plurality of carrier aggregated transmit signals.'" *Qualcomm*, 6 F.4th at 1262. The Federal Circuit agreed with Patent Owner that we "violated [Patent Owner's] procedural rights with respect to the 'plurality of carrier aggregated transmit signals' limitation." *Id.* The Federal Circuit explained that "the Board may adopt a claim construction of a disputed term that neither party proposes without running afoul of the [Administrated Procedure Act]." *Id.* As to the case here, however, the Federal Circuit pointed out that "the issue of whether increased bandwidth was a required part of the claim construction was not in dispute." *Id.* at 1262–63. That is, "[t]he Board's construction of 'a plurality of carrier aggregated transmit signals' diverged from the agreed-upon increased bandwidth requirement for the term." *Id.* at 1263. The Federal Circuit further noted that "[w]hile the Board did not change theories midstream or

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

depart from a construction it previously adopted, it is still difficult to imagine either party anticipating that this agreed-upon matter of claim construction was a moving target," and that "unlike with disputed terms, it is unreasonable to expect parties to brief or argue agreed-upon matters of claim construction." *Id.* at 1263. The Federal Circuit counseled that "the Board needed to provide notice of and an adequate opportunity to respond to its construction," which "departed from the agreed-upon increased bandwidth requirement." *Id.* at 1263, 1265.

The Federal Circuit disagreed with Petitioner that the oral hearing provided Patent Owner notice and an opportunity to respond. *Qualcomm*, 6 F.4th at 1263–64. The Federal Circuit explained that the panel's comment during the hearing that it would think about whether the increased bandwidth requirement is necessary "did not *provide* [Patent Owner] notice that the Board might depart from the increased bandwidth requirement," where "[t]he Board did not announce a construction, criticize the parties' agreed-upon requirement, ask any follow-up questions to [Petitioner], or ask any related questions to [Patent Owner]." *Id.* at 1264. The Federal Circuit further explained that "[t]he hearing also did not provide an adequate opportunity to respond" because the Board did not provide a theory or rationale for departing from the agreed-upon requirement to which Patent Owner could have responded, it did not ask Patent Owner questions about the requirement, and it did not request additional briefing after the hearing. *Id.* at 1264–65. The Federal Circuit added that Patent Owner did not have an opportunity to introduce evidence addressing why an ordinarily skilled artisan would have understood that the claim term "plurality of carrier

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

aggregated transmit signals" requires signals that increase bandwidth. *Id.* at 1265.

The Federal Circuit also disagreed with Petitioner that Patent Owner's option to seek rehearing after receiving notice through the final written decisions provided an adequate opportunity to respond. *Qualcomm*, 6 F.4th at 1263, 1265. The Federal Circuit explained that "a party need not seek rehearing in order to seek relief from a Board decision on appeal." *Id.* at 1265. The Federal Circuit acknowledged that "it may have been a more efficient use of resources had [Patent Owner] sought rehearing," but stated that Patent Owner "was not required to do so." *Id.*

Without deciding whether Patent Owner must show prejudice, as Petitioner argued, the Federal Circuit further reasoned that Patent Owner had made a sufficient showing. *Qualcomm*, 6 F.4th at 1263 & n.3. The Federal Circuit explained that Patent Owner "argued throughout the IPR proceedings that the prior art did not disclose the increased bandwidth requirement," and that "[b]y removing that requirement, the Board eliminated an element on which [Petitioner] bore the burden of proof." *Id.* The Federal Circuit additionally explained that "without notice of the Board's elimination of the increased bandwidth requirement, [Patent Owner] had no reason to brief that requirement or establish an evidentiary record supporting it, particularly given the limited word count and breadth of issues in these IPRs." *Id.* at 1263–64.

Accordingly, the Federal Circuit determined that we did not provide Patent Owner adequate notice of and opportunity to respond to our claim construction of "plurality of carrier aggregated transmit signals," vacated our

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

final written decisions, and remanded for further proceedings.  *Qualcomm*, 6
F.4th at 1267.

### *C.  Claim Construction*

The claim construction standard applicable to these *inter partes*
review proceedings is the broadest reasonable interpretation in light of the
patent specification.  *See* 37 C.F.R. § 42.100(b) (2018); *Cuozzo Speed Techs.
LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the
broadest reasonable interpretation standard).[16]  Under this standard, claim
terms generally are given their ordinary and customary meaning, as would
be understood by one of ordinary skill in the art in the context of the entire
disclosure.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257
(Fed. Cir. 2007).  That is, we give words "their plain meaning" unless,
however, it is "inconsistent with the specification and prosecution history."
*Arista Networks, Inc. v. Cisco Sys., Inc.*, 908 F.3d 792, 796–98 (Fed. Cir.
2018) (rejecting construction as "overly broad, even under the broadest
reasonable interpretation standard"); *see also Personalized Media
Comm'cns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) ("[T]he
Board's interpretation must be reasonable in light of the specification,
prosecution history, and the understanding of one skilled in the art.").

---

[16] The revised claim construction standard for interpreting claims in *inter
partes* review proceedings as set forth in the final rule published October 11,
2018, does not apply to these proceedings because the new "rule is effective
on November 13, 2018 and applies to all IPR, PGR and CBM petitions filed
on or after the effective date."  Changes to the Claim Construction Standard
for Interpreting Claims in Trial Proceedings Before the Patent Trial and
Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (codified at 37 C.F.R.
§ 42.100(b) (2019)).  The petitions here were filed on July 3, 2018.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

In view of the Federal Circuit's remand decision, we address the parties' arguments on remand as to whether we properly construed the claim term "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers."[17]

The term "plurality of carrier aggregated transmit signals" appears in each of challenged independent claims 1, 18, and 28, as well as several dependent claims. Petitioner originally proposed that we construe this term to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." Pet. 12. On remand, however, Petitioner argues that we properly construed the term to mean, more broadly, "signals for transmission on multiple carriers." Pet. Remand Br. 7–12. As support, Petitioner contends that "the '675 patent provides explicit definitions for this

---

[17] Referring to Petitioner's opening briefs, Patent Owner asserts that, "[c]ontrary to the Board's Order dated November 1, 2021 (Paper 35 ('Order') in IPR2018-01326), Petitioner filed six substantively different briefs, which collectively exceed the 20-page limit set by the Order." PO Remand Resp. n.1. Patent Owner does not identify any differences. We have reviewed Petitioner's six opening briefs, and they appear to be substantively similar except for the discussions as to the applicability of our previous construction of "plurality of carrier aggregated transmit signals" to the asserted prior art disclosures. *Compare, e.g.*, Pet. Remand Br., *with, e.g.*, IPR2018-01326, Paper 36. In that regard, the briefs in IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340 focus on Yu's disclosures, whereas the briefs in IPR2018-01328 and IPR2018-01330 focus on Chen's disclosures. Pet. Remand Br. 12–14; IPR2018-01326, Paper 36, 13–16. If the six briefs each included the discussions regarding both Yu and Chen, the briefs would be substantively the same, and the sum total of pages for each brief would be less than twenty. Pet. Remand Br. 1–14 (brief, including Chen discussion, comprising about fourteen pages); IPR2018-01326, Paper 36, 13–16 (Yu discussion comprising about four pages). Thus, it is harmless for us to consider Petitioner's opening briefs.

claim term, by stating that 'carrier aggregation . . . *is* operation on multiple carriers' and 'a transmit signal *is* a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" *Id.* at 7 (quoting Ex. 1201, 2:63–64, 3:60–62).[18] Petitioner asserts that "[t]he Federal Circuit has recognized that the use of the term 'is' or similar language can 'signify that a patentee is serving as its own lexicographer.'" *Id.* (quoting *Sinorgchem Co., Shandong v. USITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007)).

Petitioner also points to various other portions of the specification. Pet. Remand Br. 9. For example, Petitioner cites the teaching that "[c]arrier aggregation may also be referred to as multi-carrier operation." *Id.* (citing Ex. 1201, 2:64–65). Petitioner additionally cites the teaching that "[i]ntra-band [carrier aggregation] refers to operation on multiple carriers within the same band," and "[i]nter-band [carrier aggregation] refers to operation on multiple carriers in different bands." *Id.* (citing Ex. 1201, 3:1–5). According to Petitioner, these teachings "confirm[] the accuracy of the Board's construction under the broadest reasonable interprerion standard." *Id.*

Petitioner acknowledges that our previous construction is broader than the construction it originally proposed in the petitions. Pet. Remand Br. 10. In particular, our construction omits two requirements from Petitioner's

---

[18] There are instances in the parties' remand briefs where citations refer to IPR2018-01326, a related case not addressed here. *See, e.g.*, PO Remand Resp. n.1; Pet. Remand Reply n.1. Many of the same papers and exhibits have been filed in both IPR2018-01326 and IPR2018-01328. For purposes of this Decision, citations attributed to the parties refer to IPR2018-01328, unless noted otherwise.

originally-proposed construction, namely, signals for transmission *at the same time* and *increasing the bandwidth for a user*. *Id.* Petitioner explains that it originally "proposed its construction in an effort to minimize disputes," noting that its "construction was actually the Patent Owner's construction in the earlier ITC proceeding." *Id.* Petitioner contends, however, "[t]he Board properly omitted the limitation 'to increase the bandwidth for a user' because, as the Board explained, the claim language says nothing about increasing bandwidth for a user." *Id.* at 10 (citing Final Dec. 23). Petitioner further asserts that "while the '675 patent ***does*** include an example of carrier aggregation increasing bandwidth, it ***does not*** expressly limit carrier aggregation to this purpose." *Id.* at 11 (citing Ex. 1201, 2:65–67 ("Wireless device 110 ***may*** be configured with up to 5 carriers in one or two bands in LTE Release 11.") (emphasis added)).

Petitioner adds that "the Board properly omitted the limitation 'at the same time'" because claim 1 recites "a plurality of carrier aggregated transmit signals being sent simultaneously," and requiring signals for transmission *at the same time* "would render superfluous the claim language 'being sent simultaneously.'" Pet. Remand Br. 11–12; *see id.* at 9 n.6.

Patent Owner responds that the term "carrier aggregated transmit signals" instead carries its ordinary and customary meaning, which Petitioner originally proposed in its petitions: "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." PO Remand Resp. 2, 9; *see also* Pet. 12. Patent Owner contends that "[w]hile it is true that transmission of signals on multiple carriers is an attribute of carrier aggregation, the [person having ordinary skill in the art] would have further understood the term to mean that the multiple component carriers are

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

aggregated (*i.e.*, combined) to increase the bandwidth for a user." PO
Remand Resp. 9 (internal citation omitted). As support, Patent Owner relies
on the '675 patent, its prosecution history file, as well as extrinsic evidence.

Starting with the '675 patent, Patent Owner asserts that the
specification "specifically describes an example of a user device (*i.e.*,
wireless device 110) that 'supports carrier aggregation' by being 'configured
with up to 5 carriers in one or two bands [in LTE Release 11].'" PO
Remand Resp. 10 (quoting Ex. 1201, 2:63–67). To illustrate, Patent Owner
asserts that "user devices of earlier LTE systems were limited to the 20 MHz
bandwidth of a single channel," whereas "the carrier aggregation introduced
in LTE Release 11 enables a user device to aggregate up to five of these 20
MHz channels as component carriers of a single virtual channel having a
bandwidth of up to 100 MHz." *Id.* (citing Ex. 1201, 2:59–60, 65–67,
Figs. 2A–2D). Patent Owner notes that "[t]he '675 patent further explains
that LTE carriers may be aggregated from frequency bands listed in 3GPP
TS (Technical Specification) 36.101," a 3GPP[19] technical report that Patent
Owner points to specifically for describing carrier aggregation as
"[a]ggregation of two or more component carriers in order to support wider
transmission bandwidths." *Id.* at 11 (citing Ex. 1201, 2:58–62; quoting
Ex. 2011, 14 (3GPP technical report)).

Moving on to the prosecution history of the '675 patent, Patent Owner
asserts that the Examiner applied a U.S. publication, namely, the Chen

---

[19] 3GPP stands for 3rd Generation Partnership Project. Ex. 2011 (cover).

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

publication,[20] in an Office action because it "discloses a plurality of carrier aggregated transmit signals." PO Remand Resp. 11 (quoting Ex. 1202, 266–279 (Office action, July 2, 2015)). According to Patent Owner, the Chen publication "makes clear that its multi-carrier aggregation provides increased bandwidth." *Id.* Patent Owner relies on the Chen publication's teaching that the "bandwidth of a signal constantly increases due to multi-carrier applications." *Id.* (quoting Ex. 2012 ¶ 4).

As to extrinsic evidence, Patent Owner points to teachings across various patents and publications to support its proposed construction on remand. PO Remand Resp. 12–13 (citing Ex. 2015, 6; Ex. 2016; Ex. 2017, 3:20–22; Ex. 2018, 3:27–62). For example, Patent Owner asserts that "U.S. Patent No. 9,161,254 teaches that carrier aggregation is a 'technique for providing additional bandwidth capacity to wireless devices' by 'aggregat[ing] . . . multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE).'" *Id.* at 12 (quoting Ex. 2017, 3:19–22[21]). Patent Owner also asserts that "a 2013 Qualcomm document states that '[c]arrier aggregation, as the name suggests, combines multiple carriers (a.k.a. channels) at the device to provide a bigger data pipe to the user.'" *Id.* (quoting Ex. 2015, 6).

With respect to our previous construction (which is Petitioner's proposed construction on remand), Patent Owner contends that it "is wrong because it reads 'aggregated' out of the term 'carrier aggregated transmit

---

[20] Chen, U.S. Publication No. 2012/0321018 A1, published Dec. 20, 2012 (Ex. 2012). The Chen publication is different than Chen, which is an asserted reference in the petitions.
[21] Patent Owner cites Exhibit 2017, lines 20 through 22, but the quoted language appears at lines 19 through 22.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

signals.'" PO Remand Resp. 13. Patent Owner asserts that "[a]ggregation refers to the process of combining constituent parts into a single thing." *Id.* (citing Ex. 2029 (dictionary defining "aggregation" as "the collecting of units . . . into a mass or whole")). Patent Owner further asserts that an ordinarily skilled artisan "would not have understood 'carrier aggregation' to be equivalent to any generic 'transmission on multiple carriers' because nothing is being aggregated when disparate signals are transmitted on different carriers to separate destinations." *Id.* at 14.

Patent Owner further contends "there is no lexicography" here, contrary to Petitioner's position. PO Remand Resp. 2 (capitalization and emphasis omitted); *see also* Pet. Remand Br. 7. Patent Owner asserts that "[w]hen the '675 patent sought to define a term, it used a very specific format, *i.e.*, putting the defined term in quotations marks, followed by the phrase 'is used herein to mean,' followed by the definition in quotation marks." PO Remand Resp. 3. For example, Patent Owner directs us to where the specification states, "The word 'exemplary' is used herein to mean 'serving as an example, instance, or illustration.'" *Id.* (citing Ex. 1201, 2:10–11). Patent Owner further asserts that "[n]one of the statements [Petitioner] relies on for the term 'carrier aggregated transmit signals' resembles this format" because "neither of [Petitioner's] citations employs the phrase 'is used herein to mean'" or "uses quotation marks for the term or its purported definition." *Id.* at 4 (citing Ex. 1201, 2:63–54, 3:60–62). As discussed above, Petitioner cites the '675 patent's statement that "carrier aggregation . . . is operation on multiple carriers" as well as its statement that "[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels,

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

etc." Pet. Remand Br. 7 (quoting Ex. 1201, 2:63–64, 3:60–62). According to Patent Owner, "[t]hese departures from the '675 patent's distinctive definitional format show that the patentee did not intend these statements to redefine the plain and ordinary meaning of 'carrier aggregated transmit signals.'" PO Remand Resp. 4; *see also id.* at 8 (characterizing "the '675 patent's statement 'carrier aggregation . . . is operation on multiple carriers' [a]s nothing more than a generalized introduction to carrier aggregation, highlighting one aspect of it").

Patent Owner also urges that, "[t]aken together, the [person having ordinary skill in the art] would recognize that neither statement is definitional" because they additionally are inconsistent. PO Remand Resp. 5–6 (citing Ex. 1201, 2:63–64, 3:60–62); PO Remand Sur-reply 6–7. Patent Owner points out in particular that one statement "has a broader scope than the [other statement], encompassing transmission on *one or more* general frequencies rather than *multiple carriers*," and "is open-ended via its use of the word 'etc.'" PO Remand Resp. 6; *see also* PO Remand Sur-reply 6 ("For example, . . . 'transmit signals' includes transmission on *one* carrier, while 'carrier aggregation' is limited to implementations utilizing *multiple* carriers."). *Compare* Ex. 1201, 2:63–64 ("carrier aggregation . . . is operation on multiple carriers"), *with* Ex. 1201, 3:60–62 ("[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.").

Lastly, Patent Owner directs our attention to another Board decision in a different case, IPR2019-00128, in which, according to Patent Owner, the parties "litigated nearly the same issue that is now before the Board," namely, "the correct construction of the term 'carrier aggregation.'" PO

23

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Remand Resp. 14 (citing Ex. 2026). In that decision, the Board determined that "carrier aggregation" requires, in part, providing higher bandwidth. Ex. 2026, 24–26. The Board relied on intrinsic evidence in that case, including a technical report cited in the patent specification and a reference relied on during prosecution. *Id.* Patent Owner asserts that the technical report cited there is the same 3GPP technical report cited in the '675 patent regarding LTE Release 11. PO Remand Resp. 17 (citing Ex. 1201, 2:60–67; Ex. 2026, 24).

In reply, Petitioner addresses Patent Owner's arguments regarding Petitioner's reliance on the '675 patent's two statements that "carrier aggregation . . . is operation on multiple carriers" and "[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc." Ex. 1201, 2:63–64, 3:60–62. Petitioner reiterates that "the Federal Circuit *has* found that 'is' can signal lexicography," and has further "held that specific or even explicit definitional formats are *not* required." Pet. Remand Reply 2; *see also id.* at 4 (asserting that "Patent Owner's argument . . . is contradicted by the Federal Circuit's holdings that the word 'is' may define a term"). Petitioner also asserts that "operation on multiple carriers" is a "definition [that] is in the 'Detailed Description' of the purported invention," rather than "a generalized introduction to carrier aggregation," contrary to Patent Owner's position. *Id.* at 4. As to Patent Owner's emphasis on the way the '675 patent defines "exemplary," Petitioner counters that "the alleged 'definitional format' . . . is merely a legal boilerplate definition of 'exemplary,'" a word that "is not a technical claim term." *Id.* at 3.

24

Regarding Patent Owner's characterization of the two statements as inconsistent with each other, Petitioner responds that Patent Owner "relies on a misquote of the definition of 'transmit signals'" and "omits the word 'channels.'" Pet. Remand Reply 3–4. Petitioner asserts that "[t]he actual phrases in that definition—'transmission on one or more carriers' and 'transmission on one or more frequency channels'—which Patent Owner's own expert confirmed is 'reasonable'—are consistent and closely related because a carrier is transmitted on a frequency *channel*." *Id.* at 4 (citing Ex. 1201, 3:60–62; Ex. 1244 ¶¶ 10–17; Ex. 1241, 15:8–16:4). Petitioner further asserts that "Patent Owner also cites the 'etc.' in the definition but fails to identify what else is signaled by that language." *Id.*

Turning to Patent Owner's proposed construction of "plurality of carrier aggregated transmit signals," Petitioner argues that "Patent Owner seeks to import 'to increase the bandwidth for a user.'" Pet. Remand Reply 5. Petitioner contends that the "added language is improper because it imports an ***objective*** or potential ***result or benefit*** of carrier aggregation, not what carrier aggregation ***is***." *Id.* (citing *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1355 (Fed. Cir. 2014)). Petitioner adds that "increased signal bandwidth is only a ***potential*** result of carrier aggregation which may not occur." *Id.* at 6. As support, Petitioner relies on Dr. Choi's testimony in his reply declaration on remand. *Id.* at 6 n.5 (citing Ex. 1244 ¶¶ 18–29). To illustrate, Dr. Choi testifies,

> So, for example, . . . one component carrier from each of Band 1 and Band 18 can be carrier aggregated. . . . [I]n Band 1, carriers with 5, 10, 15, and 20 MHz bandwidths are available for aggregation . . . , while in Band 18, carriers with 5, 10, or 15 MHz are available for aggregation . . . .

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

> As one example where carrier aggregation would not result in increased bandwidth, ***aggregating a 5 MHz carrier from Band 1 . . . with a 5 MHz carrier from Band 18 . . . would only result in 10 MHz, which does not result in increased bandwidth compared with the bandwidth of a single, non-aggregated, carrier***, for instance, a single 20 MHz carrier in Band 1 . . . a single 15 MHz carrier in Band 1, or a single 15 MHz carrier in Band 18, etc.

Ex. 1244 ¶¶ 24–25.

Petitioner further contends that neither the specification, the prosecution history, nor the extrinsic evidence of record supports Patent Owner's proposed construction.  Pet. Remand Reply 6–7.  Referring to the specification, Petitioner asserts that it "states that multiple transmissions on different carriers '***may*** have increased envelope bandwidth,'" its "discussion of Figures 2A–2D, cited by Patent Owner . . . does not mention increasing bandwidth," its "discussion of the LTE specification . . . mentions only that frequency bands may cover up to 200 MHz and 35 bands are supported in Release 11," and it "does not incorporate the statement in 3GPP TS 36.101 about 'carrier aggregation' quoted by Patent Owner."  *Id.* at 6 (citing Ex. 1201, 2:58–62, 6:10–12).  As for the prosecution history, Petitioner asserts that "[n]either the Examiner nor the applicant made ***any*** such argument or suggestion" about understanding "that increasing bandwidth for a user is a required part of the construction of 'carrier aggregated transmit signals.'"  *Id.* at 6–7.  Petitioner also notes that the Examiner never cited paragraph 4 of the Chen publication on which Patent Owner relies.  *Id.* at 7.  With respect to the extrinsic evidence, Petitioner asserts that it was not cited or considered during prosecution.  *Id.*  Petitioner adds that "[w]here, as here, the claim term is defined in the patent, reliance on such extrinsic evidence is

26

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

improper." *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584–85 (Fed. Cir. 1996)).

Also, Petitioner contends that "Patent Owner wrongly criticizes the Board's construction for allegedly 'read[ing] "aggregated" out of the term'" because "the claims already state that the claimed apparatus 'produce[s] a single output radio frequency (RF) signal.'" Pet. Remand Reply 7 (citing Ex. 1244 ¶¶ 30–33).

Lastly, Petitioner contends that the Board's construction of "carrier aggregation" in the other decision, in IPR2019-00128, should not dictate our decision here because the construction there "***excludes*** 'for a user,' and relies on several prior art references not relevant here." Pet. Remand Reply 8. Petitioner also submits, "More importantly, [the] Board's construction here is consistent with the ALJ's construction of the same term in the associated ITC investigation as 'simultaneous operation on multiple carriers,' whereas the [other] construction—currently on appeal—is not." *Id.* (citing Ex. 1242, 37–42). Petitioner asserts that "[t]he ALJ's construction and reasoning expressly rejected the inclusion of 'to increase the bandwidth for a user.'" *Id.* (citing Ex. 1242, 37–42).

Patent Owner counters that "increased user bandwidth is the necessary purpose of carrier aggregation," and that "Dr. Choi fails to show that carrier aggregation does not always increase the bandwidth of a user." PO Remand Sur-reply 2. Referring to Dr. Choi's example discussed above (*see also* Ex. 1244 ¶ 25), Patent Owner asserts that "[a]ggregating *two 5-MHz carriers* necessarily increases the bandwidth for a user as compared to a *single 5-MHz carrier* allocated to the user and Dr. Choi admits this." PO Remand Sur-reply 2 (citing Ex. 2030, 28:2–24 ("So I think you're asking me if you

were to aggregate these two 5-megahertz carriers for a resultant total aggregated bandwidth of 10 megahertz, would that be greater than if you were just to have a single 5-megahertz carrier.  And the answer's, obviously, yes because ten is greater than five.")).  Patent Owner adds that during prosecution "[t]he applicant amended the claims based on the prior art to recite 'carrier *aggregated* transmit signals' (Ex. 1[2]02 at 237), and the increased bandwidth requirement gives meaning to the explicitly recited 'aggregat[ion].'"  *Id.* at 2–3.  Patent Owner states that "[p]ointing to other language in the claim as allegedly establishing the 'aggregating' concept," as Petitioner does, "would cause the word 'aggregated,' where it is recited in the claim, to be superfluous."  *Id.* at 5 (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)).

With respect to Petitioner's contention that Patent Owner's proposed construction on remand is unsupported by the specification, the prosecution history, and the extrinsic evidence, Patent Owner responds that Petitioner "point[s] to no counter-examples where increased bandwidth for a user is not present."  PO Remand Sur-reply 3.  Patent Owner also notes Petitioner "does not even attempt to show" that the statement in the 3GPP technical report describing carrier aggregation as "[a]ggregation of two or more component carriers in order to support wider transmission bandwidths" is "wrong or inconsistent with the [person having ordinary skill in the art's] understanding of the term."  *Id.*; *see also id.* at 4 (stating "[Petitioner's] only counter to [Patent Owner's] evidence that the Examiner understood 'carrier aggregation' to increase the bandwidth of a user is that [Patent Owner] cited Chen paragraph [0004], whereas the Examiner specifically cited paragraph [0007]"); *id.* at 4 (stating "[Petitioner's] further criticism that [Patent

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Owner's] 'external documents' were not 'cited or considered during prosecution' just means that they are extrinsic evidence" (internal citation omitted)).

Patent Owner further maintains its position that there is no lexicography in this case. PO Remand Sur-reply 6–8. Patent Owner adds that Petitioner "cites no authority for the proposition that two alleged definitions can be combined to yield lexicography for a disputed claim term." *Id.* at 7. Lastly, Patent Owner notes that "there is no rule forbidding generalized introductions in a patent's detailed description." *Id.* at 8.

On the record now before us, we determine that our previous construction of "plurality of carrier aggregated transmit signals" (i.e., "signals for transmission on multiple carriers") is overly broad. As Petitioner points out, the '675 patent "stat[es] that 'carrier aggregation . . . *is* operation on multiple carriers' and 'a transmit signal *is* a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" Pet. Remand Br. 7 (quoting Ex. 1201, 2:63–64, 3:60–62). Read together in isolation, we agree with Petitioner that these statements in the specification say "carrier aggregated transmit signals" means "signals for transmission on multiple carriers." Our construction, however, must also take into account the prosecution history. *See Personalized Media*, 952 F.3d at 1340. The prosecution history "facilitates claim construction by revealing the intended meaning and scope of technical terms and may even trump the weight of specification language in some circumstances." *TDM Am., LLC v. U.S.*, 85 Fed. Cl. 774, 788 (2009) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999)). For example, "an applicant's amendment accompanied by

29

**Appx141**

explanatory remarks can define a claim term by demonstrating what the applicant meant by the amendment." *Personalized Media*, 952 F.3d at 1340. Thus, "like the specification, the prosecution history can act like a dictionary." *Hemphill v. McNeil-PPC, Inc.*, 25 F. App'x 915, 918 (Fed. Cir. 2001) (non-precedential).

Here, during prosecution of the '675 patent, the applicant amended independent claim 1 to recite "a plurality of different transmit signals" as well as "a power amplifier to receive . . . the plurality of different transmit signals . . . and to produce a single output RF signal." Ex. 1202, 189 (Amendment, Nov. 12, 2014). The applicant later amended claim 1 again solely to replace "a plurality of *different* transmit signals" with "a plurality of *carrier aggregated* transmit signals," and remarked to the Examiner that "[i]t is Applicant's understanding that the above amendments place all claims in a condition for allowance." *Id.* at 237, 246 (Amendment, March 6, 2015). The applicant similarly amended the other independent claims during prosecution. *Id.* at 191–194, 240–241, 243–244.

Based on the applicant's amendments, we agree with Patent Owner that maintaining our previous construction of "plurality of carrier aggregated transmit signals" as "signals for transmission on multiple carriers" would ignore the word "aggregated." *See* PO Remand Resp. 13–14. The amendment limiting the recited signals to "carrier aggregated" signals indicates that the claims require something more than just signals for transmission on multiple carriers; otherwise, the claims would encompass signals that are *not* carrier aggregated. *See, e.g.*, Ex. 1201, 6:10–12 ("Multiple transmit signals may be sent on different frequencies (e.g., different carriers) and hence *may* have increased envelope bandwidth."

(emphasis added)) (cited by Pet. Remand Reply 6); Ex. 1202, 189, 237
(application claims reciting *different* transmit signals before being amended
to recite *carrier aggregated* transmit signals). Thus, our previous
construction of "plurality of carrier aggregated transmit signals," though
consistent with the specification language, is broader than the applicant's
intended meaning and scope of the term as illuminated by the prosecution
history.

    We note Petitioner's contention that the claim limitation "produc[ing]
a single output radio frequency (RF) signal" accounts for the claim term
"aggregated." Pet. Remand Reply 7. As discussed above, however, that
limitation was already included in the claims before the applicant amended
them to require "carrier aggregated" signals. *Compare* Ex. 1202, 189
(Amendment, Nov. 12, 2014), *with id.* at 237 (Amendment, March 6, 2015).
Thus, if producing a single output RF signal were to account for
"aggregated," as Petitioner urges, then "aggregated" would be rendered
superfluous. *See Dig.-Vending Servs. Int'l, LLC v. Univ. of Phx., Inc.*, 672
F.3d 1270, 1275 (Fed. Cir. 2012) (noting "the importance of construing
claim terms in light of the surrounding claim language, such that words in a
claim are not rendered superfluous").

    We turn now to Patent Owner's proposed construction on remand,
namely, "signals for transmission on multiple carriers at the same time to
increase the bandwidth for a user," which can be divided into three parts:
(1) "signals for transmission on multiple carriers," (2) "at the same time,"
(3) "to increase the bandwidth for a user." PO Remand Resp. 9. The
parties' dispute in this regard addresses primarily the third part of Patent
Owner's proposed construction, centering on whether the broadest

reasonable interpretation of "plurality of carrier aggregated transmit signals" requires increasing bandwidth.[22]  *See* Pet. Remand Br. 10–12; PO Remand Resp. 9–18; Pet. Remand Reply 5–8; PO Remand Sur-reply 1–5.  We determine that the intrinsic evidence supports this aspect of Patent Owner's proposed construction.

"[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence," and "when prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (quoting *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000)) (other citations omitted).  Thus, for the third part of Patent Owner's proposed construction, we rely on the 3GPP technical report cited in the '675 patent, as well as the Chen publication, which was cited in the prosecution history of the '675 patent.  The 3GPP technical report defines "[c]arrier

---

[22] Petitioner does not dispute the first part of Patent Owner's proposed construction. *See* Pet. Remand Br. 7 ("The Board construed the claim term 'plurality of carrier aggregated transmit signals' to mean 'signals for transmission on multiple carriers.'  This construction is correct." (internal citation omitted)).  With respect to the second part of the construction, we note Petitioner's contention that our previous construction properly omitted "at the same time." *See id.* at 11–12.  Determining whether "plurality of carrier aggregated transmit signals" requires this aspect of Patent Owner's proposed construction, however, is not necessary to resolve any controversy here. *See Vivid Techs.*, 200 F.3d at 803 (explaining that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy").

aggregation" as "[a]ggregation of two or more component carriers in order
to *support wider transmission bandwidths*."  Ex. 2011, 14 (emphasis added)
(cited by Ex. 1201, 2:60–62 ('675 patent)).  The Chen publication
additionally states that the "*bandwidth of a signal constantly increases* due
to multi-carrier applications."  Ex. 2012 ¶ 4 (emphasis added) (cited by
Ex. 1202, 270 (Office Action, July 2, 2015)).

    The teachings in both the 3GPP technical report and the Chen
publication are consistent with contemporaneous extrinsic evidence
introduced into the record on remand.  For example, as discussed above,
Patent Owner directs us to U.S. Patent No. 9,161,254, which states that
"[o]ne technique for providing additional bandwidth capacity to wireless
devices is through the use [of] carrier aggregation of multiple smaller
bandwidths to form a virtual wideband channel at a wireless device (e.g.,
UE)."  Ex. 2017, 3:19–22 (quoted in PO Remand Resp. 12); *see also id.* at
3:49–51 ("Carrier aggregation . . . enable[es] more bandwidth to be
obtained.") (cited by PO Remand Resp. 12).  The application for that patent
was filed in May 2013, just three months after the application for the '675
patent was filed.  Ex. 1201, code (22); Ex. 2017, code (22).  Similarly,
Patent Owner draws our attention to a 2013 Qualcomm paper, which states
that "[c]arrier aggregation, as the name suggests, combines multiple carriers
. . . at the device to provide a bigger data pipe to the user."  Ex. 2015, 6
(quoted in PO Remand Resp. 12).

    We note Petitioner's contention that the passage in the Chen
publication on which Patent Owner relies was never cited by the Examiner.
*See* Pet. Remand Reply 7.  That passage provides additional support for the
definition of carrier aggregation that is provided in the 3GPP technical

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

report, however, and is therefore relevant to our analysis here. *See V-Formation*, 401 F.3d at 1311; *see also* Ex. 1202, 278 (the Examiner advising the applicant during prosecution "to fully consider the [cited] references in their entirety as potentially teaching all or part of the claimed invention, as well as the context of the passage as taught by the prior art or disclosed by the Examiner"). Moreover, contrary to Petitioner's position, that neither the Examiner nor the applicant explicitly expressed an understanding that carrier aggregation requires increasing bandwidth does not change what is taught in the 3GPP technical report or in the Chen publication, both part of the intrinsic evidence. *See* Pet. Remand Reply 6–7 (Petitioner arguing that "the file history does not support Patent Owner's argument that the Examiner 'understood' that increasing bandwidth for a user is a required part of the construction of 'carrier aggregated transmit signals'" because "[n]either the Examiner nor the applicant made ***any*** such argument or suggestion").

We further note Petitioner's contention that the third part of Patent Owner's proposed construction, increasing bandwidth, "is improper because it imports an objective or potential result or benefit of carrier aggregation, not what carrier aggregation is." Pet. Remand Reply 5 (emphases omitted). Petitioner relies on *Braintree*, a Federal Circuit case in which the court rejected the argument that "purgation" means cleansing, even though "the specification . . . indicates that a dosage amount is 'effective' only if it produces a clean colon in preparation for a colonoscopy." *Braintree*, 749 F.3d at 1354–55. The court explained that "while cleansing is the goal specifically articulated in the specification, it is not a claim requirement," where the claims "only require that the compositions 'induce' (i.e., bring about or start) diarrhea," rather than "achiev[e] a fully cleansed colon." *Id.*

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Petitioner's reliance on *Braintree* is misplaced. The facts here are different. Specifically, the claims of the '675 patent require *carrier aggregated* transmit signals. The 3GPP technical report noted above, which is part of the intrinsic evidence, defines "carrier aggregation" as "[a]ggregation of two or more component carriers in order *to support wider transmission bandwidths*." Ex. 2011, 14 (emphasis added); *see also* Ex. 2012 ¶ 4 (Chen publication, also part of the intrinsic evidence, stating that the "*bandwidth of a signal constantly increases* due to multi-carrier applications" (emphasis added)). Thus, carrier aggregation *is* the aggregation of two or more carriers in order *to support wider transmission bandwidths*. As discussed above, the extrinsic evidence supports this definition. *See* Ex. 2015, 6 ("Carrier aggregation, as the name suggests, combines multiple carriers . . . at the device to provide a bigger data pipe to the user."); Ex. 2017, 3:19–22 ("One technique for providing additional bandwidth capacity to wireless devices is through the use [of] carrier aggregation of multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE)."), 49–51 ("Carrier aggregation . . . enable[es] more bandwidth to be obtained.").

Dr. Choi's example about aggregating two 5 MHz carriers from different bands also supports this definition. *See* Ex. 1244 ¶¶ 24–25 (cited by Pet. Remand Reply 6 n.5). Dr. Choi states that the aggregation of two 5 MHz carriers, which would provide a bandwidth of 10 MHz, "does not result in increased bandwidth compared with the bandwidth of a single, non-aggregated, carrier, for instance, a single 20 MHz carrier." *Id.* ¶ 25 (emphasis omitted). As Patent Owner points out, however, such aggregation "necessarily increases the bandwidth for a user as compared to a *single 5-*

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

*MHz carrier* allocated to the user." PO Remand Sur-reply 2. We agree with
Patent Owner's reasoning in this regard. *See* Ex. 2011, 14 (defining
"[c]arrier aggregation" as "[a]ggregation of two or more *component* carriers
in order *to support wider transmission bandwidths*" (emphases added)).
Indeed, Dr. Choi testified at his deposition on remand, "So I think you're
asking me if you were to *aggregate these two 5-megahertz carriers for a
resultant total aggregated bandwidth of 10 megahertz*, would that be greater
than if you were just to have a single 5-megahertz carrier. And the answer's,
obviously, yes because ten is greater than five." Ex. 2030, 28:2–24
(emphasis added) (cited by PO Remand Sur-reply 2). Consistently, Dr. Choi
also previously testified in his reply declaration during trial,

> LTE explicitly allows for transmission of *two aggregated 1.4
> MHz signals*, even though the standard can also transmit a single
> 20 MHz carrier, which provides much higher bandwidth than the
> *combined bandwidth of 2.8 MHz.* . . . [C]arrier aggregation can
> achieve higher data rates and can increase the overall capacity of
> wireless networks by allowing network operators to exploit
> fragmented spectrum allocations. . . . *Aggregating two narrow
> band signals could do precisely that—increasing bandwidth by
> using fragmented spectrum allocations.*

Ex. 1231 ¶ 25 (emphases added) (cited by PO Remand Sur-reply 2).

In view of the foregoing, we adopt Patent Owner's proposed
construction of "plurality of carrier aggregated transmit signals" on remand
(which is the same construction that Petitioner originally proposed in its
petitions), namely, "signals for transmission on multiple carriers at the same

36

**Appx148**

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

time to increase the bandwidth for a user." [23]  *See* PO Remand Resp. 9;
Pet. 12.  For the reasons given above, our construction is supported by the
intrinsic evidence.  *See, e.g.*, Ex. 1201, 2:60–67, 3:60–62 ('675 patent);
Ex. 1202, 189, 237, 246 (prosecution history file); Ex. 2011, 14 (3GPP
technical report); Ex. 2012 ¶ 4 (Chen publication).  Our construction also is
consistent with relevant extrinsic evidence.  *See, e.g.*, Ex. 2015, 6; Ex. 2017,
3:19–22, 3:49–51.  Further, our construction reflects Petitioner's proposed
language on remand, "signals for transmission on multiple carriers," as well
as portions of the specification cited by Petitioner.  *See* Pet. Remand Br. 7
(citing Ex. 1201, 2:63–64, 3:60–62).

### D. Obviousness Based on Chen

Petitioner asserts that claims 1–3, 5, 7, 11, 17–21, and 27 would have
been obvious over Chen and Wang; claims 8–10 and 28–30 would have
been obvious over Chen, Wang, and Choi; claim 12 would have been
obvious over Chen, Wang, and Eliezer; and claims 13–15 and 23–25 would
have been obvious over Chen, Wang, and Dahlman.  Pet. 15–81; 1330-
Paper 3, 22–75.  Patent Owner opposes.  PO Resp. 21–53.  For the reasons
explained below, we determine that Petitioner has *not* demonstrated by a

---

[23] As previously noted, determining whether "plurality of carrier aggregated
transmit signals" requires the second part of Patent Owner's proposed
construction, "at the same time," is not necessary to resolve any controversy
here.  *See Vivid Techs.*, 200 F.3d at 803.  We explain below it is undisputed
that the asserted prior art teaches this aspect of Patent Owner's proposed
construction.  *See infra* Part III.D.2.a.ii.  The outcome of our obviousness
analysis would thus be the same whether or not our construction requires "at
the same time."

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

preponderance of the evidence that claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 would have been obvious over the asserted grounds.

We start with an overview of Chen. As the issues in dispute all turn on the teachings and suggestions of Chen, we do not address the substance of Wang, Choi, Eliezer, or Dahlman.

### 1. Overview of Chen

Chen is a paper that proposes a hybrid envelope tracking scheme. Ex. 1212, 662. Figure 1 of Chen, which is reproduced below, illustrates the proposed scheme. *Id.*



**Figure 1** Proposed hybrid ET scheme for concurrent dual-band PAs.

In particular, Figure 1 of Chen shows the proposed hybrid envelope tracking architecture for concurrent dual-band power amplifiers. *Id.* Input signals 1

38

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

and 2 are provided at different frequencies (*id.* at 662), and each signal follows two paths (*see id.*, Fig. 1). Along one path, input signals 1 and 2 are fed separately to respective envelope detectors 1 and 2, where the envelopes of the signals are detected. *Id.* at 662, Fig. 1. The signals are then weighted using power weighting factor Ɛ. *Id.* Next, the signals are added together by the envelope combiner and injected into the envelope amplifier. *Id.* The output of the envelope amplifier is used to modulate the supply voltage of the target dual-band power amplifier (PA). *Id.* at 662. Chen indicates that $E_1(t)$ and $E_2(t)$ represent the signal envelopes in dual bands, and $E_D(t)$ represents the final modulated supply of the power amplifier. *Id.*

Along the other path, Figure 1 of Chen shows input signals 1 and 2 also being fed separately to respective delay lines 1 and 2. *See* Ex. 1212, Fig. 1. The signals are then upconverted by upconverters 1 and 2 and added together by the power combiner. *See id.* The power combiner outputs a signal that is provided to the dual-band PA. *See id.*

After receiving signals from both the envelope amplifier and the power combiner, the dual-band PA generates an output signal. Ex. 1212, Fig. 1.

### 2. Analysis

As discussed above, the Federal Circuit explained in its remand decision that we "needed to provide notice of and an adequate opportunity to respond to [our] construction" of the claim limitation "plurality of carrier aggregated transmit signals," and then it remanded for further proceedings. *Qualcomm*, 6 F.4th at 1263, 1267. Our analysis here thus focuses on

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

whether the asserted prior art teaches or suggests the limitation "plurality of carrier aggregated transmit signals" in view of our construction on remand.

### a. Independent Claims 1, 18, and 28

Each of independent claims 1, 18, and 28 recites, in relevant part, "plurality of carrier aggregated transmit signals." As discussed above, we construe "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." *Supra* Part III.C. This construction can be divided into three parts: (1) "signals for transmission on multiple carriers," (2) "at the same time," (3) "to increase the bandwidth for a user." We address each part of the construction in turn.

### i. "signals for transmission on multiple carriers"

In its opening brief on remand, Petitioner maintains its position set forth in the petitions that Chen teaches signals for transmission on multiple carriers. *Compare* Pet. 23–24, *with* Pet. Remand Br. 12–14. Petitioner identifies Chen's input signals 1 and 2 as "carrier aggregated transmit signals." Pet. Remand Br. 13–14 (citing Pet. 23–24); *see also* Pet. 23–24 ("Chen's Input 1 and Input 2 are signals for transmission on multiple carriers . . . ."). As support, Petitioner directs us to where Chen states that it "propose[s] for the first time a hybrid ET [envelope tracking] scheme for concurrent dual-band PAs, which combines the signal envelopes in dual bands." Pet. Remand Br. 13 (citing Ex. 1212, 662); *see also* Pet. 24. According to Petitioner, "[t]he validation prototype in Chen uses '[t]wo single carrier wideband code division multiple access signals' at two

40

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

different frequencies[,] 900 MHz and 2000 MHz," which "indicates that they are from different (i.e., 'multiple') carriers." Pet. Remand Br. 13–14 (quoting Ex. 1212, 663); *see also* Pet. 24. Petitioner contends that Chen's teachings satisfy the first part of our construction of "plurality of carrier aggregated transmit signals," namely, "signals for transmission on multiple carriers." Pet. Remand Br. 14; *see also* Pet. 23–24. Petitioner relies on Dr. Choi's testimony from his declaration submitted in support of the petitions. Pet. Remand Br. 13 (citing Ex. 1203 ¶ 103); *see also* Pet. 24.

Patent Owner does not dispute Petitioner's showing for this aspect of our construction. *See* PO Remand Resp. 18–19; PO Resp. 46–47.

Based on the record before us, we are persuaded that Chen teaches signals for transmission on multiple carriers.

### ii. "at the same time"

As discussed above, Petitioner argues on remand that the claim term "plurality of carrier aggregated transmit signals" does not require the second part of our construction, "at the same time." Pet. Remand Br. 7, 11–12. Petitioner nonetheless asserts that its petitions "explained that the prior art disclosed this claim term even under a narrower construction." *Id.* at 13 (citing Pet. 23–24). In the petitions, Petitioner "applie[d] the construction 'signals for transmission on multiple carriers at the same time to increase the bandwidth for a user,'" which is the same as our construction on remand. Pet. 23. Petitioner argued that "Chen's power tracking signal is based on a plurality of carrier aggregated transmit signals being sent *simultaneously*," and, more specifically, that "Input 1 and Input 2 are signals for transmission on multiple carriers *at the same time . . . ." Id.* at 23–24 (emphases added)

41

(citing Ex. 1212, 662–663). This is supported by Chen's teaching that, "[t]o investigate the performance of the ET scheme, two continuous wave signals have been fed into the dual-band PA *simultaneously*." Ex. 1212, 663 (emphasis added).

Patent Owner does not dispute Petitioner's showing for this aspect of our construction. *See* PO Remand Resp. 18–19; PO Resp. 46–47.

Based on the record before us, we are persuaded that Chen teaches signals for transmission on multiple carriers *at the same time*.

### iii. "to increase the bandwidth for a user"

Petitioner also argues on remand that "plurality of carrier aggregated transmit signals" does not require the third part of our construction, "to increase the bandwidth for a user." Pet. Remand Br. 7, 10–11. In its petitions, however, Petitioner "applie[d] the construction, 'signals for transmission on multiple carriers at the same time to increase the bandwidth for a user.'" Pet. 41–43. As noted above, this construction is the same as our construction on remand. We thus consider the parties' arguments during trial.

In the petitions, Petitioner contends that Chen's "method of aggregating multiple signals on different frequencies increases the bandwidth for a user, allowing more information to be transmitted per unit of time." Pet. 24. Petitioner relies on the declaration testimony of Dr. Choi. Pet. 24 (citing Ex. 1203 ¶ 103).

In its responses, Patent Owner counters that "Chen describes base station technology that is processing signals provided by different users." PO Resp. 46; *see also id.* at 24–27 (providing reasons why Chen is directed

to base station technology (citing Ex. 2002 ¶¶ 76–78)).  According to Patent Owner, "when two signals from two users are sent simultaneously, neither user gets an increased bandwidth."  *Id.*  Patent Owner relies on the declaration testimony of Dr. Williams.  *Id.* (citing Ex. 2002 ¶¶ 112–113).

Petitioner replies that "Patent Owner's argument relies entirely on the assumptions that (1) 'user' in this claim construction refers only to an individual mobile device owner, and (2) Chen is inapplicable because it is directed to transmissions by base stations," both of which Petitioner says "are wrong."  Pet. Reply 21.  Regarding the first assumption, Petitioner contends that "[i]f a base station is processing two signals, then it is undisputed that the bandwidth for that user, i.e., the base station, is increased."  *Id.*

As to the second assumption, Petitioner contends that carrier aggregation "is not, in ordinary usage, limited to the transmission of signals by a wireless device to a base station, *i.e.*, it is not limited [to] 'uplink' transmissions."  Pet. Reply 21–22.  As support, Petitioner directs us to where Dahlman describes carrier aggregation as "multiple component carriers [that] are aggregated and jointly used for *transmission to/from a single terminal*."  Ex. 1206, 104 (emphasis added & original emphasis omitted) (cited by Pet. Reply 22).  In other words, according to Dahlman, "component carriers can be aggregated for the downlink and uplink."  *Id.* (cited by Pet. Reply 22).  Petitioner also notes that Patent Owner stated at the ITC *Markman* hearing that "carrier aggregation . . . can be used in both the uplink and downlink a[s] it exists in systems, and the patent is really agnostic as to that."  Pet. Reply 22 (quoting Ex. 1229, 143:17–19); *see also*

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Ex. 1230, 45:5–12 (Dr. Williams's deposition transcript) (cited by Pet.
Reply 22).

Petitioner adds that "[a]lthough the authors of Chen validated their
envelope-tracking structure for transmitting multiple signals with a single
amplifier by using a base-station implementation, nothing in Chen limits its
structure to base stations, and Patent Owner's Response makes no real
argument that it is so limited." Pet. Reply 23.

With respect to Petitioner's user argument, Patent Owner responds
that it "is inconsistent with the plain and ordinary meaning of 'user' and
contradicted by the '675 patent and other evidence of record." PO Sur-
reply 20. As support, Patent Owner asserts that "the '675 patent uses the
term 'user equipment (UE)' to refer to a wireless device 110, as depicted in
Fig. 1," whereas "the base stations 130, 132 of Fig. 1 are only referred to as
'base stations,'" never as "users" or "user equipment." *Id.* at 20–21 (citing
Ex. 1201, 2:28–34, Fig. 1). In particular, the '675 patent teaches that its
"[w]ireless device 110 may also be referred to as a user equipment (UE), a
mobile station, a terminal, an access terminal, a subscriber unit, a station,
etc." Ex. 1201, 2:32–34. Patent Owner also directs us to a 2010 3GPP
technical paper that distinguishes between user equipment and base stations.
PO Sur-reply 21 (citing Ex. 1236, 6 (listing technical reports titled "User
Equipment (UE) radio transmission and reception" and "Base Station (BS)
radio transmission and reception")).

Turning to Petitioner's uplink/downlink argument, Patent Owner
counters that "in both the uplink and downlink scenarios, the bandwidth
must be extended for a single user terminal." PO Sur-reply 22. According
to Patent Owner, "Chen does not disclose downlink carrier aggregation—

44

**Appx156**

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

*i.e.*, using a base station to simultaneously transmit multiple signals to a single terminal to increase the bandwidth for that terminal." *Id.* Patent Owner asserts that "Chen discloses using its base station to transmit the two input signals Input 1 and Input 2 to multiple, different destination terminals simultaneously." *Id.* Patent Owner further asserts that "[d]ownlink carrier aggregation had not yet been implemented as of January 2018—much less as of Chen's 2012 publication date—and Chen contains no teaching or suggestion of this theoretical system." *Id.*

Patent Owner further contends that Petitioner's "argu[ment] that 'nothing in Chen limits its structure to base stations' . . . is an improper new reply argument." PO Sur-reply 22. Patent Owner adds that the belief that Chen is not limited to base stations is an insufficient "reason why the [person of ordinary skill in the art] would allegedly be motivated to modify the embodiment of this reference." *Id.* at 23.

On the record before us, we agree with Patent Owner that "user," in the construction applicable here, does not encompass a base station. As Patent Owner points out, the '675 patent distinguishes between wireless device 110 (which may be referred to as a *user* equipment) and base stations 130 and 132. PO Sur-reply 20–21 (citing Ex. 1201, 2:32–34, Fig. 1). To illustrate, Figure 1 of the '675 patent is reproduced below.

45

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2



*FIG. 1*

Figure 1 shows a wireless device communicating with a wireless system.
Ex. 1201, 1:56–57. Specifically, Figure 1 shows wireless device 110
communicating with wireless system 120 that includes base stations 130 and
132. *Id.* at 2:19–20, 28–30. Extrinsic evidence supports this distinction
between wireless device 110 (e.g., user equipment) and a base station. *See*
Ex. 1236, 6 (cited by PO Sur-reply 21). Accordingly, the third part of our
construction, "to increase the bandwidth for a user," does not encompass
increasing the bandwidth for a base station.

Petitioner does not dispute that Chen is directed to base stations,
acknowledging that "the authors of Chen validated their envelope-tracking
structure for transmitting multiple signals with a single amplifier by using a
base-station implementation." Pet. Reply 23. Although Petitioner argues
that Chen is not limited to base stations, Petitioner points to nothing in the
record as support. *See id.* We note Petitioner's contention that Patent
Owner "makes no real argument that [Chen] is so limited." *Id.* Yet the

burden is not on Patent Owner to show that Chen is limited to base stations; rather, the burden is on Petitioner to show that Chen satisfies the requirement of increased bandwidth for a user, and that Chen's disclosure of base stations is applicable. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) ("In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee."). Petitioner does not meet its burden. Chen's silence as to whether its concurrent dual-band PA is limited to base station implementations does not adequately show that Chen's teachings also extend to user equipment. *See* Pet. Reply 23 ("[N]othing in Chen limits its structure to base stations."); *Dynamic Drinkware*, 800 F.3d at 1379 ("[I]f the fact trier of the issue is left uncertain, the party with the burden loses.").

Even if Chen were not limited to base stations, however, we note that Petitioner does not proffer any reason as to why an ordinarily skilled artisan would have considered modifying Chen's base station implementation of the concurrent dual-band PA to provide a user device implementation of the concurrent dual-band PA. *See* Pet. 23–24; *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."); *see also Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1330 (Fed. Cir. 2009) ("[T]o invoke 'common sense' or any other basis for extrapolating from prior art to a conclusion of obviousness, a district court must articulate its reasoning with sufficient clarity."). Petitioner's declarant likewise fails to discuss any potential modification of Chen for implementation in a user device.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

For the reasons given above, we are not persuaded that Chen teaches or suggests the third part of our construction, "to increase the bandwidth for a user."

### b. Dependent Claims 2, 3, 5, 7–15, 17, 19–21, 23–25, 27, 29, and 30

The dependent claims include the limitation "plurality of carrier aggregated transmit signals" by virtue of their dependency from claims 1, 18, or 28. In its analysis of the dependent claims, Petitioner does not provide argument or evidence overcoming the deficiencies noted above as to the independent claims. *See* Pet. 42–81; 1330-Paper 3, 60–75.

### 3. Summary

In view of the foregoing, we determine that Petitioner has *not* demonstrated by a preponderance of the evidence that claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 would have been obvious over the asserted prior art. We determine in particular that Petitioner has *not* demonstrated by a preponderance of the evidence that claims 1–3, 5, 7, 11, 17–21, and 27 would have been obvious over Chen and Wang; claims 8–10 and 28–30 would have been obvious over Chen, Wang, and Choi; claim 12 would have been obvious over Chen, Wang, and Eliezer; and claims 13–15 and 23–25 would have been obvious over Chen, Wang, and Dahlman.

### IV. CONCLUSION

On remand, we determine that Petitioner has *not* shown by a preponderance of the evidence that claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 of the '675 patent are unpatentable.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 5, 7, 11, 17–21, 27 | 103 | Chen, Wang | | 1–3, 5, 7, 11, 17–21, 27 |
| 8–10, 28–30 | 103 | Chen, Wang, Choi | | 8–10, 28–30 |
| 12 | 103 | Chen, Wang, Eliezer | | 12 |
| 13–15, 23–25 | 103 | Chen, Wang, Dahlman | | 13–15, 23–25 |
| **Overall Outcome** | | | | 1–3, 5, 7–15, 17–21, 23–25, 27–30 |

## V.  ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 of the '675 patent have not been shown to be unpatentable; and

FURTHER ORDERED that, because this Decision on Remand amounts to a final written decision, parties to the proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

49

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2


For PETITIONER:

David Cavanaugh
Richard Goldenberg
Theodoros Konstantakopoulos
Louis Tompros
Kathryn Zalewski
WILMER CUTLER PICKERING HALE & DORR LLP
David.cavanaugh@wilmerhale.com
Richard.goldenberg@wilmerhale.com
Louis.tompros@wilmerhale.com
Theodoros.konstantakopoulos@wilmerhale.com
Kathryn.zalewski@wilmerhale.com

For PATENT OWNER:

Matthew Johnson
Joseph Sauer
David Cochran
David Maiorana
Richard Graham
Joshua Nightingale
JONES DAY
mwjohnson@jonesday.com
jmsauer@jonesday.com
dcochran@jonesday.com
dmaiorana@jonesday.com
ragraham@jonesday.com
jrnightingale@jonesday.com

Trials@uspto.gov                                                    Paper 46
571.272.7822                                              Date: March 23, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

INTEL CORPORATION,
Petitioner,

v.

QUALCOMM INCORPORATED,
Patent Owner.

———————

IPR2018-01328
IPR2018-01330[1]
Patent 9,608,675 B2

———————

Before MICHELLE N. WORMMEESTER, AMANDA F. WIEKER, and
SCOTT B. HOWARD, *Administrative Patent Judges*.

WORMMEESTER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision on Remand
Determining No Challenged Claims Unpatentable
*35 U.S.C. §§ 144, 318*

———

[1] This Decision addresses issues that are identical in each of the identified
cases.  We exercise our discretion to issue this Decision to be filed in each
case.  The parties may not use this style heading in subsequent papers.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

## I.  INTRODUCTION

We address these two cases on remand after a consolidated decision for six related cases, including these two cases, by the U.S. Court of Appeals for the Federal Circuit in *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256 (Fed. Cir. 2021).

As background, Intel Corporation[2] ("Petitioner") petitioned for six *inter partes* reviews challenging the validity of U.S. Patent No. 9,608,675 B2 (Ex. 1201,[3] "the '675 patent").  This Decision addresses only two of those *inter partes* reviews, namely, IPR2018-01328 and IPR2018-01330.[4] Petitioner filed petitions requesting *inter partes* review of claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 of the '675 patent across these two cases. Paper 2 ("Petition" or "Pet.") (requesting review of claims 1–3, 5, 7–15, 17–21, 23–25, and 27); 1330-Paper 3 (requesting review of claims 28–30). Qualcomm Incorporated ("Patent Owner") filed preliminary responses. Paper 7; 1330-Paper 7.  Pursuant to 35 U.S.C. § 314, we instituted *inter partes* reviews as to all the challenged claims and all the grounds of unpatentability raised in the petitions.  Paper 8 ("Institution Decision" or "Inst. Dec."); 1330-Paper 8.

During trial, Patent Owner filed responses.  Paper 14 ("Response" or "PO Resp."); 1330-Paper 14.  Petitioner filed replies.  Paper 16 ("Reply" or

---

[2] Intel Corporation identifies itself and Apple Inc. ("Apple") as real parties in interest.  Paper 2, 1.

[3] Unless otherwise noted, papers and exhibits refer to IPR2018-01328. Papers and exhibits preceded by "1330-" refer to IPR2018-01330.

[4] We address the other four *inter partes* reviews, IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340, in a separate decision on remand entered concurrently with this Decision.

2

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

"Pet. Reply"); 1330-Paper 16.  Patent Owner filed sur-replies.  Paper 19
("Sur-reply" or "PO Sur-reply"); 1330-Paper 19.  On October 9, 2019, we
conducted a consolidated oral hearing for all six related cases, including the
two cases addressed in this Decision.  A copy of the transcript is included in
the record.  Paper 29 ("Tr.").  With our authorization (*see* Paper 26), the
parties subsequently filed additional briefs on the meaning of the claim term
"generates the single power tracking signal based on a combination of the
plurality of I and Q components."  Paper 27 (Patent Owner's brief); Paper 28
(Petitioner's brief).

Pursuant to 35 U.S.C. § 318(a), we issued final written decisions in
the two cases addressed here.  Paper 30 ("Final Written Decision" or "Final
Dec."); 1330-Paper 30.  We determined that Petitioner demonstrated by a
preponderance of the evidence that all challenged claims, namely, claims 1–
3, 5, 7–15, 17–21, 23–25, and 27–30 of the '675 patent, are unpatentable.
Final Dec. 79; 1330-Paper 30, 85.  Patent Owner appealed our
determinations that these challenged claims are unpatentable to the Federal
Circuit.  Paper 31; 1330-Paper 31.

In its remand decision, the Federal Circuit addressed Patent Owner's
arguments that "it was not afforded notice of, or an adequate opportunity to
respond to, the Board's construction of 'a plurality of carrier aggregated
transmit signals,'" as well as Patent Owner's arguments "challeng[ing] the
Board's construction of the power tracker limitation," which refers to the
claim term "means for determining a single power tracking signal."
*Qualcomm*, 6 F.4th at 1262.  The power tracker limitation appears in just one
of four challenged independent claims, namely, claim 28, and the Federal
Circuit "s[aw] no error" in our construction of that limitation.  *Id.*  The

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Federal Circuit, however, agreed that "the Board violated [Patent Owner's] procedural rights with respect to the 'plurality of carrier aggregated transmit signals' limitation," vacated our final written decisions, and remanded for further proceedings. *Id.* at 1262, 1267. Each of the four challenged independent claims includes the limitation "plurality of carrier aggregated transmit signals." The Federal Circuit's mandate issued on September 17, 2021. *Qualcomm Inc. v. Intel Corp.*, No. 20-1589 (Fed. Cir. Sept. 17, 2021) (Document No. 63).

We subsequently issued an order in each case authorizing post-remand briefing tailored narrowly to addressing whether we properly construed "plurality of carrier aggregated transmit signals," and to addressing the applicability of our construction of "plurality of carrier aggregated transmit signals" to the asserted prior art disclosures. Paper 32, 2. Petitioner filed opening briefs (Paper 33, "Pet. Remand Br."), Patent Owner filed responsive briefs (Paper 35, "PO Remand Resp."), Petitioner filed reply briefs (Paper 38, "Pet. Remand Reply"), and Patent Owner filed sur-reply briefs (Paper 45, "PO Remand Sur-reply").

We have considered the record anew by reviewing the parties' positions on remand. For the reasons that follow, we determine that Petitioner has *not* shown by a preponderance of the evidence that claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 of the '675 patent are unpatentable.

## II. BACKGROUND

### A. Related Proceedings

Prior to institution, the parties identified various matters involving the '675 patent, including a federal district court case, an International Trade

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Commission ("ITC") investigation, as well as the six petitions for *inter partes* review identified above. Pet. 2; Paper 4, 2. Since the entry of our institution decisions, Patent Owner has asserted that "[t]he '675 patent is currently not involved in any litigation beyond the PTAB." PO Resp. 16. Petitioner has not stated otherwise.

The six *inter partes* review cases that the parties identified are IPR2018-01326, IPR2018-01327, IPR2018-01328, IPR2018-01329, IPR2018-01330, and IPR2018-01340. Pet. 2; Paper 4, 2. These cases can be divided into two sets of cases, where the first set of cases includes IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340. These four cases involve prior art challenges based on Yu[5] as a primary reference. The second set of cases includes IPR2018-01328 and IPR2018-01330, which involve prior art challenges based on Chen[6] as a primary reference. As noted above, this Decision addresses only the second set of cases. The first set of cases is addressed in a separate decision on remand entered concurrently with this Decision.

### B. The '675 Patent

The '675 patent describes power tracking for generating a power supply voltage for a circuit, such as an amplifier, that processes multiple transmit signals sent simultaneously. Ex. 1201, 1:8–10, 1:35–38. Figure 5,

---

[5] Yu, EP 2442440 A1, published Apr. 18, 2012 (IPR2018-01326, Ex. 1004).
[6] W. Chen et al., Hybrid Envelope Tracking for Efficiency Enhancement in Concurrent Dual-Band PAs, 54 Microwave & Optical Tech. Letters 662 (2012) (Ex. 1212).

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

which is reproduced below, illustrates a transmit module with power tracking for all transmit signals according to the '675 patent. *Id.* at 1:65–67.



*FIG. 5*

In particular, Figure 5 shows transmit module 500, which includes K transmit circuits 540a to 540k that can simultaneously process K transmit signals, with each transmit circuit processing one transmit signal. *Id.* at 6:34–37. Transmit module 500 also includes summer 552, power amplifier ("PA") 560, duplexer 570, and power tracking supply generator (or voltage generator) 580. *Id.* at 6:37–39.

Inphase (I) and quadrature (Q) samples for a transmit signal are provided to both a transmit circuit and voltage generator 580. Ex. 1201, 6:42–44. For example, transmit circuit 540a receives $I_1$ and $Q_1$ samples for a first transmit signal and generates a first upconverted radio frequency ("RF")

6

**Appx224**

signal for the first transmit signal. *Id.* at 6:40–42. Within transmit circuit 540a, the $I_1$ and $Q_1$ samples are converted to I and Q analog signals by digital-to-analog converters (DACs) 542a and 543a. *Id.* at 6:44–46. The I and Q analog signals are then filtered by lowpass filters 544a and 545a, amplified by amplifiers 546a and 547a, upconverted from baseband to RF by mixers 548a and 549a, and summed by summer 550a to generate the first upconverted RF signal. *Id.* at 6:46–50.

The other transmit circuits operate similarly. Ex. 1201, 6:54–57. Summer 552 receives all upconverted RF signals from the transmit circuits, sums the upconverted RF signals, and provides a modulated RF signal to PA 560. *Id.* at 6:59–62.

Within voltage generator 580, power tracker 582 receives $I_1$ to $I_K$ samples and $Q_1$ to $Q_K$ samples for all transmit signals being sent simultaneously. Ex. 1201, 6:63–65. Power tracker 582 then computes a digital power tracking signal based on the I and Q samples for these transmit signals and provides the digital power tracking signal to DAC 584. *Id.* at 6:65–7:1, 8:6–32. DAC 584 converts the digital power tracking signal to analog and provides the analog power tracking signal to power supply generator 586. *Id.* at 7:1–4, Fig. 5. Power supply generator 586 generates a power supply voltage for PA 560. *Id.* at 7:6–8.

Once PA 560 receives both the modulated RF signal from summer 552 and the power supply voltage from power supply generator 586, PA 560 amplifies the modulated RF signal using the power supply voltage. Ex. 1201, 7:8–11. PA 560 then provides an output RF signal for all the transmit signals being sent simultaneously. *Id.* at 7:11–12.

7

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

The output RF signal is routed through duplexer 570 and transmitted via antenna 590. *Id.* at 7:12–14.

### *C. Illustrative Claim*

Petitioner challenges claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 of the '675 patent, all for our consideration on remand. Claims 1, 18, and 28 are independent. Claim 1 is illustrative of the challenged claims and includes the subject matter the Federal Circuit instructed us to reconsider on remand:

> 1. An apparatus comprising:
>
> a power tracker configured to determine a single power tracking signal based on a plurality of inphase (I) and quadrature (Q) components of a plurality of carrier aggregated transmit signals being sent simultaneously, wherein the power tracker receives the plurality of I and Q components corresponding to the plurality of carrier aggregated transmit signals and generates the single power tracking signal based on a combination of the plurality of I and Q components, wherein the plurality of carrier aggregated transmit signals comprise Orthogonal Frequency Division Multiplexing (OFDM) or Single Carrier Frequency Division Multiple Access (SC-FDMA) signals;
>
> a power supply generator configured to generate a single power supply voltage based on the single power tracking signal; and
>
> a power amplifier configured to receive the single power supply voltage and the plurality of carrier aggregated transmit signals being sent simultaneously to produce a single output radio frequency (RF) signal.

8

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

### D. Instituted Grounds of Unpatentability

As discussed above, we instituted *inter partes* review based on all grounds raised in the two petitions addressed here.  Inst. Dec.; 1330-Paper 8. The instituted grounds are as follows.

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–3, 5, 7, 11, 17–21, 27[7] | 103 | Chen, Wang[8] |
| 12[9] | 103 | Chen, Wang, Eliezer[10] |
| 8–10, 28–30[11] | 103 | Chen, Wang, Choi[12] |
| 13–15, 23–25[13] | 103 | Chen, Wang, Dahlman[14] |

In support of its petitions, Petitioner relied on a declaration (Ex. 1203) as well as a reply declaration (Ex. 1231) of David Choi, Ph.D.  Patent Owner submitted with its responses a declaration of Tim Williams, Ph.D. (Ex. 2002).  The transcripts of the depositions of Dr. Choi are entered in the record as Exhibits 2006 and 2007, and the transcript of the deposition of Dr. Williams is entered in the record as Exhibit 1230.

---

[7] Petitioner challenges claims 1–3, 5, 7, 11, 17–21, 27 in IPR2018-01328.

[8] Wang et al., *Design of Wide-Bandwidth Envelope-Tracking Power Amplifiers for OFDM Applications*, 53 IEEE Transactions on Microwave Theory & Techniques 1244 (2005) (Ex. 1205).

[9] Petitioner challenges claim 12 in IPR2018-01328.

[10] Eliezer, US 2009/0004981 A1, published Jan. 1, 2009 (Ex. 1211).

[11] Petitioner challenges claims 8–10 in IPR2018-01328, and claims 28–30 in IPR2018-01330.

[12] Jinsung Choi et al., *Envelope Tracking Power Amplifier Robust to Battery Depletion*, 2010 IEEE MTT-S Int'l Microwave Symposium Digest 1074 (2010) (Ex. 1208, at Ex. A).

[13] Petitioner challenges claims 13–15 and 23–25 in IPR2018-01328.

[14] Erik Dahlman et al., 4G LTE / LTE-ADVANCED FOR MOBILE BROADBAND 11–12, 19, 27, 103–104, 132–135, 205, 347–351, 355–358, 389 (2011) (Ex. 1206).

## III. ANALYSIS

### A. Final Written Decisions

Our discussion of the final written decisions focuses on our previous construction of the claim term "plurality of carrier aggregated transmit signals," as recited in challenged independent claims 1, 18, and 28. In the final written decisions, we began our analysis by addressing the parties' arguments regarding the construction of that term. Final Dec. 18–25. Based on our review of the claims and specification of the '675 patent, we disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires signals comprising transmissions on *component* carriers. *Id.* at 20–21. We explained that the '675 patent explicitly defines "carrier aggregation" as "operation on multiple carriers," and that it also explicitly defines "[a] transmit signal" as "a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc." *Id.* at 21 (citing Ex. 1201, 2:63–64, 3:60–62). We further determined that these definitions refer broadly to signals comprising transmissions on carriers. *Id.*

We also disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires signals *from a single terminal*. Final Dec. 21–23. We explained that the claim language recites nothing about signals from a single terminal. *Id.* at 22. We additionally explained that although the '675 patent discloses examples and embodiments where signals are from a single terminal, the specification does not limit "carrier aggregated transmit signals" to those examples and embodiments. *Id.* (citing Ex. 1201, 14:21–25 (stating that the "disclosure is not intended to be limited to the examples and designs described")). We further noted that the

10

'675 patent teaches that a wireless device "'may send and/or receive transmissions' on multiple carriers according to various combinations of bands and band groups." *Id.* at 22–23 (citing Ex. 1201, 3:1–35). We found this to be consistent with Dahlman, extrinsic evidence regarding carrier aggregation, which Patent Owner cited as teaching that multiple carriers "are aggregated and jointly used for transmission *to/from* a single terminal." *Id.* at 23 (citing Ex. 1206, 104 (cited by PO Resp. 15)).

Lastly, we disagreed with Patent Owner that the term "plurality of carrier aggregated transmit signals" requires extended bandwidth for a user transmission from a single terminal. Final Dec. 23. We explained that the claim language recites nothing about extended transmission bandwidth, and that although the '675 patent discloses an example where carrier aggregation provides extended transmission bandwidth, it does not limit "carrier aggregated transmit signals" to that example. *Id.* (citing Ex. 1201, 2:65–67 ("Wireless device 110 *may* be configured with up to 5 carriers in one or two bands in LTE[15] Release 11.") (emphasis added)).

Turning to Petitioner's proposed construction for the term "plurality of carrier aggregated transmit signals," we noted its similar requirement of increasing the bandwidth for a user. Final Dec. 23. As with Patent Owner, we disagreed with Petitioner in this regard for the same reasons discussed above. *Id.* We additionally noted that Petitioner's counsel conceded during oral argument that this requirement "does not come specifically from the specification," and that Petitioner would not object to eliminating the requirement. *Id.* at 24 (citing Tr. 10:22–11:17).

---

[15] LTE stands for Long Term Evolution. Ex. 1201, 2:21.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

We also disagreed with Petitioner that the term "plurality of carrier aggregated transmit signals" requires "signals for transmission . . . at the same time." Final Dec. 24. We explained that the claim recites "a plurality of carrier aggregated transmit signals being sent simultaneously," and that requiring signals for transmission *at the same time* would render the claim language "being sent simultaneously" redundant and superfluous. *Id.*

In summary, we concluded that the broadest reasonable interpretation of the claim term "plurality of carrier aggregated transmit signals" is "signals for transmission on multiple carriers." Final Dec. 24. We stated that "[o]ur construction is consistent with the '675 patent, which defines the term 'carrier aggregation' as 'operation on multiple carriers' and the term '[a] transmit signal' as 'a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" *Id.* at 24–25 (citing Ex. 1201, 2:63–64, 3:60–62). We additionally noted that "[o]ur construction also encompasses, but is not limited to, Patent Owner's proposed construction." *Id.* at 25.

After providing a brief overview of Chen, we addressed whether Petitioner demonstrated by a preponderance of the evidence that the teachings in Chen account for the "plurality of carrier aggregated transmit signals," as recited in each of independent claims 1, 18, and 28. Final Dec. 32–37. In particular, consistent with our construction of the claim term "plurality of carrier aggregated transmit signals," we agreed with Petitioner that Chen's input signals 1 and 2 are transmitted on multiple carriers because the signals are "two single carrier wideband code division multiple access signals" that operate at different frequencies. *Id.* at 37 (citing Pet. 24 (citing Ex. 1212, 663)). We also credited the testimony of Petitioner's declarant

12

**Appx230**

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Dr. Choi on this particular issue. *Id.* (citing Pet. 24 (citing Ex. 1203 ¶ 103)). As to Patent Owner's argument challenging Petitioner's showing for the recited "plurality of carrier aggregated transmit signals," we disagreed because Patent Owner relied on its proposed construction, which we determined "is overly narrow and improperly requires signals from a single terminal as well as providing extended transmission bandwidth for a user transmission from a single terminal." *Id.* at 59–60 (citing PO Resp. 46).

## B. The Federal Circuit's Remand Decision

Our discussion of the Federal Circuit's remand decision focuses only on the court's analysis regarding our construction of the recited "plurality of carrier aggregated transmit signals." On appeal to the Federal Circuit, Patent Owner argued that "it was not afforded notice of, or an adequate opportunity to respond to, the Board's construction of 'a plurality of carrier aggregated transmit signals.'" *Qualcomm*, 6 F.4th at 1262. The Federal Circuit agreed with Patent Owner that we "violated [Patent Owner's] procedural rights with respect to the 'plurality of carrier aggregated transmit signals' limitation." *Id.* The Federal Circuit explained that "the Board may adopt a claim construction of a disputed term that neither party proposes without running afoul of the [Administrated Procedure Act]." *Id.* As to the case here, however, the Federal Circuit pointed out that "the issue of whether increased bandwidth was a required part of the claim construction was not in dispute." *Id.* at 1262–63. That is, "[t]he Board's construction of 'a plurality of carrier aggregated transmit signals' diverged from the agreed-upon increased bandwidth requirement for the term." *Id.* at 1263. The Federal Circuit further noted that "[w]hile the Board did not change theories midstream or

13

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

depart from a construction it previously adopted, it is still difficult to
imagine either party anticipating that this agreed-upon matter of claim
construction was a moving target," and that "unlike with disputed terms, it is
unreasonable to expect parties to brief or argue agreed-upon matters of claim
construction." *Id.* at 1263. The Federal Circuit counseled that "the Board
needed to provide notice of and an adequate opportunity to respond to its
construction," which "departed from the agreed-upon increased bandwidth
requirement." *Id.* at 1263, 1265.

The Federal Circuit disagreed with Petitioner that the oral hearing
provided Patent Owner notice and an opportunity to respond. *Qualcomm*, 6
F.4th at 1263–64. The Federal Circuit explained that the panel's comment
during the hearing that it would think about whether the increased bandwidth
requirement is necessary "did not *provide* [Patent Owner] notice that the
Board might depart from the increased bandwidth requirement," where
"[t]he Board did not announce a construction, criticize the parties' agreed-
upon requirement, ask any follow-up questions to [Petitioner], or ask any
related questions to [Patent Owner]." *Id.* at 1264. The Federal Circuit
further explained that "[t]he hearing also did not provide an adequate
opportunity to respond" because the Board did not provide a theory or
rationale for departing from the agreed-upon requirement to which Patent
Owner could have responded, it did not ask Patent Owner questions about
the requirement, and it did not request additional briefing after the hearing.
*Id.* at 1264–65. The Federal Circuit added that Patent Owner did not have
an opportunity to introduce evidence addressing why an ordinarily skilled
artisan would have understood that the claim term "plurality of carrier

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

aggregated transmit signals" requires signals that increase bandwidth. *Id.* at 1265.

The Federal Circuit also disagreed with Petitioner that Patent Owner's option to seek rehearing after receiving notice through the final written decisions provided an adequate opportunity to respond. *Qualcomm*, 6 F.4th at 1263, 1265. The Federal Circuit explained that "a party need not seek rehearing in order to seek relief from a Board decision on appeal." *Id.* at 1265. The Federal Circuit acknowledged that "it may have been a more efficient use of resources had [Patent Owner] sought rehearing," but stated that Patent Owner "was not required to do so." *Id.*

Without deciding whether Patent Owner must show prejudice, as Petitioner argued, the Federal Circuit further reasoned that Patent Owner had made a sufficient showing. *Qualcomm*, 6 F.4th at 1263 & n.3. The Federal Circuit explained that Patent Owner "argued throughout the IPR proceedings that the prior art did not disclose the increased bandwidth requirement," and that "[b]y removing that requirement, the Board eliminated an element on which [Petitioner] bore the burden of proof." *Id.* The Federal Circuit additionally explained that "without notice of the Board's elimination of the increased bandwidth requirement, [Patent Owner] had no reason to brief that requirement or establish an evidentiary record supporting it, particularly given the limited word count and breadth of issues in these IPRs." *Id.* at 1263–64.

Accordingly, the Federal Circuit determined that we did not provide Patent Owner adequate notice of and opportunity to respond to our claim construction of "plurality of carrier aggregated transmit signals," vacated our

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

final written decisions, and remanded for further proceedings. *Qualcomm*, 6 F.4th at 1267.

### C. Claim Construction

The claim construction standard applicable to these *inter partes* review proceedings is the broadest reasonable interpretation in light of the patent specification. *See* 37 C.F.R. § 42.100(b) (2018); *Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard).[16] Under this standard, claim terms generally are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). That is, we give words "their plain meaning" unless, however, it is "inconsistent with the specification and prosecution history." *Arista Networks, Inc. v. Cisco Sys., Inc.*, 908 F.3d 792, 796–98 (Fed. Cir. 2018) (rejecting construction as "overly broad, even under the broadest reasonable interpretation standard"); *see also Personalized Media Comm'cns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) ("[T]he Board's interpretation must be reasonable in light of the specification, prosecution history, and the understanding of one skilled in the art.").

---

[16] The revised claim construction standard for interpreting claims in *inter partes* review proceedings as set forth in the final rule published October 11, 2018, does not apply to these proceedings because the new "rule is effective on November 13, 2018 and applies to all IPR, PGR and CBM petitions filed on or after the effective date." Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (codified at 37 C.F.R. § 42.100(b) (2019)). The petitions here were filed on July 3, 2018.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

In view of the Federal Circuit's remand decision, we address the parties' arguments on remand as to whether we properly construed the claim term "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers."[17]

The term "plurality of carrier aggregated transmit signals" appears in each of challenged independent claims 1, 18, and 28, as well as several dependent claims. Petitioner originally proposed that we construe this term to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." Pet. 12. On remand, however, Petitioner argues that we properly construed the term to mean, more broadly, "signals for transmission on multiple carriers." Pet. Remand Br. 7–12. As support, Petitioner contends that "the '675 patent provides explicit definitions for this

---

[17] Referring to Petitioner's opening briefs, Patent Owner asserts that, "[c]ontrary to the Board's Order dated November 1, 2021 (Paper 35 ('Order') in IPR2018-01326), Petitioner filed six substantively different briefs, which collectively exceed the 20-page limit set by the Order." PO Remand Resp. n.1. Patent Owner does not identify any differences. We have reviewed Petitioner's six opening briefs, and they appear to be substantively similar except for the discussions as to the applicability of our previous construction of "plurality of carrier aggregated transmit signals" to the asserted prior art disclosures. *Compare, e.g.*, Pet. Remand Br., *with, e.g.*, IPR2018-01326, Paper 36. In that regard, the briefs in IPR2018-01326, IPR2018-01327, IPR2018-01329, and IPR2018-01340 focus on Yu's disclosures, whereas the briefs in IPR2018-01328 and IPR2018-01330 focus on Chen's disclosures. Pet. Remand Br. 12–14; IPR2018-01326, Paper 36, 13–16. If the six briefs each included the discussions regarding both Yu and Chen, the briefs would be substantively the same, and the sum total of pages for each brief would be less than twenty. Pet. Remand Br. 1–14 (brief, including Chen discussion, comprising about fourteen pages); IPR2018-01326, Paper 36, 13–16 (Yu discussion comprising about four pages). Thus, it is harmless for us to consider Petitioner's opening briefs.

17

**Appx235**

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

claim term, by stating that 'carrier aggregation . . . *is* operation on multiple carriers' and 'a transmit signal *is* a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" *Id.* at 7 (quoting Ex. 1201, 2:63–64, 3:60–62).[18]  Petitioner asserts that "[t]he Federal Circuit has recognized that the use of the term 'is' or similar language can 'signify that a patentee is serving as its own lexicographer.'" *Id.* (quoting *Sinorgchem Co., Shandong v. USITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007)).

Petitioner also points to various other portions of the specification. Pet. Remand Br. 9.  For example, Petitioner cites the teaching that "[c]arrier aggregation may also be referred to as multi-carrier operation." *Id.* (citing Ex. 1201, 2:64–65).  Petitioner additionally cites the teaching that "[i]ntra-band [carrier aggregation] refers to operation on multiple carriers within the same band," and "[i]nter-band [carrier aggregation] refers to operation on multiple carriers in different bands." *Id.* (citing Ex. 1201, 3:1–5). According to Petitioner, these teachings "confirm[] the accuracy of the Board's construction under the broadest reasonable interprerion standard." *Id.*

Petitioner acknowledges that our previous construction is broader than the construction it originally proposed in the petitions.  Pet. Remand Br. 10. In particular, our construction omits two requirements from Petitioner's

---

[18] There are instances in the parties' remand briefs where citations refer to IPR2018-01326, a related case not addressed here. *See, e.g.*, PO Remand Resp. n.1; Pet. Remand Reply n.1.  Many of the same papers and exhibits have been filed in both IPR2018-01326 and IPR2018-01328.  For purposes of this Decision, citations attributed to the parties refer to IPR2018-01328, unless noted otherwise.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

originally-proposed construction, namely, signals for transmission *at the same time* and *increasing the bandwidth for a user*. *Id.* Petitioner explains that it originally "proposed its construction in an effort to minimize disputes," noting that its "construction was actually the Patent Owner's construction in the earlier ITC proceeding." *Id.* Petitioner contends, however, "[t]he Board properly omitted the limitation 'to increase the bandwidth for a user' because, as the Board explained, the claim language says nothing about increasing bandwidth for a user." *Id.* at 10 (citing Final Dec. 23). Petitioner further asserts that "while the '675 patent **does** include an example of carrier aggregation increasing bandwidth, it **does not** expressly limit carrier aggregation to this purpose." *Id.* at 11 (citing Ex. 1201, 2:65–67 ("Wireless device 110 **may** be configured with up to 5 carriers in one or two bands in LTE Release 11.") (emphasis added)).

Petitioner adds that "the Board properly omitted the limitation 'at the same time'" because claim 1 recites "a plurality of carrier aggregated transmit signals being sent simultaneously," and requiring signals for transmission *at the same time* "would render superfluous the claim language 'being sent simultaneously.'" Pet. Remand Br. 11–12; *see id.* at 9 n.6.

Patent Owner responds that the term "carrier aggregated transmit signals" instead carries its ordinary and customary meaning, which Petitioner originally proposed in its petitions: "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user." PO Remand Resp. 2, 9; *see also* Pet. 12. Patent Owner contends that "[w]hile it is true that transmission of signals on multiple carriers is an attribute of carrier aggregation, the [person having ordinary skill in the art] would have further understood the term to mean that the multiple component carriers are

19

**Appx237**

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

aggregated (*i.e.*, combined) to increase the bandwidth for a user."  PO
Remand Resp. 9 (internal citation omitted).  As support, Patent Owner relies
on the '675 patent, its prosecution history file, as well as extrinsic evidence.

   Starting with the '675 patent, Patent Owner asserts that the
specification "specifically describes an example of a user device (*i.e.*,
wireless device 110) that 'supports carrier aggregation' by being 'configured
with up to 5 carriers in one or two bands [in LTE Release 11].'"  PO
Remand Resp. 10 (quoting Ex. 1201, 2:63–67).  To illustrate, Patent Owner
asserts that "user devices of earlier LTE systems were limited to the 20 MHz
bandwidth of a single channel," whereas "the carrier aggregation introduced
in LTE Release 11 enables a user device to aggregate up to five of these 20
MHz channels as component carriers of a single virtual channel having a
bandwidth of up to 100 MHz."  *Id.* (citing Ex. 1201, 2:59–60, 65–67,
Figs. 2A–2D).  Patent Owner notes that "[t]he '675 patent further explains
that LTE carriers may be aggregated from frequency bands listed in 3GPP
TS (Technical Specification) 36.101," a 3GPP[19] technical report that Patent
Owner points to specifically for describing carrier aggregation as
"[a]ggregation of two or more component carriers in order to support wider
transmission bandwidths."  *Id.* at 11 (citing Ex. 1201, 2:58–62; quoting
Ex. 2011, 14 (3GPP technical report)).

   Moving on to the prosecution history of the '675 patent, Patent Owner
asserts that the Examiner applied a U.S. publication, namely, the Chen

---

[19] 3GPP stands for 3rd Generation Partnership Project.  Ex. 2011 (cover).

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

publication,[20] in an Office action because it "discloses a plurality of carrier aggregated transmit signals."  PO Remand Resp. 11 (quoting Ex. 1202, 266–279 (Office action, July 2, 2015)).  According to Patent Owner, the Chen publication "makes clear that its multi-carrier aggregation provides increased bandwidth."  *Id.*  Patent Owner relies on the Chen publication's teaching that the "bandwidth of a signal constantly increases due to multi-carrier applications."  *Id.* (quoting Ex. 2012 ¶ 4).

As to extrinsic evidence, Patent Owner points to teachings across various patents and publications to support its proposed construction on remand.  PO Remand Resp. 12–13 (citing Ex. 2015, 6; Ex. 2016; Ex. 2017, 3:20–22; Ex. 2018, 3:27–62).  For example, Patent Owner asserts that "U.S. Patent No. 9,161,254 teaches that carrier aggregation is a 'technique for providing additional bandwidth capacity to wireless devices' by 'aggregat[ing] . . . multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE).'"  *Id.* at 12 (quoting Ex. 2017, 3:19–22[21]).  Patent Owner also asserts that "a 2013 Qualcomm document states that '[c]arrier aggregation, as the name suggests, combines multiple carriers (a.k.a. channels) at the device to provide a bigger data pipe to the user.'"  *Id.* (quoting Ex. 2015, 6).

With respect to our previous construction (which is Petitioner's proposed construction on remand), Patent Owner contends that it "is wrong because it reads 'aggregated' out of the term 'carrier aggregated transmit

---

[20] Chen, U.S. Publication No. 2012/0321018 A1, published Dec. 20, 2012 (Ex. 2012).  The Chen publication is different than Chen, which is an asserted reference in the petitions.
[21] Patent Owner cites Exhibit 2017, lines 20 through 22, but the quoted language appears at lines 19 through 22.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

signals.'" PO Remand Resp. 13. Patent Owner asserts that "[a]ggregation refers to the process of combining constituent parts into a single thing." *Id.* (citing Ex. 2029 (dictionary defining "aggregation" as "the collecting of units . . . into a mass or whole")). Patent Owner further asserts that an ordinarily skilled artisan "would not have understood 'carrier aggregation' to be equivalent to any generic 'transmission on multiple carriers' because nothing is being aggregated when disparate signals are transmitted on different carriers to separate destinations." *Id.* at 14.

Patent Owner further contends "there is no lexicography" here, contrary to Petitioner's position. PO Remand Resp. 2 (capitalization and emphasis omitted); *see also* Pet. Remand Br. 7. Patent Owner asserts that "[w]hen the '675 patent sought to define a term, it used a very specific format, *i.e.*, putting the defined term in quotations marks, followed by the phrase 'is used herein to mean,' followed by the definition in quotation marks." PO Remand Resp. 3. For example, Patent Owner directs us to where the specification states, "The word 'exemplary' is used herein to mean 'serving as an example, instance, or illustration.'" *Id.* (citing Ex. 1201, 2:10–11). Patent Owner further asserts that "[n]one of the statements [Petitioner] relies on for the term 'carrier aggregated transmit signals' resembles this format" because "neither of [Petitioner's] citations employs the phrase 'is used herein to mean'" or "uses quotation marks for the term or its purported definition." *Id.* at 4 (citing Ex. 1201, 2:63–54, 3:60–62). As discussed above, Petitioner cites the '675 patent's statement that "carrier aggregation . . . is operation on multiple carriers" as well as its statement that "[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels,

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

etc." Pet. Remand Br. 7 (quoting Ex. 1201, 2:63–64, 3:60–62). According to Patent Owner, "[t]hese departures from the '675 patent's distinctive definitional format show that the patentee did not intend these statements to redefine the plain and ordinary meaning of 'carrier aggregated transmit signals.'" PO Remand Resp. 4; *see also id.* at 8 (characterizing "the '675 patent's statement 'carrier aggregation . . . is operation on multiple carriers' [a]s nothing more than a generalized introduction to carrier aggregation, highlighting one aspect of it").

Patent Owner also urges that, "[t]aken together, the [person having ordinary skill in the art] would recognize that neither statement is definitional" because they additionally are inconsistent. PO Remand Resp. 5–6 (citing Ex. 1201, 2:63–64, 3:60–62); PO Remand Sur-reply 6–7. Patent Owner points out in particular that one statement "has a broader scope than the [other statement], encompassing transmission on *one or more* general frequencies rather than *multiple carriers*," and "is open-ended via its use of the word 'etc.'" PO Remand Resp. 6; *see also* PO Remand Sur-reply 6 ("For example, . . . 'transmit signals' includes transmission on *one* carrier, while 'carrier aggregation' is limited to implementations utilizing *multiple* carriers."). *Compare* Ex. 1201, 2:63–64 ("carrier aggregation . . . is operation on multiple carriers"), *with* Ex. 1201, 3:60–62 ("[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.").

Lastly, Patent Owner directs our attention to another Board decision in a different case, IPR2019-00128, in which, according to Patent Owner, the parties "litigated nearly the same issue that is now before the Board," namely, "the correct construction of the term 'carrier aggregation.'" PO

23

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Remand Resp. 14 (citing Ex. 2026).  In that decision, the Board determined that "carrier aggregation" requires, in part, providing higher bandwidth. Ex. 2026, 24–26.  The Board relied on intrinsic evidence in that case, including a technical report cited in the patent specification and a reference relied on during prosecution.  *Id.*  Patent Owner asserts that the technical report cited there is the same 3GPP technical report cited in the '675 patent regarding LTE Release 11.  PO Remand Resp. 17 (citing Ex. 1201, 2:60–67; Ex. 2026, 24).

In reply, Petitioner addresses Patent Owner's arguments regarding Petitioner's reliance on the '675 patent's two statements that "carrier aggregation . . . is operation on multiple carriers" and "[a] transmit signal is a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc."  Ex. 1201, 2:63–64, 3:60–62. Petitioner reiterates that "the Federal Circuit *has* found that 'is' can signal lexicography," and has further "held that specific or even explicit definitional formats are *not* required."  Pet. Remand Reply 2; *see also id.* at 4 (asserting that "Patent Owner's argument . . . is contradicted by the Federal Circuit's holdings that the word 'is' may define a term").  Petitioner also asserts that "operation on multiple carriers" is a "definition [that] is in the 'Detailed Description' of the purported invention," rather than "a generalized introduction to carrier aggregation," contrary to Patent Owner's position.  *Id.* at 4.  As to Patent Owner's emphasis on the way the '675 patent defines "exemplary," Petitioner counters that "the alleged 'definitional format' . . . is merely a legal boilerplate definition of 'exemplary,'" a word that "is not a technical claim term."  *Id.* at 3.

24

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Regarding Patent Owner's characterization of the two statements as inconsistent with each other, Petitioner responds that Patent Owner "relies on a misquote of the definition of 'transmit signals'" and "omits the word 'channels.'" Pet. Remand Reply 3–4. Petitioner asserts that "[t]he actual phrases in that definition—'transmission on one or more carriers' and 'transmission on one or more frequency channels'—which Patent Owner's own expert confirmed is 'reasonable'—are consistent and closely related because a carrier is transmitted on a frequency *channel*." *Id.* at 4 (citing Ex. 1201, 3:60–62; Ex. 1244 ¶¶ 10–17; Ex. 1241, 15:8–16:4). Petitioner further asserts that "Patent Owner also cites the 'etc.' in the definition but fails to identify what else is signaled by that language." *Id.*

Turning to Patent Owner's proposed construction of "plurality of carrier aggregated transmit signals," Petitioner argues that "Patent Owner seeks to import 'to increase the bandwidth for a user.'" Pet. Remand Reply 5. Petitioner contends that the "added language is improper because it imports an ***objective*** or potential ***result or benefit*** of carrier aggregation, not what carrier aggregation ***is***." *Id.* (citing *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1355 (Fed. Cir. 2014)). Petitioner adds that "increased signal bandwidth is only a ***potential*** result of carrier aggregation which may not occur." *Id.* at 6. As support, Petitioner relies on Dr. Choi's testimony in his reply declaration on remand. *Id.* at 6 n.5 (citing Ex. 1244 ¶¶ 18–29). To illustrate, Dr. Choi testifies,

> So, for example, . . . one component carrier from each of Band 1 and Band 18 can be carrier aggregated. . . . [I]n Band 1, carriers with 5, 10, 15, and 20 MHz bandwidths are available for aggregation . . . , while in Band 18, carriers with 5, 10, or 15 MHz are available for aggregation . . . .

25

**Appx243**

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

> As one example where carrier aggregation would not result in increased bandwidth, ***aggregating a 5 MHz carrier from Band 1 . . . with a 5 MHz carrier from Band 18 . . . would only result in 10 MHz, which does not result in increased bandwidth compared with the bandwidth of a single, non-aggregated, carrier***, for instance, a single 20 MHz carrier in Band 1 . . . a single 15 MHz carrier in Band 1, or a single 15 MHz carrier in Band 18, etc.

Ex. 1244 ¶¶ 24–25.

Petitioner further contends that neither the specification, the prosecution history, nor the extrinsic evidence of record supports Patent Owner's proposed construction. Pet. Remand Reply 6–7. Referring to the specification, Petitioner asserts that it "states that multiple transmissions on different carriers '***may*** have increased envelope bandwidth,'" its "discussion of Figures 2A–2D, cited by Patent Owner . . . does not mention increasing bandwidth," its "discussion of the LTE specification . . . mentions only that frequency bands may cover up to 200 MHz and 35 bands are supported in Release 11," and it "does not incorporate the statement in 3GPP TS 36.101 about 'carrier aggregation' quoted by Patent Owner." *Id.* at 6 (citing Ex. 1201, 2:58–62, 6:10–12). As for the prosecution history, Petitioner asserts that "[n]either the Examiner nor the applicant made ***any*** such argument or suggestion" about understanding "that increasing bandwidth for a user is a required part of the construction of 'carrier aggregated transmit signals.'" *Id.* at 6–7. Petitioner also notes that the Examiner never cited paragraph 4 of the Chen publication on which Patent Owner relies. *Id.* at 7. With respect to the extrinsic evidence, Petitioner asserts that it was not cited or considered during prosecution. *Id.* Petitioner adds that "[w]here, as here, the claim term is defined in the patent, reliance on such extrinsic evidence is

26

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

improper." *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584–85 (Fed. Cir. 1996)).

Also, Petitioner contends that "Patent Owner wrongly criticizes the Board's construction for allegedly 'read[ing] "aggregated" out of the term'" because "the claims already state that the claimed apparatus 'produce[s] a single output radio frequency (RF) signal.'" Pet. Remand Reply 7 (citing Ex. 1244 ¶¶ 30–33).

Lastly, Petitioner contends that the Board's construction of "carrier aggregation" in the other decision, in IPR2019-00128, should not dictate our decision here because the construction there "***excludes*** 'for a user,' and relies on several prior art references not relevant here." Pet. Remand Reply 8. Petitioner also submits, "More importantly, [the] Board's construction here is consistent with the ALJ's construction of the same term in the associated ITC investigation as 'simultaneous operation on multiple carriers,' whereas the [other] construction—currently on appeal—is not." *Id.* (citing Ex. 1242, 37–42). Petitioner asserts that "[t]he ALJ's construction and reasoning expressly rejected the inclusion of 'to increase the bandwidth for a user.'" *Id.* (citing Ex. 1242, 37–42).

Patent Owner counters that "increased user bandwidth is the necessary purpose of carrier aggregation," and that "Dr. Choi fails to show that carrier aggregation does not always increase the bandwidth of a user." PO Remand Sur-reply 2. Referring to Dr. Choi's example discussed above (*see also* Ex. 1244 ¶ 25), Patent Owner asserts that "[a]ggregating *two 5-MHz carriers* necessarily increases the bandwidth for a user as compared to a *single 5-MHz carrier* allocated to the user and Dr. Choi admits this." PO Remand Sur-reply 2 (citing Ex. 2030, 28:2–24 ("So I think you're asking me if you

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

were to aggregate these two 5-megahertz carriers for a resultant total aggregated bandwidth of 10 megahertz, would that be greater than if you were just to have a single 5-megahertz carrier.  And the answer's, obviously, yes because ten is greater than five.")).  Patent Owner adds that during prosecution "[t]he applicant amended the claims based on the prior art to recite 'carrier *aggregated* transmit signals' (Ex. 1[2]02 at 237), and the increased bandwidth requirement gives meaning to the explicitly recited 'aggregat[ion].'"  *Id.* at 2–3.  Patent Owner states that "[p]ointing to other language in the claim as allegedly establishing the 'aggregating' concept," as Petitioner does, "would cause the word 'aggregated,' where it is recited in the claim, to be superfluous."  *Id.* at 5 (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)).

With respect to Petitioner's contention that Patent Owner's proposed construction on remand is unsupported by the specification, the prosecution history, and the extrinsic evidence, Patent Owner responds that Petitioner "point[s] to no counter-examples where increased bandwidth for a user is not present."  PO Remand Sur-reply 3.  Patent Owner also notes Petitioner "does not even attempt to show" that the statement in the 3GPP technical report describing carrier aggregation as "[a]ggregation of two or more component carriers in order to support wider transmission bandwidths" is "wrong or inconsistent with the [person having ordinary skill in the art's] understanding of the term."  *Id.*; *see also id.* at 4 (stating "[Petitioner's] only counter to [Patent Owner's] evidence that the Examiner understood 'carrier aggregation' to increase the bandwidth of a user is that [Patent Owner] cited Chen paragraph [0004], whereas the Examiner specifically cited paragraph [0007]"); *id.* at 4 (stating "[Petitioner's] further criticism that [Patent

28

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Owner's] 'external documents' were not 'cited or considered during prosecution' just means that they are extrinsic evidence" (internal citation omitted)).

Patent Owner further maintains its position that there is no lexicography in this case. PO Remand Sur-reply 6–8. Patent Owner adds that Petitioner "cites no authority for the proposition that two alleged definitions can be combined to yield lexicography for a disputed claim term." *Id.* at 7. Lastly, Patent Owner notes that "there is no rule forbidding generalized introductions in a patent's detailed description." *Id.* at 8.

On the record now before us, we determine that our previous construction of "plurality of carrier aggregated transmit signals" (i.e., "signals for transmission on multiple carriers") is overly broad. As Petitioner points out, the '675 patent "stat[es] that 'carrier aggregation . . . *is* operation on multiple carriers' and 'a transmit signal *is* a signal comprising a transmission on one or more carriers, a transmission on one or more frequency channels, etc.'" Pet. Remand Br. 7 (quoting Ex. 1201, 2:63–64, 3:60–62). Read together in isolation, we agree with Petitioner that these statements in the specification say "carrier aggregated transmit signals" means "signals for transmission on multiple carriers." Our construction, however, must also take into account the prosecution history. *See Personalized Media*, 952 F.3d at 1340. The prosecution history "facilitates claim construction by revealing the intended meaning and scope of technical terms and may even trump the weight of specification language in some circumstances." *TDM Am., LLC v. U.S.*, 85 Fed. Cl. 774, 788 (2009) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999)). For example, "an applicant's amendment accompanied by

29

**Appx247**

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

explanatory remarks can define a claim term by demonstrating what the applicant meant by the amendment." *Personalized Media*, 952 F.3d at 1340. Thus, "like the specification, the prosecution history can act like a dictionary." *Hemphill v. McNeil-PPC, Inc.*, 25 F. App'x 915, 918 (Fed. Cir. 2001) (non-precedential).

Here, during prosecution of the '675 patent, the applicant amended independent claim 1 to recite "a plurality of different transmit signals" as well as "a power amplifier to receive . . . the plurality of different transmit signals . . . and to produce a single output RF signal." Ex. 1202, 189 (Amendment, Nov. 12, 2014). The applicant later amended claim 1 again solely to replace "a plurality of *different* transmit signals" with "a plurality of *carrier aggregated* transmit signals," and remarked to the Examiner that "[i]t is Applicant's understanding that the above amendments place all claims in a condition for allowance." *Id.* at 237, 246 (Amendment, March 6, 2015). The applicant similarly amended the other independent claims during prosecution. *Id.* at 191–194, 240–241, 243–244.

Based on the applicant's amendments, we agree with Patent Owner that maintaining our previous construction of "plurality of carrier aggregated transmit signals" as "signals for transmission on multiple carriers" would ignore the word "aggregated." *See* PO Remand Resp. 13–14. The amendment limiting the recited signals to "carrier aggregated" signals indicates that the claims require something more than just signals for transmission on multiple carriers; otherwise, the claims would encompass signals that are *not* carrier aggregated. *See, e.g.*, Ex. 1201, 6:10–12 ("Multiple transmit signals may be sent on different frequencies (e.g., different carriers) and hence *may* have increased envelope bandwidth."

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

(emphasis added)) (cited by Pet. Remand Reply 6); Ex. 1202, 189, 237 (application claims reciting *different* transmit signals before being amended to recite *carrier aggregated* transmit signals). Thus, our previous construction of "plurality of carrier aggregated transmit signals," though consistent with the specification language, is broader than the applicant's intended meaning and scope of the term as illuminated by the prosecution history.

We note Petitioner's contention that the claim limitation "produc[ing] a single output radio frequency (RF) signal" accounts for the claim term "aggregated." Pet. Remand Reply 7. As discussed above, however, that limitation was already included in the claims before the applicant amended them to require "carrier aggregated" signals. *Compare* Ex. 1202, 189 (Amendment, Nov. 12, 2014), *with id.* at 237 (Amendment, March 6, 2015). Thus, if producing a single output RF signal were to account for "aggregated," as Petitioner urges, then "aggregated" would be rendered superfluous. *See Dig.-Vending Servs. Int'l, LLC v. Univ. of Phx., Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (noting "the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered superfluous").

We turn now to Patent Owner's proposed construction on remand, namely, "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user," which can be divided into three parts: (1) "signals for transmission on multiple carriers," (2) "at the same time," (3) "to increase the bandwidth for a user." PO Remand Resp. 9. The parties' dispute in this regard addresses primarily the third part of Patent Owner's proposed construction, centering on whether the broadest

31

**Appx249**

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

reasonable interpretation of "plurality of carrier aggregated transmit signals" requires increasing bandwidth.[22]  *See* Pet. Remand Br. 10–12; PO Remand Resp. 9–18; Pet. Remand Reply 5–8; PO Remand Sur-reply 1–5.  We determine that the intrinsic evidence supports this aspect of Patent Owner's proposed construction.

"[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence," and "when prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (quoting *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000)) (other citations omitted).  Thus, for the third part of Patent Owner's proposed construction, we rely on the 3GPP technical report cited in the '675 patent, as well as the Chen publication, which was cited in the prosecution history of the '675 patent.  The 3GPP technical report defines "[c]arrier

---

[22] Petitioner does not dispute the first part of Patent Owner's proposed construction. *See* Pet. Remand Br. 7 ("The Board construed the claim term 'plurality of carrier aggregated transmit signals' to mean 'signals for transmission on multiple carriers.'  This construction is correct." (internal citation omitted)).  With respect to the second part of the construction, we note Petitioner's contention that our previous construction properly omitted "at the same time." *See id.* at 11–12.  Determining whether "plurality of carrier aggregated transmit signals" requires this aspect of Patent Owner's proposed construction, however, is not necessary to resolve any controversy here. *See Vivid Techs.*, 200 F.3d at 803 (explaining that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy").

aggregation" as "[a]ggregation of two or more component carriers in order to *support wider transmission bandwidths*."  Ex. 2011, 14 (emphasis added) (cited by Ex. 1201, 2:60–62 ('675 patent)).  The Chen publication additionally states that the "*bandwidth of a signal constantly increases* due to multi-carrier applications."  Ex. 2012 ¶ 4 (emphasis added) (cited by Ex. 1202, 270 (Office Action, July 2, 2015)).

The teachings in both the 3GPP technical report and the Chen publication are consistent with contemporaneous extrinsic evidence introduced into the record on remand.  For example, as discussed above, Patent Owner directs us to U.S. Patent No. 9,161,254, which states that "[o]ne technique for providing additional bandwidth capacity to wireless devices is through the use [of] carrier aggregation of multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE)."  Ex. 2017, 3:19–22 (quoted in PO Remand Resp. 12); *see also id.* at 3:49–51 ("Carrier aggregation . . . enable[es] more bandwidth to be obtained.") (cited by PO Remand Resp. 12).  The application for that patent was filed in May 2013, just three months after the application for the '675 patent was filed.  Ex. 1201, code (22); Ex. 2017, code (22).  Similarly, Patent Owner draws our attention to a 2013 Qualcomm paper, which states that "[c]arrier aggregation, as the name suggests, combines multiple carriers . . . at the device to provide a bigger data pipe to the user."  Ex. 2015, 6 (quoted in PO Remand Resp. 12).

We note Petitioner's contention that the passage in the Chen publication on which Patent Owner relies was never cited by the Examiner. *See* Pet. Remand Reply 7.  That passage provides additional support for the definition of carrier aggregation that is provided in the 3GPP technical

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

report, however, and is therefore relevant to our analysis here. *See V-Formation*, 401 F.3d at 1311; *see also* Ex. 1202, 278 (the Examiner advising the applicant during prosecution "to fully consider the [cited] references in their entirety as potentially teaching all or part of the claimed invention, as well as the context of the passage as taught by the prior art or disclosed by the Examiner"). Moreover, contrary to Petitioner's position, that neither the Examiner nor the applicant explicitly expressed an understanding that carrier aggregation requires increasing bandwidth does not change what is taught in the 3GPP technical report or in the Chen publication, both part of the intrinsic evidence. *See* Pet. Remand Reply 6–7 (Petitioner arguing that "the file history does not support Patent Owner's argument that the Examiner 'understood' that increasing bandwidth for a user is a required part of the construction of 'carrier aggregated transmit signals'" because "[n]either the Examiner nor the applicant made *any* such argument or suggestion").

We further note Petitioner's contention that the third part of Patent Owner's proposed construction, increasing bandwidth, "is improper because it imports an objective or potential result or benefit of carrier aggregation, not what carrier aggregation is." Pet. Remand Reply 5 (emphases omitted). Petitioner relies on *Braintree*, a Federal Circuit case in which the court rejected the argument that "purgation" means cleansing, even though "the specification . . . indicates that a dosage amount is 'effective' only if it produces a clean colon in preparation for a colonoscopy." *Braintree*, 749 F.3d at 1354–55. The court explained that "while cleansing is the goal specifically articulated in the specification, it is not a claim requirement," where the claims "only require that the compositions 'induce' (i.e., bring about or start) diarrhea," rather than "achiev[e] a fully cleansed colon." *Id.*

Petitioner's reliance on *Braintree* is misplaced.  The facts here are different.  Specifically, the claims of the '675 patent require *carrier aggregated* transmit signals.  The 3GPP technical report noted above, which is part of the intrinsic evidence, defines "carrier aggregation" as "[a]ggregation of two or more component carriers in order *to support wider transmission bandwidths*."  Ex. 2011, 14 (emphasis added); *see also* Ex. 2012 ¶ 4 (Chen publication, also part of the intrinsic evidence, stating that the "*bandwidth of a signal constantly increases* due to multi-carrier applications" (emphasis added)).  Thus, carrier aggregation *is* the aggregation of two or more carriers in order *to support wider transmission bandwidths*.  As discussed above, the extrinsic evidence supports this definition.  *See* Ex. 2015, 6 ("Carrier aggregation, as the name suggests, combines multiple carriers . . . at the device to provide a bigger data pipe to the user."); Ex. 2017, 3:19–22 ("One technique for providing additional bandwidth capacity to wireless devices is through the use [of] carrier aggregation of multiple smaller bandwidths to form a virtual wideband channel at a wireless device (e.g., UE)."), 49–51 ("Carrier aggregation . . . enable[es] more bandwidth to be obtained.").

Dr. Choi's example about aggregating two 5 MHz carriers from different bands also supports this definition.  *See* Ex. 1244 ¶¶ 24–25 (cited by Pet. Remand Reply 6 n.5).  Dr. Choi states that the aggregation of two 5 MHz carriers, which would provide a bandwidth of 10 MHz, "does not result in increased bandwidth compared with the bandwidth of a single, non-aggregated, carrier, for instance, a single 20 MHz carrier."  *Id.* ¶ 25 (emphasis omitted).  As Patent Owner points out, however, such aggregation "necessarily increases the bandwidth for a user as compared to a *single 5-*

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

*MHz carrier* allocated to the user." PO Remand Sur-reply 2. We agree with Patent Owner's reasoning in this regard. *See* Ex. 2011, 14 (defining "[c]arrier aggregation" as "[a]ggregation of two or more *component* carriers in order *to support wider transmission bandwidths*" (emphases added)). Indeed, Dr. Choi testified at his deposition on remand, "So I think you're asking me if you were to *aggregate these two 5-megahertz carriers for a resultant total aggregated bandwidth of 10 megahertz*, would that be greater than if you were just to have a single 5-megahertz carrier. And the answer's, obviously, yes because ten is greater than five." Ex. 2030, 28:2–24 (emphasis added) (cited by PO Remand Sur-reply 2). Consistently, Dr. Choi also previously testified in his reply declaration during trial,

> LTE explicitly allows for transmission of *two aggregated 1.4 MHz signals*, even though the standard can also transmit a single 20 MHz carrier, which provides much higher bandwidth than the *combined bandwidth of 2.8 MHz*. . . . [C]arrier aggregation can achieve higher data rates and can increase the overall capacity of wireless networks by allowing network operators to exploit fragmented spectrum allocations. . . . *Aggregating two narrow band signals could do precisely that—increasing bandwidth by using fragmented spectrum allocations*.

Ex. 1231 ¶ 25 (emphases added) (cited by PO Remand Sur-reply 2).

In view of the foregoing, we adopt Patent Owner's proposed construction of "plurality of carrier aggregated transmit signals" on remand (which is the same construction that Petitioner originally proposed in its petitions), namely, "signals for transmission on multiple carriers at the same

36

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

time to increase the bandwidth for a user."[23]  *See* PO Remand Resp. 9;
Pet. 12.  For the reasons given above, our construction is supported by the
intrinsic evidence.  *See, e.g.*, Ex. 1201, 2:60–67, 3:60–62 ('675 patent);
Ex. 1202, 189, 237, 246 (prosecution history file); Ex. 2011, 14 (3GPP
technical report); Ex. 2012 ¶ 4 (Chen publication).  Our construction also is
consistent with relevant extrinsic evidence.  *See, e.g.*, Ex. 2015, 6; Ex. 2017,
3:19–22, 3:49–51.  Further, our construction reflects Petitioner's proposed
language on remand, "signals for transmission on multiple carriers," as well
as portions of the specification cited by Petitioner.  *See* Pet. Remand Br. 7
(citing Ex. 1201, 2:63–64, 3:60–62).

### *D. Obviousness Based on Chen*

Petitioner asserts that claims 1–3, 5, 7, 11, 17–21, and 27 would have
been obvious over Chen and Wang; claims 8–10 and 28–30 would have
been obvious over Chen, Wang, and Choi; claim 12 would have been
obvious over Chen, Wang, and Eliezer; and claims 13–15 and 23–25 would
have been obvious over Chen, Wang, and Dahlman.  Pet. 15–81; 1330-
Paper 3, 22–75.  Patent Owner opposes.  PO Resp. 21–53.  For the reasons
explained below, we determine that Petitioner has *not* demonstrated by a

---

[23] As previously noted, determining whether "plurality of carrier aggregated
transmit signals" requires the second part of Patent Owner's proposed
construction, "at the same time," is not necessary to resolve any controversy
here.  *See Vivid Techs.*, 200 F.3d at 803.  We explain below it is undisputed
that the asserted prior art teaches this aspect of Patent Owner's proposed
construction.  *See infra* Part III.D.2.a.ii.  The outcome of our obviousness
analysis would thus be the same whether or not our construction requires "at
the same time."

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

preponderance of the evidence that claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 would have been obvious over the asserted grounds.

We start with an overview of Chen. As the issues in dispute all turn on the teachings and suggestions of Chen, we do not address the substance of Wang, Choi, Eliezer, or Dahlman.

### 1. Overview of Chen

Chen is a paper that proposes a hybrid envelope tracking scheme. Ex. 1212, 662. Figure 1 of Chen, which is reproduced below, illustrates the proposed scheme. *Id.*



**Figure 1** Proposed hybrid ET scheme for concurrent dual-band PAs.

In particular, Figure 1 of Chen shows the proposed hybrid envelope tracking architecture for concurrent dual-band power amplifiers. *Id.* Input signals 1

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

and 2 are provided at different frequencies (*id.* at 662), and each signal follows two paths (*see id.*, Fig. 1). Along one path, input signals 1 and 2 are fed separately to respective envelope detectors 1 and 2, where the envelopes of the signals are detected. *Id.* at 662, Fig. 1. The signals are then weighted using power weighting factor Ɛ. *Id.* Next, the signals are added together by the envelope combiner and injected into the envelope amplifier. *Id.* The output of the envelope amplifier is used to modulate the supply voltage of the target dual-band power amplifier (PA). *Id.* at 662. Chen indicates that $E_1(t)$ and $E_2(t)$ represent the signal envelopes in dual bands, and $E_D(t)$ represents the final modulated supply of the power amplifier. *Id.*

Along the other path, Figure 1 of Chen shows input signals 1 and 2 also being fed separately to respective delay lines 1 and 2. *See* Ex. 1212, Fig. 1. The signals are then upconverted by upconverters 1 and 2 and added together by the power combiner. *See id.* The power combiner outputs a signal that is provided to the dual-band PA. *See id.*

After receiving signals from both the envelope amplifier and the power combiner, the dual-band PA generates an output signal. Ex. 1212, Fig. 1.

## 2. Analysis

As discussed above, the Federal Circuit explained in its remand decision that we "needed to provide notice of and an adequate opportunity to respond to [our] construction" of the claim limitation "plurality of carrier aggregated transmit signals," and then it remanded for further proceedings. *Qualcomm*, 6 F.4th at 1263, 1267. Our analysis here thus focuses on

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

whether the asserted prior art teaches or suggests the limitation "plurality of carrier aggregated transmit signals" in view of our construction on remand.

### a. Independent Claims 1, 18, and 28

Each of independent claims 1, 18, and 28 recites, in relevant part, "plurality of carrier aggregated transmit signals."  As discussed above, we construe "plurality of carrier aggregated transmit signals" to mean "signals for transmission on multiple carriers at the same time to increase the bandwidth for a user."  *Supra* Part III.C.  This construction can be divided into three parts:  (1) "signals for transmission on multiple carriers," (2) "at the same time," (3) "to increase the bandwidth for a user."  We address each part of the construction in turn.

### i.    "signals for transmission on multiple carriers"

In its opening brief on remand, Petitioner maintains its position set forth in the petitions that Chen teaches signals for transmission on multiple carriers.  *Compare* Pet. 23–24, *with* Pet. Remand Br. 12–14.  Petitioner identifies Chen's input signals 1 and 2 as "carrier aggregated transmit signals."  Pet. Remand Br. 13–14 (citing Pet. 23–24); *see also* Pet. 23–24 ("Chen's Input 1 and Input 2 are signals for transmission on multiple carriers . . . .").  As support, Petitioner directs us to where Chen states that it "propose[s] for the first time a hybrid ET [envelope tracking] scheme for concurrent dual-band PAs, which combines the signal envelopes in dual bands."  Pet. Remand Br. 13 (citing Ex. 1212, 662); *see also* Pet. 24.  According to Petitioner, "[t]he validation prototype in Chen uses '[t]wo single carrier wideband code division multiple access signals' at two

40

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

different frequencies[,] 900 MHz and 2000 MHz," which "indicates that
they are from different (i.e., 'multiple') carriers." Pet. Remand Br. 13–14
(quoting Ex. 1212, 663); *see also* Pet. 24. Petitioner contends that Chen's
teachings satisfy the first part of our construction of "plurality of carrier
aggregated transmit signals," namely, "signals for transmission on multiple
carriers." Pet. Remand Br. 14; *see also* Pet. 23–24. Petitioner relies on
Dr. Choi's testimony from his declaration submitted in support of the
petitions. Pet. Remand Br. 13 (citing Ex. 1203 ¶ 103); *see also* Pet. 24.

Patent Owner does not dispute Petitioner's showing for this aspect of
our construction. *See* PO Remand Resp. 18–19; PO Resp. 46–47.

Based on the record before us, we are persuaded that Chen teaches
signals for transmission on multiple carriers.

### ii. "at the same time"

As discussed above, Petitioner argues on remand that the claim term
"plurality of carrier aggregated transmit signals" does not require the second
part of our construction, "at the same time." Pet. Remand Br. 7, 11–12.
Petitioner nonetheless asserts that its petitions "explained that the prior art
disclosed this claim term even under a narrower construction." *Id.* at 13
(citing Pet. 23–24). In the petitions, Petitioner "applie[d] the construction
'signals for transmission on multiple carriers at the same time to increase the
bandwidth for a user,'" which is the same as our construction on remand.
Pet. 23. Petitioner argued that "Chen's power tracking signal is based on a
plurality of carrier aggregated transmit signals being sent *simultaneously*,"
and, more specifically, that "Input 1 and Input 2 are signals for transmission
on multiple carriers *at the same time . . . .*" *Id.* at 23–24 (emphases added)

41

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

(citing Ex. 1212, 662–663).  This is supported by Chen's teaching that, "[t]o investigate the performance of the ET scheme, two continuous wave signals have been fed into the dual-band PA *simultaneously*."  Ex. 1212, 663 (emphasis added).

Patent Owner does not dispute Petitioner's showing for this aspect of our construction.  *See* PO Remand Resp. 18–19; PO Resp. 46–47.

Based on the record before us, we are persuaded that Chen teaches signals for transmission on multiple carriers *at the same time*.

### iii. "to increase the bandwidth for a user"

Petitioner also argues on remand that "plurality of carrier aggregated transmit signals" does not require the third part of our construction, "to increase the bandwidth for a user."  Pet. Remand Br. 7, 10–11.  In its petitions, however, Petitioner "applie[d] the construction, 'signals for transmission on multiple carriers at the same time to increase the bandwidth for a user.'"  Pet. 41–43.  As noted above, this construction is the same as our construction on remand.  We thus consider the parties' arguments during trial.

In the petitions, Petitioner contends that Chen's "method of aggregating multiple signals on different frequencies increases the bandwidth for a user, allowing more information to be transmitted per unit of time."  Pet. 24.  Petitioner relies on the declaration testimony of Dr. Choi.  Pet. 24 (citing Ex. 1203 ¶ 103).

In its responses, Patent Owner counters that "Chen describes base station technology that is processing signals provided by different users."  PO Resp. 46; *see also id.* at 24–27 (providing reasons why Chen is directed

42

to base station technology (citing Ex. 2002 ¶¶ 76–78)).  According to Patent Owner, "when two signals from two users are sent simultaneously, neither user gets an increased bandwidth." *Id.*  Patent Owner relies on the declaration testimony of Dr. Williams.  *Id.* (citing Ex. 2002 ¶¶ 112–113).

Petitioner replies that "Patent Owner's argument relies entirely on the assumptions that (1) 'user' in this claim construction refers only to an individual mobile device owner, and (2) Chen is inapplicable because it is directed to transmissions by base stations," both of which Petitioner says "are wrong."  Pet. Reply 21.  Regarding the first assumption, Petitioner contends that "[i]f a base station is processing two signals, then it is undisputed that the bandwidth for that user, i.e., the base station, is increased." *Id.*

As to the second assumption, Petitioner contends that carrier aggregation "is not, in ordinary usage, limited to the transmission of signals by a wireless device to a base station, *i.e.*, it is not limited [to] 'uplink' transmissions."  Pet. Reply 21–22.  As support, Petitioner directs us to where Dahlman describes carrier aggregation as "multiple component carriers [that] are aggregated and jointly used for *transmission to/from a single terminal*."  Ex. 1206, 104 (emphasis added & original emphasis omitted) (cited by Pet. Reply 22).  In other words, according to Dahlman, "component carriers can be aggregated for the downlink and uplink." *Id.* (cited by Pet. Reply 22).  Petitioner also notes that Patent Owner stated at the ITC *Markman* hearing that "carrier aggregation . . . can be used in both the uplink and downlink a[s] it exists in systems, and the patent is really agnostic as to that."  Pet. Reply 22 (quoting Ex. 1229, 143:17–19); *see also*

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

Ex. 1230, 45:5–12 (Dr. Williams's deposition transcript) (cited by Pet.
Reply 22).

Petitioner adds that "[a]lthough the authors of Chen validated their
envelope-tracking structure for transmitting multiple signals with a single
amplifier by using a base-station implementation, nothing in Chen limits its
structure to base stations, and Patent Owner's Response makes no real
argument that it is so limited." Pet. Reply 23.

With respect to Petitioner's user argument, Patent Owner responds
that it "is inconsistent with the plain and ordinary meaning of 'user' and
contradicted by the '675 patent and other evidence of record." PO Sur-
reply 20. As support, Patent Owner asserts that "the '675 patent uses the
term 'user equipment (UE)' to refer to a wireless device 110, as depicted in
Fig. 1," whereas "the base stations 130, 132 of Fig. 1 are only referred to as
'base stations,'" never as "users" or "user equipment." *Id.* at 20–21 (citing
Ex. 1201, 2:28–34, Fig. 1). In particular, the '675 patent teaches that its
"[w]ireless device 110 may also be referred to as a user equipment (UE), a
mobile station, a terminal, an access terminal, a subscriber unit, a station,
etc." Ex. 1201, 2:32–34. Patent Owner also directs us to a 2010 3GPP
technical paper that distinguishes between user equipment and base stations.
PO Sur-reply 21 (citing Ex. 1236, 6 (listing technical reports titled "User
Equipment (UE) radio transmission and reception" and "Base Station (BS)
radio transmission and reception")).

Turning to Petitioner's uplink/downlink argument, Patent Owner
counters that "in both the uplink and downlink scenarios, the bandwidth
must be extended for a single user terminal." PO Sur-reply 22. According
to Patent Owner, "Chen does not disclose downlink carrier aggregation—

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

*i.e.*, using a base station to simultaneously transmit multiple signals to a single terminal to increase the bandwidth for that terminal." *Id.* Patent Owner asserts that "Chen discloses using its base station to transmit the two input signals Input 1 and Input 2 to multiple, different destination terminals simultaneously." *Id.* Patent Owner further asserts that "[d]ownlink carrier aggregation had not yet been implemented as of January 2018—much less as of Chen's 2012 publication date—and Chen contains no teaching or suggestion of this theoretical system." *Id.*

Patent Owner further contends that Petitioner's "argu[ment] that 'nothing in Chen limits its structure to base stations' . . . is an improper new reply argument." PO Sur-reply 22. Patent Owner adds that the belief that Chen is not limited to base stations is an insufficient "reason why the [person of ordinary skill in the art] would allegedly be motivated to modify the embodiment of this reference." *Id.* at 23.

On the record before us, we agree with Patent Owner that "user," in the construction applicable here, does not encompass a base station. As Patent Owner points out, the '675 patent distinguishes between wireless device 110 (which may be referred to as a *user* equipment) and base stations 130 and 132. PO Sur-reply 20–21 (citing Ex. 1201, 2:32–34, Fig. 1). To illustrate, Figure 1 of the '675 patent is reproduced below.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2



*FIG. 1*

Figure 1 shows a wireless device communicating with a wireless system. Ex. 1201, 1:56–57. Specifically, Figure 1 shows wireless device 110 communicating with wireless system 120 that includes base stations 130 and 132. *Id.* at 2:19–20, 28–30. Extrinsic evidence supports this distinction between wireless device 110 (e.g., user equipment) and a base station. *See* Ex. 1236, 6 (cited by PO Sur-reply 21). Accordingly, the third part of our construction, "to increase the bandwidth for a user," does not encompass increasing the bandwidth for a base station.

Petitioner does not dispute that Chen is directed to base stations, acknowledging that "the authors of Chen validated their envelope-tracking structure for transmitting multiple signals with a single amplifier by using a base-station implementation." Pet. Reply 23. Although Petitioner argues that Chen is not limited to base stations, Petitioner points to nothing in the record as support. *See id.* We note Petitioner's contention that Patent Owner "makes no real argument that [Chen] is so limited." *Id.* Yet the

46

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

burden is not on Patent Owner to show that Chen is limited to base stations; rather, the burden is on Petitioner to show that Chen satisfies the requirement of increased bandwidth for a user, and that Chen's disclosure of base stations is applicable. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) ("In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee."). Petitioner does not meet its burden. Chen's silence as to whether its concurrent dual-band PA is limited to base station implementations does not adequately show that Chen's teachings also extend to user equipment. *See* Pet. Reply 23 ("[N]othing in Chen limits its structure to base stations."); *Dynamic Drinkware*, 800 F.3d at 1379 ("[I]f the fact trier of the issue is left uncertain, the party with the burden loses.").

Even if Chen were not limited to base stations, however, we note that Petitioner does not proffer any reason as to why an ordinarily skilled artisan would have considered modifying Chen's base station implementation of the concurrent dual-band PA to provide a user device implementation of the concurrent dual-band PA. *See* Pet. 23–24; *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."); *see also Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1330 (Fed. Cir. 2009) ("[T]o invoke 'common sense' or any other basis for extrapolating from prior art to a conclusion of obviousness, a district court must articulate its reasoning with sufficient clarity."). Petitioner's declarant likewise fails to discuss any potential modification of Chen for implementation in a user device.

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

For the reasons given above, we are not persuaded that Chen teaches or suggests the third part of our construction, "to increase the bandwidth for a user."

### b. Dependent Claims 2, 3, 5, 7–15, 17, 19–21, 23–25, 27, 29, and 30

The dependent claims include the limitation "plurality of carrier aggregated transmit signals" by virtue of their dependency from claims 1, 18, or 28. In its analysis of the dependent claims, Petitioner does not provide argument or evidence overcoming the deficiencies noted above as to the independent claims. *See* Pet. 42–81; 1330-Paper 3, 60–75.

### 3. Summary

In view of the foregoing, we determine that Petitioner has *not* demonstrated by a preponderance of the evidence that claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 would have been obvious over the asserted prior art. We determine in particular that Petitioner has *not* demonstrated by a preponderance of the evidence that claims 1–3, 5, 7, 11, 17–21, and 27 would have been obvious over Chen and Wang; claims 8–10 and 28–30 would have been obvious over Chen, Wang, and Choi; claim 12 would have been obvious over Chen, Wang, and Eliezer; and claims 13–15 and 23–25 would have been obvious over Chen, Wang, and Dahlman.

### IV. CONCLUSION

On remand, we determine that Petitioner has *not* shown by a preponderance of the evidence that claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 of the '675 patent are unpatentable.

48

**Appx266**

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 5, 7, 11, 17–21, 27 | 103 | Chen, Wang | | 1–3, 5, 7, 11, 17–21, 27 |
| 8–10, 28–30 | 103 | Chen, Wang, Choi | | 8–10, 28–30 |
| 12 | 103 | Chen, Wang, Eliezer | | 12 |
| 13–15, 23–25 | 103 | Chen, Wang, Dahlman | | 13–15, 23–25 |
| **Overall Outcome** | | | | 1–3, 5, 7–15, 17–21, 23–25, 27–30 |

## V.  ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1–3, 5, 7–15, 17–21, 23–25, and 27–30 of the '675 patent have not been shown to be unpatentable; and

FURTHER ORDERED that, because this Decision on Remand amounts to a final written decision, parties to the proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

49

**Appx267**

IPR2018-01328, IPR2018-01330
Patent 9,608,675 B2


For PETITIONER:

David Cavanaugh
Richard Goldenberg
Theodoros Konstantakopoulos
Louis Tompros
Kathryn Zalewski
WILMER CUTLER PICKERING HALE & DORR LLP
David.cavanaugh@wilmerhale.com
Richard.goldenberg@wilmerhale.com
Louis.tompros@wilmerhale.com
Theodoros.konstantakopoulos@wilmerhale.com
Kathryn.zalewski@wilmerhale.com

For PATENT OWNER:

Matthew Johnson
Joseph Sauer
David Cochran
David Maiorana
Richard Graham
Joshua Nightingale
JONES DAY
mwjohnson@jonesday.com
jmsauer@jonesday.com
dcochran@jonesday.com
dmaiorana@jonesday.com
ragraham@jonesday.com
jrnightingale@jonesday.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.    The filing has been prepared using a proportionally spaced typeface and includes 16,432 words.

2.    The brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Louis W. Tompros
LOUIS W. TOMPROS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

February 15, 2023